### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

CRISTOSAL HUMAN RIGHTS,
11 Bulevar Sur, Colonia Utila, Santa Tecla, El
Salvador;

CORPOCAMINOS,
19 Barrio Centro, Municipio de Timbío,
Departamento del Cauca, Colombia;

ACCIÓN CULTURAL POPULAR
HONDUREÑA,
Barrio San José, 8va calle SE, 6ta y 7ta
avenida, Morazán, Yoro, Honduras;

ASOCIACIÓN LAS PREGONERAS;
Calle Canto Rey, Mz. E Lote, 18 primera
etapa, Río Tambo, San Juan de Lurigancho,
Lima, Peru;

ALTERNATIVAS Y CAPACIDADES,
Málaga 88, Insurgentes Mixcoac, Benito
Juárez, 03920 México City, México;

FUNDACIÓN RENACE,
Av.20 de octubre 1915, La Paz, Bolivia;

SOCIEDAD COOPERATIVA DE LAS
MUJERES RURALES DE LA FRONTERA
SUR,
Carretera Tenosique a La Palma Km 27, ejido
San Isidro Guasiván, Tenosique, Tabasco,
México;

FUNDACIÓN ESCUELA DE
INTEGRACIÓN, FORMACIÓN
DEPORTIVA, EXPRESIÓN ARTÍSTICA
Y DESARROLLO LABORAL,
Urbanización San Pedro Magisterio. Km 3,
carretera a Sacaba, Calle Concordia s/n
esquina Nicaragua, Sacaba, Bolivia;

ASOCIACIÓN INSTITUTO
SALVADOREÑO DE EDUCACIÓN
COOPERATIVA Y AGRICULTURA

Case No.: _____

**COMPLAINT**

ORGÁNICA, Calle y Colonia La Mascota
No. 156, San Salvador, El Salvador,

   *Plaintiffs,*

  *v.*

PETER MAROCCO, in his official capacity
as Acting Deputy Administrator for Policy
and Planning and for Management and
Resources for USAID and Director of
Foreign Assistance at the Department of
State, and in his purported official capacity as
Chairman of the Board of the Inter-American
Foundation,
1300 Pennsylvania Avenue NW
Washington, DC 20004;

DOMINIC BUMBACA, in his purported
official capacity as the President of the Inter-
American Foundation,
1331 Pennsylvania Ave. NW, Suite 1200
Washington, D.C. 20004;

SERGIO GOR, in his official capacity as
Director of the White House Presidential
Personnel Office,
1600 Pennsylvania Avenue NW
Washington, DC 20500;

U.S. DOGE SERVICE,
736 Jackson Place, NW
Washington, DC 20503;

U.S. DOGE SERVICE TEMPORARY
ORGANIZATION,
736 Jackson Place, NW
Washington, DC 20503;

AMY GLEASON, in her official capacity as
Acting Administrator of U.S. DOGE Service,
1600 Pennsylvania Avenue NW
Washington, DC 20500;

DONALD J. TRUMP, in his official capacity
as President of the United States,
1600 Pennsylvania Avenue, NW
Washington DC 20500;

U.S. DEPARTMENT OF THE
TREASURY,
1500 Pennsylvania Avenue, NW
Washington DC 20220;

and SCOTT BESSENT, in his official
capacity as Secretary of the Treasury,
1500 Pennsylvania Avenue, NW
Washington DC 20220,

*Defendants.*

1.     This lawsuit challenges a series of unlawful and unconstitutional actions taken to eviscerate an entire independent agency, the Inter-American Foundation, despite Congress's clear direction that "[t]he Foundation … shall have perpetual succession unless sooner dissolved by an Act of Congress," 22 U.S.C. § 290f(e)(1), and in disregard of Congress's choice to appropriate funding "to carry out the functions of" the Foundation "until September 30, 2025," Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 460, 746 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(11) (2025).

2.     The Foundation is a nimble and transformative federal agency that since 1969 has focused on community-driven development across Latin America and the Caribbean. Unlike other foreign-aid agencies, which largely rely on government-to-government funding mechanisms or international contractors, the Foundation pioneered a different model: community-led development through engagement with local leaders, civil society organizations, and entrepreneurs working to make their own communities more prosperous, peaceful, and democratic. The Foundation has invested in nearly 6,000 community development projects in 35 countries, focused on addressing the root causes of migration by promoting economic stability, reducing violence, and strengthening democratic

governance. These projects work to build peaceful and safe communities, expand economic opportunities through job creation and entrepreneurship, strengthen civic engagement, and enhance social and economic inclusion. The Foundation also works to support food security and other initiatives that promote long-term stability. By empowering local communities to solve their own problems, the Foundation's work has been one of the United States' most effective and powerful tools to strengthen and build local communities in developing nations throughout the Western Hemisphere—a key effort to address the root causes of mass migration.

3.      A Brookings Institution review notes that the Foundation "has safely and successfully invested hundreds of millions of U.S. taxpayer dollars in local [nongovernmental organizations] since 1969," and it "has a library of ex-post evaluations proving the lasting impact of its investments," which "are structured so they nearly always reflect local priorities and build from on-going locally rooted efforts."[1] The Foundation's success at combatting violence, creating economic opportunities, and reducing migration have earned it longstanding, broad bipartisan support. Congress has maintained and, over time, increased the Foundation's funding regardless which political party controls each of its chambers.

4.      Notwithstanding these laudable achievements, the Trump Administration—which purports to be laser-focused on reducing migration across the southern border—has moved swiftly to dismantle the Foundation. First, President Trump issued an executive order declaring the Foundation "unnecessary" and ordering it to "reduce the performance of [its] statutory functions and associated personnel to the minimum presence and function required by law." Next, Defendants launched a full-scale hostile takeover of the agency, usurping the power of its bipartisan, presidentially appointed and Senate-confirmed Board of Directors; purporting to fire its president and chief

---

[1] George Ingram, Brookings Inst., *Locally Driven Development: Overcoming the Obstacles* 34 (2022), https://www.brookings.edu/wp-content/uploads/2022/05/Locally-Driven-Development.pdf.

executive officer; shuttering its website; cancelling its contracts and grants; placing all of its employees on administrative leave and slating them for termination within 30 days; and purporting to install Defendant Peter Marocco as the Acting Chair of the Foundation's Board of Directors and President. These actions have caused chaos for the Foundation's employees, contractors, and grantees who depend on a reliable flow of funding from the Foundation.

5.     Defendants lack any lawful authority to abolish by executive fiat an agency created by Congress. Defendants likewise lack authority to impound funds Congress appropriated and directed the Foundation spend to carry out its mission. Defendants' actions flout the separation of powers and violate numerous provisions of the U.S. Constitution, including the Appropriations Clause, the Spending Clause, the Presentment Clause, and the Take Care Clause. The purported appointment of Marocco as Acting Chair of the Board also violates the Federal Vacancies Reform Act of 1998, or, in the alternative, the Appointments Clause. And Defendants' decisions constitute arbitrary and capricious agency action, and agency action unlawfully withheld, in violation of the Administrative Procedure Act. Defendants' unlawful and unconstitutional actions pose a grave threat to Plaintiffs—grantees who depend on the Foundation's funding to conduct important community-led development work in numerous nations—and to the community members that rely on Plaintiffs' projects. Absent prompt intervention from this Court halting Defendants' continuing disregard for the rule of law, Plaintiffs and their local constituents will continue to suffer ongoing, irreparable harm.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction under the United States Constitution and 28 U.S.C. §§ 1331 and 1346.

7.     Venue is proper in this district under 28 U.S.C. § 1391(e) because all Defendants reside in this district and a substantial part of the events or omissions giving rise to this action occurred in this district.

## PARTIES

8.    Plaintiff Cristosal Human Rights is a human rights organization that operates in El Salvador, Guatemala, and Honduras, and is associated with the Episcopal Church. Cristosal's primary mission is to address internal displacement driven by criminal gangs, threats, extortions, and assassinations. Cristosal works to counteract these forces through a variety of means, such as providing victims of human rights violations with legal and mental health services and emergency shelter, food, and financial assistance. It also trains individuals and local leaders on how to advocate for policies and laws that protect their rights and prevent future displacement. Cristosal has worked closely with the Foundation since 2020. The initial term of its grant agreement provided Cristosal with $290,000 over two years. Cristosal and the Foundation subsequently agreed to several amendments, increasing the total grant amount to $540,000 and extending the grant period through September 18, 2025.

9.    Plaintiff Corpocaminos is the first community-led technical college in southwest Colombia. Colombia's Ministry of Education accredited it in 2019. Corpocaminos's mission is to expand access to higher education in the region, especially for young people and the rural poor. It provides comprehensive technical and professional training in fields such as agriculture and tourism to populations that would otherwise have few economic options available. Corpocaminos first began working with the Foundation in 2020, with which agreed to provide a total of $544,012 to Corpocaminos between 2020 and 2026.

10.    Plaintiff Acción Cultural Popular Hondureña (ACPH) is a Honduran non-governmental organization dedicated to improving living conditions in that country. It invests in community-health initiatives, finds job opportunities for women and youth, and responds to natural disasters. It began working with the Foundation in 2020 on two projects set to run through 2026. The first provides technical training to unemployed youth. Under that program, students receive 500 hours of training over a six-month period. ACPH then helps them obtain internships with local companies.

4

The program has trained nearly 500 young people and over 100 adults. The Foundation committed $564,000 to this program. The second program focuses on helping hurricane and flood victims who live near the Ulúa and Chamelecón rivers. Under this program, ACPH distributes emergency supplies in the immediate aftermath of these natural disasters, and mental-health and other services over the longer term. This program has benefitted 20 communities and led to the establishment of five collection centers outfitted with rescue boats and emergency materials. It has directly benefited 400 people and indirectly benefitted another 30,000. The Foundation committed $255,000 to this project.

11.     Plaintiff Asociación Las Pregoneras is a Peruvian organization dedicated to supporting victims of domestic violence and violence in schools. It does so by collaborating with local governments and police on violence prevention campaigns. It also provides mental-healthcare services to women and children victims of domestic violence. Among other things, Pregoneras goes door-to-door with community leaders and the Peruvian National Police to offer families guidance on how to report acts of domestic violence. It also works with students, parents, and teachers to address physical, psychological, and sexual violence in secondary schools. Pregoneras began working with the Foundation in 2023, receiving a $125,000 grant that ran through January 2025. Those funds have been used to educate 200 parents and teachers on how to identify and prevent violence in public schools. They have also been used to provide almost 200 young people, including victims of domestic violence, with problem-solving and conflict management skills and mental health services. Pregoneras's work has resulted in a 13-percent decrease in incidents of school violence. Students who took advantage of its mental-health services saw their grades improve, and they were less likely to drop out of school.

12.     Plaintiff Alternativas y Capacidades is an organization dedicated to strengthening civil society in Mexico. It has worked with the Foundation since 2023, receiving a $363,290 grant to be spent from April 2023 and April 2026. The grant has funded Alternativas's Social Laboratory for Youth-led Initiatives ("Social Lab") program, based in the Yucatán Peninsula. Youth migration from

the Yucatán is especially high, as there are few economic opportunities. For many young people—especially young men—migration is seen as the only pathway to financial stability. The Social Lab program responds to these challenges by providing training in civic engagement, which in turn helps participants invest in their communities. Forty young people have already completed the Social Lab program, and another 40 are currently enrolled. Through the Social Lab program, Alternativas also recently awarded 10 seed grants of $2,500 each to young people to let them start their own community-involvement projects, and was planning to award an additional 10 seed grants in the near future.

13.    Plaintiff Fundación Renace is a Bolivian organization dedicated to promoting local farming by providing technical assistance to local communities. It works to improve production and marketing of local products and services. Among other things, Fundación Renace has used Foundation funds to train local business owners on business management techniques and production processes; how to obtain necessary legal documentation for businesses to compete in the marketplace; how to market their products; and how to bid on government contracts. The Foundation committed $572,630 to Fundación Renace to be disbursed between September 9, 2017, and September 9, 2025.

14.    Plaintiff Sociedad Cooperativa de las Mujeres Rurales de la Frontera Sur is a savings and loan cooperative that works to improve access to credit for rural women in southern Mexico. It received a $237,780 grant that began in 2024 and was set to run through 2027. Among other things, it has used those funds to strengthen and expand the reach of its savings-and-loan programs and to increase the financial literacy of women in the community.

15.    Plaintiff Fundación Escuela de Integración, Formación Deportiva, Expresión Artística y Desarrollo Laboral (EIFODEC) is a private, non-profit school located in Bolivia. Its mission is to improve the quality of life of children and young adults with disabilities. It has worked with the Foundation since 2023, receiving a $265,000 grant. Those funds have been used for EIFODEC's Building an Inclusive World Project, allowing 120 children and youth with disabilities to attend

6

EIFODEC and learn daily life skills. Thirty-three of them have received occupational training, and under the program 23 were scheduled to receive seed capital for their own economic enterprises. EIFODEC has also supported 246 families of people with disabilities, training them on how to care for, and support the independence of, their loved ones.

16.     Plaintiff Asociación Instituto Salvadoreño de Educación Cooperativa y Agricultura Orgánica (ISEAC) is an organization that works in six rural communities in the department of Ahuachapán, El Salvador—an area impacted by drought and food insecurity. Its mission is to strengthen local agricultural practices, including by increasing crop diversification and organic production. ISEAC began working with the Foundation in 2021, receiving a total of $280,000 between 2021 and 2024. In 2024, it applied for and was awarded an additional $242,700, extending the grant through October 2026. It has used those funds to aid small farmers, teaching them farm-management techniques that will allow their land to be more productive in the long run. Under the grant, it has worked directly with 245 families, teaching them how to use the ancestral milpa system—a traditional Mesoamerican agricultural practice where crops are mixed in the same field, creating a sustainable and diverse food system.

17.     Defendant Peter Marocco is the Acting Deputy Administrator for Policy and Planning and for Management and Resources for the U.S. Agency for International Development ("USAID") and Director of Foreign Assistance at the Department of State. Marocco also claims to be Chair of the Board of the Foundation, but his appointment to that position was *ultra vires* and thus without effect. He is sued in his official capacity.

18.     Defendant Dominic Bumbaca claims to be the President of the Foundation, but his appointment to that position was *ultra vires* and thus without effect. He is sued in his official capacity.

19.     Defendant Sergio Gor is the Director of the White House Presidential Personnel Office. He is sued in his official capacity.

20.     Defendant U.S. DOGE Service is an entity that was created within the Executive Office of the President by Executive Order 14158.

21.     Defendant U.S. DOGE Service Temporary Organization is an entity that was created within the Executive Office of the President by Executive Order 14158.

22.     Defendant Amy Gleason is the Acting Administrator of both the U.S. DOGE Service and U.S. DOGE Service Temporary Organization. She is sued in her official capacity.

23.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

24.     Defendant Department of the Treasury is a Cabinet-level agency of the U.S. government. It is headquartered in Washington, D.C.

25.     Defendant Scott Bessent is the Secretary of the Treasury and is sued in his official capacity.

## LEGAL BACKGROUND

### Congress's Power of the Purse

26.     The framers of the U.S. Constitution intended Congress to exercise plenary power over federal spending: Its "power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961).

27.     To effectuate congressional control over federal spending, the Constitution's Spending Clause provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1.

28.    Relatedly, the Appropriations Clause states: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

29.    The Spending and Appropriations Clauses, among other provisions, operate together to grant Congress exclusive power over the federal purse, including the authority to attach conditions to the use of federal funds.

30.    The President lacks discretion to refuse to spend appropriated funds for the purposes and projects Congress has directed. The Constitution imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. This clause prohibits the executive from disregarding duly enacted laws.

31.    Congress also has acted specifically to protect its constitutionally derived authority to control federal spending by enacting the Congressional Budget and Impoundment Control Act of 1974 ("Impoundment Act"), Pub. L. No. 93-344, Tit. X, 88 Stat. 297. The Impoundment Act confirms that the President lacks power to unilaterally refuse to spend congressionally appropriated funds. The President may *propose* rescission of "all or part of any budget authority," but—unless Congress "complete[s] action on a rescission bill rescinding all or part of the amount proposed" within 45 days, the funds "shall be made available for obligation." 2 U.S.C. § 683(a), (b).

32.    Congress's intent in passing the Impoundment Act could not be more clear. "No matter how prudently Congress discharges its appropriations responsibility, legislative decisions have no meaning if they can be unilaterally abrogated by executive impoundments." H.R. Rep. No. 93-658, at 16 (1973). Neither "the President [nor] federal agencies may [] ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken Cnty.*, 725 F.3d 255, 260-61 (D.C. Cir. 2013). "[T]he President's duty to enforce the laws necessarily extends to appropriations … meaning that failure to act may be an abdication of the President's constitutional role." *City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018).

33.     The Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 877 (1982), imposes similar restrictions. Government officials violate that statute if they establish a reserve by withholding appropriated funds from a congressionally assigned program, except for certain limited exceptions. *See* 31 U.S.C. §§ 1301(a), 1512(c)(1). In apportioning or reapportioning an appropriation, "a reserve may be established only—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." *Id.* § 1512(c)(1). Funds appropriated by Congress may not be placed in a reserve for any other purpose.

### The President's Limited Power to Appoint Acting Officers

34.     The Federal Vacancies Reform Act is the "exclusive means for temporarily authorizing an acting official to perform the functions of an Executive agency … for which appointment is required by the President, by and with the advice and consent of the Senate," with only certain, limited exceptions. 5 U.S.C. § 3347(a). The Act provides that it "shall not apply" to members appointed by the President, by and with the advice and consent of the Senate, to a multi-member board of an independent establishment or government corporation. *Id.* § 3349c. Unless an acting appointment is made consistent with its provisions, an office "shall remain vacant," *id.* § 3348(b)(1), and actions taken by an individual purporting to serve in an acting capacity, but whose service does not comply with the Act, shall have "no force and effect," *id.* § 3348(d)(1).

35.     Absent congressional authorization, the Appointments Clause bars the President from appointing acting officers. That Clause requires the President to obtain "the Advice and Consent of the Senate" before appointing principal "Officers of the United States," U.S. Const. art II, § 2, cl. 2. It makes no provision for service in an acting capacity. Any other understanding of the Clause would deprive Congress of one of the most "critical structural safeguard[s] of the constitutional scheme." *NLRB v. Sw. Gen. Inc.*, 580 U.S. 288, 293 (2017) (cleaned up).

**The Inter-American Foundation Act**

36.     Congress created the Foundation in 1969 as a unique U.S. foreign assistance program supporting social and economic development in Latin America and the Caribbean. The Foundation's organic statute confirms that its activities are to be carried out "primarily in cooperation with private, regional, and international organizations." 22 U.S.C. § 290f(b).

37.     The Foundation exists as a "body corporate," *id.* § 290f(a), to carry out its legislatively directed purposes "to (1) strengthen the bonds of friendship and understanding among the peoples of this hemisphere; (2) support self-help efforts designed to enlarge the opportunities for individual development; (3) stimulate and assist effective and ever wider participation of the people in the development process; [and] (4) encourage the establishment and growth of democratic institutions, private and governmental, appropriate to the requirements of the individual sovereign nations of this hemisphere." *Id.* § 290f(b). Congress further directed the Foundation to "place primary emphasis" on education, food security, agricultural development, and environmental conditions promoting health, housing, free trade unions, "and other social and economic needs of the people." *Id.*

38.     Congress instructed the Foundation to carry out its purposes by working primarily with nongovernmental organizations, including "private organizations, individuals, and international organizations … undertaking or sponsoring appropriate research and by planning, initiating, assisting, financing, administering, and executing programs and projects designed to promote the achievement of such purposes." *Id.* § 290f(c).

39.     Congress took steps to ensure the Foundation's ability to function flexibly and independently to achieve its mission.

40.     Of particular importance, Congress affirmed that "[t]he Foundation … shall have perpetual succession unless sooner dissolved by an Act of Congress." *Id.* § 290f(e)(1).

41.     The Foundation has authority to hire "and fix the compensation of" up to 100 employees. *Id.* § 290f(e)(5). It also enjoys broad authority to purchase, acquire, accept as a gift, lease, or otherwise hold real and personal property, domestic or abroad, and to "in any manner dispose of all such" property and use the proceeds as general funds for its mission. *Id.* § 290f(e)(6).

42.     The Foundation possesses an unusual gift authority that allows it to directly receive tax-deductible funds from the private sector—*i.e.*, from charitable foundations or other sources—and pool that money with its own appropriations when funding projects. Specifically, the Foundation "may accept money, funds, property, and services of every kind by gift, devi[s]e, bequest, grant, or otherwise, and make advances, grants, and loans to any individual, corporation, or other body of persons, whether within or without the United States of America, or to any government or governmental agency, domestic or foreign, when deemed advisable by the Foundation in furtherance of its purposes." *Id.* § 290f(e)(9).

43.     Congress also granted the Foundation "such other powers as may be necessary and incident to carrying out its powers and duties." *Id.* § 290f(e)(11).

44.     Governance of the Board is entrusted to a nine-member Board of Directors ("Board"), members of which are chosen by the President and subject to Senate confirmation. *Id.* § 290f(g). Board members serve staggered six-year terms, but are eligible to remain in office if a replacement has not been confirmed at the expiration of their term. Congress specified that the Board come from a mix of "private life" and officers or employees of certain public agencies, that its membership be balanced between the political parties, and that "individuals appointed to the Board shall possess an understanding of and sensitivity to community level development processes." *Id.* The duly appointed "Board shall direct the exercise of all the powers of the Foundation." *Id.* § 290f(i).

45.     Administration of the Foundation is entrusted to a president and chief executive officer "who shall be appointed by the Board of Directors on such terms as the Board" determines. *Id.* § 290f(*l*).

46.     In 2024, Congress appropriated $47 million "[f]or necessary expenses to carry out the functions of the Inter-American Foundation." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 460, 746 (2024). These funds are "to remain available until September 30, 2025." *Id.* Congress reaffirmed its commitment to the Foundation by providing it with the same level of funding in a continuing resolution that became law on March 15, 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(11) (2025).

47.     Congress exercised its power to create a strong presumption against administrative actions that would fundamentally alter the Foundation. Specifically, the Foundation is included among foreign-aid agencies that Congress prohibited from using any of its funding to "implement a reorganization, redesign, or other plan" that would "expand, eliminate, consolidate, or downsize covered departments, agencies, or organizations, including the transfer to other agencies of the authorities and responsibilities of such bureaus and offices," unless the agency first consults with the Appropriations Committee in each chamber and "include[s] a detailed justification." Pub. L. No. 118-47, Div. F, tit. III, § 7063(a), (b)(1), 138 Stat. at 843-44.

## FACTUAL ALLEGATIONS

### The Executive Order

48.     On February 19, 2025, President Trump signed an executive order with the purpose "to dramatically reduce the size of the Federal Government" by "commenc[ing] a reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary." Exec. Order No. 14217, *Commencing the Reduction of the Federal Bureaucracy* ("Dismantling EO"), 90 Fed. Reg. 10577 (Feb. 19, 2025).

13

49.    The Dismantling EO targets four independent agencies, including the Foundation. It provides that all "non-statutory components and functions of the" targeted agencies "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence required by law." *Id.* It also directs the "head of each unnecessary governmental entity" to submit a report to the Director of the Office and Management and Budget ("OMB") "confirming compliance" and indicating whether any of its components or functions are statutorily mandated. *Id.*

50.    The Dismantling EO further directs the OMB Director, "to the extent consistent with applicable law," to reject funding requests from the "unnecessary" agencies "to the extent they are inconsistent with this order." *Id.*

## Unlawful Actions Taken to Shutter the Foundation

51.    DOGE acted swiftly to decimate the Foundation.

52.    The day after President Trump signed the Dismantling EO, two U.S. DOGE Service representatives in their twenties, with no prior government experience—Ethan Shaotran and Nate Cavanaugh—appeared at the Foundation's offices. The Foundation's duly appointed President, Sara Aviel, and other members of leadership met with the DOGE representatives, who falsely asserted that their intent was to help improve the Foundation's technology and systems.

53.    Aviel and her team were aware of the Dismantling EO but were operating under the reasonable assumption that a rational, legal process would control DOGE's actions. Foundation leadership both intended and attempted to work with DOGE to demonstrate that the Foundation had cut costs and was an efficient and successful agency. Neither Aviel nor other members of her leadership team had any inkling that DOGE intended to shut the Foundation down without a comprehensive review.

54.     Shaotran and Cavanaugh returned the following day, February 21, 2025, with another DOGE representative, a lawyer named Jacob Altik. Altik claimed to have reviewed the Foundation's organic statute and determined that its minimum statutory presence required only the existence of a Board, a president/CEO, an office in Washington, D.C., and the existence of one or two grants. The DOGE representatives demanded that Aviel sign on to their interpretation of the Foundation's minimum statutory presence.

55.     On a follow-up call the following Monday, February 24, DOGE pressed Foundation leadership to sign memoranda of understanding with the General Services Administration—the federal agency whose authority DOGE agents represented themselves as exercising—granting Shaotran and Cavanaugh full access to Foundation systems under the guise of technical support.

56.     Foundation leadership declined this offer, explaining that the Foundation did not need help with technology, but Shaotran, Cavanaugh, and Altik began to issue ultimatums if leadership did not cooperate with their attempt to gain unfettered access to the Foundation's computer systems.

57.     The DOGE representatives also pressed Aviel to call an immediate, Friday afternoon Board meeting to secure the Board's alignment with DOGE's statutory interpretation of the Foundation's minimum presence.

58.     Aviel pushed back, stating that it would be very difficult, if not impossible, to convene a Board meeting without more notice. Even apart from Board members' personal schedules, Aviel noted, there are legal requirements that govern Board meetings. The Government in Sunshine Act applies to the Foundation's Board meetings and commands that "every portion of every meeting of an agency [covered by the Act] shall be open to public observation," 5 U.S.C. § 552b(b), unless one of several narrow exceptions applies. It also requires the Board to publish in the *Federal Register* at least a week in advance the time, place, and subject matter of its meetings, whether the meeting will be

open to the public, and the contact information for an employee who can provide the public additional information about the meeting. *Id.* § 522b(e).

59.     DOGE representatives responded that they did not need an official, legally compliant Board meeting to take place—they simply needed an immediate answer from the Board members as to whether they would ratify DOGE's statutory interpretation and intended gutting of the agency. DOGE further indicated an intent to terminate the Board if it refused to ratify DOGE's actions.

60.     Shortly after this meeting, Aviel was contacted by congressional stakeholders from both parties and both chambers urging the Foundation to resist DOGE's efforts to dismantle the agency. These stakeholders noted that any efforts to reduce the Foundation's functions would be inconsistent with the fact that Congress had forbid it from reorganizing, eliminating functions, or downsizing without first notifying Congressional appropriations committees and providing a detailed justification for such actions. *See supra* ¶ 47.

61.     Aviel asked DOGE for a written explanation of DOGE's assessment that the Foundation's minimum statutory presence consisted of only a Board, a president, a D.C. office, and one or two grants. Cavanaugh responded with an email, sent from a GSA email address and copying Altik, containing six bullet points—each of which contained a copied-and-pasted provision from the Foundation's organic statute in which Congress used the word "shall."

62.     Separately, DOGE reached out to one of four duly appointed and Senate-confirmed members of the Foundation's Board, Lou Viada, whom DOGE apparently believed, based solely on DOGE's perceptions of Viada's political leanings, would be sympathetic to its cause. Altik, the DOGE lawyer, called Viada and said he wanted to check whether Viada was "aligned" with the Dismantling EO and the planned reduction of the Foundation's staff.

63.     Viada responded that he was aligned with the notion of analyzing efficiency, saving money, and eliminating fraud—which he understood to be DOGE's mission—believing that DOGE

was functioning as a consulting group that would work with Foundation staff to analyze and provide recommendations on individual programs. As so stated, Viada indicated alignment with *that* mission.

64.     Altik told Viada that Viada was the only remaining active Board member and that his three colleagues had been fired. Viada asked if the other Board members had received notification of their termination; Altik acknowledged that the other Board members had yet to receive notice of their alleged termination. He further indicated that DOGE wanted Viada to sign some papers and help DOGE execute its process to dismantle the Foundation.

65.     Viada then contacted the other Board members and confirmed that they had *not* received notices of termination. As it became clear that DOGE desired a more-legitimate-seeming entry point to have an existing Board member ratify their planned elimination of the Foundation, Viada told Altik that he would decline to assist those efforts and preferred to work with his Board colleagues. Altik told Viada that he could choose between being fired alongside his colleagues or he could resign if he was unwilling to do as DOGE demanded. Viada refused to resign.

66.     On February 26, Viada received an email from Trent Morse, Deputy Director of the Presidential Personnel Office, stating that he had been terminated. The other three Board members never received any notice of their termination. As of the date of filing this action, the other Board members are uncertain whether Defendants attempted to send them a notice of termination to their Foundation email accounts (to which they no longer have access).

67.     That same day, Morse sent Aviel a one-line email asserting that she had been fired from her position as President and CEO of the Foundation.

68.     Then on February 28, Morse sent an email to Foundation leadership stating that all members of the Board had been fired and that President Trump had designated Defendant Peter Marocco to be Acting Chair of the Foundation's Board. The email acknowledged that the President does not have statutory authority under either the Foundation's organic statute or the Federal

17

Vacancies Reform Act of 1998, 5 U.S.C. §§ 3345–3349, to appoint acting board members, but nonetheless asserted that President Trump was exercising inherent authority.

69.    On Friday, February 28, Marocco purported to hold an "emergency closed session of the board of directors … to discuss personnel issues." 90 Fed. Reg. 11546 (Feb. 28, 2025). Shaotran and Cavanaugh were present for this meeting. The "transcript" of this meeting—the substance of which spans only about a dozen lines of informal notes—reveals that Marocco claimed that "there's no time to give public notice of 1 week, pursuant to" the Sunshine Act, because "President Trump's EO says this agency needs to be reduced to statutory minimum (and we need to send a report to OMB)."[2] Marocco then claimed "a majority of the board" (meaning only himself) voted to hold the meeting immediately, despite the fact that it was minutes before 5 p.m. on a Friday and "no one is here to let me in" to Foundation offices, and that the General Counsel had not certified that the meeting could be closed to the public as required by  22 C.F.R. § 1004.6(d). *Id.* Marocco claimed that the meeting could nonetheless be closed because it "relate[d] solely to the personnel rules and practices of the agency." *Id.* Finally, as "Chairman and only member of the board," Marocco "designat[ed] [himself] as the acting CEO and President" of the Foundation, and also apparently took some other action that is redacted in the document attached to the Federal Register notice. *Id.*

70.    Prior to her termination, Aviel had received notice through another member of the Foundation leadership team that the Treasury Department planned unilaterally to cancel the Foundation's contracts by close of business on February 27. Aviel and her staff had pushed back with a detailed response, asserting that (among other reasons) Treasury functioned as the Foundation's bank, essentially conducting administrative-payment functions, and lacked any authority over the Foundation's congressionally appropriated funding or its contracts.

---

[2] https://drive.google.com/file/d/1opNCP4BHPx1oqFl1i8jbnMV4HinyYVvt/view.

71.     After Aviel was fired, DOGE representatives found a backdoor method to effectuate these actions. The Foundation's contracts long had been processed and paid through the Administrative Resource Center (ARC), run by the Treasury Department's Bureau of Fiscal Service. Under the direction of Marocco, purporting to be the Foundation's President, DOGE accessed ARC and acted unilaterally to cancel virtually all of the Foundation's contracts.

72.     DOGE then used the Foundation's own system to send termination communications on March 4 to all of the Foundation's active grantees, with the exception of a single grant.

73.     DOGE unlawfully canceled roughly 400 active grants in 27 countries, each of which was focused on promoting economic prosperity, advancing democratic governance, and/or fostering peace and security.

74.     DOGE also locked the majority of Foundation employees out of their IT systems and emails at the end of the day on March 3 and shuttered the agency's public-facing website.

75.     DOGE then placed nearly all of the Foundation's employees on administrative leave on that same day, March 3. The following day, the employees were given notice that they are subject to a widescale Reduction in Force that DOGE intends to use to terminate all, or nearly all, of the Foundation's roughly three-dozen employees. On information and belief, all but two or three Foundation employees will be terminated effective April 4. This means that, instead of the 60 days' notice normally given under Office of Personnel Management regulations, *see* 5 C.F.R. § 351.801(a), Foundation employees were given only 30 days' notice.

76.     Marocco subsequently purported to install Dominic Bumbaca as President of the Foundation, effective March 7, 2025.

77.     These collective actions have effectively dismantled the Foundation, which, in all relevant respects, no longer is operating as Congress directed. In particular, the Foundation has tens

of millions of dollars in congressionally appropriated funds that Defendants' actions have prevented the agency from spending to fulfill its legislatively directed mission.

## HARMS TO GRANTEES

78.    On March 4, 2025, each Plaintiff received a materially identical letter from Marocco informing them that their Foundation grants had been canceled. The letter informed Plaintiffs that their grants were "inconsistent with the agency's priorities." It further stated that the "President's February 19, 2025 executive order mandates that the [Foundation] eliminate all non-statutorily required activities and functions." It did not provide any other explanation. The letter also instructed Plaintiffs to send any remaining "unspent funds to the IAF, in accordance with the termination clause and local law, within fifteen (15) days or as soon as practicable."

79.    The immediate, sudden cancelation of these grants has caused Plaintiffs grave harm. For example, Plaintiff Cristosal is owed more than $120,000 under the terms of its grant with the Foundation, and has already diverted more than $70,000 from other sources to cover expenses incurred. As a result of the termination, Cristosal will be unable to continue providing essential legal, humanitarian, and mental health services to 372 individuals. Cristosal will also be forced to halt a project designed to document patterns of forced displacement, information critical to its efforts to support national governments in fulfilling their obligations to protect citizens who are victims of human rights abuses in El Salvador, Guatemala, and Honduras. The termination of these funds will hamper Cristosal's ability to address the root causes of migration from the countries in which it operates.

80.    Plaintiff Corpocaminos faces a similar threat. Corpocaminos is owed $116,247 under the terms of its grant. Without Foundation funds, there is a material risk that Colombia's Ministry of Education will revoke Corpocaminos's accreditation, leading to the college's dissolution. Colombian

law requires newly established institutes like Corpocaminos to derive a portion of their funds from sources other than tuition. Corpocaminos had been using its Foundation grant for that purpose.

81.    Plaintiff ACPH is owed $114,930 under the terms of its grant. The loss of these funds will have a devasting impact on ACPH's ability to operate. It has already been forced to dismiss key personnel without notice, which exposes ACPH to liability under local labor laws. It will no longer be able to offer training services to young people, leaving them without alternatives to learn job skills. That, in turn, could lead to an increase in migration out of Honduras. ACPH's ability to respond to floods with emergency supplies and care will also be significantly hampered.

82.    At the time plaintiff Asociación Las Pregoneras received the March 4 letter, it was in the midst of negotiating a $267,000 agreement with the Foundation as a follow-on to its 2023 grant. The only step remaining was for the Foundation's President to approve the agreement. Without these funds, Pregoneras will no longer be able to provide services to women and children at risk of violence. These populations face especially acute risks in the country where Preogoneras operates: in 2021, the Peruvian National Police registered more than 240,000 cases of domestic violence nationwide, and in 2023, there were approximately 12,000 cases of school violence. The end of Pregoneras's services increases the likelihood that women and children will flee Peru for the United States, as victims of domestic violence, sexual violence, and trafficking in Latin America often seek refuge in other countries.

83.    Plaintiff Alternativas y Capacidades is owed $43,000 under the terms of its grant. Without those funds, it will have to suspend its Social Laboratory for Youth-Led Initiative, directly affecting 40 youth leaders enrolled in that program. It will also be unable to issue an additional ten seed grants of $2,500 each, which would have been used by recipients to start community impact projects.

21

84.     Plaintiff Fundación Renace is owed $9,336 under the terms of its grant. At the time the funds were terminated, Fundación Renace was working with a business association to prepare three bids for government contracts, under which the businesses would have made $26,000 from selling bananas and $90,300 from selling processed banana products. The loss of these contracts affects 200 families that produce the bananas; and an additional 60 individuals who process them into banana flour and other products. In addition, Fundación Renace was in the midst of helping three organizations prepare to respond to a government contract set to open in April. Absent the grant funds it is owed, Fundación Renace will be unable to continue providing that assistance.

85.     Plaintiff Sociedad Cooperativa Las Mujeres Rurales de la Frontera Sur has received only $12,600 of the $237,780 owed to it under the terms of its grant. As a result of the termination of funds, it has had to lay off seven employees. In additional, Las Mujeres Rurales intended to provide loans and seed capital to about 600 women to expand their businesses, and it will no longer be able to offer that financing. Finally, Las Mujeres Rurales intended to provide funds for infrastructure updates to a community center used by over 300 children. That project, too, will now be impossible.

86.     Plaintiff EIFODEC is owed $121,750 under the terms of its grant. As a result of the loss of funding, it will no longer be able to train 120 disabled youth that it is currently educating. Nor will it be able to give 23 of those individuals seed funds to start their own businesses. It will no longer be able to provide support to families of those with disabilities. And it will have to lay off about ten staff members, leaving them without work at a time of economic hardship in Bolivia. The Foundation's lack of support will severely impair EIFODEC's ability to serve its intended population, and unless it is able to secure additional funds, it may consider closing.

87.     Plaintiff ISEAC is owed $187,700 under the terms of its grant. Without these funds, it will be unable to continue working with small farmers to move away from farming techniques that involve monocropping and the use of pesticides. This will reduce the capacity of the land to produce

food in a sustainable way—which will hamper the ability of families to sustain themselves and earn income. The sudden termination of ISEAC's grant will therefore exacerbate food insecurity in the area, and could therefore lead to economic instability for rural communities and greater migration out of El Salvador.

88.     Each Plaintiff also faces significant non-monetary harm from the termination of their relationship with the Foundation. Several were planning to participate in Foundation-sponsored exchanges, which would have allowed them to learn best practices related to their fields from other organizations in Latin America. Foundation liaisons have also provided each Plaintiff important support throughout the life of each grant. They connect Plaintiffs to other resources and organizations, and provide organizational and administrative troubleshooting support. In addition, monitoring and evaluation specialists from the Foundation visit each Plaintiff regularly. Those specialists provide technical support and advice, and have helped Plaintiffs improve their monitoring systems and strategies. Auditors contracted by the Foundation have also provided Plaintiffs with assistance related to accounting, documentation, and complying with relevant laws. These services have been critical to Plaintiffs' growth and have enabled them to access additional funding from other sources.

89.     Other grantees have suffered similar harms. According to an informal poll of 148 grantees (about 35 percent of all Foundation grantees) conducted over the last several weeks, more than 60 percent are at risk of closure due to the cancellation of Foundation funds. On average, Foundation funds make up 65.5 percent of these grantees' budgets. For 44 percent of respondents, Foundation funds account for at least 70 percent of their budget. Collectively, these organizations will lose more than $14 million in Foundation funds. The termination of Foundation funds also puts at risk an additional $13.5 million that these organizations secured from other sources. And it will impact more than 85,000 beneficiaries of just these 148 organizations. In addition, 14 grantees have already

returned a total of $762,253.21 to the federal government pursuant to the March 4, 2025 letter (before the federal government agreed to pause the requirement to return funds in a lawsuit challenging Aviel's dismissal). *See Aviel v. Gor*, No. 1:25-cv-778, Minute Entry for Status Conference & ECF No. 14-1 (D.D.C. Mar. 19, 2025).

## CAUSES OF ACTION

### Count I
### Violation of the Separation of Powers

90.     Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

91.     This Court has inherent equitable power to enjoin unconstitutional actions by the Executive Branch. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

92.     Defendants' actions to unilaterally impound the Foundation's congressionally appropriated funds exceeds the Executive Branch's constitutional authority and aggrandizes power over spending and appropriations that the Constitution vests in Congress.

93.     The Appropriations Clause specifically states: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Defendants lack authority to disregard or overrule Congress's duly enacted appropriations by denying the Foundation all access to its funding. *In re Aiken Cnty.*, 725 F.3d 255, 260-61 (D.C. Cir. 2013).

94.     According to the Spending Clause: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The Spending Clause grants Congress the power to determine federal expenditures, including whether to attach any conditions to federal funding.

95.     Defendants' decisions to impound the Foundation's funding infringes Congress's exclusive power of the purse and exceeds executive authority.

96.    The Presentment Clause provides that: "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it." U.S. Const. art. I, § 7, cl. 2. The President has no authority to alter duly enacted legislation—his power is limited to approving or rejecting in full legislation presented to him. *Clinton v. City of New York*, 524 U.S. 417, 439-40 (1998). Both the Foundation's organic statute and the relevant appropriations bills are validly enacted laws that the President has no power to ignore, amend, modify, or partially veto.

97.    The Take Care Clause obligates the President, and any subordinate officers to whom he delegates duties, to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

98.    Defendants lack any authority, under the Constitution or statute, to usurp legislative power by functionally abolishing an agency created by Congress and that, as a matter of federal law, "shall have perpetual succession unless sooner dissolved by an Act of Congress." 22 U.S.C. § 290f(e)(1). Defendants' decimation of the Foundation violates the Take Care Clause.

99.    Defendants' hostile takeover of the Foundation flouts our constitutional structure.

**Count II**
***Ultra Vires* Actions**

100.    Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

101.    This Court has inherent equitable power to enjoin unconstitutional actions by the Executive Branch. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

102.    No part of the U.S. Constitution, statute, or other source of law authorizes Defendants to impound the Foundation's funding. On the contrary, the Impoundment Act, the Anti-Deficiency Act, the 2024 Further Consolidated Appropriations Act, and the 2025 Full-Year Continuing Appropriations and Extensions Act obligate Defendants to allow the Foundation to access and disburse its congressionally appropriated funding.

103.    Defendants' unlawful impoundment is *ultra vires*.

25

104.     In addition, the President lacks either statutory or inherent authority to invest Marocco as sole Board member and Chair in an acting capacity, or otherwise to bypass the statutorily mandated Senate confirmation process. Members of the Foundation's Board must be appointed by the President and confirmed by the Senate. 22 U.S.C. § 290f(g). Marocco has not been nominated by the President nor confirmed by the Senate to the Foundation's Board.

105.     No provision of law authorizes the President to appoint an acting member of the Foundation's Board. On the contrary, the Federal Vacancies Reform Act prohibits the President from installing members of the Board in an acting capacity. *See* 5 U.S.C. §§ 3348(b)(1), (d)(1), 3349c. And even if Marocco's appointment does not violate the Federal Vacancies Reform Act, it violates the Appointments Clause. U.S. Const. art II, § 2, cl. 2. Marocco's purported appointment to the Board is thus *ultra vires* and without effect.

106.     Because Marocco has not been validly installed as Board Chair of the Foundation, actions he purported to take in that capacity are void *ab initio*. Most importantly, Marocco's purported self-designation as President and CEO of the Foundation is invalid—as are any actions he purported to take as Foundation President. Illustratively, Marocco's actions attempting to terminate Foundation staff and fully shuttering the Foundation's public-facing website are null and void.

107.     Marocco (and DOGE acting in concert with him) also lacked authority to cancel the Foundation's grants and contracts. Any such cancellations or terminations are likewise null and void.

**Count III**
**Violation of the Administrative Procedure Act—706(2)(A)**

108.     Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

109.     The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

110.     Defendants' impoundment of the Foundation's congressionally appropriated funding, and related actions taken to deny the Foundation access to such funding, is final agency action, *id.*

§ 704. "Agency action" encompasses an agency's "denial" of "recognition" to a "claim" or "right"; the "denial" of a "grant of money"; and the "failure to act" or "withholding" with respect to claims, rights, and grants of money. *Id.* § 551(10), (11), (13).

111.    Defendants' decision to unilaterally cancel all of the Foundation's grants and contracts constitutes arbitrary and capricious agency action. To survive arbitrary-and-capricious review, an agency must demonstrate that it "has reasonably considered the relevant issues and reasonably explained its decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide a "satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). And the APA demands that, prior to upending longstanding policies that have engendered reliance interests, agencies must acknowledge their change in course and explain the reasons for doing so. *Fed. Commc'ns Comm'n v. Fox Television*, 556 U.S. 502, 515 (2009); *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30–31 (2020).

112.    Defendants made no attempt to comply with these minimum requirements when terminating Plaintiffs' grants (and all other Foundation grants, with the exception of a single award). On information and belief, Defendants did not produce any contemporaneous memorandum or other rationale for their decision to engage in the blanket cancellation of Foundation grants. Instead, the only contemporaneous record Defendants have produced are letters to Plaintiffs stating the unreasoned assertion that the Foundation's grants suddenly were "inconsistent with the agency's priorities" and that the President had "mandate[d] that the [Foundation] eliminate all non-statutorily required activities and functions." *See supra* ¶ 77. This is the antithesis of a considered decision or a rational explanation. The APA demands more.

113.     Defendants' decision likewise failed to take into account the reliance interests of Plaintiff organizations or the communities they serve. Nor did they consider the impact on migration in the Western hemisphere that likely will result from the sudden cessation of longstanding programs and projects designed to ease the factors that cause people to migrate to the United States. These failures were arbitrary and capricious.

114.     This Court should hold unlawful and set aside Defendants' actions to withhold funds, and compel Defendants to otherwise make available the Foundation's congressionally appropriated funding.

## Violation of the Administrative Procedure Act—706(2)(A), (C)

115.     Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

116.     The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law," "in excess of statutory jurisdiction," "or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

117.     Defendants' blanket denial of funding is contrary to law and in excess of statutory authority because the Impoundment Act, the Anti-Deficiency Act, the 2024 Further Consolidated Appropriations Act, and the 2025 Full-Year Continuing Appropriations and Extensions Act all create a mandatory, nondiscretionary duty to make available and disburse the Foundation's funds as needed for it to carry out its legislatively directed mission.

118.     This Court should hold unlawful and set aside Defendants' blanket denial of funding as contrary to law and in excess of statutory jurisdiction.

## Violation of the Administrative Procedure Act—706(1)

119.     Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

120.     The APA further provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

121.     Defendant Department of the Treasury has a mandatory, nondiscretionary duty to disburse funds in its care upon a lawfully presented disbursement request from a Foundation employee with delegated authority. Treasury essentially acts as the Foundation's "bank" and lacks authority to refuse payments or cancel its contracts.

122.     Treasury has refused to fulfill that mandatory duty by impounding Foundation funds and unilaterally cancelling its contracts.

123.     This Court should compel Defendant Department of the Treasury to fulfill its mandatory duty to disburse the Foundation's funding and reinstate its contracts.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

a.     A declaration that Peter Marocco's purported appointment to the Foundation's Board is *ultra vires*, without legal effect, and that any actions Marocco purported to take as Chairman of the Board are null and void, including his self-designation as President and CEO of the Foundation;

b.     A declaration that Marocco lacked legal authority (and thus could not delegate such authority to DOGE) to cancel the Foundation's contracts and grants and that those actions are thus void *ab initio*;

c.     A declaration that the Executive Branch's impoundment of the Foundation's congressionally appropriated funds violates the Separation of Powers, intrudes on power constitutionally vested with the legislature, constitutes agency action not in accordance with law, contrary to constitutional right, and in excess of statutory authority, *see* 5 U.S.C. § 706(2)(A)-(C), and violates the Impoundment Control Act and the Anti-Deficiency Act;

29

d.      A declaration that Marocco lacked legal authority (and thus could not delegate such authority to DOGE) to place Foundation employees on administrative leave and initiate a reduction in force as to Foundation employees, and such action is thus void *ab initio*;

e.      A preliminary and permanent injunction ordering Defendants to cease their unlawful impoundment of congressionally appropriated funds and otherwise to make available the Foundation's appropriated funds;

f.      A preliminary and permanent injunction prohibiting Defendants from continuing to keep Foundation employees on administrative leave and from implementing the unlawful reduction in force of Foundation employees, and requiring Defendants to reinstate employees to the positions they held prior to Marocco's unlawful actions;

g.      A preliminary and permanent injunction requiring Defendants to reinstate contracts and grants unlawfully canceled by Marocco or others acting in concert with him that were in effect as of February 28, 2025;

h.      A preliminary and permanent injunction requiring all Defendants to pay any grant funds unlawfully withheld since February 28, 2025, and to return any funds sent by grantees back to the federal government under the terms of the March 4 letter;

i.      A preliminary and permanent injunction prohibiting Defendant Peter Marocco, and any purported successors to him, including Defendant Dominic Bumbaca, from purporting to exercise the authority of the Inter-American Foundation Board or its President unless such successor shall be installed through the statutorily required process, 22 U.S.C. § 290f(g), (*l*).

j.      An award to Plaintiffs of reasonable costs and attorneys' fees; and

k.      Such other and further relief that this Court may deem fit and proper.

March 21, 2025

Respectfully submitted,

_____/s/ Gregory Briker_____
Kate Talmor* (Maryland Bar)
Rupa Bhattacharyya† (D.C. Bar. No. 1631262)
Gregory Briker (D.C. Bar. No. 90030391)
Mary B. McCord (D.C. Bar. No. 427563)
Samuel P. Siegel* (California Bar)
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
   AND PROTECTION
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 661-6728
kt894@georgetown.edu
rb1796@georgetown.edu
gb954@georgetown.edu
mbm7@georgetown.edu
ss5427@georgetown.edu

*Attorneys for Plaintiffs*

*Pro hac vice application forthcoming. DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.*

†*Application for Admission to DDC Bar forthcoming.*