**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CRISTOSAL HUMAN RIGHTS et al.,

*Plaintiffs,*

*v.*                                          **Case No. _____**

PETER MAROCCO et al.,

*Defendants.*

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ................................................................................................................1

BACKGROUND ..................................................................................................................2

    I.     The Inter-American Foundation Act ........................................................................2

    II.    Defendants' Actions to Dismantle the Foundation ...................................................4

    III.   Plaintiffs and Other Grantees that Depend on Foundation Funding.........................9

LEGAL STANDARD ........................................................................................................10

ARGUMENT ....................................................................................................................11

    I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims.............................11

         A.    Defendants' actions violate the separation of powers ......................................11

         B.    Defendants' actions to impound funds, terminate grants and contracts, and fire employees are *ultra vires* .......................................................................15

             1.    Federal statutes prohibit Defendants' impoundment of the Foundation's funding.........................................................................................15

             2.    Marocco's appointment to the Board, and all actions he took thereafter, are invalid.................................................................................................17

         C.    Defendants' impoundment of the Foundation's funding, and cancelation of all of its contracts and grants, violates the APA .........................................21

             1.    Defendants' mass cancelation of contracts and grants is arbitrary and capricious.21

             2.    Defendants' denial of funding is contrary to law.........................................23

             3.    This Court should compel agency action unlawfully withheld and unreasonably delayed................................................................................23

    II.    Plaintiffs Are Suffering Irreparable Harm from Defendants' Actions....................24

    III.   The Balance of Equities and Public Interest Favor Plaintiffs' Request for a Preliminary Injunction.........................................................................................................................28

    IV.   The Court Should Enjoin Defendants from Taking Further Action to Dismantle the Inter-American Foundation ..............................................................30

CONCLUSION..................................................................................................................31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014) ........................................................10

*Abudllah v. Obama*, 753 F.3d 193 (D.C. Cir. 2014)........................................................10

*Aids Vaccine Advocacy Coal. v. U.S. Dep't of State*,
  2025 WL 752378 (D.D.C. Mar. 10, 2025) .................................... 14, 15, 17, 24, 29

*Asylumworks v. Mayorkas*, 590 F. Supp. 3d 11 (D.D.C. 2022) .....................................18

*Bennett v. Spear*, 520 U.S. 154 (1997) ..........................................................................21

*Bowsher v. Synar*, 478 U.S. 714 (1986) ................................................................... 11, 13

*City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).................17

*Clinton v. City of New York*, 524 U.S. 417 (1998)........................................................12

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679 (D.C. Cir. 2023)..............................19

*Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988) ...................................................15

*Does 1–26 v. Musk*, 2025 WL 840574 (D. Md. Mar. 18, 2025).....................................14

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414 (2021) ...............22

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010).........................15

*Fed. Commc'ns Comm'n v. Fox Television*, 556 U.S. 502 (2009) ............................. 22, 23

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013)........................................................28

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013).........................................................14

*J. Rotenberg Educ. Ctr., Inc. v. FDA*, 3 F.4th 390 (D.C. Cir. 2021) .............................12

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2019) ................. 24, 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983) .........22

*Nat'l Council of Nonprofits v. OMB*, 2025 WL 597959 (D.D.C. Feb. 25, 2025)............ 24, 29

ii

*New York v. Trump*, 2025 WL 715621 (D.R.I. Mar. 6, 2025)..........................................................24, 28, 29

*Nken v. Hodler*, 556 U.S. 418 (2009) ...........................................................................................................28

*NLRB v. SW Gen., Inc.*, 580 U.S. 288 (2017) .................................................................................... 18, 20

*Pacito v. Trump*, 2025 WL 655075 (W.D. Wash. Feb. 28, 2025)......................................................24, 29

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500 (D.C. Cir. 2016) .....................................28

*Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10 (D.D.C. 2021) ...........................................28

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590 (2016) .........................................................21

*U.S. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ............................... 22, 23

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339 (D.C. Cir. 2012) ............................................14

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)............................................................................10

*Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ...............................................................................24

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)..............................................................11, 13, 15

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ................................................................................11

**Statutes**

2 U.S.C. § 683(a) ...........................................................................................................................................16

2 U.S.C. § 683(b) ...........................................................................................................................................16

5 U.S.C. § 551(10) .........................................................................................................................................21

5 U.S.C. § 551(11) .........................................................................................................................................21

5 U.S.C. § 551(12) .........................................................................................................................................21

5 U.S.C. § 706(1) ...........................................................................................................................................23

5 U.S.C. § 706(2)(A).................................................................................................................................21, 23

5 U.S.C. § 706(2)(C).......................................................................................................................................23

5 U.S.C. §§ 3345-3349d........................................................................................................................... 7, 17

5 U.S.C. § 3345 ...................................................................................................................18

5 U.S.C. § 3346 ...................................................................................................................18

5 U.S.C. § 3347 ...................................................................................................................20

5 U.S.C. § 3347(a) ....................................................................................................... 17, 18

5 U.S.C. § 3348(b)(1) ..........................................................................................................18

5 U.S.C. § 3348(d)(1) ............................................................................................... 18, 19, 20

5 U.S.C. § 3349c ........................................................................................................... 18, 20

22 U.S.C. § 290f(a) .................................................................................................................2

22 U.S.C. § 290f(b) ...................................................................................................... 2, 3, 29

22 U.S.C. § 290f(c) ..................................................................................................................9

22 U.S.C. § 290f(e) ...................................................................................................... 1, 3, 12

22 U.S.C. § 290f(e)(1) ................................................................................................... 12, 13

22 U.S.C. § 290f(i) ........................................................................................................ 3, 17

22 U.S.C. § 290f(*l*) ....................................................................................................... 3, 17

22. U.S.C. § 290f(g) ................................................................................................. 3, 17, 30

31 U.S.C. § 1301(a) ............................................................................................................16

31 U.S.C. § 1512(c)(1) ........................................................................................................16

Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 877 (1982) ....................................16

Congressional Budget and Impoundment Control Act of 1974,
     Pub. L. No. 93-344, Title X, 88 Stat. 332 .................................................................15

Full-Year Continuing Appropriations and Extensions Act, 2025,
     Pub. L. No. 119-4 (2025) ................................................................................4, 14, 16, 23

Further Consolidated Appropriations Act, 2024,
     Pub. L. No. 118-47, 138 Stat. 460 (2024) ..................................................3, 4, 13, 14 23

**Regulations**

22 C.F.R. § 1004.6(d) ...................................................................................................8

5 C.F.R. § 351.801(a) ...................................................................................................9

**Constitutional Provisions**

U.S. Const. art. I, § 1 ..................................................................................................12

U.S. Const. art. I, § 7, cl. 2 .........................................................................................12

U.S. Const. art. I, § 8, cl. 1 .........................................................................................11

U.S. Const. art. I, § 9, cl. 7 .........................................................................................12

U.S. Const. art. II, § 2, cl. 2 .......................................................................................20

U.S. Const. art. II, § 3 .................................................................................................12

**Legislative Materials**

H.R. Rep. No. 93-658 (1974) ......................................................................................16

S. Rep. No. 105-250 (1998) ........................................................................................19

**Other Authorities**

90 Fed. Reg. 10577 (Feb. 19, 2025) ............................................................................4

90 Fed. Reg. 11546 (Feb. 28, 2025)..............................................................................7

Temporary Presidential Designation of Acting Board Members of the
  Inter-American Foundation and the United States African Development Foundation,
  49 Op. O.L.C. ____ (Mar. 14, 2025) ......................................................................19

The Federalist No. 47 (James Madison) (J. Cooke ed. 1961) ...................................13

The Federalist No. 76 (Alexander Hamilton) (Clinton Rossiter ed. 1961)...............20

## INTRODUCTION

Urgent action from this Court is needed to halt a series of unlawful actions being taken to eviscerate an entire independent agency. Congress created the Inter-American Foundation more than 50 years ago to perform critical development work in the Western Hemisphere and took the unusual step of mandating that, as a matter of federal law, the agency "shall have perpetual succession unless sooner dissolved by an Act of Congress." 22 U.S.C. § 290f(e). But after President Trump decreed the Inter-American Foundation to be "unnecessary," administration officials launched a full-scale hostile takeover of the agency, usurping the power of its bipartisan, presidentially appointed and Senate-confirmed Board of Directors; purporting to fire its president and chief executive officer; impounding its congressionally appropriated funding; shuttering its website; canceling its contracts and development grants; moving to fire virtually all of its employees; and purporting to install Defendant Peter Marocco as the Acting Chair of the Foundation's Board and as its President. These actions have caused chaos at the agency and are irreparably harming Plaintiffs and similarly situated grantees—community-development organizations from across Latin America that depend on a reliable flow of funding from the Foundation's grants to perform vital work aimed at reducing the factors that drive mass migration in the region. Absent this Court's intervention, as many as 60 percent of Foundation grantees are at risk of collapse.

Defendants cannot abolish by executive fiat an agency created by Congress. Defendants likewise lack authority to impound funds Congress appropriated, reaffirmed in the recently enacted continuing resolution, and directed the Foundation to spend to carry out its mission. These actions flout separation of powers principles and violate numerous provisions of the U.S. Constitution, including the Appropriations Clause, the Spending Clause, the Presentment Clause, and the Take Care Clause. Marocco's purported appointment as Acting Chair of the Board also violates the Federal Vacancies Reform Act. And Defendants' decisions to choke off the Foundation's funding and cancel

wholesale all of its contracts and grants constitute arbitrary and capricious agency action, and agency action unlawfully withheld, in violation of the Administrative Procedure Act.

Defendants' unlawful and unconstitutional actions pose a grave threat to Plaintiffs and to the community members that rely on Plaintiffs' projects. Absent prompt intervention from this Court halting Defendants' continuing disregard for the rule of law, Plaintiffs and their local constituents will continue to suffer ongoing, irreparable harm.

## BACKGROUND

### I.  The Inter-American Foundation Act

Congress created the Inter-American Foundation in 1969 as a unique foreign-assistance program supporting social and economic development in Latin America and the Caribbean. The Foundation's activities are carried out "primarily in cooperation with private, regional, and international organizations." 22 U.S.C. § 290f(b). This sets the Foundation apart from other foreign aid agencies that rely on government-to-government funding mechanisms or international contractors. *See* Compl. ¶ 2. The Foundation has invested in nearly 6,000 community development projects in 35 countries, focused on addressing the root causes of migration by promoting economic stability, reducing violence, and strengthening democratic governance. These projects work to build peaceful and safe communities, expand economic opportunities through job creation and entrepreneurship, strengthen civic engagement, and enhance social and economic inclusion. *Id.* By empowering local communities to solve their own problems, the Foundation's work has been one of the United States' most effective and powerful tools to strengthen and build local communities in developing nations throughout the Western Hemisphere—a key effort to address the root causes of mass migration. *Id.*

Congress created the Foundation as a "body corporate," 22 U.S.C. § 290f(a), to carry out its legislatively directed purposes "to (1) strengthen the bonds of friendship and understanding among

the peoples of this hemisphere; (2) support self-help efforts designed to enlarge the opportunities for individual development; (3) stimulate and assist effective and ever wider participation of the people in the development process; [and] (4) encourage the establishment and growth of democratic institutions, private and governmental, appropriate to the requirements of the individual sovereign nations of this hemisphere." *Id.* § 290f(b).

Congress took steps to ensure the Foundation's ability to function flexibly and independently. Of particular importance, Congress affirmed that "[t]he Foundation … shall have perpetual succession unless sooner dissolved by an Act of Congress." *Id.* § 290f(e). It is governed by a nine-member Board of Directors ("Board"), members of which are chosen by the President with the advice and consent of the Senate. *Id.* § 290f(g). Board members serve staggered six-year terms but are eligible to remain in office if a replacement has not been confirmed at the expiration of their terms. *Id.* Congress specified that the Board come from a mix of "private life" and officers or employees of certain public agencies; that its membership be balanced between the political parties; and that "individuals appointed to the Board shall possess an understanding of and sensitivity to community level development processes." *Id.* The duly appointed "Board shall direct the exercise of all the powers of the Foundation." *Id.* § 290f(i). Day-to-day administration is entrusted to a president and chief executive officer "who shall be appointed by the Board of Directors on such terms as the Board" determines. *Id.* § 290f(*l*).

Congress recently reiterated the Foundation's importance. Last year, Congress appropriated $47 million "[f]or necessary expenses to carry out the functions of the Inter-American Foundation." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 460, 746 (2024). These funds are "to remain available until September 30, 2025." *Id.* And they may not be used to "implement a reorganization, redesign, or other plan" that would "expand, eliminate, consolidate, or downsize" the Foundation, "including the transfer to other agencies" of its "authorities and

responsibilities," unless the Foundation first consults with the Appropriations Committee in each chamber and "include[s] a detailed justification." *Id.* § 7063(a), (b), 138 Stat. at 843-44. Indeed, even after the events described herein, Congress chose to continue the Foundation's funding in the recently enacted continuing resolution. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(11) (2025).

## II. Defendants' Actions to Dismantle the Foundation

On February 19, 2025, President Trump signed an executive order with the purpose "to dramatically reduce the size of the Federal Government" by "commenc[ing] a reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary." Exec. Order No. 14217, *Commencing the Reduction of the Federal Bureaucracy* ("Dismantling EO"), 90 Fed. Reg. 10577. The Dismantling EO targets four independent agencies, including the Foundation. It provides that all "non-statutory components and functions of the" targeted agencies "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence required by law." *Id.* at 10577. It also directs the "head of each unnecessary governmental entity" to submit a report to the Director of the Office of Management and Budget "confirming compliance" and indicating whether any of its components or functions are statutorily mandated. *Id.* The Dismantling EO further directs the OMB Director, "to the extent consistent with applicable law," to reject funding requests from the "unnecessary" agencies "to the extent they are inconsistent with this order." *Id.*

The day after President Trump signed the Dismantling EO, DOGE descended on the Foundation with the intent to decimate the agency. Two U.S. DOGE Service representatives in their twenties, with no prior government experience—Ethan Shaotran and Nate Cavanaugh—appeared at the Foundation's offices. Compl. ¶ 52. The Foundation's duly appointed President, Sara Aviel, and other members of leadership met with the DOGE representatives, who falsely asserted that their

4

intent was to help improve the Foundation's technology and systems. *Id.* Aviel and her team were aware of the Dismantling EO but presumed that a rational, legal process would control DOGE's actions. Foundation leadership both intended and attempted to work with DOGE to demonstrate that it had cut costs and was an efficient and successful agency; neither Aviel nor other members of her leadership team anticipated that DOGE intended to shutter the agency completely. *Id.* ¶ 53.

Shaotran and Cavanaugh returned the following day with another DOGE representative, a lawyer named Jacob Altik. Altik claimed to have reviewed the Foundation's organic statute and determined that its minimum statutory presence required only the existence of a Board, a president/CEO, an office in Washington, D.C., and one or two grants. The DOGE representatives demanded that Aviel sign on to their interpretation of the Foundation's minimum statutory presence. *Id.* ¶ 54 On a follow-up call the following Monday, February 24, DOGE representatives pressed Foundation leadership to sign memoranda of understanding with the General Services Administration that would grant Shaotran and Cavanaugh full access to Foundation systems under the guise of technical support. *Id.* ¶ 55.

Foundation leadership declined, explaining that it did not need help with technology, but the DOGE representatives began to issue ultimatums if leadership did not cooperate with their attempt to gain unfettered access to the Foundation's computer systems. *Id.* ¶ 56. DOGE representatives then pressed Aviel to call an immediate, Friday afternoon Board meeting to secure the Board's alignment with DOGE's interpretation of the Foundation's minimum statutory presence. *Id.* ¶ 57. Aviel pushed back, stating that it would be very difficult, if not impossible, to convene a Board meeting without more notice. Even apart from Board members' personal schedules, Aviel noted, certain legal requirements govern Board meetings. *Id.* ¶ 58. DOGE representatives responded that they did not need an official, legally compliant Board meeting to take place—they simply needed an immediate answer from the Board members as to whether they would ratify DOGE's statutory interpretation

and intended gutting of the agency. DOGE further indicated an intent to terminate the Board if it refused to ratify DOGE's actions. *Id.* ¶ 59.

Shortly thereafter, Aviel was contacted by congressional stakeholders from both parties and both chambers urging the Foundation to resist DOGE's efforts and pointing out that any effort to reduce the Foundation's functions would be inconsistent with the fact that Congress had forbid it from reorganizing, eliminating functions, or downsizing without first notifying congressional appropriations committees and providing a detailed justification for such actions. *Id.* ¶ 60.

Aviel asked DOGE for a written explanation of its assessment that the Foundation's minimum statutory presence consisted of only a Board, a president, a D.C. office, and one or two grants. Cavanaugh responded with an email, sent from a GSA email address and copying Altik, containing six bullet points—each of which contained a copied-and-pasted provision from the Foundation's organic statute in which Congress used the word "shall." Compl. ¶ 61.

DOGE separately was making overtures to one of four duly appointed and Senate-confirmed members of the Foundation's Board, Lou Viada, whom DOGE apparently believed—based solely on DOGE's perceptions of Viada's political leanings—would be sympathetic to its cause. Altik, the DOGE lawyer, called Viada and said he wanted to check whether Viada was "aligned" with the Dismantling EO and the planned reduction of the Foundation's staff. Compl. ¶ 62. Viada responded that he was aligned with the notion of analyzing efficiency, saving money, and eliminating fraud—which he understood to be DOGE's mission. As so stated, Viada indicated alignment with *that* mission. *Id.* ¶ 63. Altik told Viada that Viada was the only remaining active Board member and that his three colleagues had been fired. Viada asked if the other Board members had received notification of their termination; Altik acknowledged that the other Board members had not. He further indicated that DOGE wanted Viada to sign some papers and help DOGE execute its process to dismantle the Foundation. *Id.* ¶ 64.

Viada then contacted the other Board members and confirmed that they had *not* received notices of termination. As it became clear that DOGE desired a legitimate-seeming entry point by having an existing Board member ratify their planned elimination of the Foundation, Viada told Altik that he would decline to assist those efforts and preferred to work with his Board colleagues. Altik told Viada that he could choose between being fired alongside his colleagues or he could resign if he was unwilling to do as DOGE demanded. Viada refused to resign. *Id.* ¶ 65. On February 26, Viada received an email from Trent Morse, Deputy Director of the Presidential Personnel Office, stating that he had been terminated. The other three Board members never received any notice of their termination and remain unsure whether Defendants attempted to send notices of termination to their Foundation email accounts (to which they no longer have access). *Id.* ¶ 66.

That same day, Morse sent Aviel a one-line email asserting that she had been fired from her position as President and CEO of the Foundation. *Id.* ¶ 67. Two days later, on February 28, Morse sent an email to Foundation leadership stating that all members of the Board had been fired and that President Trump had designated Defendant Peter Marocco to be Acting Chair of the Foundation's Board. The email acknowledged that the President does not have statutory authority under either the Foundation's organic statute or the Federal Vacancies Reform Act of 1998, 5 U.S.C. §§ 3345–3349d, to appoint acting board members, but nonetheless asserted that President Trump was exercising inherent authority. *Id.* ¶ 68.

On Friday, February 28, Marocco purported to hold an "emergency closed session of the board of directors … to discuss personnel issues." 90 Fed. Reg. 11546 (Feb. 28, 2025). Shaotran and Cavanaugh were present. The "transcript" of this meeting—the substance of which spans only about a dozen lines of informal notes—reveals that Marocco claimed that "there's no time to give public notice of" the meeting because "President Trump's EO says this agency needs to be reduced to statutory minimum (and we need to send a report to OMB)." Compl. ¶ 69. Marocco then claimed "a

7

majority of the board" (meaning only himself) voted to hold the meeting immediately, despite the fact that it was minutes before 5 p.m. on a Friday, no one was there to let him in to Foundation offices, and the General Counsel had not certified that the meeting could be closed to the public as required under 22 C.F.R. § 1004.6(d). *Id.* Marocco claimed that the meeting could nonetheless be closed because it "relate[d] solely to the personnel rules and practices of the agency." *Id.* Finally, as "Chairman and only member of the board," Marocco "designat[ed] [himself] as the acting CEO and President" of the Foundation, and also apparently took some other action that is redacted in the document attached to the Federal Register notice. *Id.*

Prior to her termination, Aviel had received notice through another member of the Foundation leadership team that the Treasury Department planned unilaterally to cancel the Foundation's contracts by close of business on February 27. *Id.* ¶ 70. Aviel and her staff had provided a detailed response, asserting that (among other reasons) Treasury functioned as the Foundation's bank, essentially conducting administrative-payment functions, and lacked any authority over the Foundation's congressionally appropriated funding or its contracts. *Id.* After Aviel was fired, DOGE representatives found a backdoor method to effectuate these actions. The Foundation's contracts long had been processed and paid through the Administrative Resource Center ("ARC"), run by the Treasury Department's Bureau of Fiscal Service. Under the direction of Marocco, purporting to be the Foundation's President, DOGE accessed ARC and acted unilaterally to cancel virtually all of the Foundation's contracts. *Id.* ¶ 71. DOGE then used the Foundation's own systems to send termination communications on March 4 to all of the Foundation's active grantees, with the exception of a single grant. *Id.* ¶ 72. DOGE unlawfully canceled roughly 400 active grants in 27 countries, each of which was focused on promoting economic prosperity, advancing democratic governance, and/or fostering peace and security. *Id.* ¶ 73. The Foundation currently has tens of millions of dollars in congressionally

appropriated funds that Defendants' actions have prevented the agency from spending to fulfill its legislatively directed mission. *Id.* ¶ 76.

DOGE also locked the majority of Foundation employees out of their IT systems and email accounts at the end of the day on March 3 and shuttered the agency's public-facing website. *Id.* ¶ 74. DOGE then placed nearly all of the Foundation's employees on administrative leave that same day. The following day, employees were given notice that they are subject to a widescale reduction in force ("RIF") that DOGE intends to use to terminate all, or nearly all, of the Foundation's roughly three-dozen employees. On information and belief, all but three Foundation employees will be terminated effective April 4. This means that, instead of the 60 days' notice normally given under Office of Personnel Management regulations, 5 C.F.R. § 351.801(a), Foundation employees were given only 30 days' notice. *Id.* ¶ 75. On March 7, Marocco appointed Dominic Bumbaca as President of the Foundation. *Id.* ¶ 69.

## III.    Plaintiffs and Other Grantees that Depend on Foundation Funding

Plaintiffs are nine of the more than 400 organizations whose grants were canceled by Defendants. Consistent with Congress's directive, each has "plan[ned], initiat[ed], assist[ed], finance[ed], administer[ed], and execut[ed] programs and projects designed to promote the achievement" of the Foundation's purposes. 22 U.S.C. § 290f(c). Among other things, plaintiffs work to address internal displacement driven by criminal gangs in El Salvador, Guatemala, and Honduras, Bullock Decl. ¶ 5; combat violence against women and in schools in Peru, Reátegui Decl. ¶¶ 3–5; extend credit to rural women in southern Mexico, Porta Decl. ¶ 3; and teach small farmers sustainable agricultural techniques to help increase their yields, Gámez Decl. ¶ 3. Each has had great success with Foundation funds. *See, e.g.*, Bullock Decl. ¶¶ 6–8; Reátegui Decl. ¶ 5; Ortiz Decl. ¶¶ 5–7; Chaux Decl. ¶ 5.

On March 4, 2025, each Plaintiff received a materially identical letter from Marocco informing them that their Foundation grants had been canceled. *See, e.g.*, Bullock Decl. ¶ 9, Ex. A. The letter stated that each Plaintiff's grant was "inconsistent with the agency's priorities." *Id.* It further stated that the "President's February 19, 2025 executive order mandates that the [Foundation] eliminate all non-statutorily required activities and functions." *Id.* It did not provide any other explanation. The letter also instructed Plaintiffs to send any remaining "unspent funds to the IAF, in accordance with the termination clause and local law, within fifteen (15) days or as soon as practicable." *Id.* And it told them to send a final programmatic and financial report to the Foundation by April 2, 2025. *Id.*

The termination of the Foundation's grants will cause each plaintiff grave harm. Several have already had to lay off staff and several are considering shutting down entirely. Other grantees are in similarly dire straits: According to an informal survey of approximately 148 grantees conducted over the last several weeks, more than 60 percent are at risk of closure due to the cancelation of Foundation funds. Ibarlucia Decl. ¶ 6, Ex. A.

## LEGAL STANDARD

A plaintiff seeking preliminary injunctive relief must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The primary purpose of a preliminary injunction is to preserve … the status quo." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (internal quotation marks and citation omitted). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abudllah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quotation marks and citation omitted). These factors clearly weigh in Plaintiffs' favor.

## ARGUMENT

**I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims**

Defendants' hostile takeover and abrupt decimation of the Foundation exceed the Executive Branch's constitutional and statutory authority and violate the separation of powers. Defendants' impoundment of congressionally appropriated funds and cancelation of all the Foundation's contracts and grants also constitutes *ultra vires* actions taken without authority and unlawful action under the Administrative Procedure Act (APA). And Marocco's purported appointment to the Foundation Board violates the Federal Vacancies Reform Act (FVRA). Plaintiffs are likely to succeed on all claims.

    A.    Defendants' actions violate the separation of powers

The framers of the U.S. Constitution structured our federal government to ensure that a system of checks and balances curbs any impulses toward aggrandizement of power. "The declared purpose of separating and dividing the powers of government" between the legislative, executive, and judicial branches was "'to diffuse[e] power the better to secure liberty.'" *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)).

Although the executive and legislative branches share authority in certain spheres, such as foreign affairs, *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015), the framers granted Congress plenary control over federal spending. That control is effectuated in part by the Spending Clause, which provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1. The Constitution also grants the legislature the exclusive power to appropriate federal funds: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by

Law." U.S. Const. art. I, § 9, cl. 7. The Spending and Appropriations Clauses, among other provisions, together operate to grant Congress exclusive power over the federal purse.

Alongside control over federal spending, the Constitution also vests in Congress the power to make law—*i.e.*, to legislate. U.S. Const. art. I, § 1. And although a sitting president can *veto* legislation presented to him, U.S. Const. art. I, § 7, cl. 2, he has no power to create federal law unilaterally, nor can he alter, modify, or rescind duly enacted legislation. In other words, the President's power is limited to approving or rejecting in full legislation presented to him. *Clinton v. City of New York*, 524 U.S. 417, 439-40 (1998). And once legislation has been enacted as federal law, the Constitution charges the President with the affirmative duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

Defendants' actions to shutter the Foundation flout these core separation-of-powers principles in numerous ways. Regardless how "unnecessary" the President may consider the Foundation to be, *see* Dismantling EO, the Foundation is an independent agency created by Congress and cannot be closed (either literally or functionally) by executive fiat. "Federal agencies are creatures of statute," *J. Rotenberg Educ. Ctr., Inc. v. FDA*, 3 F.4th 390, 399 (D.C. Cir. 2021), and only Congress can abolish a federal agency or otherwise dictate (or reduce) its duties. This is true as a general matter of administrative and constitutional law, but has particular force here. Congress took the unusual step of confirming that, as a matter of federal law, the Foundation "shall have perpetual succession unless sooner dissolved by an Act of Congress." 22 U.S.C. § 290f(e)(1).

Defendants have disregarded Congress's directives and taken actions with the intent and effect of dismantling a federal agency created by Congress. These actions include, but are not limited to: usurping the power of the Foundation's presidentially appointed and Senate-confirmed Board of Directors; purporting to install Defendant Marocco as sole member of the Board; firing its President and CEO; Marocco's purporting to designate himself as President of the Foundation (and later to

designate Bumbaca as President); instituting a widescale RIF to terminate virtually all of the Foundation's employees within 30 days; terminating all of the Foundation's contracts and grants; and shuttering its website. By directing these actions, the President has violated his duties under the Take Care clause to faithfully execute laws passed by Congress. The President also has sought to unilaterally alter the Inter-American Foundation Act by gutting an agency that should exist "in perpetual succession." 22 U.S.C. § 290f(e)(1). "[T]here can be no liberty where the legislative and executive powers are united in the same person.'" *Bowsher*, 478 U.S. at 722 (quoting The Federalist No. 47, p. 325 (James Madison) (J. Cooke ed. 1961)). By carrying out the President's unlawful directives, Defendants have undertaken unconstitutional actions that this Court is empowered to enjoin.

It matters not that Defendants claim to have reduced the Foundation to its "minimum statutory presence" and thus have left in place one or two grants and two or three employees. *See* Compl. ¶¶ 51, 54, 69, 72. That is not a functioning agency and certainly does not permit the Foundation to fulfill its legislatively directed mission. *See* Compl. ¶¶ 2-3. As a practical matter, the Foundation currently is no longer functioning—a fact unchanged by Defendants' lip service to satisfying a statutory "minimum." The President (and his officers, on his direction) have "take[n] measures incompatible with the express or implied will of Congress," placing "at stake … the equilibrium established by our constitutional system." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). Such actions cannot stand.

In addition to their efforts to abolish the agency itself, Defendants have further violated the separation of powers by continuing to impound congressionally appropriated funds. In March of last year, Congress appropriated $47 million in funding "to carry out the functions of" the Foundation "until September 30, 2025." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 460, 746 (2024). Congress further instructed that funds could not be used to "implement a reorganization, redesign, or other plan" that would "expand, eliminate, consolidate, or

13

downsize" the Foundation (among others), unless the agency first consults with the Appropriations Committee in each chamber and "include[s] a detailed justification." *Id.* § 7063(a), (b)(1), 138 Stat. at 843-44. And just days before this action was filed—*even after* Defendants' unlawful actions to shutter the Foundation and freeze its funds—Congress *continued* to fund the Foundation's activities. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(11) (2025). Defendants have defied these congressional directives to spend this appropriated funding in accordance with the Foundation's mission. In so doing they have acted unilaterally to wrest control over Congress's "exclusive power over the federal purse," *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (citation omitted), by preventing the Foundation from accessing its appropriations and by canceling virtually all of its grants. Defendants' impoundment of the Foundation's funding violates "settled, bedrock principles of constitutional law" because "where previously appropriated money is available for an agency to perform a statutorily mandated activity, [there exists] no basis for a court to excuse the agency from that statutory mandate." *In re Aiken Cnty.*, 725 F.3d 255, 259-60 (D.C. Cir. 2013) (Kavanaugh, J.); *see id* at 257 (explaining that neither the President nor "subordinate executive agencies" may refuse to spend appropriated funds due to policy disagreements with the purposes set by Congress). Defendants are violating the separation of powers by aggrandizing to themselves Congress's spending power.

As this Court is well aware, Defendants' actions *vis-à-vis* the Foundation took place against the backdrop of other moves by the current administration to shutter agencies created by Congress and, in particular, to choke the flow of nearly all foreign-aid funding appropriated by Congress for expenditure by several agencies. Other courts reviewing separation-of-powers challenges to similar actions at other agencies have found likely constitutional violations, with one court in this district recently noting that "constitutional power over whether to spend foreign aid is not the President's own—and it *is* Congress's own." *Aids Vaccine Advocacy Coal. v. U.S. Dep't of State,* Nos. 25-00400, 2025

WL 752378, at *17 (D.D.C. Mar. 10, 2025).; *see id.* at *1, *17 (noting that Executive Branch has some discretion to "determine *how* appropriated funds are spent" but "Congress's appropriations laws set the amount that is to be spent"); *see also Does 1–26 v. Musk*, No. 25-0462, 2025 WL 840574, at *23 (D. Md. Mar. 18, 2025) ("Where Congress has consistently reserved for itself the power to create and abolish federal agencies, [has] specifically established … an agency by statute, and has not previously permitted actions taken toward a reorganization or elimination of the agency without first providing a detailed justification to Congress, Defendants' actions taken to abolish or dismantle [the agency] are 'incompatible with the express or implied will of Congress'") (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)).

Because Plaintiffs are likely to succeed on their claim that Defendants' actions to freeze the Foundation's funding, terminate its contracts and grants, and shutter the agency violate core separation-of-powers principles, this Court should exercise its inherent equitable power to enjoin these unconstitutional actions. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

B.  Defendants' actions to impound funds, terminate grants and contracts, and fire employees are *ultra vires*

Plaintiffs are equally likely to succeed on their claim that various actions taken to dismantle the Foundation and freeze its funding are *ultra vires* and thus null and void. "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988).

1.  *Federal statutes prohibit Defendants' impoundment of the Foundation's funding*

Taking the Foundation's funding first, Congress has acted specifically to protect its constitutionally derived authority to control federal spending by enacting the Congressional Budget and Impoundment Control Act of 1974 ("Impoundment Act"), Pub. L. No. 93-344, Title X, 88 Stat. 332. The Impoundment Act confirms that the President lacks power to unilaterally refuse to spend congressionally appropriated funds. If a disagreement with spending priorities should arise, the

President may *propose* rescission of "all or part of any budget authority." 2 U.S.C. § 683(a). But unless Congress "complete[s] action on a rescission bill rescinding all or part of the amount proposed" within 45 days, the funds "shall be made available for obligation." *Id.* § 683(a), (b). Congress left no ambiguity surrounding its intent in enacting this legislation. A House committee report notes: "No matter how prudently Congress discharges its appropriations responsibility, legislative decisions have no meaning if they can be unilaterally abrogated by executive impoundments." H.R. Rep. No. 93-658, at 16 (1973).

Closely related to the Impoundment Act is the Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 877 (1982). Government officials or agencies violate that statute if they establish any funding reserve by withholding appropriated funds from a congressionally assigned program, except for certain limited exceptions. *See* 31 U.S.C. §§ 1301(a), 1512(c)(1). In apportioning or reapportioning an appropriation, "a reserve may be established only—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." *Id.* § 1512(c)(1). Funds appropriated by Congress may not be placed in a reserve for any other purpose.

Defendants' actions to freeze the Foundation's access to its appropriated funding, and to cancel all or virtually all of its contracts and grants, violate both the Impoundment Act and the Anti-Deficiency Act. On information and belief, neither the President nor his subordinate officers have proposed the rescission of the budget authority covering the Foundation's appropriations. And Congress certainly has not acted to rescind any such funding; on the contrary, Congress acted only last week to *continue* the Foundation's funding. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(11) (2025). Defendants' unlawful retention of the Foundation's funds and refusal to honor previously approved contracts and grants likewise create a funding reserve that runs afoul of the Anti-Deficiency Act. "[T]he President's duty to enforce the laws necessarily extends to appropriations … meaning that failure to act may be an abdication of the

President's constitutional role." *City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018). No part of the U.S. Constitution, statute, or other source of law authorizes Defendants to impound the Foundation's funding; on the contrary, the Impoundment and Anti-Deficiency Acts, as well as the relevant in-effect appropriations statutes, obligate Defendants to allow the Foundation to access and disburse its congressionally appropriated funds. Defendants' actions are *ultra vires*. *See also Aids Vaccine Advocacy Coalition*, 2025 WL 752378, at *15–*16 (rejecting claim that the President has the authority to impound foreign aid funds).

2. *Marocco's appointment to the Board, and all actions he took thereafter, are invalid*

In addition, all actions taken by Defendant Peter Marocco are likewise *ultra vires* because Marocco at no point has lawfully exercised power over the Foundation or its officers. As explained above, the Inter-American Foundation Act requires that the nine members of the Board of Directors be presidentially appointed and Senate confirmed. 22 U.S.C. § 290f(g). It also outlines precise characteristics governing the composition of the Board. *Id.* § 290f(i). Only the duly appointed "Board shall direct the exercise of all the powers of the Foundation," *id.*, including the power to appoint its president and chief executive officer, *id.* § 290f(*l*). The Act does not contemplate the ability for a Board member to serve in an acting capacity or otherwise to exercise powers of the Board without investiture through the advice-and-consent process.

The FVRA, 5 U.S.C. §§ 3345-3349e, grants President Trump, in limited circumstances, the authority to appoint acting officers to temporarily fill vacant positions that otherwise require Senate confirmation. The FVRA provides "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of *any office* of an Executive agency … for which appointment is required to be made by the President, by and with the advice and consent of the Senate," absent narrow exceptions inapplicable here. 5 U.S.C. § 3347(a) (emphasis added). The FVRA explicitly controls who may serve as "an officer of an Executive agency" requiring advice and consent if the

occupant "dies, resigns, or is otherwise unable to perform the functions and duties of the office," *id.* § 3345, as well as how long such an officer may serve in a temporary capacity, *id.* § 3346. If an office requiring Senate confirmation becomes vacant, "[u]nless an officer or employee is performing the functions and duties in accordance with" the FVRA, "*the office shall remain vacant.*" *Id.* § 3348(b)(1). Congress intended the FVRA to have teeth: It specifies that, in any case where a person purports to "perform[] any function or duty of a vacant office" but did not satisfy the FVRA's strict requirements, any "action taken" by that official "shall have no force and effect." *Id.* § 3348(d)(1). Courts repeatedly have set aside agency actions taken by individuals whose service violated the FVRA. *See, e.g., NLRB v. Sw. Gen., Inc.*, 580 U.S. 288, 309 (2017); *Asylumworks v. Mayorkas*, 590 F. Supp. 3d 11, 21-22 (D.D.C. 2022) (invalidating final rules issued during tenure of improperly-appointed acting Secretary).

Critically for the present case, the FVRA prohibits service on the Board in an acting capacity. It states explicitly that "Sections 3345 through 3349b," *i.e.*, the provisions governing temporary service, "shall not apply to—(1) any member who is appointed by the President, by and with the advice and consent of the Senate to any board, commission, or similar entity that—(A) is composed of multiple members; and (B) governs an independent establishment or Government corporation." 5 U.S.C. § 3349c. By exempting Boards like the Foundation's from the FVRA altogether, Congress has made clear that the President may not "temporarily authoriz[e] an acting official to perform the functions and duties" of the Board. *Id.* § 3347(a). When a member of the Foundation's Board is "unable to perform the functions and duties of the office," the office "shall remain vacant." *Id.* § 3348(b)(1).

This result is unsurprising; as it has in other respects (such as requirements respecting political composition), Congress chose to protect the independence of multi-member boards, like the Foundation's Board, by prohibiting service on such a body in a temporary capacity. By requiring that members of an independent, multi-member board be appointed by the President and confirmed by the Senate before exercising any executive power, Congress sought to prevent just the type of

machinations that occurred at the Foundation. Peter Marocco was never appointed by the President to serve as a member of the Foundation's Board and was never confirmed (nor considered) by the Senate to serve in that role. He thus has never lawfully exercised any power granted by statute to the Foundation's Board. Any actions he purported to take in his capacity as an acting member of the Board, including to self-designate as president and CEO, "shall have no force and effect." *Id.* § 3348(d)(1).

And if there were any doubt, the FVRA's legislative history resolves it. The Senate Report accompanying an early version of the FVRA explained that, in adopting § 3349c, Congress intended to preserve the then-status quo with respect to whether the President could make acting appointments to the positions listed in that section. Congress's view was that that it had "always been the case" that the (then-existing) Vacancies Act did not apply to such positions, and wanted to "avoid any confusion that might result from the enactment of a replacement statute on this point." S. Rep. No. 105-250, at 22 (1998). Moreover, Congress indicated that—at least in its view—the President does not have the authority to appoint acting officers unless Congress has granted such authority: "[T]he President lacks any inherent appointment authority for government officers." *Id.* at 5. It was also Congress's view that "[t]he President's power to take care that the laws shall be enforced is a duty, and not a source of power"—and that absent "affirmative statutory authority to fill a vacancy, the office must remain vacant." *Id.* Thus, in seeking to preserve what had "always been the case" with respect to officers of entities like the Board, Congress meant to preclude the President from making any acting appointments to them.[1]

---

[1] Defendants may seek to rely on a newly issued memorandum from DOJ's Office of Legal Counsel opining that the President validly appointed Marocco as an acting Board member of both the Foundation and its sister agency, the African Development Agency. *See* Temporary Presidential Designation of Acting Board Members of the Inter-American Foundation and the United States African Development Foundation, 49 Op. O.L.C. ___, at *6–*7 (Mar. 14, 2025). OLC opinions are not binding on the Court. *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 689 (D.C.

Even were the Court to conclude that the FVRA posed no barrier to the President making an acting appointment to the Board, the Appointments Clause still would prohibit such action. That clause requires the President to obtain "the Advice and Consent of the Senate" before appointing "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. The Senate's "advice and consent power is a critical structural safeguard of the constitutional scheme." *SW Gen., Inc.*, 580 U.S. at 293 (cleaned up). "The Framers envisioned it as 'an excellent check upon a spirit of favoritism in the President' and a guard against 'the appointment of unfit characters from family connection, from personal attachment, or from a view to popularity.'" *Id.* (quoting The Federalist No. 76, p. 457 (Alexander Hamilton) (Clinton Rossiter ed. 1961)) (alteration omitted). And while *Congress* has given the President "limited authority to appoint acting officials to temporarily perform the functions" of vacant advice-and-consent offices since the founding, *id.*, it does not follow that the President has inherent authority under the Take Care Clause to make acting appointments when Congress does not provide for them. Any other understanding of the Appointments Clause would deprive the Senate of one of its most important checks on executive power. *See Sw. Gen.*, 580 U.S. at 293. Because Marocco has not been validly installed as a member (much less as Chair) of the Foundation's Board, actions he purported to take in that capacity are void *ab initio* as taken in the absence of any statutory authority. *See* 5 U.S.C. § 3348(d)(1). In particular, Marocco's attempt to designate himself as president and CEO of the Foundation during the hasty Board meeting he purported to hold in the Foundation's lobby is without effect. And since Marocco has not at any time lawfully exercised power as President of the Foundation,

---

Cir. 2023). OLC's opinion is unpersuasive in any event. OLC reads § 3349c's instruction that the FVRA "shall not apply" to multi-member boards as *including* § 3347's directive that the FVRA is the exclusive means by which officers may serve in an acting capacity—in other words, it views the provisions to be in tension such that the FVRA has no applicability to multi-member boards, rather than as operating to prevent temporary service. This reasoning is circular and creates surplusage, because § 3348(d)(1)'s command that actions taken "in performance of any function or duty of a vacant office … shall have no force or effect" specifically includes and cross-references § 3349c, the multi-member Board provision.

actions he took in that capacity likewise are void. In particular, Marocco's unilateral actions to cancel all of the Foundation's contracts and grants, including Plaintiffs' grants, are *ultra vires* and without legal effect. Marocco also lacked authority to terminate all of the Foundation's staff through a RIF.

### C. Defendants' impoundment of the Foundation's funding, and cancelation of all of its contracts and grants, violates the APA

Plaintiffs are also likely to succeed on each of their three APA claims.

#### 1. *Defendants' mass cancelation of contracts and grants is arbitrary and capricious*

The APA instructs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A). Review under this provision is available only for final agency action. "Agency action" encompasses an agency's "denial" of "recognition" to a "claim" or "right"; the "denial" of a "grant of money"; and the "failure to act" or "withholding" with respect to claims, rights, and grants of money. *Id.* § 551(10), (11), (13).  Agency action is "final" for purposes of APA review if it "mark[s] the consummation of the agency's decisionmaking process," rather than "be[ing] of a merely tentative or interlocutory nature," and if the decision is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted).

Defendants' cancelation of the Foundation's contracts and grants is final agency action. It plainly marks the completion of agency decisionmaking, since Defendants have deemed the Foundation "unnecessary," Dismantling EO, and determined to eviscerate it to the maximum extent that, in *their* view, is permissible by law. The decision to cancel grants and contracts *en masse* also is a decision from which rights and obligations are determined and which "give rise to 'direct and appreciable legal consequences,'" *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 598 (2016) (citation omitted). Plaintiffs now face the consequence of not only losing access to immediate sources of grant funding, but also face the prospect of losing the return on their own investments, the potential

collapse of vital projects, and the ability to work with the Foundation as a trusted partner in improving their communities through effective development processes. This is reviewable agency action.

Defendants' decision to unilaterally cancel all of the Foundation's grants and contracts is arbitrary and capricious. To survive arbitrary-and-capricious review, an agency must demonstrate that it "has reasonably considered the relevant issues and reasonably explained its decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide a "satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). And the APA demands that, prior to upending longstanding policies that have engendered reliance interests, agencies must acknowledge their change in course and explain the reasons for doing so. *Fed. Commc'ns Comm'n v. Fox Television*, 556 U.S. 502, 515 (2009); *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30–31 (2020).

Defendants made no attempt to comply with these minimum requirements. There is no indication that Defendants engaged in any considered approach or attempted to set forth a contemporaneous memorandum articulating a rationale for their decision to engage in blanket cancelations. Defendants did not purport to investigate the Foundation's grants and contracts to determine whether and, if so, which should be cancelled—or even to ascertain what projects these grants and contracts funded. Defendants likewise did not consider the lawfulness of these blanket cancelations under the Further Consolidated Appropriations Act of 2024 or the Impoundment and Anti-Deficiency Acts. Instead, the only contemporaneous records Defendants have produced are form emails to Plaintiffs stating the unreasoned conclusion that their grants suddenly were inconsistent with administration priorities and that the President had directed the Foundation to eliminate all non-statutorily required functions. This is the antithesis of a considered decision.

Defendants took no account of Plaintiffs' and their communities' reliance on the projects funded by Foundation grants and contracts. *See Regents of the Univ. of Calif.*, 591 U.S. at 30–31. They also failed to consider the broader impacts of abruptly ceasing hundreds of programs aimed at easing the factors driving mass migration in the Western hemisphere. *See* Compl. ¶¶ 2-4. Defendants made no effort to proffer a "reasoned explanation … for disregarding facts or circumstances that underlay or were engendered by the prior policy," or even to assess whether "there are good reasons for the new policy," *Fox Television*, 556 U.S. at 515-16.

These failures are arbitrary and capricious.

### 2.  *Defendants' denial of funding is contrary to law*

The APA also instructs that a reviewing court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law" or "in excess of statutory jurisdiction." 5 U.S.C. § 706(2)(A), (C). Defendants' blanket denial of access to congressionally appropriated funding is contrary to law and in excess of statutory jurisdiction. The Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 460, 746 (2024), and the newly enacted Continuing Resolution, 2025, Pub. L. No. 119-4, § 1101(a)(11) (2025), create on the part of Defendant Department of Treasury a mandatory, nondiscretionary duty to make available and disburse the Foundation's funds as needed for it to carry out its legislatively directed mission. Treasury has no discretion as to whether it will allow the Foundation access to its congressionally appropriated funds. The Court should hold unlawful Defendants' blanket denial of funding.

### 3.  *This Court should compel agency action unlawfully withheld and unreasonably delayed*

Finally, the APA instructs that a court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). This provision operates in a manner similar to a mandamus action by allowing courts to order agencies to comply with mandatory, nondiscretionary duties for which action has been unlawfully refused or delayed. Defendant Department of the Treasury has a

mandatory, nondiscretionary duty to disburse funds in its care upon a lawfully presented disbursement request from a Foundation employee with delegated authority over Foundation funding. In performing this role, Treasury essentially acts as the Foundation's "bank" and lacks authority to refuse payments or cancel its grants and contracts. Treasury has refused to fulfill that mandatory duty by impounding the Foundation's funds and unilaterally canceling its contracts. This Court should compel the Treasury Department to fulfill its mandatory duty to disburse the Foundation's funding.

## II.    Plaintiffs Are Suffering Irreparable Harm from Defendants' Actions

Plaintiffs are suffering irreparable harm due to Defendants' illegal efforts to shut the Foundation down—harm that threatens the very existence of several of them. Defendants' actions have also significantly impaired each Plaintiff's ability to accomplish its primary mission. These harms mirror those that courts across the country have recognized as irreparable when granting preliminary relief in cases involving the Executive Branch's recent efforts to illegally terminate or impound congressionally appropriated funds. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, No. 25-239, 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025) (actions that "threaten the very existence of [plaintiffs'] business" constitute irreparable harm) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (brackets omitted); *Aids Vaccine Advocacy Coalition*, 2025 WL 752378, at *18–*20 (actions that "make it more difficult for the plaintiffs to accomplish their primary mission" demonstrate irreparable harm) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2019) (brackets omitted); *see also New York v. Trump*, No. 25-cv-39, 2025 WL 715621, at *13 (D.R.I. Mar. 6, 2025); (similar); *Pacito v. Trump*, No. 2:25-cv-255, 2025 WL 655075, at *22–*23 (W.D. Wash. Feb. 28, 2025) (similar).

For example, plaintiff Coprocaminos may have to close its doors as a result of the loss of Foundation funds. Chaux Decl. ¶¶ 8 –9. Coprocaminos is the first community-led technical college in southwestern Colombia. *Id.* ¶ 2. The Colombian Ministry of Education accredited it in 2019. *Id.*

Coprocaminos has used Foundation funds to pay for physical and technological infrastructure, books, and computers. *Id.* ¶ 5. Foundation funding has also been used to help bring two of Corpocaminos's academic programs into compliance with the Ministry's standards. *Id.* Graduates have gone on to work in tourism, at restaurants, and agroecology. *Id.* Under Colombian law, when a new institution like Corpocaminos is established, it must receive a certain portion of its financing from sources other than tuition fees. *Id.* ¶ 8. Corpocaminos had identified Foundation funds as one of these sources, and without them, it may lose its accreditation. *Id.*

Other plaintiffs face a similarly existential threat. Plaintiff Acción Cultural Popular Hondureña ("ACPH") is owed more than $100,000 under the terms of its grant. Zepeda Decl. ¶ 10. Foundation funds represent 70 percent of ACPH's overall budget. *Id.* ¶ 11. As a result of the abrupt cancelation of funds, it has been forced to lay off all of its staff that worked in Valle de Sula, one of the most important regions in which ACPH operates. *Id.* It will be forced to suspend its youth skills training program, which has successfully trained nearly 600 people for jobs in a diverse array of industries, including electrical technicians, graphic designers, cell phone repair and computer scientists, and whose graduates have gone on to successfully establish their own businesses and secure employment. *Id.* ¶¶ 6, 12. The end of Foundation funds will also severely hamper ACPH's ability to help communities prepare for, and respond to, natural disasters, including hurricanes and flooding from the Ulúa and Chamelecón rivers. *Id.* ¶¶ 8, 13. And it will impair its ability to leverage funds from other sources, including philanthropic foundations and the city of El Progreso. *Id.* ¶ 7.

Plaintiff Escuela de Integración, Formación Deportiva, Expresión Artística y Desarrollo Laboral ("EIFODEC") will have to shut down its Building an Inclusive World project. Mendoza Decl. ¶ 7. Under this program, EIFODEC has trained 120 children and youth with disabilities, teaching them occupational and daily-life skills. *Id.* ¶ 3. It also trained nearly 250 families of persons with disabilities on how to care for, and support the independence of, their loved ones. *Id.* It had planned

to award small grants to 23 students to start their own businesses. *Id.* The cancelation of Foundation funds will force EIFODEC to end this project and lay off its staff. *Id.* ¶¶ 6–7.

And the list goes on. Plaintiff Sociedad Cooperativa Las Mujeres Rurales de la Frontera Sur is still owed more than $225,000 of the $237,780 guaranteed under its grant agreement. Porta Decl. ¶ 5. It has had to lay off seven employees as a result of these funds being cut off. *Id.* Las Mujeres Rurales will also be unable to extend credit to 600 women in rural Mexico, money they would have used to start their own businesses. *Id.* Plaintiff Asociación Instituto Salvadoreño de Educación Cooperativa y Agricultura Orgánica will be unable to continue and expand its agricultural training program, under which it has taught 245 small family farms sustainable agricultural techniques that enabled them to nearly double the size of their farms on average. Gámez Decl. ¶¶ 3, 4, 6. Plaintiff Fundación Renace will be unable to continue helping several small business associations prepare bids for government contracts, affecting the food security and economic livelihood of more than 1,000 people. Chavez Decl. ¶ 4. Plaintiff Cristosal will be unable to continue providing essential legal, humanitarian, and mental-health services to 372 individuals. Bullock Decl. ¶ 12. Indeed, it has already spent nearly $75,000 of other funds to cover expenses incurred under the terms of its grant. *Id.* ¶ 10. Plaintiff Alternativas y Capacidades will have to shut down its Social Laboratory for Youth-led Initiatives program, which is in the midst of training 40 young leaders on the Yucatán Peninsula and helping them start community-led social projects. Ortiz Decl. ¶¶ 6, 10, 11. It will also be unable to offer these leaders seed funding for that purpose, money that would have been used to leverage funds from elsewhere. *Id.* ¶ 10.

These are just a few examples of the widespread harm that Defendants have inflicted on Foundation grantees. Indeed, according to an informal poll of approximately 148 grantees (about 35 percent of all Foundation grantees) conducted over the last several weeks, more than 65.5 percent are at risk of closure due to the cancelation of Foundation funds. Ibarlucia Decl. ¶ 6, Ex. A. On average,

Foundation funds make up 50 percent of these grantees' budgets. *Id.* For 44 percent of respondents, Foundation funds account for at least 70 percent of their budget. *Id.* Collectively, these organizations will lose more than $14 million in Foundation funds. *Id.* The termination of Foundation funds also puts at risk an additional $13.5 million that these organizations secured from other sources. *Id.* And it will impact more than 85,000 beneficiaries of just these 148 organizations.

Nor are Plaintiffs' harms limited to the loss of awarded funds. Several were in the midst of negotiating extensions of their grant agreements or planned to do so in the near future. For example, while Plaintiff Asociación Las Pregoneras had received all the funds owed to it under the terms of its grant, it was in the process of negotiating a two-year, $267,000 extension. Reátegui Decl. ¶ 7. The only step left before March 4 was for the Foundation's President to sign the agreement. *Id.* Without these funds, Pregoneras will have to lay off staff. *Id.* ¶ 8. And it will be unable to continue its work combatting violence against women and children in Peru, an effort in which it has had great success: schools Pregoneras worked in saw a 13-percent drop in violence over the past two years. *Id.* ¶¶ 5, 8. Similarly, based on its past experience, Plaintiff Cristosal had anticipated applying for additional funds. Bullock Decl. ¶ 11. Indeed, it was in the process of applying for a supplemental grant agreement that would have allowed it to continue providing services for an additional two years. *Id.*

Plaintiffs also face the loss of significant non-monetary benefits. Several Plaintiffs participated in Foundation-sponsored exchanges, allowing them to learn best practices from organizations with similar missions throughout Latin America. *See, e.g.*, Reátegui Decl. ¶ 9; Ortiz Decl. ¶ 12. In addition, Foundation staff has provided critical technical support and advice, helping to improve Plaintiffs' monitoring systems and strategies. *See, e.g.*, Bullock Decl. ¶ 13. Auditors contracted by the Foundation have also provided Plaintiffs with accounting, documentation, and legal compliance assistance. *E.g.*, *id.* These services have been critical to Plaintiffs' growth and have enabled them to access additional funding from other sources. *See id.*; *see also* Ortiz Decl. ¶ 13; Reátegui Decl. ¶ 10; Chavez Decl. ¶ 5;

Zepeda Decl. ¶ 14; Porta Decl. ¶ 6; Chaux Decl. ¶ 11; Mendoza Decl. ¶ 9; Gámez Decl. ¶ 9. Defendants' illegal dissolution of the Foundation will permanently deprive Plaintiffs of these valuable resources.

These harms plainly warrant preliminary injunctive relief. As one district court recently observed, "[i]t is so obvious that it almost need not be stated that when money is obligated and therefore expected … and is not paid as promised, harm follows—debt is incurred, debt is unpaid, essential health and safety services stop, and budgets are upended." *New York*, 2025 WL 715621, at *13. And where, as here, "there is no end in sight to the Defendants' funding freeze, that harm is amplified because those served by the expected but frozen funds have no idea when the promised monies will flow again." *Id.*

## III.   The Balance of Equities and Public Interest Favor Plaintiffs' Request for a Preliminary Injunction

The final two factors—balancing the equites and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). Here, both strongly support granting a preliminary injunction. As the D.C. Circuit has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. "To the contrary, there is substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operation." *Id.* (quotation marks and citation omitted). That is especially true where an agency's actions are not merely unlawful but unconstitutional. *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest."). Conversely, the "Government cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 34 (D.D.C. 2021) (cleaned up). These principles apply with full force here, as Plaintiffs seek an order requiring Defendants to cease their unlawful—and unconstitutional—

cancelation of grants and contracts; efforts to withhold funds already due; efforts to fire Foundation employees; and the unlawful exercise of executive authority by an official unauthorized to wield it.

In addition to the obvious public interest in having the Executive Branch follow the law, there are compelling practical reasons for granting a preliminary injunction. Since 1969, the Foundation has steadfastly worked to accomplish its congressionally mandated purposes: supporting self-help efforts and increasing opportunities for people throughout Latin America; strengthening the bonds of friendship and understanding among the peoples of the Western Hemisphere; and encouraging the establishment and growth of democratic institutions. *See* 22 U.S.C. § 290f(b). Over the past half century, it has successfully invested hundreds of millions of dollars to address key regional challenges, including violence, natural disasters, and economic instability. *See* Compl. ¶¶ 2–3. Plaintiffs work to counteract these forces, many of which increase the incentives for populations to migrate—including to the United States. *See, e.g.*, Reátegui Decl. ¶ 8; Zepeda Decl. ¶¶ 12–13; Chaux Decl. ¶ 10. And they have been successful: For example, in a study of 400 cases of internally displaced persons that received assistance from Plaintiff Cristosal, *none* migrated, and the intent to migrate among beneficiaries decreased by 60 percent after six months of assistance. Bullock Decl. ¶ 8.

Like the irreparable harm analysis, these considerations are the same as those that courts nationwide have relied on when granting preliminary relief to parties harmed by the Executive Branch's recent attempts to cut off agency funds. *See, e.g.*, *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19; *Aids Vaccine Advocacy Coalition*, 2025 WL 752378, at *21; *New York*, 2025 WL 715621, at *15–*16; *Pacito*, 2025 WL 655075, at *24. It is manifestly in the public interest to restore the proper balance of power between Congress and the Executive; to alleviate poverty, violence, and the impacts of natural disasters; and to halt the Executive Branch's illegal effort to withhold funds to which the grantees are entitled.

**IV.    The Court Should Enjoin Defendants from Taking Further Action to Dismantle the Inter-American Foundation**

Plaintiffs have established that they are likely to succeed on the merits; that Defendants' actions are irreparably harming them; and that the balance of the equities weighs strongly in favor of granting preliminary relief. And their harms will only be remedied by granting the relief requested here: (1) an order enjoining all Defendants from freezing, pausing, or otherwise preventing the disbursement of funds obligated under the terms of grant agreements and contracts entered into by the Inter-American Foundation that were in effect as of February 28, 2025; (2) an order enjoining all Defendants from continuing to keep Inter-American Foundation employees on administrative leave and from implementing or otherwise giving effect to a RIF with respect to those employees; (3) an order enjoining all Defendants to pay any grant and contract funds unlawfully withheld since February 28, 2025, and to return any funds sent by grantees back to the federal government under the terms of the March 4 letter; and (4) an order enjoining Defendant Peter Marocco, and any purported successors to him, from purporting to exercise the authority of the Inter-American Foundation Board or its President unless a Board member shall be installed through the statutorily required advice-and-consent process, 22 U.S.C. § 290f(g), and thereby designates a new President. As detailed above, each passing day without Foundation funds injures plaintiffs, forcing them to make difficult decisions about whether to lay off staff, how deeply to cut services, and whether to shut down entirely. Requiring Defendants to honor the terms of the Foundation's grants and contracts is the only way to prevent further irreparable harm. Similarly, Plaintiffs rely heavily on Foundation staff and contractors for a wide variety of support—support crucial to their ongoing success. It is self-evident that the Foundation cannot function as Congress intended without a staff to perform its operations. Only by preventing the RIFs from taking place and returning employees to their positions can Plaintiffs' harms be remedied.

Plaintiffs are aware that, in a separate case challenging Defendants' attempt to fire Aviel,

Defendants have agreed not to require Plaintiffs and other grantees to return funds already allocated until that court hears argument on Aviel's emergency motion. *See Aviel v. Gor*, No. 1:25-cv-778, Minute Entry for Status Conference (D.D.C. Mar. 19, 2025). Plaintiffs also understand that a briefing schedule has been set in that case that would allow the court to issue a decision before the April 4, 2025, RIFs are scheduled to take place. *See id.* Minute Order (Mar. 19, 2025). Plaintiffs respectfully request a similar briefing schedule in this case, under which Defendants would file their opposition to this motion for a preliminary injunction by Friday, March 28, and Plaintiffs would file their reply by Tuesday, April 1. Plaintiffs further respectfully request that the Court may wish to hold a hearing in this matter on a similar timeframe as the hearing set in the *Aviel* matter.

## CONCLUSION

This Court should grant Plaintiffs' motion for a preliminary injunction.

March 21, 2025                                    Respectfully submitted,

                                                 /s/ Gregory Briker
                                                 Kate Talmor* (Maryland Bar)
                                                 Rupa Bhattacharyya† (D.C. Bar No. 1631262)
                                                 Gregory Briker (D.C. Bar No. 90030391)
                                                 Mary B. McCord (D.C. Bar No. 427563)
                                                 Samuel P. Siegel* (California Bar No. 294404)
                                                 INSTITUTE FOR CONSTITUTIONAL ADVOCACY
                                                     AND PROTECTION
                                                 600 New Jersey Avenue, NW
                                                 Washington, DC 20001
                                                 (202) 661-6806
                                                 kt894@georgetown.edu
                                                 rb1796@georgetown.edu
                                                 gb954@georgetown.edu
                                                 ss5427@georgetown.edu

                                                 *Attorneys for Plaintiffs*

*Pro hac vice application forthcoming. DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.

†Application for DDC Admission forthcoming

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 21, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. There is currently no Counsel of Record for Defendants. I certify that I will serve the foregoing on Defendants.

/s/ Gregory Briker
Gregory Briker