# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CRISTOSAL HUMAN RIGHTS, *et al.*, | |
| *Plaintiffs*, | |
| *v.* | |
| PETE MAROCCO, in his official capacity as the Acting Deputy Administrator for Policy Planning and for Management and Resources for the U.S. Agency for International Development and Director of Foreign Assistance at the Department of State, *et al.*, | Civil Action No. 1:25-cv-857-LLA |
| *Defendants*. | |

# MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................................... 1

BACKGROUND ......................................................................................................................... 3

I.     Legal Background .......................................................................................................... 3

II.    The President's Directive To Reduce The Foundation To The Minimum Presence
Required By Law ........................................................................................................... 4

III.   Plaintiffs And This Action ............................................................................................ 6

LEGAL STANDARD ................................................................................................................. 7

ARGUMENT .............................................................................................................................. 8

I.     Plaintiffs are not likely to succeed on the merits. ........................................................ 8

     A.    Plaintiffs fail to establish that this Court has subject-matter jurisdiction. .............. 8

          1.    No waiver of sovereign immunity authorizes Plaintiffs' claims seeking
payment under terminated grant agreements. ............................................. 9

          2.    Plaintiffs lack Article III standing to obtain broad relief as to agency acts
implementing Executive Order No. 14,217. .............................................. 14

     B.    Plaintiffs are unlikely to succeed on their separation-of-powers claim. ............... 16

     C.    Plaintiffs are unlikely to succeed on their *ultra vires* claims. .............................. 21

     D.    Plaintiffs are unlikely to succeed on their APA claims. ....................................... 26

II.    The remaining preliminary injunction factors weigh against Plaintiffs............................ 30

     A.    Plaintiffs fail to show that they will suffer imminent irreparable harm
absent a preliminary injunction.............................................................................. 30

     B.    The public interest does not weigh in Plaintiffs' favor......................................... 32

III.   Any relief should be limited. ....................................................................................... 34

IV.   Plaintiffs should be ordered to post security in connection with any emergency
relief…. ....................................................................................................................... 35

V.     Any injunctive relief should be stayed........................................................................ 36

CONCLUSION.......................................................................................................................... 36

# TABLE OF AUTHORITIES

## CASES

*Adams v. Vance*,
    570 F.2d 950 (D.C. Cir. 1978) .................................................................................... 8, 21

*Albrecht v. Comm. on Emp. Benefits*,
    357 F.3d 62 (D.C. Cir. 2004) .................................................................................... 11, 13

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ...................................................................................................... 19

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*,
    801 F. Supp. 2d 383 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012) ................................ 29

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
    897 F.3d 314 (D.C. Cir. 2018) ........................................................................................ 8

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ...................................................................................................... 35

*Bancoult v. McNamara*,
    445 F.3d 427 (D.C. Cir. 2006) ...................................................................................... 20

*Bates v. United States*,
    522 U.S. 23 (1997) ........................................................................................................ 24

*Bernstein v. Kerry*,
    962 F. Supp. 2d 122 (D.D.C. 2013), *aff'd*, 584 F. App'x 7 (D.C Cir. 2014) ............................ 16

*Boaz Housing Auth.* v. *United States*,
    994 F.3d 1359 (Fed. Cir. 2021) ...................................................................................... 11

*Boivin v. U.S. Airways, Inc.*,
    297 F. Supp. 2d 110 (D.D.C. 2003) ................................................................................ 32

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) .................................................................................................. 14, 27

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos*,
    344 F. Supp. 3d 158 (D.D.C. 2018) ................................................................................ 10

*California v. Texas*,
    593 U.S. 659 (2021) ...................................................................................................... 17

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ...................................................................................... 31

ii

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ................................................................................... 20

*Church v. Biden*,
  573 F. Supp. 3d 118 (D.D.C. 2021) ............................................................ 32

*Citizens for Const. Integrity v. Census Bureau*,
  115 F.4th 618 (D.C. Cir. 2024) ................................................................... 17

*City of New Haven v. United States*,
  809 F.2d 900 (D.C. Cir. 1987) .................................................................... 23

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ................................................................................... 15

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
  38 F.4th 1099 (D.C. Cir. 2022) ............................................ 10, 11, 12, 14

*Dabney v. Reagan*,
  542 F. Supp. 756 (S.D.N.Y. 1982) ............................................................. 23

*Dalton v. Specter*,
  511 U.S. 462 (1994) .......................................................... 17, 18, 21, 22

*Davis v. Pension Benefit Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) .................................................................. 33

*DHS v. New York*,
  140 S. Ct. 599 (2020) ................................................................................. 35

*Doehla Greeting Cards, Inc. v. Summerfield*,
  227 F.2d 44 (D.C. Cir. 1955) ...................................................................... 22

*Doe 2 v. Trump*,
  319 F. Supp. 3d 539 (D.D.C. 2018) ............................................................ 36

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999) ...................................................................... 36

*Elm 3DS Innovations LLC v. Lee*,
  No. 1:16–cv–1036, 2016 WL 8732315 (E.D. Va. Dec. 2, 2016) ................ 27

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ................................................................................... 26

*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) ..................................................................... 23

*Feng Wang v. Pompeo*,
  354 F. Supp. 3d 13 (D.D.C. 2018) ............................................................................................ 9

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ............................................................................................................... 17

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ......................................................................................................... 29, 35

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ............................................................................................................... 22

*Garcia v. Vilsack*,
  563 F.3d 519 (D.C. Cir. 2009) .............................................................................................. 27

*Gen. Land Off. v. Biden*,
  722 F. Supp. 3d 710 (S.D. Tex. 2024) ................................................................................. 23

*Gill v. Whitford*,
  585 U.S. 48 (2018) ........................................................................................................... 17, 35

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002) ............................................................................................................... 14

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) ............................................................................................................... 35

*Gulf Oil Corp. v. Dep't of Energy*,
  514 F. Supp. 1019 (D.D.C. 1981) ......................................................................................... 31

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) ............................................................................................................... 21

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ......................................................................................................... 20, 29

*Henke* v. *U.S. Dep't of Com.*,
  83 F.3d 1445 (D.C. Cir. 1996) .............................................................................................. 11

*Hi-Tech Pharmacal Co. v. FDA*,
  587 F. Supp. 2d 1 (D.D.C. 2008) .......................................................................................... 31

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ................................................................................................................... 34

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) .............................. 34

*Indigenous People of Biafra v. Blinken*,
   639 F. Supp. 3d 79 (D.D.C. 2022) ....................................................... 16

*Ingersoll-Rand Co. v. United States*,
   780 F.2d 74 (D.C. Cir. 1985) ............................................................... 14

*Johnson v. Eisentrager*,
   339 U.S. 763 (1950) ............................................................................ 20

*Kansas v. United States*,
   124 F.4th 529 (8th Cir. 2024) ......................................................... 32-33

*Khadr v. United States*,
   529 F.3d 1112 (D.C. Cir. 2008) ............................................................. 9

*Kidwell v. Department of the Army*,
   56 F.3d 279 (D.C. Cir. 1995) ............................................................... 14

*Kim v. FINRA*,
   698 F. Supp. 3d 147 (D.D.C. 2023),
   *appeal dismissed*, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025) ................................ 33

*Lincoln* v. *Vigil*,
   508 U.S. 182 (1993) ...................................................................... 28, 29

*Lujan v. Defs. Of Wildlife*,
   504 U.S. 555 (1992) ............................................................................ 22

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ............................................................................ 34

*Mahorner v. Bush*,
   224 F. Supp. 2d 48 (D.D.C. 2002), *aff'd*, 2003 WL 349713 (D.C. Cir. Feb. 12, 2003) ........... 16

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ........................................................ 11, 12

*Mississippi v. Johnson*,
   71 U.S. (4 Wall.) 475 (1866) ......................................................... 22, 35

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................ 30

*Motorola, Inc. v. Perry*,
   917 F. Supp. 43 (D.D.C. 1996) ............................................................. 13

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ............................................................................ 15

*Myers v. United States,*
    272 U.S. 52 (1926) ........................................................................................... 27

*Mylan Pharms., Inc. v. Shalala,*
    81 F. Supp. 2d 30 (D.D.C. 2000) ..................................................................... 9

*N. Am. Butterfly Ass'n v. Wolf,*
    977 F.3d. 1244 (D.C. Cir. 2020) ........................................................... 22-23, 24

*Nat'l Mining Ass'n v. Jackson,*
    768 F. Supp. 2d 34 (D.D.C. 2011) ................................................................... 32

*Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.,*
    435 F.3d 326 (D.C. Cir. 2006) ......................................................................... 34

*New Mexico v. Musk,*
    --- F. Supp. 3d ----, 2025 WL 520583 (D.D.C. Feb. 18, 2025) ..................... 32, 33

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ......................................................................................... 36

*Nken v. Holder,*
    556 U.S. 418 (2009) ......................................................................................... 33

*Perry Capital LLC v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017) ........................................................ 10, 11, 13, 27

*Printz v. United States,*
    521 U.S. 898 (1997) ......................................................................................... 25

*Pub. Citizen v. Stockman,*
    528 F. Supp. 824 (D.D.C. 1981) ..................................................................... 23

*Russello v. United States,*
    464 U.S. 16 (1983) ........................................................................................... 24

*Safari Club Int'l v. Jewell,*
    47 F. Supp. 3d 29 (D.D.C. 2014) ..................................................................... 31

*Schneider v. Kissinger,*
    412 F.3d 190 (D.C. Cir. 2005) ......................................................................... 20

*Shaffer v. Veneman,*
    325 F.3d 370 (D.C. Cir. 2003) ................................................................... 11, 12

*Sharp v. Weinberger,*
    798 F.2d 1521 (D.C. Cir. 1986) ....................................................................... 13

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) ............................................................................. 12, 13

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
    560 F. Supp. 3d 81 (D.D.C. 2021) ............................................................................ 9

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ............................................................................... 36

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
    967 F.2d 598 (D.C. Cir. 1992) ........................................................................... 11, 13

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .............................................................................................. 15

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) ............................................................................... 10

*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021) ................................................................................... 8

*Twin Metals Minn. LLC v. United States*,
    No. 1:22-cv-2506, 2023 WL 5748624 (D.D.C. Sept. 6, 2023) ................................. 13

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
    No. 1:25-cv-00465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) ..................... 9-10

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936) .......................................................................................... 19, 20

*United States v. Hansen*,
    599 U.S. 762 (2023) .............................................................................................. 16

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) .............................................................................................. 16

*Versata Dev. Corp. v. Rea*,
    959 F. Supp. 2d 912 (E.D. Va. 2013), *aff'd*, 793 F.3d 1352 (Fed. Cir. 2015) ......... 28

*Warth v. Seldin*,
    422 U.S. 490 (1975) .............................................................................................. 16

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................... 8

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ........................................................................... 31, 32

*Worthy v. Herter*,
  270 F.2d 905 (D.C. Cir. 1959) ................................................................... 21

*Wright v. Foreign Serv. Grievance Bd.*,
  503 F. Supp. 2d 163 (D.D.C. 2007) ........................................................... 13

*Yee v. Jewell*,
  228 F. Supp. 3d 48 (D.D.C. 2017) ............................................................. 10

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ............................................................................ 19, 25

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ....................................................................................... 19

## U.S. CONSTITUTION

U.S. Const. art. II, § 1, cl. 1 ......................................................................... 24

U.S. Const. art. II, § 3 ....................................................................... 21, 22, 24

## STATUTES

5 U.S.C. § 701 .............................................................................................. 28

5 U.S.C. § 702 ............................................................................... 10, 11, 14

5 U.S.C. § 704 .............................................................................................. 27

5 U.S.C. § 3347 ............................................................................................ 26

5 U.S.C. § 3349c .................................................................................... 25, 26

22 U.S.C. § 290f ....................................................................................... 3, 4, 25

28 U.S.C. § 1331 .......................................................................................... 10

28 U.S.C. § 1346 .......................................................................................... 10

28 U.S.C. § 1491 .......................................................................................... 11

31 U.S.C. §§ 9101 *et seq.*............................................................................. 4

Anti-Deficiency Act,
  Pub. L. No. 97-258, 96 Stat. 877 (1982) ................................................... 23

Consolidated Appropriations Act, 2023,
  Pub. L. No. 117-328, 136 Stat. 4459 (2022) .............................................. 24

Full-Year Continuing Appropriations and Extensions Act, 2025,
Pub. L. No. 119-4, 139 Stat. 9 ..................................................................................... 5

Further Consolidated Appropriations Act, 2024,
Pub. L. No. 118-47, 138 Stat. 460 ......................................................... 4, 12, 18, 24

Impoundment Control Act of 1974,
Pub. L. No. 93-344, 88 Stat. 297 (1974) (codified as amended at 2 U.S.C. §§ 682 *et seq.*) .... 23

**RULES**

Fed. R. App. P. 8 ................................................................................................ 36

Fed. R. Civ. P. 65 ........................................................................................ 36, 36

**ADMINISTRATIVE & EXECUTIVE MATERIALS**

Executive Order No. 14,217,
90 Fed. Reg. 10,577 (Feb. 25, 2025) ............................................................... *passim*

Notices, *Inter-American Foundation:  Sunshine Act Meetings*,
90 Fed. Reg. 11546 (Mar. 7, 2025) ................................................................ 6

**OTHER AUTHORITIES**

Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel,
Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally
Impacted Schools,
1 Suppl. Op. O.L.C. 303 (1969) ................................................................... 20

Nominations in Committee, *United States Senate*,
https://www.senate.gov/legislative/nom_cmtec.htm .............................................. 27

*Request of the Senate for an Opinion as to the Powers of the President "in Emergency
or State of War,"*
39 Op. Att'y Gen. 343 (1939) ..................................................................... 24

*Temporary Presidential Designation of Acting Board Members of the Inter-American
Foundation and the United States African Development Foundation*,
49 Op. O.L.C. ___ (Mar. 14, 2025) ..................................................... 5, 6, 25, 27

## INTRODUCTION

This action concerns the efforts of Plaintiffs, nine former recipients of grants provided by the Inter-American Foundation ("IAF" or the "Foundation"), to obtain payments they claim they are owed under grant agreements that the Foundation terminated on March 4, 2025. Plaintiffs' claims fail for a simple, overarching reason: their grant agreements all explicitly confer on the Foundation the contractual authority to terminate those agreements at will. The Foundation exercised that authority at the direction of the President, and Plaintiffs do not (and cannot) identify any provision in the grant agreements, the relevant congressional appropriations, or any other statute that precludes the Foundation from exercising that contractual right. This fundamental defect undermines every aspect of Plaintiffs' action and precludes the emergency preliminary relief that Plaintiffs seek, *see* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. ("Mot."), ECF No. 6-1.

Start with subject-matter jurisdiction. At their core, Plaintiffs' claims state a simple breach of contract, alleging that the government improperly terminated its agreements with Plaintiffs and now must restore those contracts and continue to perform. But Congress through the Tucker Act allocated exclusive jurisdiction over claims against the federal government for contractual relief to the Court of Federal Claims, not to federal district courts. Thus, the APA's waiver of sovereign immunity is not available and this Court lacks subject-matter jurisdiction over those claims.

Plaintiffs also bring an assortment of constitutional and *ultra vires* claims challenging the acting chairman of the Foundation's appointment and the Foundation's implementation of an Executive Order directing that "[t]he non-statutory components and functions of" the Foundation "be eliminated to the maximum extent consistent with applicable law." Executive Order No. 14,217, 90 Fed. Reg. 10,577 (Feb. 25, 2025). But Plaintiffs suffered injury only as a result of the termination of the grant agreements, and that injury is redressable only through the reinstatement of those grant agreements. Accordingly, Plaintiffs lack Article III standing to pursue other claims.

Even if this Court were to reach the merits, Plaintiffs' claims fail on their own terms.  With respect to their constitutional claims, Plaintiffs miss the mark because those claims fundamentally aver that Defendants violated their statutory obligations, which is not a constitutional violation.  And in any event, those claims fail because the Foundation has not violated any congressional mandate—no statute requires that Plaintiffs' grants be preserved forever, particularly because they implicate foreign affairs, where the President's discretion is vast and generally unreviewable.  Plaintiffs' *ultra vires* claims premised on impoundment fail for this same reason.  Likewise, Plaintiffs' claims concerning the designation of Pete Marocco as acting chairman of the Board of the Foundation overlook the President's Article II authority, which is not constrained here by the Federal Vacancies Reform Act because that Act does not apply to the Foundation.  Finally, APA review is not available because the Tucker Act provides an alternative path for review of Plaintiffs' contract-specific grievances, and because the allocation of funds among grantees is an agency determination that is not susceptible to judicial review under longstanding Supreme Court precedent.  Accordingly, both the Foundation's actions and the President's designation of an acting chairman were consistent with all statutory obligations.

Plaintiffs fare no better under the remaining preliminary injunction factors.  Because the relief they seek is essentially monetary, Plaintiffs fail to show harm that could not be remedied by payment after final judgment.  And because the public has an interest in the President minimizing taxpayer waste and acting decisively in the realm of foreign affairs, the public interest and balance of the equities tip in Defendants' favor.

For these reasons, explained further below, the Court should deny Plaintiffs' motion for a preliminary injunction.

# BACKGROUND

## I.    Legal Background

In 1969, Congress established the Foundation to "strengthen the bonds of friendship and understanding" among the peoples of the Western Hemisphere, to "support self-help efforts designed to enlarge the opportunities for individual development," to "stimulate and assist effective and ever wider participation of the people in the development process," and to "encourage the establishment and growth of democratic institutions . . . appropriate to the requirements" of the Nations in the Western Hemisphere. 22 U.S.C. § 290f(b). The Foundation carries out these purposes through "undertaking or sponsoring appropriate research and by planning, initiating, assisting, financing, administering, and executing programs and projects" in partnership with private entities. *Id.* § 290f(c). To facilitate those actions, Congress empowered the Foundation to "make and perform contracts and other agreements with any individual, corporation, or other body of persons . . ., and with any government or governmental agency, domestic or foreign." *Id.* § 290f(e)(3). The Foundation is subject to the provisions of the Government Corporation Control Act [31 U.S.C. §§ 9101 *et seq.*]. 22 U.S.C. § 290f(t).

The Foundation is managed by its Board of Directors, which contains up to nine members appointed by the President and subject to Senate confirmation. *Id.* § 290f(g). Board members serve six-year terms and no more than five Board members can be members of any one political party. *Id.* Board members do not enjoy any protection from at-will removal by the President. *See generally id.* § 290f. The President designates a Chairman and Vice Chairman from among the Board Members. *Id*. § 290f(g). The Board directs "the exercise of all the powers of the Foundation." *Id*. § 290f(i). And a "majority of the Board . . . required as a quorum "may prescribe, amend, and repeal bylaws, rules, and regulations governing the manner in which the business of the Foundation may be conducted and in which the powers granted to it by law may

be exercised and enjoyed." *Id.* § 290f(j). Finally, the Board appoints a president of the Foundation, who acts as chief executive of the Foundation and serves "on such terms as the Board may determine." *Id.* § 290f(l)(1).

Congressional appropriations statutes make funding available for the Foundation without mandating that any specific sum within the appropriation be granted to any particular recipient or, indeed, used for grants at all. For example, in 2024, Congress appropriated $47 million "[f]or necessary expenses to carry out the functions of the Inter-American Foundation in accordance with the provisions of section 401 of the Foreign Assistance Act of 1969." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 460, 746. These funds are "to remain available until September 30, 2025." *Id.* Congress then provided the Foundation with the same level of funding in a continuing resolution that became law on March 15, 2025, again without mandating that funds be used for grants. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(11), 139 Stat. 9, 11-12.

## II. The President's Directive To Reduce The Foundation To The Minimum Presence Required By Law

On February 19, 2025, President Trump signed an Executive Order to "commence[] a reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary." Executive Order No. 14,217, 90 Fed. Reg. 10577 (Feb. 25, 2025). The Executive Order reflected the President's determination that "[r]educing the size of the Federal Government will minimize Government waste and abuse, reduce inflation, and promote American freedom and innovation." *Id.* § 1. To accomplish that end, the Executive Order directed that "the non-statutory components and functions of" four named governmental entities "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required

4

by law." *Id.* § 2(a). The Foundation was among the four entities subject to the order. *Id.* § 2(a)(ii). The Executive Order directed the Foundation to "submit a report to the Director of the Office of Management and Budget . . . confirming compliance with this [Executive Order] and stating whether the governmental entity, or any components or functions thereof, are statutorily required and to what extent." *Id.* § 2(b).

As of February 23, 2025, the Foundation had only four Board members. After determining that the Board members were not adequately complying with his order, the President removed three of the four Board members on February 24, 2025. *See Temporary Presidential Designation of Acting Board Members of the Inter-American Foundation and the United States African Development Foundation*, 49 Op. O.L.C. ___ (Mar. 14, 2025) ("OLC Op."). President Trump removed the remaining Board member on February 26, 2025, through an email from Trent Morse, Deputy Director of the Presidential Personnel Office. *See id.*; *see also* Compl. ¶¶ 66-68.

On February 28, 2025, President Trump requested advice from the Department of Justice's Office of Legal Counsel on "whether the President has authority to designate acting Board members notwithstanding the absence of specific statutory authorization to do so." OLC Op. at 3. "Consistent with the Office's longstanding view," the President was advised that his "constitutional duty to 'take Care that the Laws be faithfully executed,' U.S. Const. art. II, § 3, conveys that authority." *Id.* Later that day, the President designated Pete Marocco as an acting Board member and Chairman of the Foundation. *See id.*; *see also* Decl. of Pete Marocco ¶ 3, *Aviel v. Gor*, No. 1:25-cv-778, ECF No. 14-1 (D.D.C. Mar. 19, 2025) ("Marocco Decl."). Mr. Marocco was the sole member of the Board at that time. Marocco Decl. ¶ 3.

Once designated, Marocco in his capacity as Acting Chairman held an "emergency closed session of the board of directors . . . to discuss personnel issues" on February 28, 2025. Notices,

*Inter-American Foundation: Sunshine Act Meetings*, 90 Fed. Reg. 11546 (Mar. 7, 2025).  On March 7, 2025, Mr. Marocco appointed Dominic Bumbaca as President of the Foundation. Marocco Decl. ¶ 4.

## III.    Plaintiffs And This Action

Plaintiffs are nine grantees, each of which had either entered into a grant agreement with the Foundation that was in effect until it was terminated on March 4, 2025, or had historically entered into such an agreement and anticipated entering into a similar agreement shortly after that date.  *See* Compl. ¶¶ 8-16.  Each of the grant agreements contains an identical provision authorizing either party to "terminate the Agreement upon written notice to the other."[1]  No cause is required for termination.   And each grant agreement specifically reserves for the Foundation "the right to suspend disbursements for the activities set forth in the Agreement by providing written notice to the Grantee."[2]  The grant agreements also reserve for the Foundation "the right to alter the terms and conditions of the Agreement unilaterally."[3]

On March 4, 2025, the Foundation exercised its right to terminate through written notice the grant agreements with Plaintiffs that were in existence at that time.  *See* Compl. ¶ 78.  The Foundation informed the grantees by written letter that the terminated grants were "unfortunately

---

[1] *See* Ex. A, Inter-American Foundation Grant Agreement No. BO-532 (Sept. 15, 2017) at 8; Ex. B, Inter-American Foundation Grant Agreement No. BO-545 (Aug. 31, 2023) at 12; Ex. C, Inter-American Foundation Grant Agreement No. CO-592 (May 28, 2020) at 7; Ex. D, Inter-American Foundation Grant Agreement No. ES-306 (Sep. 9, 2020) at 11; Ex. E, Inter-American Foundation Grant Agreement No. ES-307 (Feb. 9, 2021) at 12; Ex. F, Inter-American Foundation Grant Agreement No. HO-324 (Feb. 2, 2023) at 12; Ex. G, Inter-American Foundation Grant Agreement No. ME-587 (Apr. 10, 2023) at 10; Ex. H, Inter-American Foundation Grant Agreement No. ME-593 (June 3, 2024) at 12; Ex. I, Inter-American Foundation Grant Agreement No. PU-612 (July 24, 2023) at 11

[2] *See* Ex. A at 8; Ex. B at 12; Ex. C at 7; Ex. D at 11; Ex. E at 12; Ex. F at 12; Ex. G at 10; Ex. H at 12; Ex. I at 11.

[3] *See* Ex. A at 8; Ex. B at 11; Ex. C at 7; Ex. D at 10; Ex. E at 11; Ex. F 11; Ex. G at 9; Ex. H at 11; Ex. I at 10.

inconsistent with the agency's priorities." *See, e.g.*, Notice of Grant Termination, ECF No. 6-9 at 11. "Independently and secondly," the letters informed the grantees that the Foundation was terminating the grant pursuant to "the President's February 19, 2025 executive order," which "mandates that the [Foundation] eliminate all non-statutorily required activities and functions." *Id.* The letters also reiterated to the grantees their obligations to return "unspent funds to the" Foundation "within fifteen (15) days or as soon as practicable using the attached instructions." *Id.* Plaintiffs do not allege that the termination of those grants violated any Terms and Conditions of their grant agreements with the Foundation. *See generally* Compl. ¶¶ 78-89.

On March 19, 2025, the Foundation informed its grantees that the deadline to send remaining, unspent funds has been extended indefinitely. *See* Defs.' Status Report, *Aviel v. Gor*, No. 1:25-cv-778, ECF No. 18 (D.D.C. Mar. 20, 2025). The Foundation had previously informed the Court in *Aviel* that the Foundation "will notify grantees that have not returned funds that the deadline will be extended until the Court resolves Ms. Aviel's motion for preliminary injunction." Marocco Decl. ¶ 8.

On March 21, 2025, Plaintiffs filed suit here. *See* Compl., ECF No. 1. Plaintiffs moved for a preliminary injunction that same day. *See* Pls.' Mot. for Prelim. Inj., ECF No. 6.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Accordingly, the moving party must "make a 'clear showing that four factors, taken together, warrant [such] relief'": (1) "likely success on the merits"; (2) "likely irreparable harm in the absence of preliminary relief"; (3) "a balance of the equities in its favor"; and (4) "accord with the public interest." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018) (citation omitted). "The likelihood

of success and irreparability of harm 'are the most critical' factors." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (citation omitted). And the third and fourth factors "merge when the government is the opposing party." *Id.*

The required showing for Plaintiffs is doubly heightened here. For one, Plaintiffs seek a mandatory preliminary injunction, which would alter rather than preserve the status quo by compelling affirmative action, *i.e.*, the provision of taxpayer dollars under terminated contracts. Such injunctions "are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government." *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quotation marks and citations omitted); *see also*, *e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000). The standard for obtaining such an injunction "is significantly heightened." *Feng Wang v. Pompeo*, 354 F. Supp. 3d 13, 20 (D.D.C. 2018). "[C]ourts exercise extreme caution in assessing" motions seeking affirmative injunctive relief, and as a general rule they deny such relief unless "the facts and law clearly favor the moving party." *Shipbrokers*, 560 F. Supp. 3d at 93 (quotation marks omitted). Moreover, relief that "deeply intrudes into the core concerns of the executive branch"—including foreign affairs—may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978).

## ARGUMENT

**I.    Plaintiffs are not likely to succeed on the merits.**

### A. Plaintiffs fail to establish that this Court has subject-matter jurisdiction.

Plaintiffs' claims fall into one of two categories: the first seeks to mandate payments under now-terminated grant agreements, and the second seeks to return the Foundation to its operations as existed prior to implementation of Executive Order No. 14,217. Plaintiffs fail to carry their burden to show that this Court possesses jurisdiction over either category. *See Khadr v. United*

*States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008) ("As the party claiming subject matter jurisdiction, [the plaintiff] has the burden to demonstrate that it exists."). As to the former, this Court lacks subject-matter jurisdiction because those grant agreements are contracts with the federal government, and no waiver of sovereign immunity authorizes Plaintiffs to enforce such contracts in federal district courts. To the contrary, Congress through the Tucker Act vested the Court of Federal Claims with exclusive jurisdiction over such claims. As another court in this district recently held under similar circumstances, this Court therefore lacks "the authority to afford the 'drastic' emergency relief that [Plaintiff] seeks." *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 1:25-CV-00465 (TNM), 2025 WL 763738, at *8 (D.D.C. Mar. 11, 2025). As to the latter, this Court lacks subject-matter jurisdiction because Plaintiffs fail to establish Article III standing. Any cognizable injury that Plaintiffs have suffered is neither traceable to the alleged restructuring of the Foundation, nor redressable by an order unwinding that restructuring. Plaintiffs therefore cannot obtain injunctive relief on any of their claims. *See Cal. Ass'n of Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (a party that fails to show a "substantial likelihood" of satisfying "jurisdictional prerequisites" is "not entitled to a preliminary injunction").

### 1. No waiver of sovereign immunity authorizes Plaintiffs' claims seeking payment under terminated grant agreements.

"The United States and its agencies are generally immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). This immunity is "jurisdictional in nature." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (citation omitted). Accordingly, in suits against the federal government, a district court's subject-matter jurisdiction "turns on at least 'two different jurisdictional questions'": (1) whether "Congress [has] provided an affirmative grant of subject-matter jurisdiction," and (2) whether "Congress [has] waived the United States's

immunity to suit." *Yee v. Jewell*, 228 F. Supp. 3d 48, 53 (D.D.C. 2017) (quoting *Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006)).  Although Plaintiffs invoke 28 U.S.C. §§ 1331 and 1346 as sources of statutory subject-matter jurisdiction, Plaintiffs identify no waiver of sovereign immunity authorizing their claims seeking payment under grant agreements with the Foundation.

Defendants anticipate that Plaintiffs will invoke the APA as waiving sovereign immunity for these claims.  *See* 5 U.S.C. § 702.  But that provision does not "confer[] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  *Id.*; *see also Perry Capital*, 864 F.3d at 618 (explaining the APA's waiver of sovereign immunity "does not apply if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought") (quoting 5 U.S.C. § 702); *Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 67 (D.C. Cir. 2004) (similar).  Here, the Tucker Act impliedly forbids the relief sought, providing that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  Indeed, the D.C. Circuit has "interpreted the Tucker Act . . . to 'impliedly forbid[]' contract claims against the Government from being brought in district court under the [sovereign immunity] waiver in the APA."  *Perry Capital*, 864 F.3d at 618-19 (citing *Albrecht*, 357 F.3d at 67-68); *see also Shaffer v. Veneman*, 325 F.3d 370, 373 (D.C. Cir. 2003) ("[T]his Court and others have interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government, at least *vis a vis*, the APA."); *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (same). And there can be no dispute that the grant agreements at issue here are contracts.  *See Boaz Housing Auth.* v. *United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021); *Henke* v. *U.S. Dep't of Com.*, 83 F.3d 1445, 1450-51 (D.C. Cir. 1996) (federal grant had the "essential elements of a contract").

Accordingly, regardless of how a claim is styled, a district court lacks jurisdiction if the claim "is in 'its essence' contractual." *Perry Capital*, 864 F.3d at 619 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)); *see also Albrecht*, 357 F.3d at 68 ("[T]he district court lacks jurisdiction if [plaintiff's claim] is essentially a contract action."). Determining whether a claim "is 'at its essence' contractual depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968). Both prongs of this analysis establish that Plaintiffs' claims for payment under the terminated grants are contractual.

Under the first prong, which assesses the source of rights, a court must consider whether "the plaintiff's asserted rights and the government's purported authority arise from statute"; whether "the plaintiff's rights 'exist[] prior to and apart from rights created under the contract'"; and whether "the plaintiff 'seek[s] to enforce any duty imposed upon' the government 'by the . . . relevant contracts to which' the government 'is a party.'" *Id.* at 1107 (citation omitted). Here, the source of Plaintiffs' rights underpinning their claims for payments are the grant agreements themselves, Plaintiffs have no rights to payment absent those grant agreements, and the duty (payment) that Plaintiffs seek to enforce is imposed upon the government solely by contract. *See* Compl. ¶¶ 79-87 (alleging that eight of the nine plaintiffs are "owed" amounts certain "under the terms of its grant").[4]

Indeed, Plaintiffs do not contend that they possess any statutory right to payment under appropriations laws. Nor could they, as those laws appropriate funds "[f]or necessary expenses to carry out the functions of the Inter-American Foundation in accordance with the provisions of section 401 of the Foreign Assistance Act of 1969," without specifying that Plaintiffs' grants (or,

---

[4] The ninth Plaintiff, Asociación Las Pregoneras, alleges that it was "in the midst of negotiating a $267,000 agreement with the Foundation as a follow-on to its 2023 grant." Compl. ¶ 82.

indeed, any grants) must receive funding.  Further Consolidated Appropriations Act, 2024, 138 Stat. at 746.

Thus, because Plaintiffs claims for payment under the grant agreements assert rights under contracts, the claims are essentially contractual in nature, and this Court lacks subject-matter jurisdiction.  *Shaffer*, 325 F.3d at 373 (court lacks subject-matter jurisdiction because the plaintiff's claims "involve[d] only straightforward contract issues"); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (holding the same because plaintiff's asserted right to payment "in no sense . . . exist[ed] independently of [its] contract"); *Motorola, Inc. v. Perry*, 917 F. Supp. 43, 47 (D.D.C. 1996) (holding the same because it was "possible to conceive of [th]e dispute as entirely contained within the terms of the [plaintiff's] contract"); *Twin Metals Minn. LLC v. United States*, No. 22-cv-2506, 2023 WL 5748624, at *7 (D.D.C. Sept. 6, 2023) (holding the same because the plaintiff "point[ed] to no other source of its asserted rights" beyond the lease agreements at issue).

The second prong, which assesses the type of relief sought or appropriate, confirms that Plaintiffs' claims for payment under the grant agreements are contractual in nature.  "Specific performance is an explicitly contractual remedy."  *Perry Capital*, 864 F.3d at 619; *see also Spectrum Leasing Corp.*, 764 F.2d at 894-95 (similar).  And that is precisely what Plaintiffs seek.  *See* Compl. Prayer for Relief, ¶ g (seeking "[a] preliminary and permanent injunction requiring Defendants to reinstate contracts and grants"); *id.* ¶ h (seeking "a preliminary and permanent injunction requiring all Defendants to pay any grant funds unlawfully withheld since February 28, 2025").  Plaintiffs' claims pertaining to the grant agreements therefore "sound in contract," *Perry Capital*, 864 F.3d at 619, and this Court lacks subject-matter jurisdiction, *Transohio Sav. Bank*,

967 F.2d at 613 ("[T]he APA does *not* waive sovereign immunity for contract claims seeking specific relief").[5]

Plaintiffs may argue that their complaint does not seek exclusively contractual relief for their claims pertaining to termination of the grant agreements. But Plaintiffs cannot evade the Tucker Act's jurisdictional bar through artful pleading. *See Crowley*, 38 F.4th at 1107 ("[W]e have cautioned plaintiffs that this court prohibits the creative drafting of complaints . . . to avoid the jurisdictional consequences of the Tucker Act.") (cleaned up); *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985) ("We begin with the well-accepted proposition that a plaintiff may not avoid the jurisdictional bar of the [Contract Disputes Act, vesting jurisdiction in the Court of Federal Claims] merely by alleging violations of regulatory or statutory provisions rather than breach of contract."). And the non-monetary injunctive relief that Plaintiffs seek on these claims is inseparable from the fundamentally contractual relief that they seek—uninterrupted grant funding they claim they are entitled to under their grants. Plaintiffs thus cannot evade the Tucker Act's exclusive jurisdiction channeling. *Kidwell v. Department of the Army*, 56 F.3d 279, 284 (D.C. Cir. 1995) (explaining that a request for declaratory and injunctive relief can avoid

---

[5] Under binding D.C. Circuit precedent, that the Court of Claims cannot award injunctive relief is immaterial to this analysis. *See Albrecht*, 357 F.3d at 68 ("We have held that the Tucker Act 'impliedly forbids—in APA terms—not only district court awards of money damages, which the Claims Court may grant, but also injunctive relief*, which the Claims Court may not.") (quoting *Transohio Sav. Bank*, 967 F.2d at 609)); *Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986) ("The waiver of sovereign immunity in the [APA] does not run to actions seeking declaratory relief or specific performance in contract cases . . . ."); *see also Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 180 (D.D.C. 2007) ("Because the Tucker Act—which does not authorize equitable relief—was intended to provide 'the exclusive remedy for contract claims against the government,' this Circuit has interpreted the Tucker Act as 'impliedly forbidding' district courts from awarding equitable relief against the government on a contract claim brought under the APA.").

Tucker Act's exclusive jurisdiction bar only if that relief "is not 'negligible in comparison' with" any "potential monetary recovery").[6]

In sum, when a plaintiff's claim is premised on a contract with the government, depends on the government's having breached that contract, and seeks to compel the government to pay sums due under the contract, that is a Tucker Act claim.  Under those circumstances, the APA's waiver of sovereign immunity is not available.

### 2. Plaintiffs lack Article III standing to obtain broad relief as to agency acts implementing Executive Order No. 14,217.

This Court lacks jurisdiction over Plaintiffs' remaining claims because Plaintiffs have failed to establish Article III standing.  It is well-established that "standing is not dispensed in gross," such that "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'"  *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).  Accordingly, for each claim, against each defendant, and for each form of relief sought, Plaintiffs must show "an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Id.* at 57 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  Plaintiffs fail to make these showings for their claims seeking to enjoin Defendants "[f]rom continuing to keep Inter-American Foundation employees on administrative leave and from implementing or otherwise giving effect to a reduction in force" and Defendant

---

[6] *Bowen v. Massachusetts*, 487 U.S. 879 (1988), does not help Plaintiffs here.  That case did not address a contractual arrangement between a government agency and private party, but rather concerned states' entitlement to federal funding under a statute.  Accordingly, the Supreme Court in that case addressed the APA's exclusion from its waiver of sovereign immunity for suits for "money damages," *see* 5 U.S.C. § 702.  As the Supreme Court has explained, its jurisprudence addressing that distinct carve-out from the APA's waiver of sovereign immunity "has no bearing" on the ability of private parties to obtain injunctions to enforce contractual obligations against the federal government.  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002).

Marocco from "purporting to exercise the authority of the Inter-American Foundation Board or its President." *See* Proposed Order at 1-2, ECF No. 6-12.

*First*, Plaintiffs fail to show an injury in fact apart from the termination of the grant agreements. Plaintiffs' broad fears about foreign policy outcomes do not amount to a cognizable injury. *See, e.g.*, Compl. ¶ 3 ("The Foundation's success at combatting violence, creating economic opportunities, and reducing migration have earned it longstanding, broad bipartisan support."). Rather, courts in this Circuit recognize that "the specific fear arising from a foreign policy, no matter how severe a plaintiff's disagreement with that foreign policy may be, cannot constitute injury-in-fact without a concrete harm." *Bernstein v. Kerry*, 962 F. Supp. 2d 122, 127 (D.D.C. 2013), *aff'd*, 584 F. App'x 7 (D.C Cir. 2014). And Plaintiffs' forecasts of harms to conditions overseas "amount[] to nothing more than speculation about future events that may or may not occur." *See Mahorner v. Bush*, 224 F. Supp. 2d 48, 50 (D.D.C. 2002) ("The plaintiff's allegation that he will suffer an increased chance of losing his life if President Bush initiates a military conflict with Iraq, amounts to nothing more than speculation about future events that may or may not occur."), *aff'd*, 2003 WL 349713 (D.C. Cir. Feb. 12, 2003) (per curiam); *Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79, 85 (D.D.C. 2022) (John Does who "reasonably fear[] injury at the hands of the Nigerian government," after the United States' sale of aircraft to Nigerian government, failed to allege injury-in-fact).

Nor do Plaintiffs' asserted harms (Mot. at 2) to the Foundation's employees or Plaintiffs' "local constituents" establish an injury in fact. It is well-established that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see*

*also United States v. Hansen*, 599 U.S. 762, 769 (2023) ("[L]itigants typically lack standing to assert the constitutional rights of third parties.").

*Second*, the sole cognizable injury that Plaintiffs do assert—denial of payment under the grant agreements—is not traceable to the Foundation's restructuring. The Foundation in any form could terminate Plaintiffs' grant agreements under their contractual right, as the Foundation did on March 4, 2025. And Plaintiffs have not established (and could not do so) that they have suffered any other harm traceable to the placement of Foundation employees on leave or from Defendant Marocco exercising authority of the Foundation's Board. Accordingly, because Plaintiffs cannot show that the government "action or inaction" challenged in these claims "is 'causally connected to [their] injury,' they cannot demonstrate Article III standing." *Citizens for Const. Integrity v. Census Bureau*, 115 F.4th 618, 628 (D.C. Cir. 2024) (quoting *California v. Texas*, 593 U.S. 659, 660 (2021)).

*Third*, and for similar reasons, Plaintiffs' injury in the form of loss of payments is not redressable by an order either prohibiting acting chairman Marocco from exercising Foundation authority or unwinding reductions to the Foundation's footprint. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) ("causation and redressability[] are often 'flip sides of the same coin'"). That is because even if such relief were granted, it would not remedy the only cognizable injury that Plaintiffs have suffered—the termination of their grant agreements. Plaintiffs have therefore failed to carry their burden to establish standing for claims seeking that relief because Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018).

**B.  Plaintiffs are unlikely to succeed on their separation-of-powers claim.**

Plaintiffs invoke a grab-bag of separation-of-powers provisions to argue that Defendants' actions violate the constitution. These claims are unlikely to succeed because: (1) they merely

16

clothe Plaintiffs' statutory claims in constitutional garb, which Supreme Court precedent does not permit; (2) Plaintiffs have not asserted a viable statutory (much less constitutional) violation; and (3) the provisions that Plaintiffs invoke cannot be enforced by a private action.

  1. Plaintiffs' separation-of-powers claim seeks to transform a dispute over statutory interpretation—what functions the Foundation must carry out to fulfill Congress's mandate—into an interbranch, constitutional dispute. But Plaintiffs' artful pleading is insufficient to overcome the Supreme Court's clear instruction that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472.

  Indeed, Plaintiffs' reliance (Mot. at 13-14) on Section 7063(a), (b)(1) of the Further Consolidated Appropriations Act, 2024, 138 Stat. at 746, demonstrates why Plaintiffs' claims present, at most, a dispute regarding statutory construction. That provision directed that appropriated funds "may not be used to implement a reorganization, redesign, or other plan . . . without prior consultation by the head of such department, agency, or organization with the appropriate congressional committees." *Id.* at 843-44. But Executive Order No. 14,217 did not contravene that instruction. To the contrary, it directed that "the non-statutory components and functions of" four named governmental entities "shall be eliminated to the maximum extent *consistent with applicable law*, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function *required by law*." Executive Order No. 14,217 § 2(a) (emphasis added). The only relevant question, then, is whether the law requires that the Foundation continue to fund Plaintiffs' grants. Plaintiffs' constitutional

claims therefore merely restate the allegations that Defendants acted in excess of their statutory duties, and Plaintiffs cannot independently prevail on their constitutional claims.

2. In any event, Plaintiffs do not allege viable constitutional claims merely by invoking the Spending Clause and the Appropriations Clause. *See* Mot. at 11-12. Neither of these constitutional provisions—or even the appropriations statutes that Congress passed pursuant to its Article I powers—requires that the Foundation continue to fund Plaintiffs through now-terminated grant agreements. That is because Plaintiffs are not funded through direct congressional appropriations; rather, they are funded through specific grant agreements. Accordingly, the Foundation's conduct under those grant agreements may be reviewable in the Court of Federal Claims, but the mere fact that the Foundation is funded through Congressional appropriations does not mean that the routine execution of those grant agreements takes on statutory, let alone constitutional, dimensions.

Indeed, it is the relief that Plaintiffs' seek that threatens the separation of powers and would undermine the President's authority over foreign affairs. The Foundation here determined, consistent with the President's direction, that the grants in question were "inconsistent with the agency's priorities" to "foster[] security and development in the Western Hemisphere." *See, e.g.*, Decl. of Nadia Valería Enríquez Ortiz, Ex. A at 7, ECF No. 6-7. And under Article II of the Constitution, the President and his subordinates have broad authority to attend to the foreign affairs of the nation, including by determining how foreign aid funds are used. Accordingly, while the Executive is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015), the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343

U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)).  Thus, "in foreign affairs the President has

a degree of independent authority to act."  *Id.*; *see also United States v. Curtiss-Wright Exp. Corp.*,

299 U.S. 304, 320 (1936) (the President's power in the field of international relations "does not

require as a basis for its exercise an act of Congress."); *Youngstown*, 343 U.S. at 635 & n.2 (the

President can "act in external affairs without congressional authority").

Plaintiffs' contention (Mot. 13-14) that the Executive Branch is infringing on Congress's

power of the purse is therefore incorrect even if funding for the grant agreements at issue here

were congressionally mandated (and it is not).  "[I]f a congressional directive to spend were to

interfere with the President's authority in an area confided by the Constitution to his substantive

direction and control, such as his authority . . . over foreign affairs . . . a situation would be

presented very different from [a domestic impoundment]."  Memorandum from William H.

Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: Presidential Authority to

Impound Funds Appropriated for Assistance to Federally Impacted Schools, 1 Suppl. Op. O.L.C.

303, 310–11 (1969).[7]  Defendants' actions not only fit comfortably within the Executive Branch's

unique expertise and constitutional role as to foreign affairs but also dovetail with its unreviewable

discretion not to take action.  *Cf. Heckler v. Chaney*, 470 U.S. 821 (1985).  It is precisely the sort

of conduct that a federal court should be loath to disrupt, absent a valid and binding direction to

the contrary.

Moreover, Plaintiffs' request that this Court supervise the Foundation's foreign assistance

grants in some sort of receivership arrangement would create a grave separation of powers

problem.  Diplomacy and foreign relations fall within the "plenary and exclusive power of the

President as the sole organ of the federal government in the field of international relations."

---

[7] To be clear, Defendants' position is that no impoundment has taken place.  *Infra* Part I.C.

*Curtiss–Wright*, 299 U.S. at 319–20; *see Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot . . . be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."); *see Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions . . . entrusted foreign affairs and national security powers to the political branches[.]"); *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative.''); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (noting that the President is "exclusively responsible" for "conduct of diplomatic and foreign affairs"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) (matters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *Worthy v. Herter*, 270 F.2d 905, 911 (D.C. Cir. 1959) ("It is settled that in respect to foreign affairs the President has the power of action and the courts will not attempt to review the merits of what he does. The President is the nation's organ in and for foreign affairs.''). As such, injunctive relief related to foreign affairs "deeply intrudes into the core concerns of the executive branch" and may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams*, 570 F.2d at 954–55. Plaintiffs are therefore not likely to prevail on their separation of powers claims because the relief they seek would overstep into the exclusive domain of the Executive.

3. Plaintiffs' arguments regarding the Take Care Clause (Mot. at 12-13) do not alter this analysis. At the outset, the Government is not aware of any case that has ever held that the Take Care Clause can be used as a mechanism to obtain affirmative relief. Nothing in its plain text suggests that the Take Care Clause provides a cause of action against the President or any other

Defendant, and this Court has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity based on constitutional claims, *see Dalton*, 511 U.S. at 473.

Through the Take Care Clause, the Constitution vests broad, discretionary authority to "take Care that the Laws be faithfully executed" by the President. U.S. Const. art. II, § 3. Inevitably, the laws that the President executes are those enacted by Congress. But no court has read the Take Care Clause as opening the door to any plaintiff seeking to challenge the way the President executes Congress's laws. Rather, as the Supreme Court has recognized, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866). To hold otherwise would upset our constitutional scheme of separation of powers and allow judicial superintendence over the exercise of Executive power that the Clause commits to the President alone. *See Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 577 (1992) (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)).

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *id.* at 495–97.

C. **Plaintiffs are unlikely to succeed on their *ultra vires* claims.**

Plaintiffs assert (Mot. at 15-21) that (1) Defendants have engaged in *ultra vires* impoundment of the Foundation's funding and (2) that Mr. Marocco's appointment as an acting

member and chairman of the Board was *ultra vires*, invaliding all the actions taken by the Board since his appointment.  The bar for asserting an *ultra vires* claim is high:  "[a] claim of error" in the exercise of delegated power "is not sufficient" to support an *ultra vires* claim because "[n]ot every statutory prescription of elements requisite to administrative action is jurisdictional." *Doehla Greeting Cards, Inc. v. Summerfield*, 227 F.2d 44, 46–47 (D.C. Cir. 1955).  Accordingly, an *ultra vires* cause of action requires a violation of "a specific prohibition in the statute that is clear and mandatory," a violation that was "obviously beyond the terms of the statute," or action that "was far outside the scope of the task that Congress gave it."  *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d. 1244, 1263 (D.C. Cir. 2020).  For the reasons explained below, Plaintiffs' claims are unlikely to clear this bar.

1.  To start, Plaintiffs may not rely on the Impoundment Control Act to sustain their *ultra vires* claim.  That act enforces Congress's power over the purse in relation to the Executive.  *See Dabney v. Reagan*, 542 F. Supp. 756, 760 (S.D.N.Y. 1982); *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987) (explaining that the Act "was passed at a time when Congress was united in its furor over presidential impoundments and intent on reasserting its control over the budgetary process").  Thus, the statute provides for enforcement only by the Comptroller General (an official in the Legislative Branch), not private parties.  *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734–35 (S.D. Tex. 2024) ("In short, an alleged ICA violation has only one proper plaintiff: the Comptroller General."); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981).  And an *ultra vires* claim cannot be brought by invoking a statute that channels review of the statutory claim through a particular mechanism, as does the Impoundment Control Act.  *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (to prevail on

an *ultra vires* claim, a plaintiff must show "there is no alternative procedure for review of the statutory claim").

In any event, Plaintiffs are incorrect that any of Defendants' actions vis-à-vis Plaintiffs violate the Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 333 (1974) (codified as amended at 2 U.S.C. §§ 682 *et seq.*) or the Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 877, 929 (1982) (codified as amended at scattered sections of Title 31).  As explained *supra* Part I.B, Plaintiffs identify no provisions in congressional appropriations that mandate Plaintiffs (or, indeed, any specific Foundation grantee) continue to receive funding, and no such provisions exists.

If Congress had intended to mandate that Plaintiffs' grants continue to be funded, it would have done so.  Indeed, Congress is familiar with such line-item appropriations.  For example, in funding for the Executive Office of Immigration Review, the same appropriations statutes that Plaintiffs invoke here required appropriated $844,000,000 to that office for fiscal year ("FY") 2024 and mandated that "not less than $28,000,000" of that amount "shall be available for services and activities provided by the Legal Orientation Program." Consolidated Appropriations Act, 2024, 138 Stat. at 133; *see also, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4522 (2022) (appropriating $860,000,000 to EOIR, "of which not less than $29,000,000 shall be available for services and activities provided by the Legal Orientation Program").  And "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Bates v. United States*, 522 U.S. 23, 29-30 (1997) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).  Accordingly, Defendants did not violate any

"clear and mandatory" statutory requirement by terminating Plaintiffs' grant agreements, and Plaintiffs have not asserted an *ultra vires* claim.  *N. Am. Butterfly Ass'n*, 977 F.3d. at 1263.

2.  Plaintiffs fare no better on their *ultra vires* claim concerning the designation of Marocco as the sole member of the Foundation Board, even assuming they have standing to bring such a suit (they do not, *supra* Part I.B).  The President must be able to designate acting officials to fulfill his duty to "take care that the laws be faithfully executed."  *See* U.S. Const. art. II, § 1, cl. 1; *id.* § 3.  The President has "powers not enumerated in the statutes—powers derived not from statutory grants but from the Constitution."  *See Request of the Senate for an Opinion as to the Powers of the President "in Emergency or State of War,"* 39 Op. Att'y Gen. 343, 347 (1939).  Those constitutional powers encompass the "concomitant power to name acting officials when necessary to fulfill his constitutional duties, at least where no statute precludes it."  *See* OLC Op. at 4.

Here, the President lawfully exercised his discretion in removing the Foundation Board members.  No statute limits or prohibits the President's prerogative to ensure that the Foundation has temporary leadership, particularly in the context of a presidential transition.  Therefore, nothing required the President to leave the Foundation leaderless and unable to "direct the exercise of all the powers of the Foundation" as the Senate considers his nominees for to fill vacancies on the Board.  22 U.S.C. § 290f(i).  Instead, the President has the concomitant authority, incident to his Article II power, to designate acting officers. *Youngstown*, 343 U.S. at 637 (Jackson, J. concurring) ("congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility").  And the President's authority to designate in the face of statutory silence is consistent with the Framers' demand for "unity in the Federal Executive" to guarantee "both vigor and accountability."  *Printz v. United States*, 521 U.S. 898, 922 (1997)

Plaintiffs nonetheless argue (Mot. at 19-21) that the Federal Vacancies Reform Act of 1998 ("Vacancies Act") limits the President's inherent authority to designate acting Board members for the Foundation. However, the Vacancies Act does not apply to "any member who is appointed by the President, by and with the advice and consent of the Senate to any board, commission, or similar entity that . . . is composed of multiple members; and governs an independent establishment or Government corporation." 5 U.S.C. § 3349c(1). Plaintiffs concede (Mot. 18) that the Foundation qualifies as an entity described in this provision, and instead construe this provision to mean that the President does not have any authority to designate officials to act as Board members. This selective interpretation is incorrect. If the Vacancies Act itself does not apply to the Foundation, then other sections of the Vacancies Act, including Section 3345 (which governs procedures for designating acting officers in the event that a Senate-confirmed position becomes vacant) and Section 3346 (which limits the amount of time that a designee can serve in an acting role) would not apply to the Foundation either. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000) (statutory provisions "must [be] place[d] . . . in context"—including in the context of each other—and "interpret[ed] . . . to create a symmetrical and coherent regulatory scheme.").

Section 3347 does not change this analysis. That provision provides that the Vacancies Act is the "exclusive means" for filling vacancies in positions that it covers, save for situations where there is a separate statutory authority providing for position-specific acting service or where the President exercises his power to make recess appointments. 5 U.S.C. § 3347. It does not speak to the available methods for filling vacancies on an acting basis in positions expressly excluded from the Vacancies Act under section 3349c. Plaintiffs also argue that Section 3348(b) of the Vacancies Act requires the Foundation Board seats to remain vacant until the Senate confirms President

Trump's nominees.  But this reading of the statute would contradict the exclusion in Section 3349c, which provides that Section 3348 does not apply to entities like the Foundation.  5 U.S.C. § 3349c (stating "Sections 3345 through 3349b shall not apply to— (1) any member who is appointed by the President, by and with the advice and consent of the Senate to any board, commission, or similar entity that—(A) is composed of multiple members . . .").

Because Congress has not provided for procedures that the President must undertake to fill vacancies on the Foundation Board, and because the President must "take care that the laws be faithfully executed" from the beginning of his Administration and cannot wait for the Senate to confirm all nominees, the President must be able to "select those who [are] to act for him under his direction in the execution of the laws."  *Myers v. United States*, 272 U.S. 52, 117 (1926).  This need was especially pressing here because the Board Members that President Trump removed signaled that they did not intend to comply with President Trump's Executive Order to "reduce the performance of [the Foundation's] statutory functions and associated personnel to the minimum presence and function required by law."  Executive Order No. 14,217 § 2; *see* OLC Op. at 9.  And the President has since nominated two individuals to the Board.  *See* Nominations in Committee,              *United States              Senate*,              available              at: https://www.senate.gov/legislative/nom_cmtec.htm (last accessed: Mar. 31, 2025).

### D.  Plaintiffs are unlikely to succeed on their APA claims.

Plaintiffs advance (Mot. at 21-24) three APA claims:  that the termination of contracts and grants is arbitrary and capricious; that the "denial of funding" is contrary to law; and that agency action (in the form of grant payments) has been unlawfully withheld.  Plaintiffs are not likely to prevail on any of these claims because APA review is not available here and because, in any event, the termination of Plaintiffs' grants was lawful.

1.  Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704.  That requirement reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen*, 487 U.S. at 903.  As the D.C. Circuit has observed, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted).  Further, a remedy may be adequate even if "the arguments which can be raised [in the alternative proceeding] are not identical to those available in an APA suit." *Elm 3DS Innovations LLC v. Lee*, No. 1:16–cv–1036, 2016 WL 8732315, at *6 (E.D. Va. Dec. 2, 2016).  Accordingly, if there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA.  *See Perry Capital*, 864 F.3d at 621; *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing putative APA claim under Rule 12(b)(6) because decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit), *aff'd,* 793 F.3d 1352 (Fed. Cir. 2015).

As explained *supra* Part I.A, this is, in essence, a contract dispute for payment of funds allegedly unlawfully withheld and for an improper breach of contract.  Because the Tucker Act provides specified remedies for such contractual claims, that statute provides Plaintiffs an adequate alternative.  Plaintiffs are therefore barred from bringing these APA claims.

2.  Even assuming the Tucker Act does not foreclose APA review of Plaintiffs' grant-termination claims, such terminations are quintessential agency actions "committed to agency discretion by law," for which the APA does not provide an avenue for review.  5 U.S.C. § 701(a)(2).  The Supreme Court has long recognized that an agency's determination of how to allot appropriated funds among competing priorities and recipients—precisely what Plaintiffs

challenge here—is classic discretionary agency action. *See Lincoln* v. *Vigil*, 508 U.S. 182, 193 (1993).

In *Lincoln*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA. *Id.* at 185-188, 193. The Court explained that the "allocation of funds from a lump-sum appropriation" is an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. "[A]n agency's allocation of funds from a lumpsum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831). "Of course," such discretion is not unbounded, because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id.* As discussed above, Congress did not make specific line-item appropriations to the Foundation; it is thus a lump-sum appropriation, and *Lincoln* applies here no differently than a lump-sum appropriation to a larger agency.

3.  Even if APA review were available, the termination of Plaintiffs' grants is not arbitrary and capricious.  As an initial matter, requiring a federal agency to articulate a rationale for its action beyond simple compliance with the President's directives would, in essence, subject the President's directive to arbitrary and capricious review, contrary to the principle that the President is not an agency under the APA.  *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992); *cf. Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 403 (D. Md. 2011) ("[T]he State Department and Assistant Secretary were acting on behalf of the President, and therefore their actions are not reviewable under the APA."), *aff'd*, 698 F.3d 171 (4th Cir. 2012).

In any event, the grants were terminated because the Foundation determined that they were "unfortunately inconsistent with the agency's priorities" and because "the President's February 19, 2025 executive order mandates that the [Foundation] eliminate all non-statutorily required activities and functions."  *See, e.g.*, Decl. of Nadia Valería Enríquez Ortiz, Ex. A at 7, ECF No. 6-7.  Executive Order No. 14,217 did in fact direct the Inter-American Foundation to "reduce the performance if [its] statutory functions and associated personnel to the minimum presence and function required by law."  The agency thus articulated a rational basis for the termination:  the fact that the grants were not required under statute.  That basis was correct—indeed, there is no requirement in the relevant statutes to issue these specific grants, *see supra* Part I.B—and that is all the APA requires.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  That Plaintiffs do not agree with Defendants' preferred policy approach does not mean that Defendants acted arbitrarily and capriciously in forming that policy. To put it succinctly, policy disagreements cannot form the basis of an APA arbitrary and capricious claim, and Plaintiffs are therefore not likely to succeed on the merits.

Plaintiffs' argument (Mot. at 22-24) that the grant terminations are contrary to law is similarly meritless. The grant funding that Plaintiffs seek is subject to grant agreements that authorize the Foundation to terminate funding at will, and the Foundation exercised that contractual right on March 4, 2025. Plaintiffs identify no contractual provision or statutory authority that compelled a different outcome.

Finally, Plaintiffs assert (Mot. at 23-24) that agency action has been unlawfully withheld because the Department of Treasury has a mandatory duty to disburse funds upon a lawfully presented disbursement request from a Foundation employee. But Plaintiffs do not identify any "lawfully presented disbursement requests from a Foundation employee with delegated authority over Foundation funding," Mot. at 24, that have been denied. Indeed, no such requests have been made because the Foundation under its acting Chairman determined to terminate Plaintiffs' grant agreements. Nor would it be reasonable to conclude that the Treasury *had* to disburse funds for a terminated contract; such would be a recipe for misuse of taxpayer funds.

## II.    The remaining preliminary injunction factors weigh against Plaintiffs.

### A.    Plaintiffs fail to show that they will suffer imminent irreparable harm absent a preliminary injunction.

To demonstrate irreparable harm, Plaintiffs must meet a "high standard"—they must show that they face injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008), and that are "beyond remediation," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Making that showing requires "proof" that the harm they identify "is certain to occur in the near future." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). Plaintiffs fail to carry that heavy burden here.

Plaintiffs identify several harms that stem from its lack of access to grant funds, in the form of harms to its operations and efforts to fulfill its missions. But "[m]ere injuries, however

substantial, in terms of money, time and energy necessarily expended . . . are not enough." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wis. Gas Co.*, 758 F.2d at 674). Rather, it is black-letter law that economic harm is generally not irreparable because compensation after the lawsuit generally ensures full relief. *Wis. Gas Co.*, 758 F.2d at 674 (describing that principle as "well-settled"). The only exceptions are "where the loss threatens the very existence of the movant's business," *id.*, or "where the claimed economic loss is unrecoverable." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014) (citation omitted).

The first exception is a narrow one—it encompasses only cases where the plaintiffs demonstrate "extreme hardship to the business." *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981). Plaintiffs may be forced to make difficult choices in critical areas of their operations without incurring irreparable harm sufficient to warrant injunctive relief. *Cf. Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) ("[T]he forced sale of a house . . . do[es] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary injunction."). And Plaintiffs must document any claim that an alleged harm is a threat to the business's very existence with specific details. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51–52 (D.D.C. 2011) (plaintiff needed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, [and] explain with . . . specificity how he arrived at the conclusion that he would be forced out of business in eighteen months" to show irreparable harm on this theory).

Here, Plaintiffs' declarations assert that (Mot. 24-26) a lack of funds "*may*" result in one Plaintiff "hav[ing] to close its doors" and that other Plaintiffs will "shut down" or "suspend" certain programs. But Plaintiffs offer no meaningful explanation for why, if funding were restored after an outcome favorable to Plaintiffs in this action, they would not be able to reopen generally

or restart those specific programs. Accordingly, even Plaintiffs who allege the most serious harms have not offered "proof" that they will cease to exist if the Defendants' grant terminations are not preliminary enjoined. *Wis. Gas Co.*, 758 F.2d at 674.

Finally, Plaintiff identifies (Mot. at 28) other forms of harm that may flow to third parties, including its employees, contractors, or individuals served by Plaintiff's mission. But "harm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court." *New Mexico v. Musk*, --- F. Supp. 3d ---, 2025 WL 520583, at *4 (D.D.C. Feb. 18, 2025) (quoting *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021)); *see also Kansas v. United States*, 124 F.4th 529, 534 (8th Cir. 2024) ("The irreparable-harm analysis focuses on the moving party, not the nonmoving party or some third party.") (citation omitted). Thus, in *New Mexico*, although the Court noted that "[t]erminating thousands of federal employees may cause extreme harm to the individual employees, and potentially the institution writ large," 2025 WL 520583, at *4, the Court held that it could not consider alleged harm to parties not before the Court on a request for emergency injunctive relief. *See id.* Likewise, in this case, Plaintiffs' allegations concerning possible harm to third parties cannot support emergency relief.

Ultimately, even if Plaintiffs can claim some threat of harm, there is no reason why they cannot vindicate that threatened harm through individualized, specific lawsuits challenging particular funding terminations in the correct court. Their declarations do not establish the need for broad injunctive relief in a single lawsuit as required to obtain the relief sought here.

### B. The public interest does not weigh in Plaintiffs' favor.

A preliminary injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party"). As an initial matter,

given that Plaintiffs cannot establish the first two factors necessary to obtain a preliminary injunction, "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009).

But even if Plaintiffs could satisfy one or both of those factors, the remaining factors weigh in Defendants' favor and are sufficient to deny injunctive relief. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), *appeal dismissed*, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025). The public has an interest in ensuring that tax dollars are not spent towards foreign projects that inconsistent with American interests. And the President determined that reducing the size of the Foundation, amongst other agencies, "will minimize Government waste and abuse, reduce inflation, and promote American freedom and innovation." Executive Order No. 14,217 § 1. A preliminary injunction would displace and frustrate the President's decision about how to best address these questions in the arena of foreign affairs, and the Court must give deference to the Executive Branch's "evaluation of the facts" and the "sensitive and weighty interests of . . . foreign affairs," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010), including "the timing of those . . . decisions." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

By contrast, Plaintiffs voluntarily contracted with the Foundation under grant agreements that contained clauses that permitted the Foundation to amend, suspend, or terminate those agreements at will. Any pecuniary harm that Plaintiffs now suffer is because of them taking on

that risk, and in any event, such pecuniary harm can later be remedied should they prevail on the merits.

## III.    Any relief should be limited.

For the reasons explained above, Plaintiffs are not entitled to any preliminary relief.  But if the Court concludes otherwise, the relief granted both "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).  The expansive relief that Plaintiffs seek flouts these well-established principles and should be narrowed in at least two respects.

First, Plaintiffs have at most attempted to show that they would personally suffer harm in the absence of relief ordering continued payments under Plaintiffs' grant agreements.  As such, any preliminary injunction should do no more than restore payments under the grant agreements to the specific funding-recipient Plaintiffs that are before this Court.  Extending relief that is either broader in substance (*i.e.*, enjoining Marocco from acting as a Board member) or scope (*i.e.*, awarding relief to protect other grantees not before this Court) would violate the foundational Article III principle that judicial remedies "must be tailored to redress the plaintiff's particular injury." *Gill*, 585 U.S. at 73.  A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Id.* at 66 (citation omitted).  Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable practice." *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).

Second, the requested equitable and declaratory relief is categorically unavailable against the President, named as a Defendant here.  Although courts of equity may in some circumstances

34

permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). There is no such tradition of equitable relief against the President. To the contrary, federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Johnson*, 71 U.S. at 501.

The Supreme Court reaffirmed that principle in *Franklin*, 505 U.S. at 800–01, where the Court declined to construe the APA to supply a cause of action against the President "[o]ut of respect for the separation of powers and the unique constitutional position of the President." That tradition properly respects the President's "unique position in the constitutional scheme." *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749–50 (1982) (declining to assume that implied damages "cause[s] of action run[] against the President of the United States").

In this case, similarly, the "reasons why courts should be hesitant to grant" injunctive relief "are painfully obvious" given the President's unique constitutional role and the potential tension with the separation of powers. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). Although, for the reasons explained above, no relief at all is proper here, if the Court were to conclude otherwise, relief could only be directed at subordinate officials. *See id.* ("In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials."); *see also Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President as a party").

## IV.    Plaintiffs should be ordered to post security in connection with any emergency relief.

Finally, if the Court grants any injunctive relief, the Court should also order Plaintiff to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary

injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). If any preliminary injunctive relief issues here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any such emergency order. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

Because Plaintiffs seek the payment of particular sums (the unpaid amounts of now-terminated grants), the Court should order the posting of a bond equal to the size of any payment that the Court orders on a preliminary basis. Without such a protective measure, there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that Defendants were "wrongfully enjoined." *See* Fed. R. Civ. P. 65(c).

## V.     Any injunctive relief should be stayed.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized. *See* Fed. R. App. P. 8(a)(1).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: March 31, 2025                    Respectfully submitted,


                                         YAAKOV M. ROTH
                                         *Acting Assistant Attorney General*

                                         JOSEPH E. BORSON
                                         *Assistant Branch Director*

                                         <u>*/s/ Alexander W. Resar*</u>
                                         ALEXANDER W. RESAR
                                         *Trial Attorney*
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, NW
                                         Washington, DC 20530
                                         Telephone: (202) 616-8188
                                         Email: alexander.w.resar@usdoj.gov

                                         *Counsel for Defendants*