**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CRISTOSAL HUMAN RIGHTS et al.,

*Plaintiffs,*

*v.*

PETER MAROCCO et al.,

*Defendants.*

**Case No. 1:25-cv-857-LLA**

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

ARGUMENT ..... 1

I. This Court Has Jurisdiction to Hear this Suit ..... 1

A. Plaintiffs have Article III standing with respect to each form of relief requested ..... 1

B. The Tucker Act does not deprive this Court of jurisdiction ..... 3

II. Plaintiffs Are Likely To Succeed On The Merits Of Their Claims ..... 6

A. Plaintiffs have presented a cognizable separation-of-powers claim ..... 6

B. Defendants' actions to impound funds, terminate grants and contracts, and fire employees are ultra vires ..... 10

1. Federal statutes prohibit Defendants' impoundment of the Foundation's funding ..... 10

2. Marocco was improperly appointed to the Board, and all actions he has purported to take in that role are without effect ..... 12

C. Plaintiffs are likely to succeed on their APA claims ..... 14

III. The Irreparable Harm, Balance of the Equities, and Public Interest Factors Favor Plaintiffs' Request for a Preliminary Injunction ..... 17

IV. The Scope of Relief Requested Is Proper ..... 18

V. The Court Should Waive Any Security ..... 20

CONCLUSION ..... 21

# TABLE OF AUTHORITIES

## Cases

*Aids Vaccine Advocacy Coal. v. U.S. Dep't of State*, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ....4, 8, 9, 16, 17, 18, 20

*Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, 2025 WL 863319 (D. Md. Mar. 19, 2025) ....4

*Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126 (D.D.C. 2023) ....4

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354 (D.C. Cir. 2023) ....3

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ....6

*California v. U.S. Dep't of Educ.*, 2025 WL 878431 (1st Cir. Mar. 21, 2025) ....4

*City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ....10

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020) ....19

*Climate United Fund v. Citibank*, 2025 WL 842360 (D.D.C. Mar. 18, 2025) ....4

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099 (D.C. Cir. 2022) .... 4, 5, 6

*Dalton v. Specter*, 511 U.S. 462 (1994) .... 6, 7

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) ....17

*FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293 (2003) ....11

*Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271 (11th Cir. 2021) .... 19, 20

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ....2

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) .... 2, 10

*George v. Ishimaru*, 849 F. Supp. 68 (D.D.C. 1994) ....14

*Great Lakes Comnet, Inc. v. FCC*, 823 F.3d 998 (D.C. Cir. 2016) ....13

*Harlem Globetrotters Int'l, Inc. v. United States*, 168 Fed. Cl. 31 (2023) ....5

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) ....20

*Heckler v. Chaney*, 470 U.S. 821 (1985) ....9

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) .... 10, 11

*Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000) ....3

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .... 17, 18

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ....15

*Massachusetts v. Nat'l Insts. of Health*, 2025 WL 702163 (D. Mass. Mar. 5, 2025) ....4, 19, 20

*Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441 (D.C. Cir. 1985) ....5

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) .... 5, 6

*Murthy v. Missouri*, 603 U.S. 43 (2024) .......... 2

*Nat'l Council of Nonprofits v. OMB*, 2025 WL 597959 (D.D.C. Feb. 25, 2025) .......... 17, 20, 21

*Nat'l Min. Ass'n v. U.S. Army Corp of Engrs.*, 145 F.3d 1399 (D.C. Cir. 1998) .......... 18

*New York v. Trump*, 2025 WL 715621 (D.R.I. Mar. 6, 2025) .......... 10, 18

*NLRB v. SW Gen., Inc.*, 580 U.S. 288 (2017) .......... 14

*North Carolina v. Covington*, 581 U.S. 486 (2017) .......... 19

*Olympic Federal Sav. & Loan Ass'n v. Director, Office of Thrift Supervision*, 732 F. Supp. 1183 (D.D.C. 1990) .......... 14

*Pacito v. Trump*, No. 2:25-cv-255, 2025 WL 655075 (W.D. Wash. Feb. 28, 2025) .......... 4

*Roe v. Dep't of Defense*, 947 F.3d 207 (4th Cir. 2020) .......... 19

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020) .......... 2

*Sherley v. Sebelius*, 689 F.3d 776 (D.C. Cir. 2012) .......... 18

*St. Bernard Parish Gov't v. United States*, 134 Fed. Cl. 730 (2017) .......... 4, 5

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) .......... 19

*TIG Ins. Co. v. Republic of Argentina*, 110 F.4th 221 (D.C. Cir. 2024) .......... 13

*Trauma Serv. Grp. v. United States*, 104 F.3d 1321 (Fed. Cir. 1997) .......... 4

*Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571 (2017) .......... 19

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 2025 WL 763738 (D.D.C. Mar. 11, 2025) .......... 4

*Williams v. Phillips*, 360 F. Supp. 1363 (D.D.C. 1973) .......... 14

*Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) .......... 17

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) .......... 8

**Statutes**

5 U.S.C. § 3347(a) .......... 12, 13

5 U.S.C. § 3348(b)(1) .......... 12

5 U.S.C. § 3348(d)(1) .......... 12, 13

5 U.S.C. § 3349c .......... 12, 13

5 U.S.C. § 702 .......... 3

5 U.S.C. § 706(1) .......... 9

5 U.S.C. §§ 3345–3349d .......... 12

22 U.S.C. § 290f(e)(1) .......... 1, 18

28 U.S.C. § 1346 .......... 3

28 U.S.C. § 1491 ........ 3

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4 (2025) ........ 12

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2 ........ 14

U.S. Const. art. II, § 3 ........ 10

**Legislative Materials**

S. Rep. No. 105-250 (1998) ........ 13, 14

**Other Authorities**

90 Fed. Reg. 10577 ........ 2, 8

Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. Rev. 1065 (2018) ........ 19

*Temporary Presidential Designation of Acting Board Members of the Inter-American Foundation and the United States African Development Foundation*, 49 Op. O.L.C. ___ (Mar. 14, 2025) ........ 12

## INTRODUCTION

Every argument in Defendants' opposition rests on the same mischaracterization of Plaintiffs' claims. Defendants portray this as a simple contract dispute turning on the terms of Plaintiffs' grant agreements. They thus attempt to transform Plaintiffs' constitutional and statutory arguments into routine breach-of-contract claims. But Defendants' characterizations are wrong; Plaintiffs' claims do not depend on the terms of any grant agreements (or contracts). Plaintiffs have demonstrated ongoing, irreparable harm from Defendants' decisions to abolish a congressionally established agency that, by law, "shall have perpetual succession unless sooner dissolved by an Act of Congress," 22 U.S.C. § 290f(e)(1), by withholding almost all of its funding, and by terminating almost all of its contracts, grants, and staff. This Court has jurisdiction over those claims.

Nowhere do Defendants deny that they have effectively attempted to dismantle an entire independent agency. Nor do they dispute that the programs Plaintiffs run have aided this Administration's professed goal of reducing migration to the United States. Instead, they rely principally on a series of threshold jurisdictional arguments that most courts in similar lawsuits have rejected, and that are wrong in any event. On the merits, Defendants fail to address the substance of any of Plaintiffs' claims. Plaintiffs have established their entitlement to a preliminary injunction halting Defendants' unlawful actions.

## ARGUMENT

### I. This Court Has Jurisdiction to Hear this Suit

A. Plaintiffs have Article III standing with respect to each form of relief requested

Defendants argue that Plaintiffs lack Article III standing because the cancelation of their grants is not traceable to Defendants' efforts to dismantle the Foundation. Defs.' Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. 16, ECF No. 15 ("Defs.' Mem."). That is belied by the terms of the Executive Order on which Defendants' actions are based. That order explicitly states that the Foundation is

"unnecessary" and that "non-statutory components and functions … shall be eliminated." Exec. Order No. 14217, *Commencing the Reduction of the Federal Bureaucracy* ("Dismantling EO"), 90 Fed. Reg. 10577 (Feb. 19, 2025). The canceling of Plaintiffs' grants is part and parcel of that effort. To the extent Defendants argue that Plaintiffs lack standing because Defendants could have canceled the grants for other, lawful reasons, that is also incorrect: The Supreme Court has repeatedly held that a "litigant challenging governmental action as void on the basis of separation of powers is not required to prove that the Government's course of conduct would have been different in a 'counterfactual world' in which the Government had acted with constitutional authority." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 211 (2020) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 512 n.12 (2010)).

For the same reason—and contrary to Defendants' suggestion, *see* Defs.' Mem. 16—Plaintiffs' harms would be redressed by the requested injunction. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) ("[C]ausation and redressability are often 'flip sides of the same coin.'") (citation omitted). Indeed, Defendants do not appear to dispute that at least part of the injunction requested here—an order preventing Defendants from refusing to disburse funds obligated under the terms of grant agreements that were in effect as of February 28, 2025—would remedy a harm that even Defendants recognize is cognizable: the "denial of payment under the grant agreements." Defs.' Mem. 16.

Defendants further err in arguing that Plaintiffs lack standing to seek an order enjoining Defendants from keeping Foundation employees on administrative leave, barring them from implementing or otherwise giving effect to the reduction in force ("RIF"), and prohibiting Marocco from exercising Foundation authority. *Id.* at 14-16. Although Plaintiffs must show an injury in fact for each form of relief sought, *Murthy v. Missouri*, 603 U.S. 43, 61 (2024), they are also entitled to "complete relief," *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1365 (D.C.

Cir. 2023). Here, such relief can be awarded only by issuing the injunction Plaintiffs have requested. As Plaintiffs have explained, Foundation employees deliver critical benefits to them, including organizing regional exchanges that allow grantees to learn best practices. *See, e.g.*, Reátegui Decl. ¶ 9, ECF No. 6-11; Ortiz Decl. ¶ 12, ECF No. 6-7. Foundation employees have also provided technical support and advice, and auditors contracted by the Foundation have assisted Plaintiffs with accounting, documentation, and legal compliance, which in turn has allowed Plaintiffs to leverage funds from other sources. *See, e.g.*, Chaux Decl. ¶ 11, ECF No. 6-10; *see also* Ibarlucia Decl. ¶ 6, ECF No. 6-4 (noting that 148 grantees report the potential to lose $13.5 million secured from other sources because of the termination of Foundation funds). Ending the employees' administrative leave and preventing the RIFs from taking effect is also necessary to return to the normal process of negotiating, and eventually awarding, new grants. *See* Reátegui Decl. ¶ 7, Bullock Decl. ¶ 11, ECF No. 6-8. And an order preventing Marocco from purporting to exercise the Board's powers is necessary to ensure that Plaintiffs and other stakeholders do not continue to be subject to the unlawful exercise of executive power by an individual lacking entitlement to wield it. *See Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000) (parties are harmed by being subjected to decisions rendered by improperly appointed officials). The relief Plaintiffs seek here has nothing to do with "broad fears about foreign policy outcomes." Defs.' Mem. 15. Instead, they seek to redress specific harms that Defendants have caused them.

B. <u>The Tucker Act does not deprive this Court of jurisdiction</u>

Defendants next argue that the Administrative Procedure Act's ("APA") waiver of sovereign immunity is inapplicable here because another statute—the Tucker Act, 28 U.S.C. §§ 1346(a), 1491(a)—"expressly or impliedly forbids the relief which is sought." Defs.' Mem. 10 (quoting 5 U.S.C. § 702). But Defendants' assertion that Plaintiffs' claims are "contractual," *id.* at 11, is wrong. Indeed, nearly every court to address similar arguments in the context of the Executive Branch's

recent efforts to cut off agency funds to grantees has rejected it. *See California v. U.S. Dep't of Educ.*, No. 25-1244, 2025 WL 878431, at *22 (1st Cir. Mar. 21, 2025); *Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, No. 1:25-cv-702, 2025 WL 863319, at *2–*5 (D. Md. Mar. 19, 2025); *Climate United Fund v. Citibank*, No. 1:25-cv-698, 2025 WL 842360, at *5–*6 (D.D.C. Mar. 18, 2025); *Aids Vaccine Advocacy Coal. v. U.S. Dep't of State*, No. 1:25-cv-400, 2025 WL 752378, at *8–*9 (D.D.C. Mar. 10, 2025); *Massachusetts v. Nat'l Insts. of Health*, No. 1:25-cv-10338, 2025 WL 702163, at *6–*8 (D. Mass. Mar. 5, 2025); *Pacito v. Trump*, No. 2:25-cv-255, 2025 WL 655075, at *16–*18 (W.D. Wash. Feb. 28, 2025). *But see U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 1:25-cv-465, 2025 WL 763738, at *4–*7 (D.D.C. Mar. 11, 2025).

Defendants' argument fails for at least two reasons. First, the agreements here are not properly characterized as contracts for purposes of the Tucker Act. The Tucker Act confers "exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (citation omitted). "For the Court of Federal Claims to have jurisdiction, a contract must contain 'the four required elements of offer, acceptance, consideration, and proper government authority.'" *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023) (citation omitted); *see also Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997) (similar). The consideration that the government receives must be "'tangible' and 'direct,' rather than 'generalized' or 'incidental.'" *Am. Near E. Refugee Aid*, 703 F. Supp. 3d at 132 (quoting *St. Bernard Parish Gov't v. United States*, 134 Fed. Cl. 730, 736 (2017), *aff'd on other grounds*, 916 F.3d 987 (Fed. Cir. 2019)). Here, although the United States' interests are served by, for example, helping rural women in southern Mexico access credit, *see* Porta Decl. ¶ 3, ECF No. 6-3, or teaching small farmers in El Salvador sustainable agricultural techniques, Gámez Decl. ¶¶ 3–4, ECF No. 6-2, the benefit the federal government receives is not the type that courts have recognized as "tangible"

or "direct." *St. Bernard Parish*, 134 Fed. Cl. at 736; *see also id.* at 735–736 (contrasting the incidental benefit the government received from grants to clean up debris in the wake of Hurricane Katrina with direct benefits such as service fees and facilities for federal use); *see generally Harlem Globetrotters Int'l, Inc. v. United States*, 168 Fed. Cl. 31, 38 (2023) (the "mere fact" that an agency makes a monetary grant is "not itself sufficient to prove or disprove the existence of a contract" between the agency and the grant recipient).

Second, the D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley*, 38 F.4th at 1107 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)). Instead, in determining whether the Tucker Act requires a claim to be brought in the Court of Claims, courts ask whether the action is "*at its essence* a contract claim." *Id.* (quoting *Megapulse*, 672 F.2d at 967). That analysis "depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Id.* (quoting *Megapulse*, 672 F.2d at 968).

Here, both the source of Plaintiffs' rights and the type of relief they seek demonstrate that Plaintiffs' claims are not contractual in nature. Plaintiffs do not seek recovery based on the particulars of the terms of the grant agreements. They do not seek damages for breach of contract or specific performance. Instead, they assert claims arising under the Constitution, the FVRA, and the APA, *see* Compl. ¶¶ 90–123, ECF No. 1, regardless of any breach of any agreement or the extent of their losses. Because Plaintiffs claims "require[] primarily an examination of the statutes the [government] has purportedly violated, not of [Plaintiffs'] contract" with the government, the Tucker Act does not divest this Court of jurisdiction. *Crowley*, 38 F.4th at 1109; *see also Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (Bork, J.) (Tucker

Act does not apply where claims "arise under a federal program and turn on the interpretation of statutes and regulations rather than on the interpretation of the agreement negotiated by the parties").

Nor do Plaintiffs seek damages owed for a contract or compensation for past wrongs. Rather, they seek declaratory and injunctive relief—relief that the Court of Claims has no authority to grant, *see Megapulse*, 672 F.2d at 963 n.13—ordering Defendants to comply with their constitutional and statutory obligations and preventing Marocco from purporting to exercise power he does not have. *See* Compl. pp.29–30. And the Tucker Act's jurisdictional requirements do not apply "merely because a plaintiff hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant." *Crowley*, 38 F.4th at 1108 (cleaned up); *see also Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (the mere "fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages'"). In any event, the benefits that Plaintiffs would receive from a ruling in their favor are not limited to the receipt of funds. They would also receive substantial benefits from an order ending Foundation employees' administrative leave and halting the RIF process, such as the ability learning best practices at regional exchanges and getting technical support and advice. *See supra* Section I.A.

## II. Plaintiffs Are Likely To Succeed On The Merits Of Their Claims

### A. Plaintiffs have presented a cognizable separation-of-powers claim

Defendants rely on *Dalton v. Specter*, 511 U.S. 462 (1994), to contend that Plaintiffs' separation-of-powers claim is no more than a dispute over statutory interpretation. Defs.' Mem. 17. Not so: Plaintiffs' claim cannot be reduced to a mundane dispute about the proper "statutory minimum" created under the Foundation's organic statute. Plaintiffs demonstrated in their motion for preliminary injunction that Defendants' decisions to fundamentally dismantle an agency created by Congress,

impound almost all of its appropriated funding, and effectively cease its operations trample upon Congress's power to make law (by creating the agency and specifying its functions) and to control federal funding. *See* Mem. in Supp. of Pls.' Mot. for Prelim. Inj. 11–15, ECF 6-1 ("Pls.' Mem."). This *is* "an interbranch, constitutional dispute," *contra* Defs.' Mem. 17, because Plaintiffs do not claim that the President "has acted in excess of his statutory authority," *Dalton*, 511 U.S. at 472, but instead that he has no authority—constitutional or statutory—unilaterally to abolish part of the federal government. Stated differently, Plaintiffs do not allege that the Further Consolidated Appropriations Act (or any other statute) granted Defendants some power vis-à-vis the Foundation and that such power has been exceeded. Rather, they allege that Defendants' actions violate core facets of our constitutional structure.

As is the case throughout their brief, Defendants mischaracterize Plaintiffs' claims as narrowly limited to whether some statutory provision requires the Foundation to fund *their grants*. *See* Defs.' Mem. 17 ("The only relevant question, then is whether the law requires that the Foundation continue to fund Plaintiffs' grants."). This framing ignores the substance of Plaintiffs' arguments that Defendants' decisions to effectively shutter the Foundation, in abdication of its statutory purpose and mission, and to impound its appropriated funding, arrogate to the Executive Branch powers reserved for Congress. These are properly pleaded constitutional claims.

Defendants' substantive objections to Plaintiffs' separation-of-powers claim is a distraction. Once again, they argue that no source of law "requires that the Foundation continue to fund Plaintiffs through now-terminated grant agreements … because Plaintiffs are not funded through direct congressional appropriations." *Id.* at 18. This is true but irrelevant. Plaintiffs did not argue, and need not establish, that some source of law prevents Defendants from *lawfully* terminating their grants. Plaintiffs have established, however, that Defendants' actions to cancel *all* but one or two of the Foundation's grants, fire all but three of its employees, usurp the powers of its Senate-confirmed

Board, fire its President, and all but cease its operations violate structural constitutional safeguards by aggrandizing power that does not belong to the President (or his officers). That is a viable constitutional claim that simply does not turn on "the routine execution of [Plaintiffs'] grant agreements." *Id.*[1]

The contention that "[t]he Foundation here determined … that the grants in question were 'inconsistent with the agency's priorities' … in the Western Hemisphere," *id.* at 18, is likewise unfounded. Defendants do not dispute that they undertook no process to discover what any Foundation grants actually fund, how they were operating, or how successful they have proven, or to consider the consequences of abrupt, across-the-board termination of almost all Foundation grants. This is not a foreign-affairs decision—it's simply an arbitrary set of actions taken to effectuate the President's own arbitrary determination that the Foundation itself is "unnecessary." Dismantling EO.

And contrary to Defendants' assertion, *see* Defs.' Mem. 19, review of these actions does not intrude on the foreign affairs power. That power is shared between Congress and the President. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015). In any event, the relevant powers here are Congress's powers to fund the Foundation's activities and make law. As another court in this district persuasively explained in rejecting this same argument, "[n]o one does or could doubt that the Executive is afforded significant discretion in administering the funds appropriated" to decide "how to use the[] funds," but the "critical point here, which Defendants do not contest, is that Congress's appropriations laws set the amount that is to be spent" and thus "reflect an exercise of Congress's own, core constitutional power to determine *whether and how much* money is spent." *Aids Vaccine Advocacy Coal.*, 2025 WL 752378 at *17. Plaintiffs' claim properly challenges Defendants' decision to

[1] Defendants' characterization of the actions challenged here as "the routine execution of … grant agreements," Defs.' Mem. 18, does not withstand scrutiny. As Plaintiffs' have explained, Defendants' actions have left the Foundation in ashes. *See* Compl. ¶¶ 48–89.

shutter the Foundation's operations, and relief on that claim would not intrude upon the Executive's core constitutional power.

Defendants' reliance on an opinion of the Department of Justice's Office of Legal Counsel ("OLC") distinguishing "a congressional directive to spend … in an area confided by the Constitution to [the President's] substantive direction and control, such as his authority … over foreign affairs" from a domestic impoundment, *see* Defs.' Mem. 19, is misplaced. The President undoubtedly has discretion over what projects the Foundation funds, but he lacks authority to determine that congressionally appropriated funding *will not* be spent—whether that appropriation concerns activities domestic or abroad.[2] *See Aids Vaccine Advocacy Coal.*, 2025 WL 752378, at * 17 (finding plaintiffs likely to succeed on constitutional claim challenging termination of USAID funding because "Defendants' unbridled understanding of the President's foreign policy power … would put the Executive above Congress in an area where it is 'firmly established' that the two branches share power … where Congress is exercising one of its core powers, and where there is no constitutional objection to the laws it has made").

Plaintiffs do not ask this Court to "supervise the Foundation's foreign assistance grants in some sort of receivership arrangement." Defs.' Mem. 19. Plaintiffs' requested relief would not preserve their grant awards in perpetuity, or prevent the Foundation from later canceling their or other grants—if undertaken in a lawful manner by an officer lawfully wielding the power of the Foundation. Plaintiffs ask this Court simply to roll back unlawful actions taken in the absence of authority, and

[2] Defendants also rely on a purported "unreviewable discretion not to take action," Defs.' Mem. 19, citing *Heckler v. Chaney*, 470 U.S. 821 (1985). But *Heckler* did not establish any such unreviewable discretion not to act—it merely stands for the proposition that an agency's decision not to take *an enforcement action* is presumptively unreviewable. *See* 470 U.S. at 831. Besides, 5 U.S.C. § 706(1) instructs courts to "compel agency action unlawfully withheld or unreasonably delayed," and Plaintiffs properly have invoked that provision as grounds for the Court to order Defendants to cease their unlawful impoundment.

that request falls firmly within the equitable power routinely exercised by the judicial branch. Defendants' invocation of cases confirming that the conduct of foreign affairs rests with the political branches, *id.* at 19–20, is beside the point.

Nor does it matter that "[n]othing in [the Take Care Clause's] plain text suggests that [it] provides a cause of action against the President." Defs'. Mem. 20. Plaintiffs brought a claim for violations of the separation of powers—a claim that courts hear routinely. *E.g.*, *Free Enter. Fund*, 561 U.S. at 491 n.2. One of the (many) ways in which Defendants have violated the separation of powers here is through abdication of the President's responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Plaintiffs' arguments are justiciable. *See City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) ("[T]he President's duty to enforce the laws necessarily extends to appropriations … meaning that failure to act may be an abdication of the President's constitutional role."); *In re Aiken Cnty.*, 725 F.3d 255, 259–60 (D.C. Cir. 2013) (Kavanaugh, J.) (confirming that neither President nor his subordinates have power to refuse to spend appropriated funds due to policy disagreements with the purposes chosen by Congress).

B. Defendants' actions to impound funds, terminate grants and contracts, and fire employees are *ultra vires*

1. *Federal statutes prohibit Defendants' impoundment of the Foundation's funding*

Defendants' contention that an *ultra vires* claim cannot rest on flagrant violation of the Impoundment Control Act is wrong. *See* Defs.' Mem. 22-23. It matters not that the Impoundment Act does not create a private right of action, or that the Comptroller General typically superintends compliance with its provisions. Nothing in the Impoundment Act or other statutes prohibits consideration of its provisions when reviewing whether an agency has acted in a manner not in accordance with law. *See New York v. Trump*, No. 1:25-cv-39, 2025 WL 715621, at *25 n.13 (D.R.I. Mar. 6, 2025) (rejecting same argument presented here, explaining that the court "declines to adopt such a narrow view of what it may consider when determining whether an agency has acted 'not in

accordance with law'" which "refers to *any* law" (quoting *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003))). Besides, Defendants' view of unreviewable power to take the challenged actions is inconsistent with *Aiken County*, which granted a petition for mandamus, explaining that "our constitutional system of separation of powers would be significantly altered if we were to allow executive and independent agencies to disregard federal law" by refusing to undertake activities directed by Congress. 725 F. 3d at 394; *see also id.* at 394 n.1 (confirming that, under Impoundment Act, "even the President does not have unilateral authority to refuse to spend the funds" appropriated by Congress because of policy disagreements).

Defendants' substantive argument regarding the Impoundment Act and the Anti-Deficiency Act, *see* Defs.' Mem. 23, is meritless. Defendants ignore the thrust of Plaintiffs' argument—and the broader context of their own actions in refusing to spend the federal funds Congress appropriated to the Foundation—and blithely claim that "Plaintiffs identify no provisions in congressional appropriations that mandate Plaintiffs (or, indeed, any specific Foundation grantee) continue to receive funding." *Id.* Of course Congress did not appropriate funding *to a grantee*, but that is of no import. Congress appropriated millions of dollars *to the Foundation*; Defendants have canceled almost all of its contracts and grants, fired all but three of its employees, and refused to spend those appropriated dollars. That refusal to allow the Foundation to access and spend its appropriated funds (thereby leaving those funds unallocated, in the custody of the Treasury Department) violates the Impoundment Act and creates a reserve in violation of the Anti-Deficiency Act. Those actions are *ultra vires*.

Defendants' artful drafting is noteworthy. Nowhere do Defendants claim that their refusal to spend the Foundation's appropriated funding writ large comports with the Impoundment Act and the Anti-Deficiency Act. Instead, they contend that "Plaintiffs are incorrect that any of Defendants' actions *vis-à-vis Plaintiffs* violate the" acts. *Id.* (emphasis added). This is nonresponsive to Plaintiffs'

claims and ignores the substantive requirements imposed by the relevant statutes. It matters not that Congress has not chosen "to mandate that Plaintiffs' grants continue to be funded." *Id.* Congress *did* choose to continue *the Foundation's* funding as recently as last month. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(11) (2025). Defendants' refusal to spend that money or to continue the vast majority of the Foundation's grants is *ultra vires.*

2. *Marocco was improperly appointed to the Board, and all actions he has purported to take in that role are without effect*

Defendants argue that "no statute limits or prohibits the President's prerogative to ensure that the Foundation has temporary leadership, particularly in the context of a presidential transition," so "nothing required the President to leave the Foundation leaderless." Defs.' Mem. 24. This contention not only flies in the face of the Appointments Clause, which requires that principal officers be nominated through the advice-and-consent process, but also ignores the carefully reticulated scheme set forth in the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. §§ 3345–3349d, which gives *limited* authority for acting appointments to certain principal offices.

Plaintiffs demonstrated in their motion that there is no "statutory silence," *contra* Defs.' Mem. 24, regarding the President's power to appoint acting Board members, because the FVRA plainly prohibits it. *See* Pls.' Mem. 17–19. Specifically, 5 U.S.C. § 3349c provides that the FVRA's authority to appoint acting officials "shall not apply" to entities like the Board. As a result, the President lacks the authority to "temporarily authoriz[e] an acting official to perform the function and duties" of the Board, *id.* § 3347(a), and the offices "shall remain vacant" until someone is appointed by the President with the advice and consent of the Senate, *id.* § 3348(b)(1). Defendants' alternative reading is incorrect for three reasons. First, it would render section 3348(d)(1)'s specific reference to section 3349c superfluous—a result that the OLC opinion on which Defendants rely acknowledges. *See Temporary Presidential Designation of Acting Board Members of the Inter-American Foundation and the United States African Development Foundation*, 49 Op. O.L.C. ___, at *8 n.3 (Mar. 14, 2025). Section 3348(d)(1) provides that

if a person purports to take actions "in performance of any function or duty of a vacant office to which … [section] 3349c appl[ies]," those actions "shall have no force or effect." If, despite section 3349c's language directing that the provisions allowing for acting appointments "shall not apply" to the positions listed in that section (including the Board positions) is nonetheless read to allow the President to appoint someone to the positions listed therein on an acting basis, it would render this language meaningless. But when construing statutes, "courts give effect, if possible to every clause and word." *Great Lakes Comnet, Inc. v. FCC*, 823 F.3d 998, 1003 (D.C. Cir. 2016) (quotation marks and citation omitted).

Second, Defendants' preferred reading of section 3349c ignores the fact that Congress has carefully identified when the President may appoint acting officers. The FVRA directs that its provisions—specially, sections 3345 and 3346—are the "exclusive means for temporarily authorizing an acting official to perform the functions and duties" of principal officers, "unless" there is "express[]" statutory authorization or the President makes an appointment under the Recess Appointments Clause. 5 U.S.C. § 3347(a). Neither exception applies here: Marocco's appointment was not pursuant to the Recess Appointments Clause, and section 3349c is not an "express[]" grant of authority. *Id.* Instead, section 3349c's "shall not apply" language is best understood as Congress divesting the President of the authority that he would otherwise have to make an acting appointment to the Board under sections 3345 and 3346. This reading of the statute is the only one that makes sense of the "statutory text as a whole[,] and asses[es] the words in the context in which they are used." *TIG Ins. Co. v. Republic of Argentina*, 110 F.4th 221, 231 (D.C. Cir. 2024).

Third, Defendants' reading cannot be reconciled with the FVRA's legislative history. As Plaintiffs have explained, in exempting entities like the Board from the FVRA, Congress intended to preserve the status quo with respect to the President's lack of power to make acting appointments to them. *See* Pls.' Mem. 19 (citing S. Rep. No. 105-250, at 22 (1998)). And Congress's view was that the

President did not have the authority to make such appointments. *See* S. Rep. No. 105-250, at 5. Defendants' contrary reading cannot be reconciled with what Congress clearly intended.

In the alternative, if the FVRA does not preclude Marocco's appointment to the Board, the Appointments Clause does. *See* Pls.' Mem. 20–21. Defendants dispute that understanding, arguing that the Take Care Clause carves out an implicit exception to the Appointments Clause under which the President may appoint acting officers unless Congress has explicitly forbidden him from doing so. Defs.' Mem. 24. That interpretation cannot be reconciled with the plain text of the Appointments Clause, which provides that "*all* … Officers of the United States" must obtain the "Advice and Consent of the Senate" before they may be appointed. U.S. Const. art. II, § 2, cl. 2 (emphasis added). It would also render one of the Constitution's most "critical structural safeguard[s]" impotent for potentially lengthy periods of time. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017) (cleaned up). Indeed, the few courts to address this topic have rejected Defendants' position. *See Williams v. Phillips*, 360 F. Supp. 1363, 1368 (D.D.C. 1973); *Olympic Federal Sav. & Loan Ass'n v. Director, Office of Thrift Supervision*, 732 F. Supp. 1183, 1199–1200 (D.D.C. 1990); *George v. Ishimaru*, 849 F. Supp. 68, 71 (D.D.C. 1994), *vacated as moot per curiam*, 1994 WL 517746 (D.C. Cir. 1994 Aug. 25, 1994).

C. Plaintiffs are likely to succeed on their APA claims

Defendants first recycle their sovereign immunity argument, *see supra* Section I.B, to argue that Plaintiffs' APA claims are not cognizable because they belong in the Court of Federal Claims. But as explained above, Plaintiffs have not, in fact, brought "a contract dispute for payment of funds" or a claim "for an improper breach of contract," *contra* Defs.' Mem. 27. Defendants' channeling argument under the APA fares no better than its jurisdictional defense. Plaintiffs' challenges to agency action are justiciable and properly pled under the APA.

Defendants' argument that their mass-cancelation decision was committed to agency discretion by law, *id.* at 27-28, is easily dispatched. It is true that an agency typically has broad, even

unreviewable, discretion to determine how to allocate a lump-sum appropriation. *See id.* (relying on *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993)). But Plaintiffs do not here challenge the Foundation's decision to allocate funding to one priority over another—or even the decision to cancel any particular grant based on the need "to allot appropriated funds among competing priorities and recipients." *Id.* at 27. Plaintiffs challenge (1) the decision to impound the Foundation's congressionally appropriated funding and unilaterally cancel almost all of its grants and contracts (Compl. ¶¶ 108–114); (2) the blanket denial of funding to the Foundation itself to pursue its legislatively directed mission (Compl. ¶¶ 115–118); and (3) the Treasury Department's violation of its mandatory duty to disburse funds upon a lawfully presented request from the Foundation (Compl. ¶¶ 119–123). Not only are these actions *not* committed to agency discretion by law, but the latter violates a nondiscretionary duty to act. Plaintiffs' APA claims are reviewable.

Defendants' APA merits responses continue to fundamentally misrepresent the nature of Plaintiffs' claims. The arbitrary-and-capricious claim, for instance, does not simply challenge "the termination of Plaintiffs' grants," nor does it turn on whether there exists any "requirement in the relevant statutes to issue these specific grants." Defs.' Mem. 29. Plaintiffs' motion plainly challenged "[t]he decision to cancel grants and contracts *en masse*," and demonstrated that Defendants (1) made no attempt to engage in any considered approach to determine whether and, if so, which grants should be canceled (or even to discover what the roughly 400 canceled grants funded); (2) failed to consider the requirements of the Impoundment and Anti-Deficiency Acts; (3) gave no reasoned explanation to support their decision; and (4) took no account of reliance interests. Pls.' Mem. 21. Defendants largely ignore these arguments.

Defendants also contend that "requiring a federal agency to articulate a rationale for its action beyond simple compliance with the President's directive" would contravene the principle that "the President is not an agency under the APA." Defs.' Mem. 29. Acceptance of this argument would gut

APA review, as the President is the head of the Executive Branch and a great many agency actions are taken at the President's directive (express or implied). *See Aids Vaccine Advocacy Coal.*, 2025 WL 752378, at *9 n.8 (rejecting this same argument as "not ground[ed] … in the text of the APA" and essentially boundless).

Defendants next argue that their across-the-board termination of contracts and grants was lawful because Plaintiffs' specific grant agreements "authorize the Foundation to terminate funding at will." Defs.' Mem. 30. This is true but equally nonresponsive. Plaintiffs' claim is that Defendant Treasury has a mandatory, nondiscretionary duty under the relevant appropriations statutes to make available and disburse the Foundation's funds for it to carry out its mission, and that Treasury lacks discretion to impound the Foundation's funds. This claim has nothing to do with the terms of any grant agreement. Defendants' response utterly fails to grapple with Plaintiffs' argument.

Defendants' final response is stunning. They assert that Plaintiffs' claim to compel agency action unlawfully withheld—which challenges Treasury's failure to comply with its nondiscretionary duty to disburse funds to the Foundation, in accordance with its congressional appropriations—fails because "Plaintiffs do not identify any 'lawfully presented disbursement requests from a Foundation employee with delegated authority over Foundation funding.'" Defs.' Mem. 30 (quoting Pls.' Mem. 24). Contrary to Defendants' assertion, if no such specific request has been made, it is not because Marocco "determined to terminate Plaintiffs' grant agreements," *id.*, but because Defendants *put almost all of the Foundation's employees an administrative leave and fired its President*, leaving no one in place to continue requesting appropriations and carrying out the Foundation's mission. Regardless, Plaintiffs have established that Treasury has a mandatory duty to make available the Foundation's appropriated funds for obligation and that this Court can compel that delayed or withheld agency action.

### III. The Irreparable Harm, Balance of the Equities, and Public Interest Factors Favor Plaintiffs' Request for a Preliminary Injunction

Defendants assert that Plaintiffs have not demonstrated irreparable harm and that preliminary relief is therefore inappropriate. Defs.' Mem. 30. Defendants assert that financial harms alone are not irreparable, *id.* at 31, but they neglect that Plaintiffs have demonstrated far more sweeping injuries. Irreparable injuries include those that "threaten[] the very existence" of a plaintiff, *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), or pose "obstacles unquestionably mak[ing] it more difficult for [a plaintiff] to accomplish [its] primary mission," *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (recognizing irreparable injury in form of actions that would cause plaintiffs "a substantial loss of business and perhaps even bankruptcy"). As courts in this district (including this one) recently recognized, funding cutoffs pose irreparable harms when they threaten the ability of organizations "to keep their doors open," *Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-239, 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025), or "force[] them to significantly cut down on staff or otherwise reduce core operations," *Aids Vaccine Advocacy Coal.*, 2025 WL 752378, at *17.

That is the case here. Contrary to Defendants' assertion, Plaintiffs have extensively "document[ed]" their claim that the termination of Foundation funds threatens their very existence with "specific details." Defs.' Mem. 31. Several Plaintiffs have provided detailed declarations explaining that, without Foundation funds, they may be forced to shutter entirely. *See, e.g.*, Chaux Decl. ¶ 8; Mendoza Decl. ¶¶ 6–7, ECF No. 6-5. Others have explained how Defendants' actions have forced them to lay off employees and cancel programs. *See, e.g.*, Zepeda Decl. ¶ 11, ECF No. 6-6; Porta Decl. ¶ 5. In any event, Defendants nowhere dispute that the termination of Foundation funds will make it more difficult for plaintiffs to accomplish their "primary mission[s]." *League of Women Voters*, 838 F.3d at 9. As Plaintiffs have explained, without Foundation funds, Plaintiffs will be unable to continue providing critical support to farmers, students, persons with disabilities, small

business owners, victims of violence, and others in their communities. *See* Gámez Decl. ¶¶ 3, 4, 6; Zepeda Decl. ¶ 6, 11–12; Chaux Decl. ¶¶ 2, 5; Mendoza Decl. ¶¶ 3, 6–7; Chavez Decl. ¶ 4, ECF No. 6-9; Reátegui Decl. ¶¶ 5, 8. Plaintiffs' "core missions"—and the "vital services" they provide—are therefore at stake. *Aids Vaccine Advocacy Coal.*, 2025 WL 752378, at *19; *see also New York*, 2025 WL 715621, at *14 (the "ripple effect of cutting off" federal funds is a component of irreparable harm).

And Defendants do not seriously dispute that the balance of the equities and the public interest favor a preliminary injunction. While the President has certain foreign affairs powers, *see* Defs.' Mem. 33, they do not vest him with the authority to ignore Congress's command that the Foundation "shall have perpetual succession unless sooner dissolved by an Act of Congress," 22 U.S.C. § 290f(e)(1); *see also supra* Section II.A. Nor do they entitle him to refuse to spend funds that Congress has appropriated, *see supra* Section II.A, or take arbitrary and capricious actions, *see supra* Section II.C. On the contrary, there is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operation." *League of Women Voters*, 838 F.3d at 12 (quotation marks and citation omitted). That is especially true in a case like this one, where following the law would enhance one of this Administration's professed priorities: addressing the root causes of migration. *See* Bullock Decl. ¶ 8 (noting that *none* of 400 internally displaced persons that received assistance from Plaintiff Cristosal migrated).

## IV. The Scope of Relief Requested Is Proper

Defendants are also wrong that relief should be limited to the Plaintiffs. Defs.' Mem. 34. "[D]istrict courts enjoy broad discretion in awarding injunctive relief." *Nat'l Min. Ass'n v. U.S. Army Corp of Engrs.*, 145 F.3d 1399, 1408 (D.C. Cir. 1998). Preliminary injunctions are "intended to maintain a status quo or to preserve the relative positions of the parties until a trial on the merits can be held." *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (citation and quotation marks omitted). Crafting a preliminary injunction requires courts to exercise their "discretion and

judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). To this end, in ordering equitable relief, courts must consider "what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (cleaned up).

Consistent with these principles, this Court may issue relief that applies to parties not before it "in appropriate circumstances." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1281–82 (11th Cir. 2021) (quoting *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015)). One such circumstance is where an injunction is necessary "to protect similarly situated nonparties." *Id.* at 1282 (quoting *City of Chicago v. Barr*, 961 F.3d 882, 916–917 (7th Cir. 2020)). That is the case here: Almost all grantees' funds were cut off in the same manner—a form letter—based on the Executive Branch's conclusion that they were "inconsistent with the agency's priorities." *E.g.*, Gámez Decl. ¶ 5 & Ex. A. Where the federal government relies on a "categorical polic[y]," "categorical relief" is "call[ed] for." *Roe v. Dep't of Defense*, 947 F.3d 207, 232 (4th Cir. 2020). "[J]ust as the Government identified no facts particular to any one" grantee to justify terminating grants, "no facts require different relief for [grantees] subjected to the same categorical determination." *Id.* Indeed, an injunction with respect to other grantees is especially appropriate here, because only a few parties have "the ability to quickly bring their case before a court." *Nat'l Insts. of Health*, 2025 WL 702163, at *33 (quoting Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. Rev. 1065, 1094–1095 (2018)). Most Foundation grantees are small organizations with limited funds operating in other countries. *See* Ibarlucia Decl. ¶ 6 & Ex. A. They "should not be forced to suffer harm just because there was not enough time and resources for them to join the suit because of [Defendants'] rush to" shut the Foundation down. *Nat'l Insts. of Health*, 2025 WL 702163, at *33.

An injunction tailored to the scope of Defendants' illegal actions is appropriate for additional reasons. Other grantees are not merely "dispersed throughout the United States," *Florida*,

19 F.4th 1282, but throughout the Western Hemisphere. Plaintiffs have also asserted claims under the APA, and if they prevail, the ordinary result would be that the actions are vacated, "not that their application to the individual [Plaintiffs] is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). It would be "anathema to reasonable jurisprudence that only the named Plaintiffs should be protected from the irreparable harms of an unlawful regulation." *Nat'l Insts. of Health*, 2025 WL 702163, at *34. In addition, the "broad impact" of Defendants' actions "warrants a broad response" until this case can be finally resolved. *Id.* These considerations plainly warrant the injunction Plaintiffs request. *See Nat'l Council of Nonprofits*, 2025 WL 579959, at *19 (awarding similar relief); *Aids Vaccine Advocacy Coal.*, 2025 WL 752378, at *23 (similar); *Nat'l Insts. of Health*, 2025 WL 702163, at *33 (similar).[3]

**V. The Court Should Waive Any Security**

Finally, the Court should deny Defendants' request that Plaintiffs post a bond under Federal Rule of Civil Procedure 65(c). Defs.' Mem. 35–36. This Court has previously explained that "Rule 65(c) 'has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond,' 'including the discretion to require no bond at all.'" *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19 (citations omitted). "A bond 'is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action.'" *Id.* (citation omitted). That is the case here. Defendants ask this Court to require Plaintiffs—nine organizations with small budgets—to post a bond that could run into the millions of dollars. It would "defy logic" to "hold Plaintiffs hostage" in a case where the government is

[3] Defendants argue that "relief is categorically unavailable against the President." Defs.' Mem. 34. The Court need not address this argument at this juncture, as Plaintiffs have not requested that the preliminary injunction run against the President. *See* Proposed Order, ECF No. 6-12.

alleged to have withheld "previously committed funds to" hundreds of recipients—especially where Defendants will "personally face no monetary injury from the injunction." *Id.*[4]

**CONCLUSION**

This Court should grant Plaintiffs' motion for preliminary injunction.

April 2, 2025

Respectfully submitted,

/s/ Samuel P. Siegel
Kate Talmor* (Maryland Bar)
Rupa Bhattacharyya† (D.C. Bar No. 1631262)
Gregory Briker (D.C. Bar No. 90030391)
Mary B. McCord (D.C. Bar No. 427563)
Samuel P. Siegel* (California Bar No. 294404)
INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 661-6806
kt894@georgetown.edu
ss5427@georgetown.edu
gb954@georgetown.edu

*Attorneys for Plaintiffs*

* *DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.*

† *Application for DDC Admission forthcoming*

[4] Defendants' request for a stay pending appeal, Defs.' Mem. 36, is premature. If the Court enters injunctive relief, Defendants can request a stay based on the terms of the actual order.

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2025, I caused the foregoing to be served on counsel of record for the Defendants via the Court's electronic case filing system.

/s/ Samuel P. Siegel
Samuel P. Siegel

Attorney for Plaintiffs Cristosal Human Rights, et al.