# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CRISTOSAL HUMAN RIGHTS, *et al.*,

        *Plaintiffs*,

*v.*

PETE MAROCCO, in his official
capacity as the Acting Deputy Administrator for
Policy Planning and for Management and
Resources for the U.S. Agency for International
Development and Director of Foreign
Assistance at the Department of State, *et al.*,

        *Defendants*.

Civil Action No. 1:25-cv-857-LLA

**COMBINED MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION
TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

### TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 2

I.      Legal Background ................................................................................................................ 2

II.     The President's Directive To Reduce The Foundation To The Minimum Presence
        Required By Law ................................................................................................................ 4

III.    Plaintiffs And This Action ................................................................................................. 6

LEGAL STANDARDS .................................................................................................................. 8

ARGUMENT .................................................................................................................................. 9

I.      This Court lacks subject-matter jurisdiction ...................................................................... 9

        A.     This action should be dismissed as moot or, at a minimum, stayed because
              Plaintiffs challenge actions that this Court already held void. ................................. 9

        B.     This Court lacks jurisdiction over Plaintiffs' claims pertaining to their grant
              agreements. ............................................................................................................... 12

              1. The grant agreements are contracts. ................................................................ 14

              2. Plaintiffs' claims are contractual. ................................................................... 18

              3. That Plaintiffs seek to remedy additional harms does not confer jurisdiction over
              Plaintiffs' contractual claims. .............................................................................. 21

         C.     Plaintiffs lack Article III standing to obtain much of the relief sought ..................... 23

II.     Plaintiffs' separation-of-powers claim fails ..................................................................... 25

        A.     Plaintiffs' claim is statutory, not constitutional. ...................................................... 25

        B.     The relief sought by Plaintiffs, not any action taken by Defendants, threatens
              the separation of powers. .......................................................................................... 27

III.    Plaintiffs' *ultra vires* claims fail. ................................................................................... 30

        A.     Plaintiffs fail to state an *ultra vires* claim alleging violations of the
              Impoundment Control Act and the Anti-Deficiency Act. ........................................ 30

        B.     Plaintiffs fail to state an *ultra vires* claim regarding Marocco's appointment as
              an acting member of the Foundation Board. ........................................................... 32

IV.    Plaintiffs' APA claims fail. .............................................................................................. 37

i

A.     APA review is unavailable because the Tucker Act provides an adequate remedy. ................................................................................................37

B.     Termination of grants is committed to agency discretion by law ..............................38

C.     Defendants' actions did not violate the APA .................................................39

V.    Any relief should be limited. .............................................................................................40

A.     Plaintiffs are not entitled to a permanent injunction .......................................40

1. Plaintiffs fail to show irreparable harm that cannot be remedied at law ................41

2. The balance of the equities and public interest disfavor injunctive relief. ..............42

B.     Relief must be limited to address Plaintiffs' injuries ......................................43

C.     Relief is not available against the President. ..................................................44

CONCLUSION ...................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*360Training.com, Inc. v. United States,*
  104 Fed. Cl. 575 (2012)................................................................................................17

*Abdelfattah v. U.S. Dep't of Homeland Sec.,*
  787 F.3d 524 (D.C. Cir. 2015) .....................................................................................10

*ACLU of Ky. v. McCreary Cnty., Ky.,*
  607 F.3d 439 (6th Cir. 2010)........................................................................................13

*Adams v. Vance,*
  570 F.2d 950 (D.C. Cir. 1978) .....................................................................................30

*Air Line Pilots Ass'n v. Miller,*
  523 U.S. 866 (1998)......................................................................................................11

*Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.,*
  357 F.3d 62 (D.C. Cir. 2004) .......................................................................................21

*Am. Bar Ass'n v. FTC,*
  636 F.3d 641 (D.C. Cir. 2011) .....................................................................................11

*Am. Ground Transportation, Inc. v. United States,*
  165 Fed. Cl. 659 (2023)................................................................................................15

*Am. Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003)......................................................................................................28

*Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.,*
  703 F. Supp. 3d 126 (D.D.C. 2023) .......................................................................14, 16

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.,*
  64 F.4th 1354 (D.C. Cir. 2023).....................................................................................41

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015)......................................................................................................44

*Auster v. Ghana Airways Ltd.,*
  514 F.3d 44 (D.C. Cir. 2008) .........................................................................................9

*Bancoult v. McNamara,*
  445 F.3d 427 (D.C. Cir. 2006) .....................................................................................29

*Bates v. United States,*
  522 U.S. 23 (1997)........................................................................................................20

*Boivin v. U.S. Airways, Inc.,*
  297 F. Supp. 2d 110 (D.D.C. 2003)..............................................................................42

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988).................................................................................................22, 38

*California v. Texas,*
  593 U.S. 659 (2021)......................................................................................................25

*California v. U.S. Dep't of Educ.,*
   132 F.4th 92 (1st Cir. 2025) ........................................................................................21

*California v. U.S. Dep't of Educ.,*
   --- F. Supp. 3d ---, 2025 WL 760825 (D. Mass. Mar. 10, 2025)........................................13

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ................................................................................................9

*Chamber of Com. v. Reich,*
   74 F.3d 1322 (D.C. Cir. 1996) ..................................................................................12

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) ...........................................................................41, 42

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.,*
   333 U.S. 103 (1948) ..............................................................................................29

*Citizens for Const. Integrity v. Census Bureau,*
   115 F.4th 618 (D.C. Cir. 2024) .................................................................................25

*City of Wheeling, W. Va. v. United States,*
   20 Cl. Ct. 659 (Fed. Cl. 1990) ..................................................................................18

*City of Wheeling, W. Va. v. United States,*
   928 F.2d 410 (Fed. Cir. 1991) ..................................................................................18

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ..............................................................................................24

*Clarke v. United States,*
   915 F.2d 699 (D.C. Cir. 1990) ..................................................................................10

*Conservation Force, Inc. v. Jewell,*
   733 F.3d 1200 (D.C. Cir. 2013) .................................................................................10

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,*
   38 F.4th 1099 (D.C. Cir. 2022) ...........................................................................18, 21

*Ctr. for Biological Diversity v. McAleenan,*
   404 F. Supp. 3d 218 (D.D.C. 2019) ..............................................................................9

*Dalton v. Specter,*
   511 U.S. 462 (1994) ..............................................................................................26

*D'Andrea Bros. LLC v. United States,*
   96 Fed. Cl. 205 (2010)............................................................................................18

*Davis v. Pension Benefit Guar. Corp.,*
   571 F.3d 1288 (D.C. Cir. 2009) .................................................................................43

*DCH Reg'l Med. Ctr. v. Azar,*
   925 F.3d 503 (D.C. Cir. 2019) ..................................................................................30

*Dep't of Education v. Cal.,*
   145 S. Ct. 966 (2025) .........................................................................................1, 12

*Doe 2 v. Trump,*
  319 F. Supp. 3d 539 (D.D.C. 2018) ...................................................................................45

*Doehla Greeting Cards, Inc. v. Summerfield,*
  227 F.2d 44 (D.C. Cir. 1955) ..........................................................................................31

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) .........................................................................................................41

*Edmond v. United States,*
  520 U.S. 651 (1997) ...................................................................................................32, 34

*Ehrman v. United States,*
  429 F. Supp. 2d 61 (D.D.C. 2006) ....................................................................................9

*Fed. Express Corp. v. U.S. Dep't of Com.,*
  39 F.4th 756 (D.C. Cir. 2022) .........................................................................................30

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) .........................................................................................................45

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) .............................................................................................32, 34, 37

*Garcia v. Vilsack,*
  563 F.3d 519 (D.C. Cir. 2009) ........................................................................................38

*Gaylor v. United States,*
  74 F.3d 214 (10th Cir. 1996) ...........................................................................................13

*Gen. Land Off. v. Biden,*
  722 F. Supp. 3d 710 (S.D. Tex. 2024) .............................................................................31

*Gill v. Whitford,*
  585 U.S. 48 (2018) .....................................................................................................25, 44

*Great-West Life & Annuity Ins. Co. v. Knudson,*
  534 U.S. 204 (2002) .........................................................................................................22

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.,*
  527 U.S. 308 (1999) .........................................................................................................44

*Gulf Oil Corp. v. Dep't of Energy,*
  514 F. Supp. 1019 (D.D.C. 1981) ...................................................................................42

*Hall v. CIA,*
  437 F.3d 94 (D.C. Cir. 2006) ..........................................................................................10

*Harisiades v. Shaughnessy,*
  342 U.S. 580 (1952) .........................................................................................................29

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ...................................................................................................29, 39

*Hi-Tech Pharmacal Co. v. FDA,*
  587 F. Supp. 2d 1 (D.D.C. 2008) ....................................................................................41

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ..................................................................................................................43

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  219 F. Supp. 2d 57 (D.D.C. 2002) ........................................................................................43

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  333 F.3d 156 (D.C. Cir. 2003) ..............................................................................................43

*Hometown Connections v. Noem*,
  No. 8:25-cv-885, 2025 WL 1103253 (D. Md. Apr. 14, 2025) ..............................................13

*Hulley Enters. Ltd. v. Russian Fed'n*,
  211 F. Supp. 3d 269 (D.D.C. 2016) ......................................................................................12

*In re Aiken County*,
  725 F.3d 255 (D.C. Cir. 2013) ........................................................................................27, 28

*In re Operation of Mo. River Sys. Litig.*,
  421 F.3d 618 (8th Cir. 2005) .................................................................................................11

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985) ................................................................................................21

*Iron Arrow Honor Soc'y v. Heckler*,
  464 U.S. 67 (1983) ...................................................................................................................9

*Johnson v. Eisentrager*,
  339 U.S. 763 (1950) ...............................................................................................................29

*Kidwell v. Dep't of the Army*,
  56 F.3d 279 (D.C. Cir. 1995) ................................................................................................22

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) .................................................................................................................9

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936) ...............................................................................................................11

*Larsen v. U.S. Navy*,
  525 F.3d 1 (D.C. Cir. 2008) ..................................................................................................10

*Lenoir v. Porters Creek Watershed Dist.*,
  586 F.2d 1081 (6th Cir. 1978) ..............................................................................................23

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ...............................................................................................................39

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...............................................................................................................24

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ...............................................................................................................44

*McKay v. United States*,
  703 F.2d 464 (10th Cir. 1983) ..............................................................................................23

*Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.,*
    763 F.2d 1441 (D.C. Cir. 1985) ................................................................................20

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) ............................................................................ 18, 21

*Mississippi v. Johnson,*
    71 U.S. 475 (1866) ................................................................................................45

*Mo. Health and Med. Org., Inc. v. United States,*
    641 F.2d 870 (Ct. Cl. 1981) ..................................................................................18

*Monzillo v. Biller,*
    735 F.2d 1456 (D.C. Cir. 1984) .............................................................................10

*Moore v. United States,*
    48 Fed. Cl. 394 (2000) ..........................................................................................18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................................40

*Murthy v. Missouri,*
    603 U.S. 43 (2024) .......................................................................................... 23, 24

*Myers v. United States,*
    272 U.S. 52 (1926) .......................................................................................... 35, 37

*N. Am. Butterfly Ass'n v. Wolf,*
    977 F.3d. 1244 (D.C. Cir. 2020) ....................................................................... 31, 32

*Nat'l Indus. for Blind v. Dep't of Veterans Affs.,*
    296 F. Supp. 3d 131 (D.D.C. 2017) .......................................................................11

*Nat'l Mining Ass'n v. Jackson,*
    768 F. Supp. 2d 34 (D.D.C. 2011) .........................................................................42

*Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.,*
    435 F.3d 326 (D.C. Cir. 2006) ..............................................................................44

*New York v. Raimondo,*
    No. 1:19-CV-09380-MKV, 2021 WL 1339397 (S.D.N.Y. Apr. 9, 2021) .......................11

*Newdow v. Bush,*
    391 F. Supp. 2d 95 (D.D.C. 2005) .........................................................................13

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ..............................................................................................45

*Nken v. Holder,*
    556 U.S. 418 (2009) ..............................................................................................43

*Nyunt v. Chairman, Broad. Bd. of Governors,*
    589 F.3d 445 (D.C. Cir. 2009) ..............................................................................30

*Perry Cap. LLC v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017) .................................................................... 20, 21, 38

*Pharmachemie B.V. v. Barr Laboratories, Inc.*,
   276 F.3d 627 (D.C. Cir. 2002) ........................................................................................10

*Pippenger v. U.S. DOGE Service*,
   No. 25-CV-1090 (BAH), 2025 WL 1148345 (D.D.C. Apr. 17, 2025).................................13

*Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
   337 F. Supp. 3d 308 (S.D.N.Y. 2018) ...............................................................................31

*Pub. Citizen v. Stockman*,
   528 F. Supp. 824 (D.D.C. 1981) .......................................................................................31

*Quiman, S.A. de C.V. v. United States*,
   No. 98-5036, 1999 WL 44182 (Fed. Cir. 1999)..................................................................15

*Russello v. United States*,
   464 U.S. 16 (1983) ...........................................................................................................20

*Safari Club Int'l v. Jewell*,
   47 F. Supp. 3d 29 (D.D.C. 2014) .....................................................................................42

*San Antonio Hous. Auth. v. United States*,
   143 Fed. Cl. 425 (2019).........................................................................................14, 17, 18

*Schneider v. Kissinger*,
   412 F.3d 190 (D.C. Cir. 2005) .........................................................................................29

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
   591 U.S. 197 (2020) .........................................................................................................32

*Seneca Nation of Indians v. U.S. Dep't of Health & Human Servs.*,
   144 F. Supp. 3d 115 (D.D.C. 2015) ..................................................................................12

*Sharp v. Weinberger*,
   798 F.2d 1521 (D.C. Cir. 1986) .......................................................................................21

*Spectrum Leasing Corp. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985) .........................................................................................20

*St. Bernard Parish Government v. United States*,
   134 Fed. Cl. 730 (2017)....................................................................................................16

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) .........................................................................................45

*Talavera v. Shah*,
   638 F.3d 303 (D.C. Cir. 2011) ...........................................................................................9

*Texas v. United States*,
   537 F.2d 466 (Ct. Cl. 1976) .............................................................................................18

*Thermalon Indus., Ltd. v. United States*,
   34 Fed. Cl. 411 (1995)................................................................................................16, 17

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992) .........................................................................................21

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) .................................................................................................23

*Trauma Serv. Grp. v. United States,*
   104 F.3d 1321 (Fed. Cir. 1997) ..............................................................................17

*Twin Metals Minn. LLC v. United States,*
   No. 22-cv-2506, 2023 WL 5748624 (D.D.C. Sept. 6, 2023) ..........................20, 33

*Union of Concerned Scientists v. Dep't of Energy,*
   998 F.3d 926 (D.C. Cir. 2021) ...............................................................................25

*United States v. Arthrex, Inc.,*
   594 U.S. 1 (2021) .............................................................................................*passim*

*United States v. Curtiss-Wright Exp. Corp.,*
   299 U.S. 304 (1936) ..........................................................................................28, 29

*United States v. President & Fellows of Harvard Coll.,*
   323 F. Supp. 2d 151 (D. Mass. 2004) ....................................................................16

*Versata Dev. Corp. v. Rea,*
   959 F. Supp. 2d 912 (E.D. Va. 2013) ....................................................................38

*Versata Dev. Corp. v. Rea,*
   793 F.3d 1352 (Fed. Cir. 2015) .............................................................................38

*Ware v. United States,*
   626 F.2d 1278 (5th Cir. 1980) ...............................................................................23

*Wilkerson v. United States,*
   67 F.3d 112 (5th Cir. 1995) ..............................................................................22, 23

*Williams v. Phillips,*
   482 F.2d 669 (D.C. Cir. 1973) ....................................................................34, 35, 36

*Wis. Gas Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) ..........................................................................41, 42

*Worthy v. Herter,*
   270 F.2d 905 (D.C. Cir. 1959) ...............................................................................30

*Wright v. Foreign Serv. Grievance Bd.,*
   503 F. Supp. 2d 163 (D.D.C. 2007) .......................................................................21

*York Assocs., Inc. v. Sec'y of Hous. & Urb. Dev.,*
   815 F. Supp. 16 (D.D.C. 1993) ..............................................................................22

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ...............................................................................................28

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
   576 U.S. 1 (2015) ...................................................................................................28

## Constitution

U.S. Const. art. II ........................................................................................5, 32, 33

## Statutes

2 U.S.C. § 687 ..............................................................................................31

5 U.S.C. § 701(a)(2) ......................................................................................38

5 U.S.C. § 702 ..............................................................................................22

5 U.S.C. § 704 ..............................................................................................38

22 U.S.C. § 290f(b) ........................................................................................3

22 U.S.C. § 290f(c) ........................................................................................3

22 U.S.C. § 290f(e) ........................................................................................3

22 U.S.C. § 290f(g) ........................................................................................3

22 U.S.C. § 290f(i) ........................................................................................3

22 U.S.C. § 290f(j) ........................................................................................3

22 U.S.C. § 290f(l) ........................................................................................3

22 U.S.C. § 290f(t) ........................................................................................3

28 U.S.C. § 1491(a)(1) .............................................................................. 12, 17

31 U.S.C. § 6304(1) ......................................................................................17

31 U.S.C. § 6305(1) ......................................................................................17

42 U.S.C. § 10134(d) ....................................................................................28

Anti-Deficiency Act,
    Pub. L. No. 97-258, 96 Stat. 877 (1982) .............................................31

Federal Vacancies Reform Act of 1998,
    5 U.S.C. § 3345 *et seq.* ................................................................*passim*

Consolidated Appropriations Act, 2023,
    Pub. L. No. 117-328, 136 Stat. 4459 (2022) ......................................19

Further Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 460.............................*passim*

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. No. 119-4, § 1101(a)(11), 139 Stat. 9 .....................................4

Impoundment Control Act of 1974,
    Pub. L. No. 93-344, tit. X, 88 Stat. 297 (1974)...................................30

## Rules

Fed. R. Civ. P. 12(h)(3)...................................................................................9

Fed. R. Civ. P. 56(a) ......................................................................................8

Fed. R. Civ. P. 25(d) ......................................................................................1

## Regulations

Notices, *Inter-American Foundation: Sunshine Act Meetings*, 90 Fed. Reg. 11546-01 (Mar. 7, 2025)...........5

Executive Order No. 14,217, 90 Fed. Reg. 10577 (Feb. 25, 2025).......................................*passim*

**Other Authorities**

*Auth. of the Pres. to Remove the Staff Director of the Civil Rights Comm'n & Appoint an Acting Staff Director*,
  25 Op. O.L.C. 103 (2001) ......................................................................................................34

*Mem. from William H. Rehnquist, Ass. Att'y Gen., Off. of L. Couns., Re: Pres. Auth. to Impound Funds
  Appropriated for Assistance to Federally Impacted Schs.*,
  1 Suppl. Op. O.L.C. 303 (1969) ............................................................................................29

*Power of the President to Designate Acting Member of the Federal Home Loan Bank Board*,
  1 Op. O.L.C. 150 (1977)..........................................................................................33, 34, 35

Pres. Nom. 29-1, 119th Cong. (Mar. 10, 2025),
  https://www.congress.gov/nomination/119th-congress/29/1?s=2&r=167 ..................................5

Pres. Nom. 29-4, 119th Cong. (Mar. 10, 2025),
  https://www.congress.gov/nomination/119th-congress/29/4?s=2&r=164 ..................................5

*Temp. Pres. Designation of Acting Bd. Members of Inter-Am. Found. & U.S. African Dev. Found.*,
  49 Op. O.L.C. ___ (Mar. 14, 2025) ...................................................................................*passim*

## INTRODUCTION

This action concerns the efforts of Plaintiffs, nine former recipients of grants provided by the Inter-American Foundation ("IAF" or the "Foundation"), to restart the flow of funds under grant agreements that the Foundation terminated on March 4, 2025. Plaintiffs' wide-ranging claims—which allege violations of numerous federal statutes and constitutional provisions—fail for both jurisdictional and merits-based reasons.

Start with subject-matter jurisdiction. Almost all of Plaintiffs' claims fall into one of two categories: they either seek payment under or reinstatement of grant agreements, or they seek relief wholly disconnected from Plaintiffs' injuries. As to the former, Plaintiffs cannot identify any waiver of sovereign immunity to pursue claims against the government in federal district court for payment under contracts such as the terminated grant agreements. To the contrary, the Supreme Court recently held in an indistinguishable action that also challenged a programmatic termination of grants that such claims must be brought under the Tucker Act in the Court of Federal Claims. *Dep't of Education v. Cal.*, 145 S. Ct. 966, 968 (2025) (per curiam). And D.C. Circuit precedent is clear that Plaintiffs cannot evade the Tucker Act's jurisdictional bar merely by appending additional requests for relief to their claims that principally seek the reinstatement of terminated contracts. This Court also lacks subject matter jurisdiction over Plaintiffs' claims that seek to place the Foundation under judicial receivership because Plaintiffs fail to show that both Foundation grants for non-party recipients and Foundation employment levels must be maintained at their current levels to avoid any injury to these Plaintiffs.

Even if this Court were to reach the merits, Plaintiffs' claims fail on their own terms. With respect to their constitutional claims, Plaintiffs' claims fundamentally aver that Defendants violated their statutory obligations. This is a separate claim that, even if true (and it is not), would not amount to a constitutional violation. And in any event, those claims fail because the Foundation has not

violated any congressional mandate—no statute requires that Plaintiffs' grants exist in perpetuity, particularly because they implicate foreign affairs, where the President's discretion is vast.

Plaintiffs' *ultra vires* claim premised on impoundment fail for this same reason, and independently because Congress carefully crafted a mechanism for judicial review of impoundment claims—a lawsuit brought by the Comptroller General—that precludes *ultra vires* review. Likewise, Plaintiffs' *ultra vires* claims concerning the designation of Pete Marocco as acting chairman of the Board of the Foundation overlook the President's Article II authority, which is not constrained here by the Federal Vacancies Reform Act because that Act does not apply to the Foundation.

Finally, Administrative Procedure Act (APA) review is not available because the Tucker Act provides an alternative path for review of Plaintiffs' contract-specific grievances, and because the allocation of funds to grantees is an agency determination that is not susceptible to judicial review under longstanding Supreme Court precedent. In any event, the Foundation's termination of the grant agreements stated a sufficient rationale: the grant agreements were no longer consistent with the Foundation's priorities and contrary to the President's instructions. The APA requires no more.

For these reasons, explained further below, the Court should deny Plaintiffs' motion for summary judgment, dismiss this action for lack of jurisdiction or, in the alternative, grant Defendants' cross-motion for summary judgment.

## BACKGROUND

### I.    Legal Background

In 1969, Congress established the Foundation to "strengthen the bonds of friendship and understanding" among the peoples of the Western Hemisphere, to "support self-help efforts designed to enlarge the opportunities for individual development," to "stimulate and assist effective and ever wider participation of the people in the development process," and to "encourage the establishment and growth of democratic institutions . . . appropriate to the requirements" of the Nations in the

Western Hemisphere.  22 U.S.C. § 290f(b).  The Foundation seeks to achieve these goals by "undertaking or sponsoring appropriate research and by planning, initiating, assisting, financing, administering, and executing programs and projects" in partnership with private entities.  *Id.* § 290f(c). Congress thus empowered the Foundation to "make and perform contracts and other agreements with any individual, corporation, or other body of persons . . ., and with any government or governmental agency, domestic or foreign."  *Id.* § 290f(e)(3).  The Foundation is subject to the provisions of the Government Corporation Control Act [31 U.S.C. §§ 9101 *et seq.*].  22 U.S.C. § 290f(t).

The Foundation is managed by its Board of Directors, which contains up to nine members appointed by the President and subject to Senate confirmation.  *Id.* § 290f(g).  Board members serve six-year terms and no more than five Board members can be members of any one political party.  *Id.* Board members do not enjoy any protection from at-will removal by the President.  *See generally id.* § 290f.  The President designates a Chairman and Vice Chairman from among the Board Members.  *Id.* § 290f(g).  The Board directs "the exercise of all the powers of the Foundation."  *Id.* § 290f(i). Accordingly, a "majority of the Board . . . required as a quorum" "may prescribe, amend, and repeal bylaws, rules, and regulations governing the manner in which the business of the Foundation may be conducted and in which the powers granted to it by law may be exercised and enjoyed."  *Id.* § 290f(j). Finally, the Board appoints a president of the Foundation, who acts as chief executive of the Foundation and serves "on such terms as the Board may determine."  *Id.* § 290f(l)(1).

Congressional appropriations statutes make funding available for the Foundation without mandating that any specific sum within the appropriation be granted to any particular recipient or, indeed, used for grants at all.  For example, in 2024, Congress appropriated $47 million "[f]or necessary expenses to carry out the functions of the Inter-American Foundation in accordance with the provisions of section 401 of the Foreign Assistance Act of 1969."  Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 460, 746.  These funds are "to

3

remain available until September 30, 2025." *Id.* Congress then provided the Foundation with the same level of funding in a continuing resolution that became law on March 15, 2025, again without mandating that funds be used for grants. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(11), 139 Stat. 9, 11-12.

## II.    The President's Directive To Reduce The Foundation To The Minimum Presence Required By Law

On February 19, 2025, President Trump signed an Executive Order to "commence[] a reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary." Executive Order No. 14,217, 90 Fed. Reg. 10577 (Feb. 25, 2025).[1] The Executive Order reflected the President's determination that "[r]educing the size of the Federal Government will minimize Government waste and abuse, reduce inflation, and promote American freedom and innovation." *Id.* § 1. To accomplish that end, the Executive Order directed that "the non-statutory components and functions of" four named governmental entities "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id.* § 2(a). The Foundation was among the four entities subject to the order. *Id.* § 2(a)(ii). The Executive Order directed the Foundation to "submit a report to the Director of the Office of Management and Budget . . . confirming compliance with this [Executive Order] and stating whether the governmental entity, or any components or functions thereof, are statutorily required and to what extent." *Id.* § 2(b).

---

[1] Defendants refer to materials already before this Court or in the public record rather than produce a certified administrative record. In light of the competing claims to the exercise of the Foundation's authority at issue in *Aviel v. Gor*, No. 1:25-cv-778 (D.D.C.) ("*Aviel*"), Defendants cannot obtain a certified administrative record from a current Foundation employee. To Defendants' knowledge, the decisional documents that would compose the administrative record in this matter—Executive Order No. 14,217, the grant agreements, and the notices terminating those grant agreements—are either publicly available or already in the record before this Court. Counsel for Defendants have advised counsel for Plaintiffs of Defendants' intention to refer to materials already before this Court or in the public record in place of an administrative record.

As of February 23, 2025, the Foundation had only four Board members. After determining that the Board members were not adequately complying with his order, the President removed three of the four Board members on February 24, 2025. *See Temporary Presidential Designation of Acting Board Members of the Inter-American Foundation and the United States African Development Foundation*, 49 Op. O.L.C. ___ (Mar. 14, 2025) (*Temporary Presidential Designation*). President Trump removed the remaining Board member on February 26, 2025. *See id.*; *see also* Compl. ¶¶ 66-68.

On February 28, 2025, President Trump requested advice from the Department of Justice's Office of Legal Counsel on "whether the President has authority to designate acting Board members notwithstanding the absence of specific statutory authorization to do so." *Temporary Presidential Designation*, at *3. "Consistent with the Office's longstanding view," the President was advised that his "constitutional duty to 'take Care that the Laws be faithfully executed,' U.S. Const. art. II, § 3, conveys that authority." *Id.* Later that day, the President designated Pete Marocco as an acting Board member and Chairman of the Foundation. *See id.*; *see also* Decl. of Pete Marocco ¶ 3, *Aviel*, ECF No. 14-1 ("Marocco Decl."). Mr. Marocco was the sole member of the Board at that time. Marocco Decl. ¶ 3.

Once designated, Marocco in his capacity as Acting Chairman held an "emergency closed session of the board of directors . . . to discuss personnel issues" on February 28, 2025. Notices, *Inter-American Foundation: Sunshine Act Meetings*, 90 Fed. Reg. 11546-01 (Mar. 7, 2025). On March 7, 2025, Mr. Marocco appointed Dominic Bumbaca as President of the Foundation. Marocco Decl. ¶ 4.

On March 10, the President submitted nominations for two permanent Board members: Kenneth Jackson and Russell Vought. Both nominations were received by the Senate on March 10, and referred to the Senate Committee on Foreign Relations on March 14. *See* Pres. Nom. 29-1, 119th Cong. (Mar. 10, 2025), https://www.congress.gov/nomination/119th-congress/29/1?s=2&r=167; Pres. Nom. 29-4, 119th Cong. (Mar. 10, 2025), https://www.congress.gov/nomination/119th-congress/29/4?s=2&r=164.

### III.   Plaintiffs And This Action

Plaintiffs are nine grantees, each of which had either entered into a grant agreement with the Foundation that was in effect until it was terminated on March 4, 2025, or had historically entered into such an agreement and anticipated entering into a similar agreement shortly after that date.  *See* Compl. ¶¶ 8-16.  Each of the grant agreements contains an identical provision authorizing either party to "terminate the Agreement upon written notice to the other."[2]  No cause is required for termination. And each grant agreement specifically reserves for the Foundation "the right to suspend disbursements for the activities set forth in the Agreement by providing written notice to the Grantee,"[3] and "the right to alter the terms and conditions of the Agreement unilaterally."[4]

On March 4, 2025, the Foundation exercised its right to terminate through written notice the grant agreements with Plaintiffs that were in existence at that time.  *See* Compl. ¶ 78.  The Foundation informed the grantees by written letter that the terminated grants were "unfortunately inconsistent with the agency's priorities."  *See, e.g.*, Inter-American Foundation Action Memorandum & Notice of Grant Termination at 11, ECF No. 6-9.  "Independently and secondly," the letters informed the grantees that the Foundation was terminating the grant pursuant to "the President's February 19, 2025

---

[2] *See* Ex. A, Inter-American Foundation Grant Agreement No. BO-532 (Sept. 15, 2017) at 8, ECF No. 15-1; Ex. B, Inter-American Foundation Grant Agreement No. BO-545 (Aug. 31, 2023) at 12, ECF No. 15-2; Ex. C, Inter-American Foundation Grant Agreement No. CO-592 (May 28, 2020) at 7, ECF No. 15-3; Ex. D, Inter-American Foundation Grant Agreement No. ES-306 (Sep. 9, 2020) at 11, ECF No. 15-4; Ex. E, Inter-American Foundation Grant Agreement No. ES-307 (Feb. 9, 2021) at 12, ECF No. 15-5; Ex. F, Inter-American Foundation Grant Agreement No. HO-324 (Feb. 2, 2023) at 12, ECF No. 15-6; Ex. G, Inter-American Foundation Grant Agreement No. ME-587 (Apr. 10, 2023) at 10, ECF No. 15-7; Ex. H, Inter-American Foundation Grant Agreement No. ME-593 (June 3, 2024) at 12, ECF No. 15-8; Ex. I, Inter-American Foundation Grant Agreement No. PU-612 (July 24, 2023) at 11, ECF No. 15-9.

[3] *See* Ex. A at 8, ECF No. 15-1; Ex. B at 12, ECF No. 15-2; Ex. C at 7, ECF No. 15-3; Ex. D at 11, ECF No. 15-4; Ex. E at 12, ECF No. 15-5; Ex. F at 12, ECF No. 15-6; Ex. G at 10, ECF No. 15-7; Ex. H at 12, ECF No. 15-8; Ex. I at 11, ECF No. 15-9.

[4] *See* Ex. A at 8, ECF No. 15-1; Ex. B at 11, ECF No. 15-2; Ex. C at 7, ECF No. 15-3; Ex. D at 10, ECF No. 15-4; Ex. E at 11, ECF No. 15-5; Ex. F 11, ECF No. 15-6; Ex. G at 9, ECF No. 15-7; Ex. H at 11, ECF No. 15-8; Ex. I at 10, ECF No. 15-9.

executive order," which "mandates that the [Foundation] eliminate all non-statutorily required activities and functions." *Id.* The letters also reiterated to the grantees their obligations to return "unspent funds to the" Foundation "within fifteen (15) days or as soon as practicable using the attached instructions." *Id.* Plaintiffs do not allege that the termination of those grants violated any Terms and Conditions of their grant agreements with the Foundation. *See generally* Compl. ¶¶ 78-89.

On March 19, 2025, the Foundation informed its grantees that the deadline to send remaining unspent funds has been extended indefinitely. *See* Defs.' Status Report, *Aviel*, ECF No. 18 (D.D.C. Mar. 20, 2025). The Foundation had previously informed the Court in *Aviel* that the Foundation "will notify grantees that have not returned funds that the deadline will be extended until the Court resolves Ms. Aviel's motion for preliminary injunction." Marocco Decl. ¶ 8.

On March 21, 2025, Plaintiffs filed suit here challenging the grant terminations and other actions taken by Marocco in his capacity as acting Chairman of the Board of the Foundation. *See* Compl. Plaintiffs noticed their action as related to *Aviel.* Plaintiffs moved for a preliminary injunction that same day. *See* Pls.' Mot. for Prelim. Inj., ECF No. 6.

On April 2, 2025, this Court held a hearing on Plaintiffs' motion for a preliminary injunction consolidated with the hearing on plaintiff's motion for a temporary restraining order and preliminary injunction in *Aviel. See* Tr. of Mot. Hearing, ECF No. 21.

The Court granted plaintiff's motion for a preliminary injunction in *Aviel*, ordering that: (1) defendants in that case were enjoined from removing Sara Aviel from her position as president and CEO of the Foundation; (2) Marocco was enjoined from serving as an acting Board member of the foundation absent an appointment under Article II of the United States Constitution and the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*; (3) defendants in that case may not appoint Marocco or any other individual as an acting member of the Foundation's Board; (4) any actions taken by "Marocco in his role as 'acting' Board member of the IAF—including, but not limited to, the removal

of Ms. Aviel as president and CEO of the IAF, the termination of any grants or other forms of agreements entered into by the IAF, and the attempted reduction-in-force of the IAF's employees— are *void ab initio* and without any legal effect"; (5) defendants in that case must provide written notice of the Court's preliminary injunction the Foundation's employees and grantees by a specified date and time; and (6) defendants in that case file a status report by a specified date apprising the Court of the status of their compliance with the order; and (7) the parties meet and confer and file a joint status report proposing next steps in the proceeding, including an expedited schedule for summary judgment briefing.  Order, ECF No. 18-1.

Defendants in *Aviel* appealed that order on April 6, 2025, *see Aviel*, ECF No. 26, and then moved before both this Court and the D.C. Circuit for a stay of that order pending appeal.  *See Aviel*, ECF No. 27; Mot. to Stay Underlying Order Pending Appeal, Immediate Administrative Stay, and a Stay Pending Appeal, *Aviel v. Gor*, No. 25-5105 (D.C. Cir. Apr. 7, 2025).  This Court denied the motion for a stay pending appeal on April 10, 2025.  *See Aviel*, ECF No. 34.  Defendants-Appellants' motion remains pending before the D.C. Circuit.

In light of order issued in *Aviel*, this Court then directed Plaintiffs to show cause whether the Court is required to rule on their motion for a preliminary injunction.  Order, ECF No. 18.  Plaintiffs responded that "in light of the relief granted in *Aviel*, the Court is not at this time required to rule on Plaintiffs' pending motion."  *See* Resp. to Order to Show Cause, ECF No. 20.   Plaintiffs "reserve[d] the right to renew their motion should the status of this Court's order materially change."  *Id.*  After entry of a briefing schedule, *see* ECF No. 23, Plaintiffs moved for summary judgment, *see* Mem. in Supp. of Mot. for Summ. J ("Pls.' Mot."), ECF No. 24-1.

## LEGAL STANDARDS

Rule 56 requires a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The "evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party," *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011), but the question whether the Constitution grants the government "the power to act in a certain way is a pure question of law," *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 233 (D.D.C. 2019) (citation omitted).  "When, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006).

A plaintiff bears the burden of demonstrating that the court has jurisdiction over the claim. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  At any time, if the plaintiff fails to carry that burden, the court must dismiss the action, including at the summary judgment stage. Fed. R. Civ. P. 12(h)(3); *see Auster v. Ghana Airways Ltd.*, 514 F.3d 44, 48 (D.C. Cir. 2008) ("When a court lacks subject matter jurisdiction, it must dismiss the case and not grant summary judgment.").

## ARGUMENT

## I.    This Court lacks subject-matter jurisdiction.

### A.    This action should be dismissed as moot or, at a minimum, stayed because Plaintiffs challenge actions that this Court already held void.

Plaintiffs challenge agency actions that this Court held in *Aviel* were "*void ab initio* and without any legal effect," Order at 1, ECF No. 18-1.  Because any opinion this Court issues on the legality of agency actions that have no legal effect would be an advisory opinion, this Court should dismiss Plaintiffs' claims without prejudice as moot or, at a minimum, stay this action pending any subsequent ruling in *Aviel* that could create a live controversy.

1. "Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 70 (1983). "[A] case becomes moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir.

2013) (quoting *Larsen v. U.S. Navy,* 525 F.3d 1, 3 (D.C. Cir. 2008)). "This occurs when, among other things, the court can provide no effective remedy because a party has already 'obtained all the relief that it has sought.'" *Id.* (quoting *Monzillo v. Biller,* 735 F.2d 1456, 1459 (D.C. Cir. 1984)). "Even where litigation poses a live controversy when filed," mootness "requires a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc); *see also Abdeljattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 534 (D.C. Cir. 2015) (same).

Here, Plaintiffs' claims are moot so long as this Court's order in *Aviel* remains in effect, whether on its own terms or if it were extended into a permanent injunction. In *Aviel*, this Court ordered that "any actions taken by Peter Marocco in his role as 'acting' Board member of the IAF—including, but not limited to . . . the termination of any grants or other forms of agreements entered into by the IAF, and the attempted reduction-in-force of the IAF's employees—are *void ab initio* and without any legal effect." Order at 2, ECF No. 18-1. Plaintiffs here challenge only those actions. Accordingly, "because [they] have 'obtained all the relief that they sought,'" Plaintiffs' "claims . . . are moot." *Conservation Force*, 733 F.3d at 1204 (quoting *Monzillo,* 735 F.2d at 1459).

Indeed, so long as the challenged agency actions remain *void ab initio*, any order that this Court may issue would amount to an advisory opinion on the legality of agency actions that have not occurred. The mootness doctrine exists precisely to prevent such an outcome: "The rule against deciding moot cases forbids federal courts from rendering advisory opinions or 'deciding questions that cannot affect the rights of litigants in the case before them.'" *Hall v. CIA*, 437 F.3d 94, 99 (D.C. Cir. 2006) (quoting *Pharmachemie B.V. v. Barr Laboratories, Inc.*, 276 F.3d 627 (D.C. Cir. 2002)).

And this holds true even if Plaintiffs could show that some future iteration of the Foundation may engage in the same actions challenged here because "[t]hese are merely hypothetical possibilities"

that are "not enough to give rise to a live dispute." *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 647 (D.C. Cir. 2011); *see also id.* ("It does not matter that the FTC might hereafter pursue notice-and-comment rulemaking to promulgate *new* rules pursuant to which the agency may seek to regulate lawyers and law firms."). That is particularly true here because, so long as the relief awarded in *Aviel* remains in place, any future actions the Foundation takes similar to those challenged by Plaintiffs would be carried out by different agency officials on a different record. Accordingly, the mere "possibility that the challenged" agency action "could become operative again based on the outcome of" related litigation "does not keep the controversy in this case live." *New York v. Raimondo*, No. 1:19-CV-09380-MKV, 2021 WL 1339397, at *2 (S.D.N.Y. Apr. 9, 2021); *see also In re Operation of Mo. River Sys. Litig.*, 421 F.3d 618, 631-32 (8th Cir. 2005) ("speculative possibility is not a basis for retaining jurisdiction").

2. At a minimum, these mootness concerns support a stay of this instant action pending resolution of *Aviel*.[5] "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). Courts thus "have broad discretion" to stay proceedings "pending the resolution of independent legal proceedings." *Nat'l Indus. for Blind v. Dep't of Veterans Affs.*, 296 F. Supp. 3d 131, 137 (D.D.C. 2017) (citing *Landis*, 299 U.S. at 254; *Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 879 n.6 (1998)). The Court should exercise that discretion to stay resolution of the parties' cross-motions for summary judgment pending an order in *Aviel* (from an appellate court or this Court) that reinstates the voided agency actions. Unless and until those eventualities occur, Plaintiffs here will suffer no harm because the agency actions they are challenging are not legally in effect. This Court would also preserve judicial resources by delaying a decision until it determines its decision will have legal effect.

---

[5] Counsel for Defendants conferred with counsel for Plaintiffs regarding this alternative relief and confirms that Plaintiffs oppose a stay.

And the Court need not first resolve the Article III mootness issues to issue such a stay. Courts routinely issue stays prior to resolving questions of subject-matter jurisdiction. *See Hulley Enters. Ltd. v. Russian Fed'n*, 211 F. Supp. 3d 269, 286 (D.D.C. 2016) (issuing a stay prior to ruling on jurisdictional question); *Seneca Nation of Indians v. U.S. Dep't of Health & Human Servs.*, 144 F. Supp. 3d 115, 118–19 (D.D.C. 2015) (granting stay prior to ruling on subject matter jurisdiction "because jurisdiction is vital only if the court proposes to issue a judgment on the merits") (quotation omitted).

## B. This Court lacks jurisdiction over Plaintiffs' claims pertaining to their grant agreements.

This Court lacks subject-matter jurisdiction over Plaintiffs' claims that seek to mandate payment under and reinstate grant agreements because no waiver of sovereign immunity authorizes Plaintiffs to enforce contracts with the federal government in federal district courts. To the contrary, Congress through the Tucker Act vested the Court of Federal Claims with exclusive jurisdiction over such claims. As the Supreme Court recently explained when staying a district court's injunction in another challenge to programmatic grant terminations in *Department of Education v. California*, "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA" because "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" 145 S. Ct. at 968 (quoting 28 U.S.C. § 1491(a)(1)).

That order controls here notwithstanding Plaintiffs' arguments (Pls.' Mot. at 24) to the contrary. Plaintiffs first note that the district court in *California* granted relief only on an APA claim. True enough, but the Supreme Court's ruling addressed the availability of the APA's waiver of sovereign immunity, which is the only waiver of sovereign immunity on which Plaintiffs in this action can rely for any of their claims. *See Chamber of Com. v. Reich,* 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("APA's waiver of sovereign immunity applies to any suit whether under the APA or not."). Plaintiffs next argue that the *California* plaintiffs did not allege that the termination of their grants interfered with

their ability to compete for future grants.  But the mere supplemental assertion of future harm does not change the contractual nature of Plaintiffs' claim here, as explained *infra* Parts I.B.2-3.  Plaintiffs also argue that the claims in *California* turned on the grants at issue and individual termination decisions.  Not so.  Just like Plaintiffs here, the *California* plaintiffs argued "that the dispute does not hinge on the terms of a contract between the parties, but rather federal statute and regulations," *California v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, 2025 WL 760825, at *1 (D. Mass. Mar. 10, 2025).  Plaintiffs finally note that *California* is not a ruling on the merits.  But the Supreme Court unequivocally stated that claims pertaining to grant terminations should not be brought in federal district court, and "[a] district court should not disregard the strong pronouncements of the Supreme Court."  *Newdow v. Bush*, 391 F. Supp. 2d 95, 107 (D.D.C. 2005); *see also Gaylor v. United States,* 74 F.3d 214, 217 (10th Cir. 1996) ("While these statements [of the Supreme Court] are dicta, this court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements."); *ACLU of Ky. v. McCreary Cnty., Ky.*, 607 F.3d 439, 447 (6th Cir. 2010) (lower courts "obligated to follow Supreme Court dicta" absent "substantial reason for disregarding it").

Unsurprisingly, then, courts around the country have understood the Supreme Court's order to "deprive this Court of the authority to consider claims sounding in contract or to enjoin further termination of contracts, even if they are styled as APA claims." *Pippenger v. U.S. DOGE Service*, No. 25-CV-1090 (BAH), 2025 WL 1148345, at *5 (D.D.C. Apr. 17, 2025); *see also Sols. in Hometown Connections v. Noem*, No. 8:25-cv-885, 2025 WL 1103253, at *11 (D. Md. Apr. 14, 2025) (denying motion for emergency relief challenging the termination of grants in light of the Supreme Court's order and concluding that plaintiffs' APA claims were "in essence contract claims against the United States for which the . . . Court of Federal Claims has exclusive jurisdiction"); Order, *Am. Ass'n of Colls. For Tchr. Educ. v. McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025), ECF No. 30 (staying district court's

preliminary injunction involving education-related grants in light of the Supreme Court's *Department of Education* decision); Order, *U. S. Conf. of Catholic Bishops v. State*, No. 25-5066 (D.C. Cir. Mar. 28, 2015), ECF No. 2108313 (denying motion for injunction pending appeal in grant termination case).

Plaintiffs advance three arguments to evade the Tucker Act's jurisdictional bar as applied by the Supreme Court in *California*. None is availing.

### 1. The grant agreements are contracts.

Plaintiffs first argue (Pls.' Mot. at 16-17) that the grant agreements are not contracts. Plaintiffs explain that "a contract must contain 'the four required elements of offer, acceptance, consideration, and proper government authority,'" *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023) (quoting *San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 463 (2019)). Plaintiffs then argue that the grants at issue do not confer consideration on the government.

Plaintiffs are incorrect because the grant agreements confer multiple concrete and tangible benefits on the United States. First, the grant agreements confer knowledge and information regarding the success of development projects, as the grant agreements themselves explain. *See, e.g.*, Ex. A, ECF No. 15-1 at 9 ("The Grantee agrees to make available to IAF staff and consultants all Grant-related records and documents that may be requested. The intent of the IAF is not only to assist the immediate beneficiaries of its funded projects, but also to learn from and with its Grantees. Therefore, the IAF collaborates with the Grantee and others to document and evaluate the Grantee's project. After consulting with the Grantee, the IAF may then choose to share this information with others interested in development."). The Foundation can thus better understand what makes certain projects successful and utilize its resources more effectively going forward. The Federal Circuit has recognized that cooperative agreements conferring similar benefits—such as enabling the Department of Agriculture to inspect a company's facilities—constitute contracts under the Tucker Act. *See Quiman, S.A. de C.V. v. United States*, No. 98-5036, 1999 WL 44182, at *2 (Fed. Cir. 1999) (finding a cooperative agreement

under which the Department of Agriculture would provide inspectors for certain facilities was not too indefinite to constitute an enforceable contract and should not fail for lack of consideration). And this was true even though the contract "provided no direct monetary value to the United States." *Id.*

Here, the grant agreements do confer such a direct monetary benefit on the United States. Each grant requires the grantee, when grant funds are allocated for international travel, to "use U.S. flag air carriers for international air travel to the extent that service is available." *See, e.g.*, Ex. A. ECF No. 15-1 at 8-9. This clause would, at a minimum, benefit the government through any taxes paid on such tickets, if applicable, as well as increasing the revenue of U.S. flag carriers in a way that may further increase revenues to the government. Plaintiffs may quibble over the magnitude of this benefit, but contractual counterparties "decide for themselves what consideration is sufficient. If bargained for, a mere peppercorn satisfies." *Am. Ground Transportation, Inc. v. United States*, 165 Fed. Cl. 659, 666 (2023); *see also Restatement (Second) of Contracts* § 79 (1981) ("If the requirement of consideration is met, there is no additional requirement of . . . equivalence in the values exchanged.").

Certain grant agreements also confer on the government royalty-free rights to media created by the grantee. *See, e.g.*, Ex. B at 15, ECF No. 15-2 ("The Grantee will grant the IAF, its designees, assignees, successors, etc. a worldwide, royalty-free, nonexclusive, irrevocable and perpetual right to reproduce, publish, or otherwise use the Media. The Grantee agrees to defend, indemnify and hold harmless the IAF and the U.S. Government . . . for infringement claims made by any third party due to or arising from use of the Media or any other intellectual property misappropriation."). This, too, is concrete consideration. *See Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 415 (1995) (holding "a royalty-free license to the intellectual property resulting from the research" conducted under a grant agreement constitutes "significant consideration passed to the government").

Finally, broader policy aims achieved through grant agreements are sufficient consideration. *See United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 164 (D. Mass. 2004) ("The

Cooperative Agreements between Harvard and USAID constitute contracts to assist Russia in developing capital markets and foreign investments."). Indeed, Plaintiffs here claim that the grant agreements fund "programs aimed at easing the factors driving mass migration in the Western hemisphere." Pls.' Mot. at 39. Insofar as Plaintiffs' assertion is correct, reducing unlawful migration has massive value, monetary and otherwise, to the United States.

The consideration provided to the Foundation and United States under the grant agreements thus distinguishes those agreements from the cooperative agreements at issue in Plaintiffs' authorities, Pls.' Mot. at 17-18. In *American Near East*, the court addressed a cooperative agreement between the United States Agency for International Development and a funding recipient used to construct clean water infrastructure in Palestine, and nothing in the agreements "granted USAID or other U.S. agencies access to or use of the new infrastructure." 703 F. Supp. 3d at 134. The court emphasized that the agreement may only, at most, serve "an important U.S. foreign policy objective" without providing any possibility of the United States receiving "a financial benefit." Here, on the other hand, the Foundation receives documentation reflecting knowledge, rights to media, monetary benefits for U.S. air carriers and thus monetary benefits to the government, and achievement of policy objectives that directly implicate the nation's finances. Plaintiffs also rely on *St. Bernard Parish Government v. United States*, 134 Fed. Cl. 730 (2017), which did not consider the removal of sediment following Hurricane Katrina to be a tangible benefit to the United States. Other Courts of Federal Claims have appropriately rejected that reasoning as "not persuasive." *San Antonio Hous. Auth.*, 143 Fed. Cl. at 462.

Plaintiffs further argue (Pls.' Mot. at 17) that the agreements are not contracts because provisions of the Grant Act, 31 U.S.C. §§ 6304(1), 6305(1), distinguish between "grant agreements" and "procurement contracts." These provisions are irrelevant to the scope of the Tucker Act's jurisdictional bar, which is not limited to "procurement contracts." Rather, the Tucker Act confers jurisdiction on the Court of Federal Claims for all claims "founded . . . upon any express or implied

16

contract with the United States," 28 U.S.C. § 1491(a)(1). Accordingly, "Congress' use of the term 'agreement' in the Grant Act to describe a grant relationship cannot reasonably be interpreted as an indication that Congress intended for all grant agreements not to constitute contracts and to fall outside the scope of this court's Tucker Act jurisdiction." *Thermalon*, 34 Fed. Cl. at 418. "Indeed, instead of supporting the conclusion that Congress intended the Grant Act to narrow this court's Tucker Act contract jurisdiction, the legislative history of the Grant Act demonstrates that Congress intended the definitions and mandates therein to address a very different set of concerns." *Id.*; *see also 360Training.com, Inc. v. United States*, 104 Fed. Cl. 575, 587 (2012) ("[T]he [Grant Act] is directed to a different set of concerns than the Tucker Act."); *San Antonio Hous. Auth.*, 143 Fed. Cl. at 462 (same).

For this reason, the Federal Circuit has explained that "any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997). Thus, both the Court of Federal Claims and its predecessor routinely recognized that the Tucker Act confers exclusive jurisdiction over disputes regarding grant and cooperative agreements that are otherwise contractual, regardless of the agreement's title. *See Thermalon*, 34 Fed. Cl. at 415 (Tucker Act confers jurisdiction over grant agreement); *D'Andrea Bros. LLC v. United States*, 96 Fed. Cl. 205, 214 (2010) (Tucker Act confers jurisdiction over cooperative research and development agreement); *Moore v. United States*, 48 Fed. Cl. 394, 397 (2000) ("[I]n cases involving grants and cooperative agreements, this court has often . . . h[e]ld[] that jurisdiction exists."); *San Antonio Hous. Auth.*, 143 Fed. Cl. at 462 ("[A] number of Judges of this court have noted that a contract's classification as a cooperative or grant agreement does not determine whether this court has jurisdiction."); *Mo. Health and Med. Org., Inc. v. United States*, 641 F.2d 870, 873 (Ct. Cl. 1981) (Tucker Act jurisdiction over grant agreement under Public Health Service

Act); *Texas v. United States*, 537 F.2d 466, 468–69 (Ct. Cl. 1976) (Tucker Act jurisdiction over Disaster Assistance Agreement under the Federal Disaster Act); *City of Wheeling, W. Va. v. United States*, 20 Cl. Ct. 659, 663–64 (Fed. Cl. 1990) (Tucker Act Jurisdiction over grant agreement under the Federal Water Pollution Control Act), *aff'd*, 928 F.2d 410 (Fed. Cir. 1991).

### 2. Plaintiffs' claims are contractual.

Plaintiffs argue (Pls.' Mot. 19-23) that even if the grant agreements are contracts, their claims are not contractual. Determining whether a claim "is 'at its essence' contractual for the Tucker Act 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). Both prongs of this analysis establish that Plaintiffs' claims for payment under and reinstatement of the terminated grants are contractual.

Under the first prong, which assesses the source of rights, a court must consider whether "the plaintiff's asserted rights and the government's purported authority arise from statute"; whether "the plaintiff's rights 'exist[] prior to and apart from rights created under the contract'"; and whether "the plaintiff 'seek[s] to enforce any duty imposed upon' the government 'by the . . . relevant contracts to which' the government 'is a party.'" *Id.* at 1107 (citation omitted). Here, the source of Plaintiffs' rights underpinning their claims for payments and reinstatement of the grant agreements are those very agreements. Plaintiffs have no rights to payment absent those grant agreements, and the duty (payment) that Plaintiffs seek to enforce is imposed upon the government solely by contract. *See* Compl. ¶¶ 79-87 (alleging that eight of the nine plaintiffs are "owed" amounts certain "under the terms of its grant").[6]

---

[6] The ninth Plaintiff, Asociación Las Pregoneras, alleges that it was "in the midst of negotiating a $267,000 agreement with the Foundation as a follow-on to its 2023 grant." Compl. ¶ 82.

Plaintiffs insist (Pls.' Mot. at 19-20) that they possess statutory rights to Foundation funding. This claim lacks any basis because no statute requires that the Foundation fund Plaintiffs' grants, much less require that those grants be funded under all circumstances. Rather, the appropriations statutes Plaintiffs invoke generally provide funds "[f]or necessary expenses to carry out the functions of the Inter-American Foundation in accordance with the provisions of section 401 of the Foreign Assistance Act of 1969," without specifying that Plaintiffs' grants (or, indeed, any grants) must receive funding. *See* Further Consolidated Appropriations Act, 2024, 138 Stat. at 746.

If Congress had intended to mandate that Plaintiffs' grants continue to be funded, it would have done so, as Congress is familiar with such line-item appropriations. For example, in funding for the Executive Office of Immigration Review, the same appropriations statutes that Plaintiffs invoke here required appropriated $844,000,000 to that office for fiscal year ("FY") 2024 and mandated that "not less than $28,000,000" of that amount "shall be available for services and activities provided by the Legal Orientation Program." Consolidated Appropriations Act, 2024, 138 Stat. at 133; *see also, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4522 (2022) (appropriating $860,000,000 to EOIR, "of which not less than $29,000,000 shall be available for services and activities provided by the Legal Orientation Program"). And "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Bates v. United States*, 522 U.S. 23, 29-30 (1997) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Thus, if the grant agreements to which Plaintiffs are party had never existed, Plaintiffs would have no claim to funds from the Foundation. That means the source of Plaintiffs' rights are contractual, and this Court lacks subject-matter jurisdiction. *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (court lacks subject-matter jurisdiction because asserted right to

payment "in no sense . . . exist[ed] independently of [its] contract"); *Twin Metals Minn. LLC v. United States*, No. 22-cv-2506, 2023 WL 5748624, at *7 (D.D.C. Sept. 6, 2023) (court lacks subject-matter jurisdiction because there were "no other source of its asserted rights" beyond contracts at issue).[7]

The second prong, which assesses the type of relief sought or appropriate, confirms that Plaintiffs' claims for payment under the grant agreements are contractual in nature. "Specific performance is an explicitly contractual remedy." *Perry Capital*, 864 F.3d at 619; *see also Spectrum Leasing Corp.*, 764 F.2d at 894-95 (similar). And that is precisely what Plaintiffs seek. *See* Compl. Prayer for Relief, ¶ g (seeking "[a] preliminary and permanent injunction requiring Defendants to reinstate contracts and grants"); *id.* ¶ h (seeking "a preliminary and permanent injunction requiring all Defendants to pay any grant funds unlawfully withheld since February 28, 2025"). That Plaintiffs here seek such relief distinguishes this case from *Megapulse*, where the D.C. Circuit emphasized that Plaintiffs' claim "is not properly characterized as one for specific performance" because the plaintiff was asserting infringement of property rights and a violation of the Trade Secrets Act wholly independent of any contractual right. 672 F.2d at 969. Plaintiffs' claims pertaining to the grant agreements therefore "sound in contract," *Perry Capital*, 864 F.3d at 619, and this Court lacks subject-matter jurisdiction, *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 613 (D.C. Cir. 1992) ("[T]he APA does *not* waive sovereign immunity for contract claims seeking specific relief").[8]

---

[7] The absence of any statutory entitlement to payment distinguishes this case from the authorities on which Plaintiffs rely (Pls.' Mot. at 19-20). *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985), involved a statutorily-created federal funding program for state provision of social services. That is distinct from the Foundation's work as no statute mandates the funding of any particular grants, much less those of Plaintiffs. And *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017), involved fiduciary duty claims, which are not dependent on contract.

[8] Under binding D.C. Circuit precedent, that the Court of Claims cannot award injunctive relief is immaterial to this analysis. *See Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004) ("We have held that the Tucker Act 'impliedly forbids—in APA terms—not only district court awards of money damages, which the Claims Court may grant, but also injunctive relief, which the Claims Court may not.") (quoting *Transohio*, 967 F.2d at 609)); *Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986) ("The waiver of sovereign immunity in the [APA] does not run to

### 3. That Plaintiffs seek to remedy additional harms does not confer jurisdiction over Plaintiffs' contractual claims.

Plaintiffs argue (Pls.' Mot. 23-24) that their complaint does not seek exclusively contractual relief for their claims pertaining to termination of the grant agreements. But that was also true of the *California* plaintiffs, *see California v. U.S. Dep't of Educ.*, 132 F.4th 92, 97 (1st Cir. 2025), and the Supreme Court nonetheless concluded that the Tucker Act foreclosed jurisdiction. That determination was consistent with longstanding precedent in this circuit—Plaintiffs cannot evade the Tucker Act's jurisdictional bar through artful pleading that merely appends additional requests for relief atop what are fundamentally contract claims. *See Crowley*, 38 F.4th at 1107 ("[W]e have cautioned plaintiffs that this court prohibits the creative drafting of complaints . . . to avoid the jurisdictional consequences of the Tucker Act.") (cleaned up); *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985) ("We begin with the well-accepted proposition that a plaintiff may not avoid the jurisdictional bar . . . merely by alleging violations of regulatory or statutory provisions rather than breach of contract.").

Here, the non-monetary injunctive relief that Plaintiffs seek (an order requiring the reinstatement of their contract) is inseparable from the fundamentally contractual relief that they seek—uninterrupted grant funding (under their contract). In other words, if Plaintiffs were not grantees of the Foundation, there would lack any entitlement to participate in Foundation-funded exchanges, receive Foundation-funded advice and guidance, and generally benefit from the Foundation's functioning at its current levels. Accordingly, the additional relief they request is wholly auxiliary to their contractual claims, and Plaintiffs thus cannot evade the Tucker Act's exclusive jurisdiction channeling merely by requesting that additional relief. *See Kidwell v. Dep't of the Army*, 56

---

actions seeking declaratory relief or specific performance in contract cases . . . ."); *see also Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 180 (D.D.C. 2007) ("Because the Tucker Act—which does not authorize equitable relief—was intended to provide 'the exclusive remedy for contract claims against the government,' this Circuit has interpreted the Tucker Act as 'impliedly forbidding' district courts from awarding equitable relief against the government on a contract claim brought under the APA.") (quoting *Transohio*, 967 F.2d at 607).

F.3d 279, 284 (D.C. Cir. 1995) (explaining that a request for declaratory and injunctive relief can avoid Tucker Act's exclusive jurisdiction bar only if that relief "is not 'negligible in comparison' with" any "potential monetary recovery").[9]

In any event, even if this Court concludes that the Tucker Act does not foreclose jurisdiction over the entirety of this action, the Court must still dismiss Plaintiffs' claims that do sound in contract. That is because "the issues of sovereign immunity waiver and subject matter jurisdiction . . . are two separate requirements which must be satisfied *for each claim*." *York Assocs., Inc. v. Sec'y of Hous. & Urb. Dev.*, 815 F. Supp. 16, 19 (D.D.C. 1993) (emphasis added). And "the doctrine of pendent jurisdiction cannot be used to waive the United States' sovereign immunity." *Wilkerson v. United States*, 67 F.3d 112, 119 n.13 (5th Cir. 1995). In other words, where, as here, "there is no waiver" of sovereign immunity "except to have the claims heard in the Court of Claims," this Court cannot exercise jurisdiction over those claims merely because Plaintiffs have alleged other claims for which a distinct waiver of sovereign immunity exists. *Id.*; *see also Ware v. United States*, 626 F.2d 1278, 1287 (5th Cir. 1980) ("[T]his court cannot, by using the judge-made doctrine of pendent jurisdiction waive the immunity of the United States where Congress, constitutional guardian of this immunity, has declined to do so."); *McKay v. United States,* 703 F.2d 464, 470–71 (10th Cir. 1983) (rejecting jurisdiction where plaintiff sought to bring a Tucker Act claim, under which jurisdiction lies exclusively with the Claims Court, as a pendent claim to a claim properly before the court); *Lenoir v. Porters Creek Watershed*

---

[9] *Bowen v. Massachusetts*, 487 U.S. 879 (1988), does not help Plaintiffs here. That case did not address a contractual arrangement between a government agency and private party, but rather concerned states' entitlement to federal funding under a statute. Accordingly, the Supreme Court in that case addressed the APA's exclusion from its waiver of sovereign immunity for suits for "money damages," *see* 5 U.S.C. § 702. As the Supreme Court has explained, its jurisprudence addressing that distinct carve-out from the APA's waiver of sovereign immunity "has no bearing" on the ability of private parties to obtain injunctions to enforce contractual obligations against the federal government. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002).

*Dist.,* 586 F.2d 1081, 1087 (6th Cir. 1978) ("pendent jurisdiction has no application to a claim against the United States").

Accordingly, this Court must, at a minimum, dismiss Plaintiffs' claims that are contractual. That includes Plaintiffs' arbitrary-and-capricious claim, which Plaintiffs themselves characterized as "limited to Defendants' decision to cancel all of the Foundation's contracts and grants." *See* Joint Status Report at 3, ECF No. 22. So, too, must Plaintiffs' remaining claims be dismissed insofar as they seek "[a] preliminary and permanent injunction requiring Defendants to reinstate contracts and grants" and "[a] preliminary and permanent injunction requiring all Defendants to pay any grant funds unlawfully withheld." Compl., Prayer for Relief ¶¶ g, h.

**C.  Plaintiffs lack Article III standing to obtain much of the relief sought.**

This Court lacks jurisdiction over almost all of Plaintiffs' remaining claims because Plaintiffs have failed to establish Article III standing. It is well-established that "standing is not dispensed in gross," such that "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413,431 (2021)). Accordingly, for each claim, against each defendant, and for each form of relief sought, Plaintiffs must show "an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Id.* at 57 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). And at the summary judgment stage, Plaintiffs "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" to show standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs fail to make these showings for the following forms of relief sought in the complaint: (1) a declaration that Marocco lacked legal authority to cancel any contracts and grants beyond those awarded to Plaintiffs; (2) a declaration that Marocco lacked legal authority to place Foundation

employees on administrative leave; (3) a preliminary and permanent injunction ordering Defendants to cease alleged impoundment except as to Plaintiffs' grants; (4) a preliminary and permanent injunction prohibiting Defendants from continuing to keep Foundation employees on administrative leave and from implementing a reduction in force of Foundation employees; (5) a preliminary and permanent injunction requiring Defendants to reinstate contracts and grants other than those with Plaintiffs; and (6) a preliminary and permanent injunction requiring all Defendants to pay any grant funds unlawfully withheld since February 28, 2025, and to return any funds sent by grantees back to the federal government, except as to Plaintiffs' grants. *See* Compl., Prayer for Relief ¶¶ b, d, e, h. Apart from the harm of lost grant funding, which is insufficient to establish standing for claims beyond those arising from termination of those grants, Plaintiffs advance two additional theories of injury. Neither confers Article III standing for the broad relief sought.

*First*, Plaintiffs claim (Pls.' Mot. at 13) "the loss of significant non-monetary benefits they derived from their partnership with the Foundation, its staff, and its contractors." But Plaintiffs have not shown that maintaining funding for other grantees is necessary to avoid this injury. Nor have Plaintiffs shown that any cuts to the current level of staffing at the Foundation will result in the loss of these non-monetary benefits. Accordingly, because Plaintiffs cannot show that the government "action or inaction" challenged in these claims "is 'causally connected to [their] injury,' they cannot demonstrate Article III standing." *Citizens for Const. Integrity v. Census Bureau*, 115 F.4th 618, 628 (D.C. Cir. 2024) (quoting *California v. Texas*, 593 U.S. 659, 660 (2021)).

*Second*, Plaintiffs assert (Pls.' Mot. at 14) injury in the form of a loss of an ability to compete for future awards. But this injury cannot confer standing for the vast majority of relief sought: it has no bearing on the Foundation's termination of employees because Plaintiffs make no effort to show that the current level of employment is necessary to issue future grants, and it has no bearing on the

Foundation's termination of existing grants because Plaintiffs make no effort to show that the current grants are necessary for future grants.

In any event, Plaintiffs cannot dispute that the Foundation's funds are appropriated only through September 30, 2025. *See* Div. F, tit. III, 138 Stat. at 746. Plaintiffs' future injury is therefore too speculative to confer Article III standing—it rests on the assumption, asserted without any support, that Congress will continue to fund the Foundation at levels that enable Plaintiffs to obtain funding. *See Union of Concerned Scientists v. Dep't of Energy*, 998 F.3d 926, 930 (D.C. Cir. 2021) ("[T]he discretion DOE has in making designation and access decisions takes the denial of access to CEII from the decidedly likely to the speculative.").

In sum, Plaintiffs seek relief that would place the Foundation in judicial receivership through an order prohibiting the Foundation from exercising its authority to cancel *any* grants, contracts, and employment arrangements. That drastic remedy is not "tailored to redress" Plaintiffs' "particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and this Court should hold that Plaintiffs lack Article III standing to seek the relief requested in paragraphs b, d, e, and h of the Prayer for Relief.

## II. Plaintiffs' separation-of-powers claim fails.

Plaintiffs invoke (Pls.' Mot. at 25-29) various separation-of-powers provisions to argue that Defendants' actions are unconstitutional. This claim fails twice over. *First*, Plaintiffs' separation-of-powers claim merely clothes their statutory claims in constitutional garb, which Supreme Court precedent does not permit. *Second*, Plaintiffs have not asserted a viable statutory (much less constitutional) violation. Instead, it is Plaintiffs' claims that threaten the separation of powers by asking this Court to superintend the Foundation, an Executive Branch instrument of foreign affairs.

### A. Plaintiffs' claim is statutory, not constitutional.

Plaintiffs' separation-of-powers claim seeks to transform a dispute over statutory interpretation—what functions the Foundation must carry out to fulfill Congress's mandate—into a

constitutional dispute.  The Supreme Court has clearly instructed that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional.'" *Dalton v. Specter*, 511 U.S. 462, 473-74 (1994).  This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472.

Section 7063(a), (b)(1) of the Further Consolidated Appropriations Act, 2024, 138 Stat. at 746, demonstrates why Plaintiffs' claims present, at most, a dispute regarding statutory construction.  That provision directed that appropriated funds "may not be used to implement a reorganization, redesign, or other plan . . . without prior consultation by the head of such department, agency, or organization with the appropriate congressional committees." *Id.* at 843-44.  But Executive Order No. 14,217 did not contravene that instruction.  To the contrary, it directed that "the non-statutory components and functions of" four named governmental entities "shall be eliminated to the maximum extent *consistent with applicable law*, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function *required by law*." Exec. Order No. 14,217 § 2(a) (emphasis added).  The only relevant question, then, is whether the law requires that the Foundation continue to fund Plaintiffs' grants.  Plaintiffs' constitutional claims therefore merely restate the allegations that Defendants acted in excess of their statutory duties, and Plaintiffs cannot independently prevail on their constitutional claims.

Plaintiffs respond (Pls.' Mot. at 28 n.7) that they do not challenge whether the President exceeded his statutory authority.  But that is the precise question posed by their claims:  whether the statutes funding and creating the Foundation require the President to maintain employment and grants at the current levels.  If so, then the President lacked statutory authority to terminate all but one grant and terminate all but one employee from the Foundation.  If not, then the President possessed

26

statutory authority for the actions taken.  Either way, that question will be resolved by statutory interpretation, not the constitution.

### B. The relief sought by Plaintiffs, not any action taken by Defendants, threatens the separation of powers.

In any event, Plaintiffs do not allege viable constitutional claims merely by invoking (Pls.' Mot. at 25-27) the Spending Clause and the Appropriations Clause.  Neither of these constitutional provisions—or even the appropriations statutes that Congress passed pursuant to its Article I powers—requires that the Foundation continue to fund Plaintiffs through now-terminated grant agreements.  That is because Plaintiffs are not funded through direct congressional appropriations; rather, they are funded through specific grant agreements, as explained *supra* Part I.B.2.  Accordingly, the Foundation's conduct under those grant agreements would be reviewable in the Court of Federal Claims, but the mere fact that the Foundation is funded through Congressional appropriations does not mean that the routine execution of those grant agreements takes on statutory, let alone constitutional, dimensions.

Then-Judge Kavanaugh's opinion in *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013), is not to the contrary.  That case addressed a statute providing "that the Nuclear Regulatory Commission 'shall consider' the Department of Energy's license application to store nuclear waste at Yucca Mountain and 'shall issue a final decision approving or disapproving' the application within three years of its submission."  *Id.* at 257 (quoting 42 U.S.C. § 10134(d)).  The Commission failed to do so, and petitioners obtained a writ of mandamus to require the Commission to resume processing the Department of Energy's pending license application as required by statute.  *Id.*  Unlike in that case, Congress did not mandate that the Foundation either continue to fund any particular grants (or,

indeed, any grants at all) or operate with any specified number of employees. Indeed, that case had nothing to do with grant or contractual funding; it was a mine run mandamus action.

If anything, then, it is the relief sought that threatens the separation of powers by undermining the President's authority over foreign affairs. The Foundation here determined, consistent with the President's direction, that the grants in question were "inconsistent with the agency's priorities" to "foster[] security and development in the Western Hemisphere." *See, e.g.*, Ex. A at 7, ECF No. 6-7. And under Article II of the Constitution, the President and his subordinates have broad authority to attend to the foreign affairs of the nation, including by determining how foreign aid funds are used. Accordingly, while the Executive is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015), the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)). Thus, "in foreign affairs the President has a degree of independent authority to act." *Id.*; *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (the President's power in the field of international relations "does not require as a basis for its exercise an act of Congress."); *Youngstown*, 343 U.S. at 635 & n.2 (the President can "act in external affairs without congressional authority").

Plaintiffs' contention (Pls.' Mot. 26-27) that the Executive Branch is infringing on Congress's power of the purse is therefore incorrect even if funding for the grant agreements at issue here were congressionally mandated (and it is not). "[I]f a congressional directive to spend were to interfere with the President's authority in an area confided by the Constitution to his substantive direction and control, such as his authority . . . over foreign affairs . . . a situation would be presented very different from [a domestic impoundment]." Memorandum from William H. Rehnquist, Assistant Attorney

General, Office of Legal Counsel, Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, 1 Suppl. Op. O.L.C. 303, 310–11 (1969).[10]  Defendants' actions not only fit comfortably within the Executive Branch's unique expertise and constitutional role as to foreign affairs but also dovetail with its unreviewable discretion not to take action.  *Cf. Heckler v. Chaney*, 470 U.S. 821 (1985).  It is precisely the sort of conduct that a federal court should not disrupt absent a valid and binding congressional direction to the contrary.

Moreover, Plaintiffs' request that this Court supervise the Foundation's foreign assistance grants in a receivership arrangement would create a grave separation-of-powers problem.  Diplomacy and foreign relations fall within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." *Curtiss–Wright*, 299 U.S. at 319–20; *see Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot . . . be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."); *see Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions . . . entrusted foreign affairs and national security powers to the political branches[.]"); *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative."); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (noting that the President is "exclusively responsible" for "conduct of diplomatic and foreign affairs"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) (matters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *Worthy v. Herter*, 270 F.2d 905, 911 (D.C. Cir. 1959) ("It is settled that in respect to foreign affairs the President has the power of action and the courts will not attempt to review the merits of what he

---

[10] To be clear, Defendants' position is that no impoundment has taken place.

does. The President is the nation's organ in and for foreign affairs."). As such, injunctive relief related to the President's oversight of the Foundation, an instrument of foreign affairs, "deeply intrudes into the core concerns of the executive branch" and may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954-55 (D.C. Cir. 1978).

## III.    Plaintiffs' *ultra vires* claims fail.

Plaintiffs assert (Pls.' Mot. at 30-37) that (1) Defendants have engaged in *ultra vires* impoundment of the Foundation's funding and (2) that Mr. Marocco's appointment as an acting member and chairman of the Board was *ultra vires*, invaliding all the actions taken by the Board since his appointment. For the reasons explained below, both claims fail.

### A.    Plaintiffs fail to state an *ultra vires* claim alleging violations of the Impoundment Control Act and the Anti-Deficiency Act.

1. Plaintiffs' *ultra vires* challenge to Defendants' alleged impoundment of federal funds fails at the threshold because there exists an alternative procedure for judicial review of statutory impoundment claims. It is well-established in the D.C. Circuit that an *ultra vires* claim may be brought only when "there is no alternative procedure for review." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)); *see also DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (to prevail on an *ultra vires* claim, a plaintiff must show "there is no alternative procedure for review of the statutory claim").

Here, there is such an alternative procedure for review. The Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 333 (1974) (codified as amended at 2 U.S.C. §§ 682 *et seq.*), provides for enforcement by the Comptroller General (an official in the Legislative Branch), not private parties under 2 U.S.C. § 687. For this reason, courts around the country have held that private plaintiffs cannot bring suit for alleged violations of the Impoundment Control Act. *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734–35 (S.D. Tex. 2024) ("In short, an alleged ICA violation has only

one proper plaintiff: the Comptroller General."); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981).

Plaintiffs' *ultra vires* claim groups the alleged violations of the Impoundment Control Act with alleged violations of the Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 877 (1982). Because the alleged underlying violations are the same and the Impoundment Control Act provides a path for judicial review through an action brought by the Comptroller General, Plaintiffs are also precluded under D.C. Circuit precedent from bringing a claim under the Anti-Deficiency Act. In any event, courts have refused to authorize *ultra vires* claims alleging violations of the Anti-Deficiency Act even when standing alone. *See Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 331 n.14 (S.D.N.Y. 2018) (collecting authorities).

2. Even if an *ultra vires* claim were available, Plaintiffs fail to clear the high bar necessary to assert such a claim. "A claim of error" in the exercise of delegated power "is not sufficient" to support an *ultra vires* claim because "[n]ot every statutory prescription of elements requisite to administrative action is jurisdictional." *Doehla Greeting Cards, Inc. v. Summerfield*, 227 F.2d 44, 46–47 (D.C. Cir. 1955). Accordingly, an *ultra vires* cause of action requires a violation of "a specific prohibition in the statute that is clear and mandatory," a violation that was "obviously beyond the terms of the statute," or action that "was far outside the scope of the task that Congress gave it." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d. 1244, 1263 (D.C. Cir. 2020).

Plaintiffs here are incorrect that Defendants' termination of Plaintiffs' grants violates any such clear and mandatory statutory prohibition. As explained *supra* Part I.B.2, Plaintiffs identify no provisions in congressional appropriations that mandate Plaintiffs (or, indeed, any specific Foundation grantee) continue to receive funding, and no such provisions exists. Accordingly, Defendants did not violate any "clear and mandatory" statutory requirement by terminating Plaintiffs' grant agreements, and Plaintiffs have not asserted an *ultra vires* claim. *N. Am. Butterfly Ass'n*, 977 F.3d. at 1263.

### B. Plaintiffs fail to state an *ultra vires* claim regarding Marocco's appointment as an acting member of the Foundation Board.

Plaintiffs fare no better on their *ultra vires* claim concerning the designation of Marocco as the sole member of the Foundation Board.  Article II of the Constitution provides that "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1).  As the framers well understood, "[i]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010) (quoting 1 Annals of Cong. 463 (1789) (Madison, J.)).  Pursuant to the Appointments Clause, the President "may be assisted in carrying out" his duties "by officers nominated by him and confirmed by the Senate, as well as by other officers not appointed in that manner but whose work … must be directed and supervised by an officer who has been."  *United States v. Arthrex, Inc.*, 594 U.S. 1, 6 (2021); U.S. Const. art II, § 2, cl. 2.

The President's appointment power serves as a "significant structural safeguard[]."  *Edmond v. United States*, 520 U.S. 651, 659 (1997).  Officers' ability to "wield executive power on behalf of the President in the name of the United States" acquires "its legitimacy and accountability to the public through 'a clear and effective chain of command' down from the President, on whom all the people vote." *Arthrex*, 594 U.S. at 11 (quoting *Free Enter. Fund*, 561 U.S. at 498).  The Appointments Clause thus "'preserve[s] political accountability' through direction and supervision of subordinates."  *Id.* at 17 (quoting *Edmond*, 520 U.S. at 663).

As an adjunct to the authority described above, Article II also has long been understood to authorize the President to "designate an official to temporarily perform the duties of a presidentially appointed position where leaving the position vacant would have the effect of seriously impeding the agency's functions."" *Temporary Presidential Designation*, *4-*5 (quotation and alteration omitted).  Although it may be "limited by statute," the authority to make such interim designations derives from

Article II rather than from any affirmative act of Congress. *Id.* at *4. Thus, while Congress has enacted provisions regulating the President's authority to make interim designations of agency heads in certain circumstances—including as set forth in the Federal Vacancies Reform Act of 1998 (FVRA), 5 U.S.C. § 3345 *et seq.*—those statutory provisions are "not a source, but rather a regulation of that power," *Power of the President to Designate Acting Member of the Federal Home Loan Bank Board*, 1 Op. O.L.C. 150, 151 (1977) (*Home Loan Bank Board*). The President therefore may "name acting officials when necessary to fulfill his constitutional duties, at least where no statute precludes it." *Temporary Presidential Designation*, at *4.

The authority "flows from the President's responsibility to keep executive branch agencies in operation." *Home Loan Bank Board*, 1 Op. O.L.C. at 151. The President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 2, "grants him the concomitant authority to designate acting officers" in order to "keep the Government running." *Temporary Presidential Designation*, at *1, *10 (quotation omitted). The President "functionally could not exercise his Take Care authority" if he were unable to "task a politically accountable official to fill … agencies' leadership positions in an acting capacity." *Id.* at *9. That is particularly true during a presidential transition, where there are "hundreds of Senate-confirmed positions to fill, many of which may well have been vacant for substantial periods of time in the prior administration." *Id.* at *10 (quotation omitted).

The authority also flows from the "structural safeguards" of political accountability reflected in the Appointments Clause. *Edmond*, 520 U.S. at 659. The power to designate acting officials ensures the President can "temporarily maintain the constitutional chain of supervision over an organization created by Congress to perform executive functions." *Temporary Presidential Designation*, at *1. Absent that "clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" *Free Enter. Fund*, 561 U.S. at 498 (quoting The Federalist No. 70, p. 467 (J. Cooke ed. 1961) (A. Hamilton)).

Given those serious constitutional concerns, Presidents of both parties have long maintained that, "at least where no statute precludes it," Article II authorizes the President to designate acting officials to supervise agencies' operations temporarily. *Temporary Presidential Designation*, at *1, *4; *see also Authority of the President to Remove the Staff Director of the Civil Rights Commission and Appoint an Acting Staff Director*, 25 Op. O.L.C. 103, 103 (2001); Memorandum for Neil Eggleston, Associate Counsel to the President, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Appointment of an Acting Staff Director of the United States Commission on Civil Rights* (Jan. 13, 1994) (*Dellinger Memo*); *Home Loan Bank Board*, 1 Op. O.L.C. at 151. That longstanding and consistent view of the Executive is matched by equally longstanding historical practice. *See Home Loan Bank Board*, 1 Op. O.L.C. at 151 (noting a consistent "governmental practice going back more than a century"); *Dellinger Memo*, at 2-3 & n.3 (detailing historical practice dating to the founding).

The D.C. Circuit, too, has suggested that the President has inherent authority to designate an acting official to supervise an agency while nominees for permanent officers are pending. In *Williams v. Phillips*, the D.C. Circuit considered the government's request for a stay from an order that "the President lacked authority to appoint an acting director of [the Office of Economic Opportunity]" absent express statutory authorization. 482 F.2d 669, 670 (D.C. Cir. 1973). The Court recognized that "[i]t could be argued that the intersection of the President's constitutional obligation to 'take care that the laws be faithfully executed' and his obligation to appoint the director . . . 'with the Advice and Consent of the Senate' provides the President an implied power, in the absence of limiting legislation . . . to appoint an acting director for a reasonable period of time before submitting the nomination of a new director to the Senate." *Id.* Although the Court ultimately denied the stay request on the ground that the President's several month delay in nominating a new director was unreasonable, *id.* at 671, the Court tellingly declined to endorse the district court's narrow view of the President's authority.

34

Accordingly, the President acted well within his Article II authority in appointing an acting Board member to temporarily supervise the agency while the President submitted nominations for permanent Board members. In the absence of serving Board members subject to the President's supervision and control, the appointment of an acting Board member was necessary to discharge the President's "own constitutional duty of seeing that the laws be faithfully executed." *Myers v. United States*, 272 U.S. 52, 135 (1926). Simply put, "if there are no Board members, then there is no one whom the President can hold to account for the [Foundation's] exercise of executive power." *Temporary Presidential Designation*, at \*9. The lack of any "'clear and effective chain of command' down from the President" would "blur the lines of accountability demanded by the Appointments Clause." *Arthrex*, 594 U.S. at 11, 16 (quoting *Free Enter. Fund*, 561 at 498).

No statutory provision, moreover, precluded the designation of an acting Board member here. Although the FVRA regulates the President's authority to designate acting officials in certain circumstances, *see* 5 U.S.C. §§ 3345-3348, the statutory scheme does not apply to the Foundation. In § 3349c, Congress included an express "[e]xclusion of certain officers" from the FVRA's restrictions. The provision makes clear that "Sections 3345 through 3349b"—that is, the provisions regulating the designation of acting officials—"shall not apply to . . . any member who is appointed by the President, by and with the advice and consent of the Senate to any board, commission, or similar entity" that "is composed of multiple members" and "governs an independent establishment or Government corporation." *Id.* § 3349c. The exclusion plainly covers the Foundation and its Board members.

Nor is this a case like *Williams* in which the President unreasonably delayed the submission of his nominations for new Board members to the Senate. As explained *supra* pp. 4-5, the President removed all then-serving Board members by February 26, and he appointed Marocco as an acting Board member on February 28. The President then submitted nominations for permanent Board members on March 10. Far from the several-month delay at issue in *Williams*, the President here

submitted nominations within two-weeks of the removal of the last Senate-confirmed Board member, well within the 30-day period that the D.C. Circuit suggested would be a "reasonable time" for the "President to select persons for nomination." 482 F.2d at 671.

Plaintiffs disregard these constitutional principles in rejecting the President's authority to designate an acting Board member to temporarily supervise the Foundation. These arguments are flawed in three critical ways.

*First*, Plaintiffs reason (Pls.' Mot. at 32-33) that the President's authority to designate acting officials derives from the FVRA and that by excluding the Foundation from the statutory scheme, the FVRA implicitly precludes the President from designating an active Board member. But that is precisely backwards; indeed, it is the narrow view of presidential authority that D.C. Circuit declined to endorse in *Williams*. As explained, the power to designate acting officials flows from the President's Article II authority, not any affirmative act of Congress. The FVRA is "not a source, but rather a regulation of that power," *Home Loan Bank Board*, 1 Op. O.L.C. at 151. Accordingly, where, as here, the President confronts "statutory silence," he is empowered to "designate acting officials to presidentially appointed positions." *Temporary Presidential Designation*, at *4.

*Second*, Plaintiffs argue (Pls.' Mot. at 34-35) that, despite § 3349c's express carve-out for entities like the Foundation, the FVRA nonetheless nullifies any action taken by acting Board members in § 3348(d)(1). That provision provides that "an action taken by any person who is not acting" pursuant to the FVRA's provisions "in the performance of any function or duty of a vacant office to which this section and sections 3346, 3347, 3349, 3349a, 3349b, and 3349c apply shall have no force or effect." But § 3349 makes clear that the FRVA's exclusivity and nullifications provisions—including § 3348(d)(1)—"shall not apply" to institutions like the Foundation; nothing in § 3348(d)(1) overrides that express exclusion. Instead, the cross-reference in § 3348(d)(1) merely "clarifies that the FVRA reaches all offices filled through the advice-and-consent process that are not subject to the carve-out

36

contained in section 3349c." *Temporary Presidential Designation*, at \*8 n.3.  Thus, Plaintiffs' reading disregards that, to trigger § 3348(d)(1), all of the listed provisions need to apply to the singular "vacant office" at issue, which is plainly not true for multimember bodies exempted by § 3349c(1).

*Third*, Plaintiffs' position—wherein the President could not designate an acting Board member to temporarily supervise the Foundation—would effect a significant intrusion on the Executive Branch's authority.  Plaintiffs would ensure that an executive branch official can continue to exercise significant executive power without any meaningful control or supervision by the President during the indefinite period before the Senate confirms the President's permanent nominees to the Board.  That outcome deprives the President of any mechanism to discharge "his own constitutional duty of seeing that the laws be faithfully executed," *Myers*, 272 U.S. at 135, as well as eviscerates any "'clear and effective chain of command' down from the President," *Arthrex*, 594 U.S. at 11 (quoting *Free Enter. Fund*, 561 U.S. at 498).  Indeed, the concern is particularly pronounced here, given that the current vacancies were occasioned by the Board's failure to adequately comply with the President's directives.

## IV.    Plaintiffs' APA claims fail.

Plaintiffs advance (Pls.' Mot. at 37-40) three APA claims:  that the termination of contracts and grants is arbitrary and capricious; that the "denial of funding" is contrary to law; and that agency action (in the form of grant payments) has been unlawfully withheld.  Plaintiffs are not likely to prevail on any of these claims because APA review is not available here and because, in any event, the termination of Plaintiffs' grants was lawful.

### A.    APA review is unavailable because the Tucker Act provides an adequate remedy.

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704.  That requirement reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen*, 487 U.S. at 903.  As the D.C. Circuit has observed, "the alternative remedy need not provide relief identical to relief under

the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted).  Accordingly, if there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA.  *See Perry Capital*, 864 F.3d at 621; *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing putative APA claim under Rule 12(b)(6) because decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit), *aff'd,* 793 F.3d 1352 (Fed. Cir. 2015).

As explained *supra* Part I.B, Plaintiffs' APA claims at their core allege a breach of contract. Because the Tucker Act provides specified remedies for such contractual claims, the Supreme Court in *California* acknowledged that statute provides Plaintiffs an adequate alternative.  Plaintiffs are therefore barred from bringing these APA claims in federal district court.

**B.  Termination of grants is committed to agency discretion by law.**

Even assuming the Tucker Act does not foreclose APA review of Plaintiffs' grant-termination claims, such terminations are quintessential agency actions "committed to agency discretion by law," for which the APA does not provide an avenue for review.  5 U.S.C. § 701(a)(2).  The Supreme Court has long recognized that an agency's determination of how to allot appropriated funds among competing priorities and recipients—precisely what Plaintiffs challenge here—is classic discretionary agency action.  *See Lincoln* v. *Vigil*, 508 U.S. 182, 193 (1993).

In *Lincoln*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA.  *Id.* at 185-188, 193. The Court explained that the "allocation of funds from a lump-sum appropriation" is an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Id.* at

192.   "[A]n agency's allocation of funds from a lumpsum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'"  *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831).   "Of course," such discretion is not unbounded, because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes."  *Id.*  But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review.  *Id.* Congress made only a lump-sum appropriation to the Foundation, and *Lincoln* controls here.

### C. Defendants' actions did not violate the APA.

Even if APA review were available, Defendants' actions are fully consistent with their obligations under that statute.  Recall, the grants themselves do not impose any restrictions on Defendants' expansive termination rights.  Under that permissive framework, the termination of Plaintiffs' grants was not arbitrary and capricious because (1) the Foundation determined that the grants were "inconsistent with the agency's priorities" and (2) "the President's February 19, 2025 executive order mandates that the [Foundation] eliminate all non-statutorily required activities and functions."  *See, e.g.*, Ex. A at 7, EC No. 6-7.

Plaintiffs cannot dispute the agency's determination that the grants were inconsistent with its priorities, and Executive Order No. 14,217 did in fact direct the Inter-American Foundation to "reduce the performance if [its] statutory functions and associated personnel to the minimum presence and function required by law."  The agency thus articulated a rational basis for the termination:  the fact that the grants were contrary to the agency's priorities and not required under statute.  That basis

was correct—indeed, there is no requirement in the relevant statutes to issue these specific grants, *see supra* Part I.A. That is all the APA requires. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). That Plaintiffs do not agree with Defendants' preferred policy approach does not mean that Defendants acted arbitrarily and capriciously in forming that policy.

Plaintiffs' argument (Pls.' Mot. at 39-40) that the grant terminations are contrary to law is similarly meritless. The grant funding that Plaintiffs seek is subject to grant agreements that authorize the Foundation to terminate funding at will, and the Foundation exercised that contractual right on March 4, 2025. Plaintiffs identify no contractual provision or statutory authority that compelled a different outcome.

Finally, Plaintiffs assert (Pls.' Mot. at 40) that agency action has been unlawfully withheld because the Department of Treasury has a mandatory duty to disburse funds upon a lawfully presented disbursement request from a Foundation employee. But Plaintiffs do not identify any lawfully presented disbursement requests from a Foundation employee with delegated authority over Foundation funding that have been denied. Nor would it be reasonable to conclude that the Treasury *had* to disburse funds for a terminated contract; such would be a recipe for misuse of taxpayer funds. Accordingly, so long as the termination of the grant agreements is lawful, so too is any decision not to disburse funds.

## V. Any relief should be limited.

### A. Plaintiffs are not entitled to a permanent injunction.

To establish that they are entitled to a permanent injunction, Plaintiffs must demonstrate: "'(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Anatol Zukerman & Charles Krause*

*Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

### 1. Plaintiffs fail to show irreparable harm that cannot be remedied at law.

To demonstrate irreparable harm, Plaintiffs must meet a "high standard"—they must show that they face injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008), and that are "beyond remediation," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Making that showing requires "proof" that the harm they identify "is certain to occur in the near future." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). Plaintiffs fail to carry that heavy burden here.

Plaintiffs identify several harms that stem from its lack of access to grant funds, in the form of harms to their operations and efforts to fulfill their missions. But "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wis. Gas Co.*, 758 F.2d at 674). Rather, it is black-letter law that economic harm is generally not irreparable because compensation after the lawsuit generally ensures full relief. *Wis. Gas Co.*, 758 F.2d at 674 (describing that principle as "well-settled"). The only exceptions are "where the loss threatens the very existence of the movant's business," *id.*, or "where the claimed economic loss is unrecoverable." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014) (citation omitted).

The first exception is a narrow one—it encompasses only cases where the plaintiffs demonstrate "extreme hardship to the business." *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981). Plaintiffs may be forced to make difficult choices in critical areas of their operations without incurring irreparable harm sufficient to warrant injunctive relief. *Cf. Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) ("[T]he forced sale of a house . . . do[es] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary

injunction."). And Plaintiffs must document any claim that an alleged harm is a threat to the business's very existence with specific details. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51–52 (D.D.C. 2011) (plaintiff needed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, [and] explain with . . . specificity how he arrived at the conclusion that he would be forced out of business in eighteen months" to show irreparable harm on this theory).

Here, Plaintiffs assert that (Pls.' Mot. 12-13) a lack of funds may result in one Plaintiff closing its doors and that other Plaintiffs will shut down or suspend certain programs. But Plaintiffs offer no meaningful explanation for why, if payments were obtained following an action under the Tucker Act in the Court of Federal Claims, they would not be able to reopen generally or restart those specific programs. In other words, they cannot show that such injuries are beyond remediation. Accordingly, even Plaintiffs who allege the most serious harms have not offered "proof" that they will cease to exist absent injunctive relief. *Wis. Gas Co.*, 758 F.2d at 674.

Ultimately, even if Plaintiffs can claim some threat of harm, there is no reason why they cannot vindicate that threatened harm through individualized, specific lawsuits challenging particular funding terminations in the correct court. Their declarations do not establish the need for broad injunctive relief in a single lawsuit as required to obtain the relief sought here.

### 2. The balance of the equities and public interest disfavor injunctive relief.

A permanent injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party"). The public has an interest in ensuring that tax dollars are not spent towards foreign projects that inconsistent with American interests. And the President determined that reducing the size of the Foundation, amongst other agencies, "will minimize Government waste and abuse, reduce inflation, and promote American freedom and innovation." Executive Order No. 14,217 § 1. A permanent injunction would displace

and frustrate the President's decision about how to best address these questions in the arena of foreign affairs, and the Court must give deference to the Executive Branch's "evaluation of the facts" and the "sensitive and weighty interests of . . . foreign affairs," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010), including "the timing of those . . . decisions." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

By contrast, Plaintiffs voluntarily contracted with the Foundation under grant agreements that contained clauses that permitted the Foundation to amend, suspend, or terminate those agreements at will. Any pecuniary harm that Plaintiffs now suffer is because of them taking on that risk, and in any event, such pecuniary harm can later be remedied through a suit under the Tucker Act.

### B. Relief must be limited to address Plaintiffs' injuries.

For the reasons explained above, Plaintiffs are not entitled to any relief. But if the Court concludes otherwise, the relief granted both "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).

The expansive relief that Plaintiffs seek flouts these well-established principles and should be narrowed. Plaintiffs have at most shown that they would suffer harm in the absence of relief ordering continued payments under Plaintiffs' grant agreements. As such, any relief should do no more than restore payments under the grant agreements to the specific funding-recipient Plaintiffs that are before this Court. Extending relief that is broader in scope (*i.e.*, awarding relief to protect other grantees not before this Court) would violate the foundational Article III principle that judicial remedies "must be tailored to redress the plaintiff's particular injury." *Gill*, 585 U.S. at 73. A federal court may entertain

a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief

only to remedy "the inadequacy that produced [the plaintiff's] injury." *Id.* at 66 (citation omitted).

### C. Relief is not available against the President.

The requested equitable and declaratory relief is categorically unavailable against the President,

named as a Defendant here. Although courts of equity may in some circumstances permit suits to

"enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575

U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded

by courts of equity," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).

There is no such tradition of equitable relief against the President. To the contrary, federal courts

have "no jurisdiction of a bill to enjoin the President in the performance of his official duties."

*Mississippi v. Johnson*, 71 U.S. 475, 501 (1866).

The Supreme Court reaffirmed that principle in *Franklin v. Massachusetts*, 505 U.S. 788, 800-01

(1992), where the Court declined to construe the APA to supply a cause of action against the President

"[o]ut of respect for the separation of powers and the unique constitutional position of the President."

That tradition properly respects the President's "unique position in the constitutional scheme." *See*

*Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749–50 (1982) (declining to assume that implied damages

"cause[s] of action run[] against the President of the United States").

In this case, similarly, the "reasons why courts should be hesitant to grant" injunctive relief

"are painfully obvious" given the President's unique constitutional role and the potential tension with

the separation of powers. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). Although, for the

reasons explained above, no relief at all is proper here, if the Court were to conclude otherwise, relief

could only be directed at subordinate officials. *See id.* ("In most cases, any conflict between the desire

to avoid confronting the elected head of a coequal branch of government and to ensure the rule of

law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against

subordinate officials."); *see also Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President as a party").

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment and dismiss the case for lack of jurisdiction or, in the alternative, grant Defendants' Cross-Motion for Summary Judgment and enter judgment for Defendants.

Dated: May 2, 2025                              Respectfully submitted,


                                               YAAKOV M. ROTH
                                               *Acting Assistant Attorney General*

                                               JOSEPH E. BORSON
                                               *Assistant Branch Director*

                                               /s/ *Alexander W. Resar*
                                               ALEXANDER W. RESAR
                                               *Trial Attorney*
                                               U.S. Department of Justice
                                               Civil Division, Federal Programs Branch
                                               1100 L Street, NW
                                               Washington, DC 20530
                                               Telephone: (202) 616-8188
                                               Email: alexander.w.resar@usdoj.gov

                                               *Counsel for Defendants*