# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5144**                    **September Term, 2024**

**1:25-cv-01015-RCL**

**Filed On:** May 3, 2025

Patsy Widakuswara, et al.,

      Appellees

    v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the U.S. Agency
for Global Media, et al.,

      Appellants

**No. 25-5145**                    **1:25-cv-00887-RCL**

Michael Abramowitz, in his official capacity as
Director of Voice of America, et al.,

      Appellees

    v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the United
States Agency for Global Media, et al.,

      Appellants

# United States Court of Appeals
### For The District Of Columbia Circuit

_____

**No. 25-5144**                                    **September Term, 2024**

**No. 25-5150**

**1:25-cv-00966-RCL**

Middle East Broadcasting Networks, Inc.,

　　　　Appellee

　v.

United States of America, et al.,

　　　　Appellants

**No. 25-5151**

**1:25-cv-00907-RCL**

Radio Free Asia,

　　　　Appellee

　v.

United States of America, et al.,

　　　　Appellants

**BEFORE:**　　Pillard*, Katsas, and Rao, Circuit Judges

## O R D E R

Upon consideration of the motions for stay pending appeal filed in the above-captioned cases, the responses thereto, and the replies; and the administrative stay entered on May 1, 2025, it is

*Judge Pillard dissents from the grant of the motions for stay.

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5144**                                         **September Term, 2024**

**ORDERED** that the motions for stay pending appeal be granted.  The following orders, or parts thereof, are stayed pending further order of the court:

In No. 25-5144, provisions (1) and (2) of the district court's preliminary injunction filed April 22, 2025;

In No. 25-5145, the district court's preliminary injunction filed April 22, 2025, to the extent the relief granted falls within provisions (1) and (2) of the April 22, 2025 preliminary injunction in No. 25-5144;

In No. 25-5150, the district court's preliminary injunction filed April 25, 2025;

In No. 25-5151, the district court's preliminary injunction filed April 25, 2025.

A *per curiam* concurring statement and a dissenting statement of Judge Pillard are attached.  It is

**FURTHER ORDERED** that the administrative stay entered in Nos. 25-5144, 25-5150, and 25-5151 be dissolved.

**<u>Per Curiam</u>**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:    /s/
Amy Yacisin
Deputy Clerk

PER CURIAM:  For the following reasons, we grant the government's motion for a stay pending appeal.

## I

The United States Agency for Global Media oversees six federally funded broadcast networks.  One of these, Voice of America, is operated by government employees and contractors.  Others, including Radio Free Asia and Middle East Broadcasting Networks, operate as private, non-profit corporations.  Through appropriations, Congress has allocated specific funding for the private networks, which USAGM disburses through grants.  *E.g.*, Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735; Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024).

On March 14, 2025, the President issued Executive Order 14238, which directed USAGM leadership to reduce the agency to the minimum level of operations required by statute. 90 Fed. Reg. 13043.  In response, USAGM placed over 1,000 employees on administrative leave, terminated nearly 600 personal-service contractors, and terminated RFA's and MBN's grant agreements for the 2025 fiscal year. *Widakuswara v. Lake*, No. 25-CV-1015, 2025 WL 1166400, at *3 (D.D.C. Apr. 22, 2025).  USAGM further directed its personnel abroad to cease broadcasting through VOA.  *Id.*

Various plaintiffs, including USAGM employees, contractors, and grantees, filed lawsuits to challenge these actions in our district court.  In one of the cases, the district court granted a preliminary injunction requiring USAGM to (1) restore its employees and contractors to their pre-March 14 status, (2) restore its FY 2025 grants with RFA and MBN, and (3) restore VOA as "a consistently reliable and authoritative

2

source of news." *Widakuswara*, 2025 WL 1166400, at *18. The court granted parallel relief in the other cases.

USAGM appealed and sought a stay of the first two portions of the preliminary injunction. Because of imminent funding deadlines, parties on both sides have requested expedited consideration of the stay motion.[1]

II

To resolve the stay motion, we consider whether the government is likely to prevail on appeal, any irreparable harm to the government, harms to the plaintiffs and others, and the public interest. *See Nken v. Holder*, 556 U.S. 418, 425–26 (2009). Applying these factors, we conclude that a stay is warranted.

A

The government is likely to succeed on the merits because the district court likely lacked subject-matter jurisdiction to enjoin USAGM's personnel actions and to compel the agency to restore RFA's and MBN's FY 2025 grants.

1

The district court likely lacked jurisdiction over USAGM's personnel actions. "We have long held that federal employees may not use the Administrative Procedure Act to challenge agency employment actions." *Filebark v. U.S. Dep't*

---

[1]    Radio Free Europe, another private network funded by USAGM, filed a similar suit and received a temporary restraining order. *See RFE/RL, Inc. v. Lake*, No. 25-CV-799, 2025 WL 1232863 (D.D.C. Apr. 29, 2025). The government has filed a separate motion to stay that order, which we do not resolve here.

3

*of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009).  Congress has instead established comprehensive statutory schemes for adjudicating employment disputes with the federal government.[2]  *See*, *e.g.*, 5 U.S.C. §§ 1204, 7121–22, 7701 (Merit Systems Protection Board); *id.* § 1214 (Office of the Special Counsel); *id*. § 7104 (Federal Labor Relations Authority); 22 U.S.C. § 4107 (Foreign Service Labor Relations Board); *id.* § 4136 (Foreign Service Grievance Board); 41 U.S.C. §§ 7103–05 (Civilian Board of Contract Appeals).  These remedial schemes "provide[] the exclusive procedures by which federal employees" may pursue employment- and contractor-related claims.  *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019); *see*, *e.g.*, *Am. Foreign Serv. Ass'n v. Baker*, 895 F.2d 1460, 1461–62 (D.C. Cir. 1990) (foreign-service labor-related claims must go through FSLRB); *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995) (Contract Disputes Act provides exclusive remedial scheme for covered contracts).  "Federal employees may not circumvent [these statutes'] requirements and limitations by resorting to the catchall APA to challenge agency employment actions."  *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009).  "And that principle applies to a 'systemwide challenge' to an agency policy … just as it does to the implementation of such a policy in a particular case."  *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).

---

[2]  The dissent doubts that Congress's chosen administrative methods could meaningfully process agency-wide claims for over 1,000 employees.  But administrative agencies are not powerless to issue broad-reaching relief in large-scale personnel matters.  *See* Order on Stay Request, *Special Counsel ex rel. John Doe v. Department of Agriculture*, No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), https://perma.cc/3F45-PKG5 (single MSPB order staying termination of nearly 6,000 employees).

4

The district court nonetheless justified the injunction on the ground that "this case is not simply a collection of employment disputes" because the "facts on the record and on the ground" suggest USAGM is being "dismantl[ed]." *Widakuswara*, 2025 WL 1166400, at *11. And in their stay briefing, plaintiffs expressly frame their claims as challenging the "wholesale shuttering of VOA" and seeking to undo "broad government actions" to "dismantl[e] an entire federal agency." Abramowitz Opp'n to Stay Mot. at 13, 18; Widakuswara Opp'n to Stay Mot. at 14. Yet plaintiffs may not use the APA to mount "wholesale" challenges to an agency's "entire program." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990) (cleaned up). The APA cause of action, like its sovereign-immunity waiver, provides for judicial review of "discrete agency actions." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004); *see* 5 U.S.C. §§ 702, 704. The "dismantling" that plaintiffs allege is a collection of "many individual actions" that cannot be packaged together and "laid before the courts for wholesale correction under the APA." *Nat'l Wildlife Fed'n*, 497 U.S. at 893.[3] Thus, while USAGM's employees and contractors might have viable, discrete claims with respect to their individual personnel actions, those claims must be pursued through other remedial channels.

2

The district court also likely lacked jurisdiction to restore RFA's and MBN's FY 2025 grants.

---

[3] Before the district court and here, the government maintained that plaintiffs fail to challenge any discrete, circumscribed agency action as required under the APA and instead seek judicial review of the agency's general compliance with its statutory mandate. *See* Opp. to Preliminary Injunction 30; Stay Mot. 22–23.

5

The Tucker Act vests the Court of Federal Claims with jurisdiction over claims against the United States "founded … upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). We have long held that this jurisdictional grant, where it applies, is exclusive and thus bars application of the sovereign-immunity waiver set forth in the APA. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022); *see* 5 U.S.C. § 702 (providing that APA waiver of sovereign immunity is inapplicable where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought"). For Tucker Act purposes, whether a claim is "founded upon" a contract hinges on "the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought." *Crowley*, 38 F.3d at 1106 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). If a claim against the United States is contractual "at its essence," district courts have no power to resolve it. *Id.* (quoting *Megapulse*, 672 F.2d at 967). The same rule applies to claims for breach of grant agreements executed through binding government contracts. *See Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338–40 (Fed. Cir. 2021).

The Supreme Court recently applied these principles to issue a stay pending appeal in a case substantially similar to this one. In *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), a district court entered an order "enjoining the Government from terminating various education-related grants." *Id.* at 968. The Supreme Court stayed the order pending the disposition of an appeal to the First Circuit and any ensuing petition for certiorari. *Id.* at 696. The Court concluded that the district court likely lacked jurisdiction to bar termination of the grants, because the Tucker Act likely conferred jurisdiction over the dispute on the CFC. *Id.* Therefore, "the APA's limited waiver of immunity d[id]

6

not extend" to the injunction at issue, which the Court described as an "order[] to enforce a contractual obligation to pay money." *Id.* (cleaned up).

That reasoning controls this case. Congress created a contractual scheme for allocating funds to the grantees. It authorizes USAGM to fund RFA, MBN, and other networks through "grants and cooperative agreements." 22 U.S.C. § 6204(a)(5). Likewise, the governing appropriation statute allocates specific funding amounts for "grants" to those networks. 2024 Appropriations Act, 138 Stat. at 735. In the grants at issue here, USAGM, acting through its Chief Executive Officer, promised to pay the appropriated funds to the networks in monthly installments. In return, the networks promised to use the funds to advance statutory objectives and to comply with all program requirements. These exchanges of promises—reflecting offer, acceptance, consideration, mutuality of intent, and action by an official with authority to bind the government—constitute government contracts for Tucker Act purposes. *Columbus Reg'l Hosp.*, 990 F.3d at 1338–39.

By the district court's own telling, the dispute here arose when USAGM terminated these agreements. *Widakuswara*, 2025 WL 1166400, at *3. The district court ordered "restor[ation] [of] the FY 2025 grants" and "disbursement to RFA and MBN of the funds Congress appropriated." *Id.* at *18. Whether phrased as a declaration that the agreements remain in force, or an order to pay the money committed by those agreements, the injunction in substance orders specific performance of the grant agreements—a quintessentially contractual remedy. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 79–80 (D.C. Cir. 1985); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894–95 (D.C. Cir. 1985). And it is the inherently contractual nature of the relief afforded—

7

*not* any characterization of the relief as money damages—that makes the CFC the exclusive forum for this suit. *See Ingersoll-Rand*, 780 F.2d at 79–80 (holding a plaintiff "may not sidestep" CFC jurisdiction by "avoiding a request for damages," when their request relief "amount[s] to a request for specific performance"); *see also Crowley*, 38 F.4th at 1107 (cautioning against "creative drafting of complaints … to avoid the jurisdictional consequences of the Tucker Act" (cleaned up)).

To distinguish *California*, the plaintiffs stress that Congress appropriated specific sums for RFA and MBN. Accordingly, plaintiffs contend, they may file an APA claim—independent of and antecedent to their grant agreements—to force USAGM to disburse the appropriated amounts. But plaintiffs overread the governing statutes, which do not give the networks an unqualified right to the appropriated funds. Rather, they allocate funds for the networks, which may be disbursed only as grants. *See* 2024 Appropriations Act, 138 Stat. at 735. If these statutes created any entitlement for the networks at all, they at most would require USAGM to enter grants obligating the appropriated amounts to the networks. *Cf. Train v. City of New York*, 420 U.S. 35, 40–43 & n.9 (1975).[4] Thus, any APA claim under these statutes would have to allege that the government failed to enter a grant agreement obligating

_____

[4] And even then, USAGM may impose various conditions on a network's receipt of the appropriated funds. *See* 22 U.S.C. § 6208(c) (listing "limitations and restrictions" to be contained in "[a]ny grant agreement"); 2024 Appropriations Act, 138 Stat. at 735 ("funds appropriated under this heading shall be made available in accordance with the principles and standards" of the statute). Moreover, even after USAGM has entered into grant agreements, the agency still may "award the grant … to another entity" if, "at any time," it determines that the network "is not carrying out the [statutory] functions … in an effective and economical manner." 22 U.S.C. § 6208(g).

8

the appropriated amount.  *See Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 199–200 (Fed. Cir. 1997) (*NCMS*).  But here, USAGM *did* obligate the appropriated funds through grants, thereby satisfying whatever duty (if any) it had under the appropriation statutes.  *See Widakuswara*, 2025 WL 1166400, at *4–*5.  Once the agency entered these contracts, it incurred a new obligation:  Unlike the relevant statutes, the grant agreements require the government to make *monthly* payments to the networks—the very obligation prompting this highly expedited stay litigation.  Accordingly, the claims of government nonpayment necessarily challenge its performance under the grants.  Such claims are squarely contract claims under the Tucker Act.  *See Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368–69 (Fed. Cir. 2021) (explaining *NCMS*); *see also Ingersoll-Rand*, 780 F.2d at 78–80 (Tucker Act applies to claims that the government's termination of a contract violated statutes or regulations incorporated therein).[5]

The plaintiffs' non-APA claims regarding grant money are unlikely to fare any better.  Below, plaintiffs raised mandamus, impoundment, Presentment Clause, Appropriations Clause, Spending Clause, Take Care Clause, Separation-of-Powers,

---

[5]  The dissent describes 22 U.S.C. § 6208(c)(5) as significantly limiting the circumstances in which USAGM may terminate grants. However, that provision sets forth when grants may be "terminated *without fiscal obligation to the United States*."  22 U.S.C. § 6208(c)(5) (emphasis added).  It thus confirms our conclusion that Congress contemplated financial liability under the grant as the remedy for any breach.  The dissent also notes that the government cannot prevent enforcement of statutes through the APA merely by incorporating the statutes into contracts.  The dissent is correct on that point.  *See Megapulse*, 672 F.2d at 967.  But in this statute, Congress chose to use a contractual mechanism for obligating the appropriated funds, rather than creating a freestanding statutory entitlement.

9

and *ultra vires* claims. And before our Court, plaintiffs argue that "serious constitutional question[s]" would arise if we concluded that the CFC had exclusive jurisdiction, as that would deprive them of meaningful judicial review of their constitutional claims. Widakuswara Opp'n to Stay Mot. at 18 (citing *Webster v. Doe*, 486 U.S. 592, 603 (1988)). But these constitutional claims simply flow from allegations that the Executive Branch has failed to abide by governing congressional statutes, which does not suffice to trigger the distinctively strong presumptions favoring judicial review of constitutional claims. *Dalton v. Specter*, 511 U.S. 462, 472–74 (1994); *see also Ingersoll-Rand*, 780 F.2d at 78 (Tucker Act governs challenge to contract termination, "despite plaintiff's allegations of statutory and constitutional violations" (cleaned up)).[6] Moreover, these claims fall short for the same reason as plaintiffs' APA claims: At most, the statutes in question required USAGM to allocate the appropriated amounts through grants enforceable as contracts, which USAGM has done.

B

On balance, the remaining *Nken* factors support a stay.

*Irreparable Harm*. The government has shown that it will face irreparable harm absent a stay. As to the reinstatement of USAGM employees and personal-service contractors: The Executive Branch has a significant interest in maintaining control over personnel matters. *See Sampson v. Murray*, 415

---

[6] In the district court, the *Widakuswara* plaintiffs also raised Appointments Clause and First Amendment claims. The district court did not address them in granting the preliminary injunction, *Widakuswara*, 2025 WL 1166400, at *5 n.13, *15 n.26, and the plaintiffs do not assert them as grounds for denying a stay. So, we do not consider these claims in resolving these stay motions.

10

U.S. 61, 83 (1974). In requiring the restoration of all employees and contractors to their pre-March 14 status, the injunction interferes with this important responsibility. This intrusion is particularly harmful because it implicates the Executive Branch's foreign-affairs authority. USAGM is responsible for "present[ing] the views of the United States Government" and "support[ing] United States foreign policy objectives" in the international community. 22 U.S.C. § 6202(b)(3), (4). By depriving the Executive Branch of control over the individuals involved in its international broadcasting, the injunction threatens its prerogative to "speak with one voice" on behalf of the United States in foreign affairs. *Cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936).

As to the restoration of the grants: Absent a stay, USAGM would be forced to imminently pay out some $15 million to RFA and MBN. And RFA and MBN have attested they intend to spend these funds "immediately." Network Opp'n to Stay Mot. at 22. Because the district court did not require plaintiffs to post any injunction bond, *Widakuswara*, 2025 WL 1166400, at *17,[7] USAGM cannot recover these funds even if it should prevail in its appeal. Under these circumstances, harm to the government is irreparable. *See California*, 145 S. Ct. at 969.

---

[7] Federal Rule of Civil Procedure 65(c) provides that a district court "may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). The "precise purpose" of such a bond is to ensure that a defendant can be fairly compensated for injury stemming from a wrongfully granted injunction. *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134 (D.C. Cir. 1992).

11

*Harm to Others*.  Plaintiffs identify various harms that they and others may incur absent a stay, including loss of employment, the possible collapse of MBN and RFA, the elimination of a union's bargaining unit, and the removal of alien employees and contractors to countries hostile to the free press.  Although we appreciate the gravity of these harms, there remain several avenues for their remediation.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("[T]he injury must be beyond remediation.").  Loss of government employment generally does not constitute irreparable injury, *see Sampson*, 415 U.S at 91–92 & n.68, especially since employees seeking to challenge their termination or placement on administrative leave may seek emergency stays from the Office of Special Counsel and MSPB, *see* 5 U.S.C. § 1214(b).  Personal-service contractors may likewise challenge their termination under the Contract Disputes Act, and unions may file complaints on behalf of their members before the FLRA.  *E.g.*, *Ho v. United States*, 49 Fed. Cl. 96, 101 (2001) (CFC exercising jurisdiction over personal-service contract), *aff'd*, 30 F. App'x 964 (Fed. Cir. 2002); *see* 41 U.S.C. § 7101 *et seq.*; 5 U.S.C. § 7118.  Journalists may seek relief in immigration proceedings to avoid potential persecution based on their political opinions.  *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158 (asylum); *id.* § 1231(b)(3) (withholding of removal).  As for MBN and RFA, they may seek to recover any wrongfully withheld grant funds in the CFC.  28 U.S.C. § 1491(a)(1). Indeed, for almost a month, the Supreme Court has made clear that the CFC is likely the only forum open to them.  *See California*, 145 S. Ct. at 968.[8]

---

[8]  We need not consider any potential harm from shuttering VOA; the district court ordered USAGM to resume VOA's statutorily required programming levels, and the government has not sought to stay that provision of the injunction.

12

*Public Interest*.  Plaintiffs allege that USAGM's implementation of the Executive Order has violated numerous statutory requirements.  At this stage of the litigation, the government has raised jurisdictional, not merits, defenses.  Of course, we recognize that the public has an interest in the Executive Branch's compliance with congressional mandates.  *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  By the same token, however, the public has an interest in the Judicial Branch's respect for the jurisdictional boundaries laid down by Congress.  Because personnel and grant disputes directly concern the public fisc, Congress has limited the resolution of these potentially costly claims to specialized tribunals such as the MSPB and the CFC.  We must respect those boundaries no less than the substantive and appropriations provisions governing the operation of USAGM.

PILLARD, *Circuit Judge*, dissenting:    Defendants are unlikely to succeed on the merits: They have not persuasively established that the district court lacked authority to enter the preliminary injunction.    Meanwhile, Voice of America, Radio Free Asia, and Middle East Broadcasting Networks face severe and irreparable harm absent injunctive relief.    Voice of America has gone dark for the first time since 1942.    Radio Free Asia and Middle East Broadcasting Networks face imminent collapse if they do not receive the funding Congress directed to each of them by name. The purpose of a stay pending appeal is to maintain the status quo until a case can be fully adjudicated on its merits.    This stay does the opposite, silencing Voice of America for the foreseeable future and eliminating Radio Free Asia and Middle East Broadcasting Networks' ability to see this case through to the end.

## I.

Defendants are not likely to succeed on the merits.    They do not claim that any court would likely hold that they are carrying out the will of Congress.    They argue instead that other entities should have heard plaintiffs' claims.    Part A describes the strong likelihood that the plaintiffs who worked for Voice of America did not have to spend years attempting to channel their claims through federal labor and employment administrative processes before they could file this suit under the Administrative Procedure Act to set aside the Agency's efforts to dismantle the work of Congress.    It also defends the scope of the district court's preliminary injunction as commensurate with defendants' baby-with-the-bathwater approach to asserting their "policy priorities."    Part B turns to the strong likelihood that the district court had jurisdiction over the claims of Radio Free Asia and Middle East Broadcasting

2

Networks, contrary to contentions that those claims belong in the Court of Federal Claims.

**A.**

On March 14, 2025, the President signed Executive Order 14238, *Continuing the Reduction of the Federal Bureaucracy*, directing USAGM to "reduce the performance of [its] statutory functions and associated personnel to the minimum presence and function required by law," and to eliminate "the non-statutory components and functions" of the agency "to the maximum extent consistent with applicable law." 90 Fed. Reg. 13043 (Mar. 14, 2025). The EO directed the head of USAGM to report its compliance to OMB with an explanation of "which components or functions of the governmental entity, *if any*, are statutorily required and to what extent." *Id.* (emphasis added).

The very next day, USAGM's website featured a statement announcing that the Agency—which it described as producing "radical propaganda," "rot from top to bottom"—is "irretrievably broken" and "not salvageable."[1] Apparently having concluded that *none* of the functions of Voice of America or the foreign affiliate networks is statutorily required, the agency's acting leadership proceeded to dismantle all of them.

To that end, the district court found, defendants "took immediate and drastic action to slash USAGM, without considering its statutorily or constitutionally required functions." *Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at *14 (D.D.C. Apr. 22, 2025). The day

---

[1] *USAGM, Senior Advisor Kari Lake Cancels Obscenely Expensive 15-Year-Lease that Burdened the Taxpayers and Enforces Trump's Executive Order to Drastically Downsize Agency*, U.S. AGENCY FOR GLOBAL MEDIA (Mar. 15, 2025), https://perma.cc/YQA4-3TVA.

3

after the EO was signed, the agency's acting leadership sent a boilerplate e-mail to 1,042 of the 1,147 full-time employees placing them on administrative leave and another such email to each USAGM affiliated network terminating its grant on the ground that it "no longer effectuates agency priorities." *Id.* at *3 & n.5. The next day, the government cancelled all USAGM personal service contracts. It then instructed all the USAGM foreign news services to shut down their transmitters and place locally employed staff on leave. USAGM prepared to send termination notices to every radio broadcast technician working for it anywhere in the world who was not already in the process of retiring. *Id.* at *3. The government informed plaintiff AFGE of its plan to terminate 594 employees who are AFGE members. *Id.*

As a result of those wholesale actions, USAGM's flagship station, Voice of America, stopped reporting the news "for the first time in its 80-year existence." *Id.* Voice of America's affiliate networks abroad went dark or switched to airing only music. Widakuswara Compl. ¶ 82.

The statute is clear: Voice of America must "serve as a consistently reliable and authoritative source of news." 22 U.S.C. § 6202(c)(1). The government touts that it did not challenge part (3) of the injunction compelling its compliance with that statutory directive. Gov't Stay Mot. 1. But the significance of that caveat—beyond the purely symbolic—remains a mystery. The district court found as fact that the Agency has placed on leave or terminated all the VOA employees and contractors who are necessary to fulfilling that mandate. *See* Widakuswara Compl. ¶ 83 (*all* transmitters abroad shuttered and *all* locally employed staff placed on administrative leave). And there is no reason to conclude that the government is in fact complying with the injunction to get Voice of America back up and running. Plaintiff Abramowitz

4

emailed Defendants Lake and Morales the morning after the district court entered the injunction, asking about their plans to bring VOA staff back to work. He received no response. Abramowitz Opp'n 21. No status report or other filing or source of information suggests that Voice of America has resumed broadcasting the news.

In support of its emergency motion for a stay pending appeal in the Voice of America cases, the government contends it is likely to succeed on the merits in its defense against the claims of Voice of America's employees for two related reasons. First, as a threshold matter, it asserts that the district court lacked jurisdiction over the employee plaintiffs' claims because the employees did not first seek relief from the Merit Systems Protection Board (MSPB) (for employment disputes), the Federal Labor Relations Authority (FLRA) (for labor disputes), or the Office of Special Counsel (for prohibited personnel practices). Gov't Stay Mot. 20-21. Second, the government argues that the preliminary injunction is overbroad in ways that are unsupported by the claims the district court held were likely to succeed. Gov't Stay Mot. 19-21.

1. The administrative channeling defense is inapposite here. The government contends that plaintiffs must treat their wholesale removal from the workplace as if it were an aggregation of individualized employment actions. It suggests that the correct response is for each of the hundreds of employees to proceed with a separate, identical administrative claim at the MSPB or FLRA. I would not indulge any such fiction. Defendants themselves never did. They took broad, blunt, and decisive action to gut USAGM and VOA. They sent identical notices to all VOA employees. Widakuswara Compl. ¶ 74. Nothing about each decision or its execution was individualized. No employment-related rationale was

5

offered—except the cold comfort that the action was *not* for any "disciplinary purpose." *Id.*

Defendants give no realistic indication why administrative exhaustion is required here other than to weakly suggest that, viewed as individual employment actions, some "may be entirely lawful." Gov't Stay Mot. 21. The government leaves unsaid how review by the agencies it identifies could discern in any individualized sense how a wholesale removal of public sector employees from their jobs without employment-related grounds, notice, or prospects for return "may" be found to be lawful—or not—by the employment-review agencies to which they would direct the plaintiffs.

Even taken at face value, the government's channeling argument is unlikely to succeed. *See Widakuswara*, 2025 WL 1166400, at *10-11. Channeling plaintiffs' claims to administrative bodies designed to adjudicate individual employment or labor disputes would entirely shut off meaningful judicial review of the claims plaintiffs assert. The VOA plaintiffs challenge the dismantling of USAGM through the wholesale placement of employees on administrative leave with one boilerplate letter. The agency took that action without any employee-related justification. The announced reason defendants acted as they did was to dismantle a broadcaster whose mission and operation they disdain. That is not a "*covered* agency action[]" that must proceed through the administrative review scheme. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5-6, 10 (2012) (emphasis added). Nor is the action challenged here a matter of federal sector "employee relations" that must proceed through the Federal Labor Relations Authority. *Cf. Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019). The plaintiffs in this lawsuit challenge the evisceration of their jobs only insofar as

6

it is the means by which they challenge defendants' unlawfully halting the work of Voice of America and shutting it down.

The channeling defense does not in any event reach all claims in the VOA cases. As the district court pointed out, *Widakuswara*, 2025 WL 1166400, at *10, there is no scenario in which the claims the nonprofit press organizations or personal service contractors raise could conceivably be channeled through the Federal Service Labor-Management Relations Statute, the Civil Service Reform Act, or the Foreign Service Act. There is no administrative agency from which plaintiffs Reporters Without Borders, Reporters Sans Frontières, or personal service contractors John Does 3 and 4 might seek relief, even if it made sense for them to try. Given defendants' failure to acknowledge or address the lack of any administrative process available to these plaintiffs, there is no basis to conclude the threshold challenge to the district court's jurisdiction to hear these plaintiffs' APA and constitutional claims is likely to succeed.

Plus, all the employees raise constitutional claims, including under the First Amendment, separation of powers, and the Take Care Clause. The government fails to acknowledge those claims. Constitutional claims are collateral to any review afforded by the Civil Service Reform Act and the Federal Service Labor-Management Relations Statute. Article III courts may retain jurisdiction over employment claims of federal employees that raise constitutional challenges. *See Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C. Cir. 1984) (retaining jurisdiction over allegation that officials responsible for reduction-in-force action held office in violation of the Appointments Clause); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1433-34 (D.C. Cir. 1996) (retaining jurisdiction over employee's First Amendment claim). The agencies' lack of expertise or capacity to address plaintiffs' properly framed

7

APA and constitutional claims is another reason the channeling requirement is unlikely to apply to them.  *See generally*, *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 194 (2023) ("The Commission knows a good deal about competition policy, but nothing special about the separation of powers."). Far more likely—and certainly more appropriate in every practical sense—is that the government's mass action to eliminate virtually all the agency's employees, like its action of wholesale elimination of the agency's contractors, is subject to review directly in the district court to determine whether it was arbitrary or unlawful under the APA and in excess of the executive's unilateral authority.

2.   The plaintiffs are also likely to succeed in defending the district court's injunction restoring the VOA employees to their pre-March 15 status as relief properly tailored to the employee-plaintiffs' claims.  The government protests that the district court issued a "broad programmatic order" to enforce compliance with a "broad statutory mandate," which they claim exceeds the bounds of judicial review of agency actions set by *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) and *Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55 (2004). Gov't Stay Mot. 22-23.  The fashioning of effective equitable relief is highly discretionary and context-specific.  As applied here, the government's cookie-cutter objection to the injunction in this case, entered by a highly experienced and able district judge based on a powerful record of extraordinary and categorical government conduct, does not persuade.

The scope of plaintiffs' claims and the preliminary relief granted to preserve their chance of permanent relief should they prevail differs in important ways from what the Court deemed problematic in *Lujan* and *SUWA*.  The plaintiffs in *Lujan* challenged the Department of the Interior's operations in reviewing, classifying, and developing plans for various public

8

lands. 497 U.S. at 890. As the Supreme Court observed, the "so-called 'land withdrawal review program'" they challenged was plaintiffs' own construct. *Id.* The complaint did not "refer to a single [agency] order or regulation, or even to a completed universe of particular [agency] orders and regulations," but to a "continuing" and "constantly changing" amalgam of discretionary activities. *Id.* Unsurprisingly, the Court saw no final, reviewable agency action in the "program" to which plaintiffs objected. The conduct plaintiffs challenge in this case is discrete and clear: halting the work of virtually all the employees working at Voice of America and bringing the operation of that station to a halt. What they asked the district court to revive and protect is no more than what Congress prescribed. The kind of difficulty described in *Lujan* is absent here. Here, there is no "continuing" and "constantly changing" set of agency operations being placed before the court.

This case is also not a "programmatic" challenge to agency policies and does not, contrary to the government's remonstrance, require the court to run the agency. Defendants rely on *SUWA*, in which the Supreme Court rejected plaintiffs' request to force the Bureau of Land Management to comply with a statutory obligation to manage certain public lands "in a manner so as not to impair the suitability of such areas for preservation as wilderness." 542 U.S. at 65 (quoting 43 U.S.C. § 1782(c)). Plaintiffs there urged the district court to order their preferred managerial regime by making the agency promulgate rules to prohibit the use of off-road vehicles. The Court observed that the statute at issue "assuredly [did] not mandate, with the clarity necessary to support judicial action . . . the total exclusion of [off-road vehicle] use." *Id.* at 66. Unlike in *SUWA*, plaintiffs are not seeking to direct the court to bring into being an alternative suite of broadcast stations to the one that Congress defined and funded. Instead, there is a "completed universe" of agency actions that plaintiffs have alleged, and the

9

district court agreed, are unlawful. Again, because they are likely to succeed in that claim, I would deny the stay.

The government cannot seriously contend on this posture that the relevant statutes—or more foundationally the constitutional separation of powers—permit the President to wholly scupper Voice of America and its affiliated Networks. Defendants characterize the claims as an impermissible attempt to clump together "many individual actions" and impermissibly challenge them as one under the APA. The fact that the government elected to take many unlawful agency actions in short order—thereby putting the whole agency on the chopping block—does not exempt their violations from judicial scrutiny. See *Widakuswara*, 2025 WL 1166400, at *11. Yes, the pace and scope of the government's destructive efforts present the courts with remedial challenges in this and many other recent cases. But the very volume of lawbreaking and the scope of operational functioning laid waste does not add up to courts losing the power to determine the lawfulness of agency action. And the government has not meaningfully disputed that the statute mandates "with the clarity necessary to support judicial action" that the USAGM operations Congress ordered be established and funded must continue to exist absent congressional action to the contrary.

**B.**

Defendants are similarly unlikely to succeed on the merits of their challenge to the preliminary injunction as it applies to Radio Free Asia (RFA) and Middle East Broadcasting Networks (MBN) (the Networks). Federal laws passed by Congress require the allocation of specified grant funding to the Networks. Nonetheless, defendants purported to terminate the Networks' grant agreements and are withholding funds allocated to them on the stated grounds that each grant award

10

"no longer effectuates agency priorities." Plaintiffs sued to halt defendants' impoundment of those funds.

The Networks claim that the defendants' funding freeze is in violation of the International Broadcasting Act and related statutes, and that its defiance of Congress's directives in those laws is *ultra vires* and unconstitutional. The government counters that plaintiffs' claims sound in contract, so must be dismissed because the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over contract claims against the federal government. That "restrictive—and unprecedented— interpretation of [the district court's jurisdiction] should be rejected because the remedy available to the [plaintiffs] in the Claims Court is plainly not the kind of 'special and adequate review procedure' that will oust a district court of its normal jurisdiction under the APA" and the Constitution. *Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988).

"This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds," *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969-70 (D.C. Cir. 1982), and it is clear from the Networks' complaint that this is not a "disguised," *id.* at 969, run-of-the-mill contract action "within the unique expertise of the Court of Claims," *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985). At its core, the Networks' suit challenges the government's assertion that it may disregard specific congressional funding directives when it disagrees with Congress's policy choices. Interpreting the Tucker Act to deny the district court jurisdiction over a matter with such "serious implications for our constitutional structure," *In re Aiken Cnty.*, 725 F.3d 255, 267 (D.C. Cir. 2013), is utterly inconsistent with both this court's and the Supreme Court's longstanding understanding of the Tucker Act as providing the exclusive forum for a narrow category of

11

"actions based on government contracts." *Megapulse*, 672
F.2d at 967; *see also United States v. Mottaz*, 476 U.S. 834, 851
(1986) (describing "the essence of a Tucker Act claim for
monetary relief" as one requesting "damages for the
Government's past acts"); *Crowley Gov't Servs., Inc. v. Gen.
Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) ("[W]e
have explicitly rejected the 'broad' notion 'that any case
requiring some reference to or incorporation of a contract is
necessarily on the contract and therefore directly within the
Tucker Act' because to do so would 'deny a court jurisdiction
to consider a claim that is validly based on grounds other than
a contractual relationship with the government.'") (quoting
*Megapulse*, 672 F.2d at 967-68). "It [is] nothing less than
remarkable to conclude that Congress intended judicial review
of these complex questions of [constitutional law] to be
reviewed in a specialized forum such as the Court of Claims."
*Bowen*, 487 U.S. at 908.

To determine whether the Court of Federal Claims has
exclusive jurisdiction, we must look to the source of the rights
plaintiffs assert and the nature of the relief they seek. "The
classification of a particular action as one which is or is not 'at
its essence' a contract action depends both on the source of the
rights upon which the plaintiff bases its claims, and upon the
type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at
968. The following explains in more detail why the district
court likely had jurisdiction to declare unlawful and enjoin the
challenged agency action.

1. Consider the source of plaintiffs' rights. In identifying
their source, we consider factors including whether "the
plaintiff's asserted rights and the government's purported
authority arise from statute," and "whether the plaintiff's rights
exist prior to and apart from rights created under the contract."
*Crowley*, 38 F.4th at 1107 (internal citations omitted and

12

formatting altered).  Here, the plaintiffs' asserted rights arise
from federal statutes and the Constitution, and they exist
independent of any contract with USAGM.  *See* MBN Compl.
¶¶ 58-60, 65-68, 77-97; RFA Compl. ¶¶ 58-60, 65-68, 77-97.
As such, the Networks' claims belong in the district court, not
the Court of Claims.

First, the Networks claim that the government has acted
contrary to the APA, the Networks' governing statutes, and
congressional appropriations.  By freezing their funding,
defendants have placed them in dire financial consequences
and will force them out of existence within a matter of days.
Federal law established Radio Free Asia and Middle East
Broadcasting Networks and required allocation of funds to
those specific, named entities to enable them to "provide
accurate and timely information, news, and commentary" to
Asia and the Middle East, and to "be a forum for a variety of
opinions and voices from within Asian nations whose people
do not fully enjoy freedom of expression."  22 U.S.C. §
6208(a)-(b);  *see*  Emergency  Wartime  Supplemental
Appropriations Act of 2003, Pub. L. No. 108-11, 117 Stat. 559,
562  (2003).    Congress,  with  the  President's  approval,
appropriated funds earmarked for MBN and RFA to carry out
statutorily  assigned  functions.    Further  Consolidated
Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I,
138 Stat. 460, 735 (2024) (requiring appropriated funds to be
"allocated in accordance with the table included … in the
explanatory statement described in section 4"); Explanatory
Statement Submitted by Ms. Granger, Chair of the House
Committee on Appropriations, Regarding H.R. 2882, Further
Consolidated  Appropriations  Act,  2024,  170  Cong.  Rec.
H1501, H2089 (Mar. 22, 2024) (table designating $60,830,000
to be allocated to RFA and $100,000,000 to MBN).

13

The Networks also point to Congress's direction that funds appropriated for RFA and MBN "*shall* be allocated" to those entities. 2024 Appropriations Act, 138 Stat. at 735 (emphasis added); 22 U.S.C. § 6204(a)(5) (USAGM is to "make and supervise" the grants to the networks). And Congress expressly requires USAGM to provide RFA and MBN virtually all the funds appropriated for each network, strictly confining USAGM's reprogramming authority to at most 5% of a network's allocation. 2024 Appropriations Act, 138 Stat. at 735; Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025). The statute allows USAGM to terminate a grant to RFA only for "failure to comply with" the requirement "that grant funds be used only for activities consistent with" the statute. 22 U.S.C. § 6208(c)(5). Those specific provisions govern over the general regulatory prerogative the government cites. The Agency has not asserted that RFA or MBN did anything inconsistent with their statutory mandates, but it has nonetheless acted to "terminate" their grants and freeze all their funding. Plaintiffs bring a classic APA challenge to the Agency's impoundment of funds—agency action that is both arbitrary and heedless of Congress's commands.

In sum, Congress called for the Networks to be established as private nonprofit entities supported by federal appropriations. It called for them to be maintained for the purpose of broadcasting uncensored journalism, especially to countries that restrict freedom of speech. And Congress made appropriations explicitly allocating funds to RFA and MBN by name. Those provisions tightly restrict the use of the Networks' funds for any other purpose. The Networks claim that the Agency acted contrary to those congressional directives when it impounded funds appropriated to support their operations. Their claims that the Agency violated the

14

International Broadcasting Act and the 2024 and 2025 Appropriations Acts thus arise from statute, not from contract.

Second, the complaint raises various constitutional claims. Plaintiffs allege that defendants acted beyond the Executive's authority by effectively repealing duly enacted law establishing the Networks for specified purposes and by freezing the funds Congress allotted to them. They frame those claims as violations of the separation of powers, the Presentment Clause, the Appropriations Clause, the Spending Clause, and the Take Care Clause. MBN Compl. ¶¶ 77-97; RFA Compl. ¶¶ 77-97. Constitutional claims for injunctive or declaratory relief face no sovereign immunity bar, per the *Larson-Dugan* exception. *See Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) ("Under [the *Larson-Dugan*] exception, suits for specific relief against officers of the sovereign allegedly acting beyond statutory authority or unconstitutionally are not barred by sovereign immunity") (internal quotation marks omitted); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690-91 (1949); *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963). The government's stay motion does not dispute that the Court of Claims could not adjudicate plaintiffs' constitutional claims, *see LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995), and the government does not appear to contest the district court's jurisdiction over them.

Defendants dispute plaintiffs' framing of their claims as statutory and constitutional. They argue that, because the Networks are funded by grants, plaintiffs' challenge to the impoundment must be treated as a breach of contract claim that belongs in the Court of Claims. Reply at 3. That misapprehends the plaintiffs' case. Their claim of entitlement rests on USAGM's alleged contravention of applicable statutory and constitutional constraints—not the terms of any particular contract. As the Networks note, if the grant

15

agreements never existed at all, they would have the same claims against USAGM. RFA/MBN Br. 14. The Congressional basis of their entitlement precedes the individual grants that deliver their allocations. *Cf. Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). USAGM's use of grants as a vehicle to deliver appropriated funds to the Networks does not "automatically transform" their case into a contract action. *Megapulse*, 672 F.2d at 968.

What matters is what the court must examine to resolve the case: If a plaintiff's claim depends on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual. *Crowley*, 38 F.4th at 1109-10 (claim was statutory, not contractual, when it "require[d] primarily an examination of the statutes"). Judge Bork's opinion for our court in *Maryland Department of Human Resources v. U.S. Department of Health and Human Services*, 763 F.2d 1441 (D.C. Cir. 1985), illustrates the point. We recognized there that the state's claim to funding under a federal grant-in-aid program for social workers' training expenses bore some resemblance to "a request for specific performance of a contract that obliges the promisor to pay money." *Id*. at 1449. But we held that, because "federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy," the state's claim of entitlement was not within the Court of Claims' jurisdiction over contracts with the government. *Id*. (quoting *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669 (1985)).

The majority submits that, "[o]nce the agency entered these contracts" appropriating the congressionally specified funds to the Networks, "it incurred a new obligation" to make monthly grant payments, and any claims of nonpayment "are squarely contract claims under the Tucker Act." Maj. at 8. But

16

we have long since rejected the notion that "an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract." *Megapulse*, 672 F.2d at 971. As we explained in *Megapulse*, the majority's premise allows the government to "avoid injunctions against activities violative of a statutory duty simply by contracting not to engage in those activities. Because government involvement in any such activities would thereby also constitute a breach of a contract term, any injunction would be equivalent to an award of specific performance, which, as a matter of public policy, is not available against the government." *Id*. There, we held that "[w]e cannot accept such an interpretation of the law." *Id*. The majority does not explain under what authority or reasoning it decides that it can accept such an interpretation today.

2. Consider next the type of relief sought. On this point, "[t]he crux of this inquiry . . . boils down to whether the plaintiff effectively seeks to attain money damages in the suit." *Crowley*, 38 F.4th at 1107. Here we must look at the causes of action in plaintiffs' complaints. *Greenhill v. Spellings*, 482 F.3d 569, 573 (D.C. Cir. 2007) ("Jurisdiction is determined by looking to the complaint."). RFA and MBN seek injunctive and declaratory relief. No count sounds in contract, and none seeks money damages for breach. Plaintiffs' claims therefore do not belong in the Court of Claims, which exists to provide a centralized, specialized forum to resolve "actions based on government contracts," *Megapulse*, 672 F.2d at 967, which result in "naked money judgment[s] against the United States," *Bowen*, 487 U.S. at 905; *see also Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995).

True, courts must be wary of plaintiffs who seek to avoid Tucker Act jurisdiction by "disguising a money claim as a claim requesting a form of equitable relief." *Kidwell*, 56 F.3d

17

at 284.  But that risk is not present here.  The reality that the Networks' *funding* is at stake does not change the analysis: "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"  *Bowen*, 487 U.S. at 893; *Kidwell*, 56 F.3d at 284 (prospect that "success on the merits may oblige the United States to pay the complainant" does not make a claim one for "money damages").

The Supreme Court in *Bowen* distinguished orders for specific relief—there, an order directing the Secretary to reverse his refusal to financially reimburse the state—from money damages.  Money damages "refers to a sum of money used as compensatory relief" that "substitutes for that which ought to have been done."  487 U.S. at 895, 910.  When plaintiffs seek funds under statutory entitlement, rather than as compensation for losses suffered, the funds are not "money damages" for purposes of the Tucker Act.  *Md. Dep't of Hum. Res.*, 763 F.2d at 1446; *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997).  Unlike disgorgement of funds owed, "money damages represent compensatory relief, an award given to a plaintiff as a substitute for that which has been lost."  *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 829 (D.C. Cir. 2000).

The type of relief plaintiffs seek is unavailable in the Court of Federal Claims, which "has no power to grant equitable relief."  *Bowen*, 487 U.S. at 905.  RFA and MBN are seeking more than the restoration of their past-due funding for April; they also request a declaration that USAGM is "required by law to take all necessary steps" to ensure that USAGM disburses to them "all congressionally appropriated funds through September 30, 2025" and an injunction against future withholding of congressionally appropriated funds.  RFA Compl. 24-25; MBN Compl. 24-25.  The Court of Federal

18

Claims' lack of authority to address these aspects of plaintiffs' claims underscores why it is not the appropriate court.  *See Crowley*, 38 F.4th at 1109; *Nat'l Ctr. for Mfg. Scis.*, 114 F.3d at 201.  When a private entity funded by federal appropriations has "a cooperative, ongoing relationship" with the agency "in the allocation and use of the funds," a simple money judgment is unlikely to be fitting relief.  *Nat'l Ctr. for Mfg. Scis.*, 114 F.3d at 201.

3.    The stay order in *Department of Education v. California*, 145 S. Ct. 966 (2025), does not change the landscape.  Unlike the Networks here, the *Department of Education* plaintiffs raised no constitutional claim.  Their only claim was to sums awarded to them in previously awarded discretionary grants.  Those plaintiffs were not entities created by statute and designated by Congress to receive specified sums.  The equities there were also very different:  The Court relied on the *Department of Education* plaintiffs' representation that they had financial resources, even without the grant funding, to keep their programs running during the litigation.  RFA and MBN have no financial cushion and are on the verge of collapse.

This case is more like *Department of State v. AIDS Vaccine Advocacy Coalition*, 145 S. Ct. 753 (2025), in which the Supreme Court declined to stay interim injunctive relief despite assertions that the plaintiffs' statutory claims were really claims for monetary relief that belonged in the Court of Claims.  *See id.* at 756 (Alito, J., joined by Thomas, Gorsuch, and Kavanaugh, JJ., dissenting from the denial of the application to vacate the district court's order).  The plaintiffs in *AIDS Vaccine Advocacy Coalition*, like the Networks here, claimed a right to be free from government action—the wholesale termination of the plaintiffs' grant funding—they claimed exceeded the authority conferred by statute and the

19

Constitution.  As here, their claims did not depend on whether their contracts were breached, but on whether the agency's policy directives were unlawful in the face of federal statutes appropriating funds for specific purposes.   To the extent that the Supreme Court's action on emergency stay orders influences how we apply binding precedent of that court and this one, it favors denying the stay here as in *AIDS Vaccine Advocacy Coalition*.

## II.

1.  Plaintiffs in each case have established that they will suffer irreparable injury if the district court's preliminary injunction is stayed.  The plaintiffs in the two VOA lawsuits will be substantially and irreparably injured by the stay.  VOA has not published or aired a single piece of news content since March 15, 2025.  Abramowitz Decl. ¶ 33.  "Its website is frozen, its radio and television channels are looping filler material, and its newsroom has shuttered."  *Id.*  VOA's journalists have been unable to exercise their First Amendment rights to free speech and free press.  And the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 559 (D.C. Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).

Each day that passes without VOA publishing any content only compounds the irreparable harm:  The stifling of its distinctive journalistic voice, the erosion of its audience, and the breach of the trust of every reporter and listener who has relied on its broadcasts.  The blight on VOA's reputation, and that of the United States, when a publicly sponsored news source with an eight-decade track record of reliability is shuttered under accusations of fraud, waste, and producing "anti-American content," Abramowitz Decl. ¶¶ 44-45, will

20

only fester while the preliminary injunction is stayed. The asserted harm to VOA's reputation is irreparable. *See, e.g.*, *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018); *Patriot, Inc. v. HUD*, 963 F. Supp. 1, 5 (D.D.C. 1997).

VOA employees also will be exposed to irreparable professional and personal consequences absent injunctive relief. For example, plaintiff John Doe 3, a foreign national on a J-1 visa, is a journalist working for VOA as a personal service contractor. Widakuswara Compl. ¶ 22. His home country is governed by an authoritarian regime that has labeled VOA a "subversive organization." *Id*. John Doe 4 is a VOA contractor whose home country is hostile to LGBTQ people like himself. *Id.* ¶ 23. The district court found that "defendants' actions virtually ensure that Does 3 and 4 will be subject to deportation immediately," and may face elevated risks in their home countries because of the work they did under the auspices of USAGM. *Widakuswara*, 2025 WL 1166400, at *16.

That the USAGM employees and personal service contractors are currently receiving full pay and benefits does not erase the harm. The government's own announced assessment that the existing agency was beyond repair spells widespread terminations once the injunction is stayed. The district court recounted the March 25, 2025, notice from USAGM's HR Director to Plaintiff AFGE that it had decided to terminate 594 AFGE members working for USAGM. *Widakuswara*, 2025 WL 1166400, at *3. That notice is a red flag for USAGM employees once the preliminary injunction is lifted. As to the personal service contractors, they are currently receiving full pay and benefits only because of court intervention; USAGM withheld the termination order only after the U.S. District Court for the Southern District of New York issued a temporary restraining order to halt it.

21

Widakuswara Opp'n 2 n.2.  The district court also foresaw
irreparable harm to plaintiff Reporters Sans Frontières in the
absence of a preliminary injunction because "VOA's silence
injured [its] ability to distribute its broadcasting and amplify
press freedom concerns."  *Widakuswara*, 2025 WL 1166400,
at *8.  Defendants have not challenged that finding on appeal.

   2.  RFA and MBN face existential harm absent injunctive
relief.  Contrary to defendants' assertions, the imminent
injuries that the affiliated Networks and their employees face
cannot be remedied by money damages at some unspecified
date in the future.  RFA "now expects that it does not have
enough funds to get through May 9, 2025, absent extreme
measures."  Second Fleming Decl. ¶ 8.  At the start of this
litigation, MBN employed more than 500 people.  Because
USAGM withheld its statutorily mandated funding, by April
12 MBN had been forced to lay off 90 per cent of those
employees.  Second Kline Decl. ¶ 3.  Layoffs of remaining staff
and the organization's bankruptcy are imminent once the
preliminary injunction is stayed.  *Id.* ¶ 12.  The network "will
cease to exist except on paper" no later than May 31, 2025.  *Id.*
¶ 15.  That existential threat should have moved this court to
deny the government's stay motion.

   RFA employees, represented by Plaintiff NewsGuild-
CWA in the *Widakuswara* suit, also face unplanned, costly, and
stressful dislocations they would not have suffered absent the
agency's challenged actions.  Many RFA employees, including
NewsGuild members—work in the United States under H1-B
visas.  Schleuss Decl. ¶ 8.  Losing their jobs likely means
deportation to their home countries.  Professionals who have
served the USAGM mission of bringing objective news
coverage to people living under repressive regimes, including
in some cases their own home countries, may have to return to
countries "that persecute journalists for reporting the news,"

22

making them all the more vulnerable because of the service they have rendered to USAGM. *Id.*

3.   Meanwhile, the government is unable to identify substantial harm it would suffer if the preliminary injunction were not stayed. It principally points to the order's restriction of its authority to manage the agency and its employees. The nature of injunctive relief is to interfere with what the enjoined party would otherwise do. And when agency action that a court concludes is likely unlawful is on a grand scale, an appropriate preliminary injunction must have scope commensurate to that of the challenged deeds. That much is unavoidable. The district court nonetheless made clear it respected the government's lawful prerogatives. In denying its motion for stay pending appeal, the court reiterated that USAGM retains its discretionary management authority:   "When USAGM returns to pre-March 14 functioning, as is required by the PI, the injunction does not prevent USAGM from executing personnel decisions for reasons unrelated to the Executive Order . . . such execution of normal operations would, to the contrary, be *in accordance with* the status quo pre-March 14." Order Denying Motion for Stay Pending Appeal at 5 [ECF No. 104] (emphasis added).

Defendants also protest that the preliminary injunction "does not account for the various costs associated with reinstating all employees and contractors." Gov't Stay Mot. 25. Again, the cost of that restoration is proportionate to the dislocation the government chose to undertake. There are less precarious ways to effect institutional change that might be easier to dial back. In eschewing them, the government presumably accepts the heightened risk calculus attending its preferred approach. But it cannot "be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).

23

Nor has the government demonstrated that restoration of congressionally appropriated funds to the Networks amounts to irreparable harm.  Plaintiffs have shown that they are likely entitled to that relief.  The government may be right that it would be unable to recover that money once handed over.  The Networks are entirely dependent on it to stay afloat and, if they had it in hand, would promptly use it for that purpose.  That said, the harm to the government from being required to release funds that are statutorily earmarked for the very purpose and entity to which the injunction directs them—funds that are legally restricted against reprogramming to other functions or entities—seems less substantial than the loss of the same amount of money might be in another circumstance.

4.  That leaves only the public interest.  Duly enacted legislation, fashioned by Congress and signed by the President, is a strong indicator of where the public interest lies.  *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  Congress founded, supported, and expanded the family of USAGM broadcast networks.  It started with Voice of America to counter Nazi propaganda.  In response to the need to more actively counter anti-American narratives with concrete and timely factual reporting, Congress has established affiliate networks in various regions of the world— Europe, Asia, and the Middle East.  Dismantling that family of networks cannot be squared with the public interest.  By contrast, restoring VOA, RFA, and MBN to operate as Congress intended, providing news that that is "consistently reliable and authoritative, accurate, objective, and comprehensive" serves the interest of the American people.  22 U.S.C. § 6202(b).

The district court's preliminary injunction was tailored to provide necessary relief to the plaintiffs while the courts work to resolve their claims on the merits.  The panel errs in staying

24

that injunction.  Rather than preserving the relative positions of the parties, this stay all but guarantees that the networks will no longer exist in any meaningful form by the time this case is fully adjudicated.    I regret that networks charged with exemplifying the ideals of free speech, free opinion, and a free press to the world at large are silenced by our own government's action in disregard of the expressed will of Congress—actions that, as the district court most ably explained, are likely to be found unlawful.

I respectfully dissent.