### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

CRISTOSAL HUMAN RIGHTS *et al.,*

     *Plaintiffs,*

     *v.*

PETER MAROCCO *et al.,*

     *Defendants.*

**Case No. 1:25-cv-857-LLA**

## COMBINED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................... 1

ARGUMENT ............................................................................................................ 2

    I.   <u>The Court has subject-matter jurisdiction over all of Plaintiffs' claims</u> ...................... 2

        A.   This case is not moot because there remains a live and urgent controversy between the parties ....................................................................................................... 2

        B.   Plaintiffs' claims belong in district court ................................................... 4

        C.   Plaintiffs have standing for each form of relief sought ........................................... 13

    II.   <u>Plaintiffs are entitled to judgment on their separation-of-powers claim</u> ................... 15

    III.   <u>Defendants' actions to impound funds, terminate grants and contracts, and fire employees are <i>ultra vires</i></u> ................................................................................ 19

        A.   Federal statutes prohibit Defendants' impoundment of the Foundation's funding 19

        B.   Marocco was improperly appointed to the Board, and all actions he has purported to take in that role are without effect ................................................... 21

    IV.   <u>Plaintiffs are entitled to final judgment on their APA claims</u> ................................ 23

    V.   <u>The Court should enjoin Defendants' lawless actions to shutter the Foundation</u> ..... 26

CONCLUSION ........................................................................................................ 29

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ....... 18, 19

*Am. Ass'n of Colls. for Teacher Educ. v. McMahon*,
  No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025) ............................................... 10

*Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126 (D.D.C. 2023) ...................... 4

*Armstrong v. Except. Child Ctr., Inc.*, 575 U.S. 320 (2015) .......................................................... 26

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ...................................................................*passim*

*California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025) ......................................... 9, 10

*Chicago Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025) .......... 10

*Climate Untied Fund v. Citibank*, 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ......................................... 10

*Clinton v. City of New York*, 524 U.S. 417 (1998) ................................................................ 29

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
  No. 25-cv-2847, 2025 WL 1168898 (N.D. Cal. Apr. 21, 2025) ........................................ 10

*Conservation Force v. Jewell*, 733 F.3d 1200 (D.C. Cir. 2013) .................................................... 3

*Correctional Svcs. Corp. v. Malesko*, 534 U.S. 61 (2001) .......................................................... 26

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099 (D.C. Cir. 2022) .................................. 6, 7

*D'Andrea Bros. LLC v. United States*, 96 Fed. Cl. 205 (2010) .................................................... 4

*Dalton v. Specter*, 511 U.S. 462 (1994) .......................................................................... 15

*Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) ................................................................ 9, 10

*District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1 (D.D.C. 2020) ......................................... 13

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59 (1978) ...................................... 14

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) ........................................................ 27

*FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293 (2003) ................................................. 20

*Hills v. Gautreaux*, 425 U.S. 284 (1976) .......................................................................... 27

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) .......................................... 27

*Heckler v. Chaney*, 470 U.S. 821 (1985) .......................................................................... 19

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) ............................................................ 17

*Ipsen Biopharmaceuticals, Inc. v. Becerra*, 678 F. Supp. 3d 20 (D.D.C. 2023) ................................. 15

*Knox v. Svc. Emps. Intern. Union*, 567 U.S. 298 (2012) ........................................................ 2

*LaShawn A. v. Berry*, 87 F.3d 1389 (D.C. Cir. 1996) ............................................................22

*League of Women Voters of the United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ...................28

*LeBlanc v. United States*, 50 F.3d 1025 (Fed. Cir. 1995) .....................................................12

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ...........................................................................25

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 743 (1994) ....................................................28

*Maine v. U.S. Dep't of Agric.*, No. 1:25-cv-131, 2025 WL 1088946 (D. Me. Apr. 11, 2025)..................10

*Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023) ............................................................11

*Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441 (D.C. Cir. 1985) .......................8

*Me. Cmty. Health Options v. United States*, 590 U.S. 296 (2020)............................................7, 12

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ....................................................5, 6

*Merrill v. Milligan*, 142 S. Ct. 879 (2022) ......................................................................9

*New York v. Raimondo*, No. 1:19-CV-09380-MKV, 2021 WL 1339397 (S.D.N.Y. Apr. 9, 2021)...........3

*New York v. Trump*, 2025 WL 715621 (D.R.I. Mar. 6, 2025)....................................................20

*New York v. Trump*, No. 1:25-cv-39, 2025 WL 1098966 (D.R.I. Apr. 14, 2025)..................................10

*New York v. Trump*, No. 1:25-cv-39, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ...................................20

*Pippenger v. U.S. Doge Service*, No. 1:25-cv-1090, 2025 WL 1148345 (Apr. 17, 2025) ...........................10

*Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Hum. Servs.*,

    337 F. Supp. 3d 308 (S.D.N.Y. 2018).........................................................................*passim*

*Richardson v. Trump*, 496 F. Supp. 3d 165 (D.D.C. 2020) .....................................................27

*San Francisco Unified Sch. Dist. v. AmeriCorps*,

    No. 25-cv-2425, 2025 WL 1180728 (N.D. Cal. Apr. 23, 2025) ......................................................10

*Sherley v. Sebelius*, 689 F.3d 776 (D.C. Cir. 2012)..............................................................22

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971) ...............................................................29

*Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411 (1995)..................................................5

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ................................................................26

*W. Va. Ass'n of Cmty. Health Ctrs., Inc. v. Heckler*, 734 F.2d 1570 (D.C. Cir. 1984)................................9

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025)..................................10

*Wilcox v. Trump*, CV 25-334, 2025 WL 720914 (D.D.C. Mar. 6, 2025) .........................................27

*Williams v. Phillips*, 482 F.2d 669 (D.C. Cir. 1973)..............................................................22

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,

    No. 1:25-CV-97, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ..................................................... 10, 11

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ...............................................................18

**Statutes**

2 U.S.C. § 682 ...............................................................................................................................21

2 U.S.C. § 684 ...............................................................................................................................21

28 U.S.C. § 1346(a) .........................................................................................................................4

28 U.S.C. § 1491(a) .........................................................................................................................4

31 U.S.C. § 6301 ..............................................................................................................................5

31 U.S.C. § 6303(1) ..........................................................................................................................5

31 U.S.C. § 6304(1) ..........................................................................................................................5

31 U.S.C. § 6305(1) ..........................................................................................................................5

5 U.S.C. § 3349(c) ..........................................................................................................................23

5 U.S.C. § 706(1) ............................................................................................................................19

Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 877 (1982) .................................. 20, 21, 22

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4 (2025) ...... 14, 21

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460 .........................15

 **Constitutional Provisions**

U.S. Const. art. II, § 2 .....................................................................................................................23

**Other Authorities**

90 Fed. Reg. 10577 (Feb. 19, 2025) ...............................................................................*passim*

As was the case at the preliminary-injunction stage, virtually every argument in Defendants' brief rests on the same mischaracterization of Plaintiffs' claims. In Defendants' telling, this case is no more than a simple contract dispute, resolution of which should turn on the terms of Plaintiffs' grant agreements. That characterization is wrong: Plaintiffs have not pleaded routine breach-of-contract claims, but instead have presented constitutional and statutory claims challenging Defendants' brazen and unlawful actions to abolish a congressionally created agency that, as a matter of federal law, "shall have perpetual succession unless sooner dissolved by an Act of Congress," 22 U.S.C. § 290f(e)(1).

Nowhere do Defendants deny that they have attempted to effectively dismantle an entire independent agency. Nor do they dispute that the programs Plaintiffs run have aided this Administration's professed goal of reducing migration to the United States. Instead, they rely principally on a series of threshold jurisdictional arguments that themselves rely on fundamental mischaracterizations of Plaintiffs' claims. Most stunning of all, perhaps, Defendants insist that Plaintiffs' claims are mooted by this Court's grant of preliminary relief in *Aviel v. Gor*, even though they are seeking emergency relief from that order in the D.C. Circuit and do not dispute that they would continue their unlawful campaign to dismantle the agency if this Court's order were lifted.

On the merits, Defendants largely fail to address the substance of Plaintiffs' claims. Plaintiffs have shown entitlement to relief on their separation-of-powers claim, which turns on violation of structural constitutional guarantees, not the bounds of any federal statute. Plaintiffs are also entitled to relief on their *ultra vires* claim because Defendants have violated the Impoundment Control and Anti-Deficiency Acts by unlawfully impounding the Foundation's congressionally appropriated funding, and because Defendants' disastrous actions to dismantle the agency—including terminating nearly all of its contracts and grants and firing nearly all of its employees—were undertaken by an individual, Peter Marocco, who was not lawfully appointed to serve on the Foundation's Board or as its President. And Plaintiffs are entitled to relief on their Administrative Procedure Act ("APA") claims

because they have shown that Defendants' mass cancellation of contracts and grants was arbitrary and capricious, and that Defendants' impoundment of funding is contrary to law and constitutes agency action unlawfully withheld.

This Court should grant summary judgment on all of Plaintiffs' claims.

## ARGUMENT

I.    <u>The Court has subject-matter jurisdiction over all of Plaintiffs' claims</u>

A.    **This case is not moot because there remains a live and urgent controversy between the parties**

Defendants' contention that this entire action should be dismissed as moot because it "challenge[s] agency actions that this Court held in *Aviel* were '*void ab initio* and without any legal effect'" is disingenuous at best. Combined Mem. in Supp. of Defs.' Opp. to Pls.' Mot. for Summ. J. and Cross-Mot. to Dismiss 9, ECF No. 26 ("Defs.' Br."). Defendants insist that there no longer exists any live controversy between the parties, *id.* at 9-11, but fail to grapple with the facts that the grant of relief in *Aviel* is only a temporary injunction to preserve the status quo; the parties in *Aviel v. Gor* currently are briefing final judgment and the government maintains that this Court's order is wrong, *see* No. 1:25-cv-778 (D.D.C.); and the government not only has appealed this Court's ruling, but also has sought an emergency stay of the injunction, and that stay request is fully briefed and ripe for decision, *see Aviel v. Gor*, No. 25-5105 (D.C. Cir.). Stated simply, the rights of the parties in *Aviel* are hotly contested and the government is fighting vigorously to overturn the order on which it here relies to argue that Plaintiffs' claims are moot. But "[a] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party," and mootness will not be found so "long as the parties have a concrete interest, however small," in its outcome." *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 307-08 (2012) (rejecting mootness where defendant "continues to defend the legality of the" challenged action) (internal quotation marks omitted)).

The status of the *Aviel* order could change at any moment, leaving Defendants free to immediately resume their unlawful attempts to shutter the Foundation. Of particular importance, the issues presented in the two cases differ so significantly that a ruling for the government in *Aviel* would not necessarily have any bearing on Plaintiffs' claims here. For example, if the court of appeals were to agree with the government that Ms. Aviel has not shown irreparable injury through the loss of her employment, *see* Emergency Mot. for a Stay Pending Appeal at 22-23, *Aviel*, No. 25-5105 (D.C. Cir. Apr. 7, 2025), or to accept the government's argument that the President has inherent Article II authority to fire Ms. Aviel even if he cannot appoint acting Board members, *id.* at 19-20, Plaintiffs immediately would be vulnerable to the catastrophic impacts accruing from Defendants' unlawful conduct, despite the fact that Plaintiffs' entitlement to relief would be unaffected by a ruling on either of those grounds. There exists both a live and urgent controversy between the parties in this matter.[1]

Tellingly, Defendants' cited cases do not support their novel proposition that a *preliminary* and contested grant of relief can moot claims in a related case. *See* Defs.' Br. 10. For example, *Conservation Force v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013), applied the unremarkable proposition that a plaintiff's claim was moot after the defendant agency had done the thing sought in the complaint. And *New York v. Raimondo*, No. 1:19-CV-09380-MKV, 2021 WL 1339397, at *2 (S.D.N.Y. Apr. 9, 2021), applied the settled principle that a challenge to a federal regulation is moot once an agency promulgates a revised or supplemental regulation that has taken effect. Defendants provide no authority supporting their request here.

---

[1] Defendants' contention that "any order that this Court may issue would amount to an advisory opinion on the legality of agency actions that have not occurred," Defs.' Br. 10, is nonsensical. The Court's ruling in *Aviel* that Defendant Peter Marocco's actions are *void ab initio* means that they have no legal effect—not that they never "occurred" as a factual matter. Likewise, Plaintiffs do not argue "that some future iteration of the Foundation may engage in the same actions challenged here," *id.* Plaintiffs challenge unlawful past actions that inflicted concrete harms, and would continue to harm them, if the order in *Aviel* is lifted.

This Court also should reject Defendants' request to stay proceedings "pending an order … that reinstates the voided agency actions." Defs.' Br. 11. Defendants' only rationale for this request is to "preserve judicial resources," *id.*, but they provide no reason why an expedited renewal of Plaintiffs' preliminary-injunction motion, if the *Aviel* order were lifted, would better preserve judicial resources than the current schedule of orderly cross-motions presenting all issues for final judgment. Plaintiffs respectfully request that this Court rule on the cross-motions once briefing is complete next week.

**B. Plaintiffs' claims belong in district court**

Defendants argue that the APA's waiver of sovereign immunity is inapplicable here because another statute—the Tucker Act, 28 U.S.C. §§ 1346(a), 1491(a)—"vested the Court of Federal Claims with exclusive jurisdiction" over Plaintiffs' claims. Defs.' Br. 12. Plaintiffs have already explained why that argument fails. Pls.' Mot. 16–25. The Court of Federal Claims is a forum for challenging the federal government's failure to perform on its contracts—not to decide whether the Executive Branch has the authority to dismantle an entire federal agency. Indeed, established law makes clear that the Court of Federal Claims does not have jurisdiction over Plaintiffs' claims, which are grounded in the Constitution and federal statutes—not in contract. And Defendants admit that the relief Plaintiffs seek here is not available in that court. *See* Defs.' Br. 20 n.8. Their arguments as to why this Court does not have jurisdiction over Plaintiffs' claims lack merit.

*First*, Plaintiffs' grant agreements with the federal government are not contracts because the federal government does not receive any direct benefit from them. Pls.' Mot. 16–18. Defendants dispute this by pointing to various intangible benefits the United States receives under the grant agreements, including achievement of the United States' "broader policy aims," Defs.' Br. 15, "knowledge and information regarding the success of development projects," *id.* at 14, "royalty-free rights to media created by the grantee," *id.* at 15, and a promise to use U.S. flag air carriers when grant funds pay for international travel, *id.* But these grant conditions are precisely the sort of "'generalized'

or 'incidental'" benefits that judges in this district and the Court of Federal Claims have held do not

amount to consideration "[i]n the context of government contracts." *Am. Near E. Refugee Aid v. U.S.*

*Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023) (citation omitted). Defendants do not

seriously argue that these conditions are the sort of "direct benefits" that the government must receive

for an agreement to be considered a contract. *Id.* at 133 (internal alteration omitted).

Next, Defendants take issue with Plaintiffs' invocation of the Federal Grant and Cooperative

Agreement Act of 1977, 31 U.S.C. § 6301 *et seq.* Defs.' Br. 16-18. That Act distinguishes between

grants and cooperative agreements—which agencies must use when "carry[ing] out a public purpose,"

31 U.S.C. §§ 6304(1), 6305(1)—and procurement contracts, which agencies must use when procuring

"property or services for the direct benefit or use of the United States Government," *id.* § 6303(1).

Defendants argue that these provisions are "irrelevant to the scope of the Tucker Act's jurisdictional

bar" because some arrangements that are formally labeled "grant agreements" may constitute

"contracts." Defs.' Br. 16-17 (quoting *Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 415 (1995)).

Even if that is correct, it does not undermine Plaintiffs' central point: that not every agreement is a

contract. As one of the authorities Defendants rely on explains, an "'agreement' is broader in scope

than [a] 'contract' in that agreements encompass both contracts and arrangements that do not qualify

as contracts" such as "'gifts or gratuities.'" *Thermalon*, 34 Fed. Cl. at 418 (citations omitted). In

distinguishing the two, a central consideration is whether the federal government receives a direct

benefit—such as "property or services" for its use, 31 U.S.C. § 6303(1) (governing contracts)—or

whether the arrangement is intended to accomplish some "public purpose," *id.* § 6304(1) (defining

grant agreements). Another important element of whether an agreement is a contract is whether the

government would incur damages if it breached the agreement. *See* Restatement (Second) of Contracts

§ 1 ("A contract is a promise or a set of promises for the breach of which the law gives a remedy[.]").

Defendants do not dispute that the agreements here allow either party to terminate "upon written

notice to the other" without having to pay compensation. *E.g.*, ECF No. 15-1, at 9 (agreement with Plaintiff Fundación Renace).

    *Second*, even if Plaintiffs' grant agreements could be considered contracts (and they are not), Plaintiffs' claims are not contract claims "at [their] essence." *Megapulse, Inc. v. Lewis*, 672 F.2d 959 967–68 (D.C. Cir. 1982); *see* Pls.' Mot. 19–23. Defendants' arguments to the contrary fail to make "rational distinctions between actions sounding genuinely in a contract and those based on truly independent legal grounds." 672 F.2d at 969–70. And they run afoul of the D.C. Circuit's repeated warning that not every case "requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act." *Id.* at 967–68; *see also Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (same).

    With respect to the first prong of this analysis—the source of Plaintiffs' rights—Defendants argue that Plaintiffs' rights are contractual because the "duty (payment) that Plaintiffs seek to enforce is imposed upon the government solely by contract." Defs.' Br. 18. That is wrong. Resolution of Plaintiffs' claims does not require consideration of any term of their agreements with the federal government. Instead, Plaintiffs' claims "require[] primarily an examination of the statutes" and constitutional provisions that the government "has purportedly violated." *Crowley*, 38 F.4th at 1108-09. As the Supreme Court has observed in a similar context, it would be "nothing less than remarkable to conclude that Congress intended judicial review of these complex questions … to be reviewed in a specialized forum such as the Court of Claims." *Bowen v. Massachusetts*, 487 U.S. 879, 908 (1988). Indeed, Defendants' position would upend decades of D.C. Circuit precedent. More than 40 years ago, that court rejected the notion that an agency action "may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to breach of contract." *Megapulse*, 672 F.2d at 971. Such a rule would allow the government to "avoid injunctions against activities violative of a statutory duty simply by contracting not to engage in those activities." *Id.* The

D.C. Circuit could not "accept such an interpretation of the law." *Id.* Defendants provide no persuasive reason to do so now.

Defendants' argument with respect to the second prong of the *Megapulse* analysis—the remedy Plaintiffs seek—similarly flies in the face of settled precedent. Defendants argue that Plaintiffs seek specific performance, an "explicitly contractual remedy." Defs.' Br. 20 (citation omitted). But they ignore the difference between an "action at law for damages"—which the Court of Claims may award—and an "equitable action for specific relief"—which it may not. *Bowen*, 487 U.S. at 893. Plaintiffs do not ask for the former—they are not seeking "compensatory relief," *id.* at 895 (citation omitted), as a "substitute[] for that which ought to have been done," *id.* at 910. Instead, they seek injunctive and declaratory relief that would halt Defendants' unconstitutional efforts to shutter a congressionally created agency and their unlawful actions to impound its funding.

Defendants' position would also require this Court to ignore binding D.C. Circuit precedent. In *Crowley*, the D.C. Circuit held that, so long as a plaintiff receives "declaratory or injunctive relief that is not negligible in comparison with the potential monetary recovery," the relief is not "in essence . . . monetary relief." 38 F.4th at 1107–08 (cleaned up). The certainty of knowing that Defendants do not "ha[ve] authority" to dismantle a federal agency has "'considerable value'"—it will allow Plaintiffs to "provide services … free of [Defendants'] alleged interference." *Id.* at 1111 (citation omitted). Plaintiffs also seek the restoration of "a host of [other] non-monetary benefits," *id.*, including technical and administrative support, such as accounting, auditing, and other critical services—which allow them to leverage money from other sources—and the opportunity to participate in Foundation-sponsored exchanges. *See* Pls.' Mot. 21.[2]

---

[2] Defendants argue that these harms are "inseparable from the fundamentally contractual relief [Plaintiffs] seek." Defs.' Br. 21. That is incorrect. Instead, the fact that Plaintiffs would receive these "non-monetary benefits" is further evidence that the value of the injunction they seek is "not negligible

To be sure, one part of the relief Plaintiffs seek—the request to pay funds that would have been disbursed but for Defendants' illegal actions, *see* Compl. Prayer for Relief, ¶¶ g, h—is "somewhat analogous to a request for specific performance on a contract that obliges the promisor to pay money." *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985). But that does not transform Plaintiffs' request for relief into a contract remedy. *Id.* As noted, there is a difference between "an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with backpay, or for 'the recovery of specific property *or monies,* ejectment from land, or injunction either directing or restraining the defendant officer's actions.'" *Bowen*, 487 U.S. at 893 (citation omitted). Plaintiffs seek the latter kind of relief. And it "simply is not the case" that an order requiring the government to "pay expenses it should have paid all along and would have borne in the first instance" had it followed the law is one for "damages." *Id.* at 894. Instead, "this outcome is a mere by-product of [the] court's primary function of reviewing the [government's] interpretation of federal law." *Id.* at 910; *see also Md. Dep't of Hum. Res.*, 763 F.2d at 1446–49 (similar).[3]

*Third*, Plaintiffs seek to remedy harms completely disconnected from the grant agreements: the inability to apply for new grant funds that would be available but for Defendants' impoundment of Foundation funds. Pls.' Mot. 23. Defendants' only response is to characterize these harms as "supplemental … future harms," Defs.' Br. 13, which they argue are "inseparable from the

---

in comparison with the potential monetary recovery," *Crowley*, 38 F.4th at 1107–08, 1111, of the restored grant funding that would flow from cessation of Defendants' unlawful activities.

[3] Defendants attempt to distinguish *Maryland Department of Human Resources* by noting that, unlike that case, here "no statute mandates the funding of any particular grants." Defs.' Br. 20 n.7. But they do not explain why that distinction matters. In both cases, the source of the plaintiffs' right turned on something other than a contract with the federal government. *See Md. Dep't of Hum. Res.*, 763 F.2d at 1449. And in both cases, the remedy sought was not compensation for an injury, but declaratory and injunctive relief. *See id.* at 1446.

fundamentally contractual relief that they seek," *id.* at 21. But that too is wrong: For more than 40 years, it has been the rule in the D.C. Circuit that "being denied an opportunity to compete" for federal grant funds is its own injury, separate and apart from any contract a party may have with the government entity. *W. Va. Ass'n of Cmty. Health Ctrs., Inc. v. Heckler*, 734 F.2d 1570, 1574 (D.C. Cir. 1984). Defendants do not seriously dispute their intent to functionally eliminate the agency; under binding precedent, these actions will inflict a separate harm on Plaintiffs by denying them the opportunity to seek future Foundation funding.

Finally, Defendants argue that the Supreme Court's per curiam, emergency-docket order in *Department of Education v. California*, 145 S. Ct. 966 (2025), "controls" here. Defs.' Br. 12. Plaintiffs have already explained why it does not. *See* Pls.' Mot. 24. Plaintiffs have asserted non-APA claims, including constitutional ones, that at one point, the federal government conceded are cognizable in district courts. *See* Hr'g Tr. at 87, *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 1:25-cv-400 (D.D.C. Mar. 8, 2025), ECF 56. In addition, unlike Plaintiffs here, the *California* plaintiffs did not allege that the termination of grants at issue interfered with their ability to compete for future grants. *See* Pls.' Mot. 24.  Nor was the Supreme Court faced with a situation where, like here, the Administration had acted to dismantle an entire federal agency. And although the *California* plaintiffs "*argued* that the dispute d[id] not hinge on the terms of a contract between the parties," Defs.' Br. 13 (emphasis added) (citation omitted), the First Circuit had concluded that "the terms and conditions of each individual grant award [*we*]*re* at issue," *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025) (emphasis added).

But perhaps most importantly, *California* does not control here because it was not a ruling on the merits. The Supreme Court has repeatedly warned against overreading a ruling on a stay application, which "is not a decision on the merits." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh J., concurring) (Mem.); *see also id.* at 883 (Kagan, J., dissenting) (noting that the Supreme

Court's emergency docket orders are issued based on a "scanty review" without "full briefing and argument"). That is particularly true with respect to *California*, where the Court's decision to grant a stay was based, at least in part, on its view of the equities—that the plaintiffs there had "the financial wherewithal to keep their programs running" until final judgment. *California*, 145 S. Ct. at 969.

Defendants are correct that some lower courts have cited *California* in denying requests for emergency relief that would have halted the federal government's decision to cut off grant funds. *See* Defs.' Br. 13. But many others have rejected the argument Defendants make here. *See, e.g.*, *Rhode Island v. Trump*, No. 1:25-cv-128, 2025 WL 1303868, at *5–*7 (D.R.I. May 6, 2025) ("*California*'s precedential value is limited" and "does not displace governing law that guides the Court's approach to discerning whether [a plaintiff's] claims are essentially contract claims"); *Climate United Fund v. Citibank*, 2025 WL 1131412, at *11–*12 (D.D.C. Apr. 16, 2025) (distinguishing *California* because, among other things, the plaintiffs challenged the federal government's "thinly veiled attempts to dismantle the entirety of a congressionally created program and seek other declaratory relief that" the Court of Federal Claims "cannot grant"); *San Francisco Unified Sch. Dist. v. AmeriCorps*, No. 25-cv-2425, 2025 WL 1180729, at *8–*9 (N.D. Cal. Apr. 23, 2025); *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-2847, 2025 WL 1168898, at *3–*4 (N.D. Cal. Apr. 21, 2025); ; *Chicago Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 1114466, at *8–*10 (N.D. Ill. Apr. 14, 2025); *New York v. Trump*, No. 1:25-cv-39, 2025 WL 1098966, at *1–*3 (D.R.I. Apr. 14, 2025); *Maine v. U.S. Dep't of Agric.*, No. 1:25-cv-131, 2025 WL 1088946, at *19 (D. Me. Apr. 11, 2025). In any event, several of the authorities Defendants cite are plainly distinguishable. For example, in *Pippenger v. U.S. DOGE Service*, No. 1:25-cv-1090, 2025 WL 1148345 (Apr. 17, 2025) the court denied a temporary restraining order seeking to enjoin the termination of contracts between the U.S. Institute of Peace and "personal services contractors—individuals who are effectively employed by the [government entity] on a contractual basis." *Id.* at *5. Plaintiffs there were not injured by the mass termination of grant agreements. And

*American Association of Colleges for Teacher Education v. McMahon*, No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025), involved the exact same grant programs that were at issue in *California*—as the district court there observed, the case was *California*'s "doppelganger," *Am. Ass'n of Colls. for Teacher Educ. v. McMahon*, ECF No. 58, No. 1:25-cv-702 (D. Md. May 6, 2025), so adopting the reasoning of the Supreme Court's emergency-docket order reasonably followed.[4]

Indeed, reading the Supreme Court's three-page order as Defendants do—to have "unequivocally stated that claims pertaining to grant terminations should not be brought in federal district court," Defs.' Br. 13—underscores the danger of interpreting a stay order as a final pronouncement on anything. At bottom, Defendants insist that, after *California*, Plaintiffs' claims sound in contract because one part of the relief they may receive is payment of funds they would have received, but for Defendants' illegal acts. *See id.* at 12. To reach that conclusion, the Supreme Court would have had to overrule *Bowen*, which held that "[t]he fact that a judicial remedy may require one party to pay money to another *is not* a sufficient reason to characterize the relief as 'money damages.'" 487 U.S. at 893 (emphasis added). Yet in *California* the Court reiterated that a "district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." 145 S. Ct. at 968 (quoting *Bowen*, 487 U.S. at 910). It is unclear what led the Court to conclude that the federal government was likely to succeed in showing that "what the District Court ordered" in *California* was akin to an "order[] 'to enforce a contractual obligation to pay

---

[4] After filing their combined brief, Defendants filed a "notice of supplemental authority" regarding a stay order issued by a D.C. Circuit panel in *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025), over a strong dissent by Judge Pillard. ECF No. 27. As of the date of the filing of this brief, the *en banc* court has administratively stayed the panel's order, *see Widakuswara v. Lake*, No. 25-5144, Doc. # 2114884 (D.C. Cir. May 7, 2025), and the full court may soon reconsider the panel's finding. In any event, even if the panel's order remains in place while litigation proceeds, that case is distinguishable. The grantees there did not seek to remedy harms beyond the failure to pay funds. *Widakuswara*, 2025 WL 1288817, at *3. And the district court's preliminary injunction did not rest on an allegation that the officials who cut off the funds had been improperly appointed and lacked authority to take the challenged actions. *See id.* at *5 n.6.

money.'" *Id.* (citation omitted). Rather than speculate about reasoning the Court did not proffer, this Court should follow well-established Supreme Court and D.C. Circuit precedent. As one district court recently explained, "[e]ven if it looks like *California* may 'have implicitly overruled' [*Bowen*], the Supreme Court has repeatedly made clear that lower courts 'should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.'" *Woonasquatucket River*, 2025 WL 1116157, at *15 (quoting *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023)). And that is true even if the Court "'thinks the precedent is in tension with some other line of decisions'"—or here, "a single three-page per curiam order granting a stay." *Id.* (quoting *Mallory*, 600 U.S. at 136).

*     *     *

The consequences of Defendants' position are stark. As Defendants' recognize, *see* Defs.' Br. 20 n.8, the Court of Federal Claims does not have authority to grant general equitable relief, including the injunctions Plaintiffs seek here. *See also Bowen*, 487 U.S. at 906 ("[T]he Court of Claims has no power to grant equitable relief.") (citation omitted). Nor does it have the power to entertain Plaintiffs' claims grounded in the Constitution, the Federal Vacancies Reform Act, and the APA. *See LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (the Court of Federal Claims does not have jurisdiction over claims arising under various constitutional provisions, including the "doctrine of separation of powers"); *Me. Cmty. Health Options*, 590 U.S. at 322 (statutory claims are only cognizable under the Tucker Act if they can "fairly be interpreted as mandating compensation by the Federal Government for the damage sustained") (cleaned up). Had Plaintiffs filed their case in the Court of Federal Claims, that court would have dismissed their claims for lack of subject-matter jurisdiction or would have been unable to grant the requested relief. Defendants' position would leave Plaintiffs without a forum to vindicate their rights—an intolerable result.

**C.  Plaintiffs have standing for each form of relief sought**

12

Defendants assert that "the harm of lost funding … is insufficient to establish standing" as to Plaintiffs' requested remedies other than restoration of lost grant funding. *Id.* But as Plaintiffs have explained, the injuries in this case "stem from the loss of the Foundation as a functioning agency," Pls.' Mot. 15, and thus go well beyond lost funding on individual grants. A number of the remedies Plaintiffs seek—such as enjoining the impoundment of Foundation funds and the termination of Foundation employees—are necessary to provide complete relief with respect to their harms from the effective dismantling of a federal agency. On its own, an order to reinstate Plaintiffs' grants would do little to ameliorate the panoply of harms Plaintiffs demonstrated. *See* Pls.' Mot. 11-14.

Defendants' other standing arguments are unavailing. First, Defendants argue that Plaintiffs are not entitled to relief that runs to nonparties because Plaintiffs "have not shown that maintaining funding for other grantees is necessary to avoid" their own harms. Defs.' Br. 24. But this claim about the proper scope of relief "is not an argument about standing." *Salazar v. Buono*, 559 U.S. 700, 713 (2010). It is instead "about the merits of the District Court's order." *Id.* Plaintiffs have met the elements of the standing inquiry, and once "one plaintiff in a suit satisfies those requirements," the question of standing is "exhausted." *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 54-55 (D.D.C. 2020). Besides, reinstatement of all of the Foundation's improperly terminated grants and contracts—not only Plaintiffs' grants—is the natural and proper result from this Court's holding, *see Aviel* Op. 18, that actions taken by Marocco are null and void.

Defendants next make a series of arguments about Plaintiffs' lost ability to compete for future grants. Defendants assert that this harm does not confer standing to enjoin the termination of employees because Plaintiffs have not shown "that the current level of employment is necessary to issue future grants." Defs.' Br. 24. Likewise, Defendants argue that this injury cannot support standing to enjoin the termination of Plaintiffs' existing grants because Plaintiffs have not shown "that the current grants are necessary for future grants." *Id.* at 25. These points misstate Plaintiffs' core

argument. Plaintiffs have not argued that the current staffing level must be maintained in perpetuity and have not requested an order that would lock staffing in place. More fundamentally, Plaintiffs have challenged the whole suite of Defendants' actions because they amount to "efforts to abolish the Foundation." Pls.' Mot. 11. Taken together, these actions—which include but are not limited to the firing of nearly all staff and the termination of nearly all existing grants—make it abundantly clear that Defendants "have no intention" of continuing to award future grants. *Id.* at 14. All of Plaintiffs' injuries, including the loss of their ability to compete for future awards, "stem … from Defendants' actions to shutter the agency writ large." *Id.* Plaintiffs thus have standing to remedy those injuries by undoing the Foundation's dismantling.

Finally, Defendants insist that Plaintiffs' claims of future harm "rest[] on the assumption, asserted without any support, that Congress will continue to fund the Foundation at levels that enable Plaintiffs to obtain funding." Defs.' Br. 25. But it is Defendants, not Plaintiffs, who engage in undue speculation on this front. Although Plaintiffs concededly do not know what the future holds, the Foundation has enjoyed consistent, bipartisan support from Congress for almost six decades, and its funding has remained steady or increased over time, across administrations of both parties. Indeed, Congress reaffirmed its commitment to the Foundation even after the events at the center of this litigation occurred. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(11) (2025). Plaintiffs need not "disprove" Defendants' assertions about a "counterfactual world" in which Congress shuts down the Foundation. *Ipsen Biopharmaceuticals, Inc. v. Becerra*, 678 F. Supp. 3d 20, 31 (D.D.C. 2023), aff'd, 108 F.4th 836 (D.C. Cir. 2024). To show standing, Plaintiffs are not required to "negate" Defendants' "speculative and hypothetical possibilities." *Id.* (quoting *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 78 (1978)). Plaintiffs acknowledge that Congress—and "only Congress"—could "abolish a federal agency" like the Foundation. *See* Pls.' Mot. 26. But that is not what happened here: Unless Congress says otherwise, the Foundation

continues to exist, and Defendants' efforts to unlawfully dismantle it inflict present and future harms on Plaintiffs.[5]

## II.    Plaintiffs are entitled to judgment on their separation-of-powers claim

Defendants' separation-of-powers argument attacks a straw man. As they did at the preliminary injunction stage, Defendants attempt to transfigure Plaintiffs' constitutional claim into a mundane dispute about the proper "statutory minimum" of activities required under the Foundation's organic statute. *See* Defs.' Br. 25-26. Defendants' framing is wholly unresponsive to Plaintiffs' argument. *See id.* (arguing that the Dismantling EO "did not contravene" the 2024 Further Consolidated Appropriations Act's requirement to notify Congress before reorganizing or reducing the Foundation's functions). Plaintiffs' motion for summary judgment demonstrated that Defendants' decisions to fundamentally dismantle an agency created by Congress, impound almost all of its appropriated funding, and effectively cease its operations trample upon Congress's power to make law (by creating the agency and specifying its functions) and to control federal funding. *See* Pls.' Mot. 25-29. Plaintiffs do not claim that the President has exceeded his authority under some statute bestowing authority on the executive branch, *contra* Defs.' Br. 25-26 (relying on *Dalton v. Specter*, 511 U.S. 462, 473-74 (1994)). Plaintiffs instead have presented a constitutional dispute demonstrating that the President has *no* authority—constitutional or statutory—unilaterally to abolish part of the federal government. Stated differently, Plaintiffs do not allege that the Further Consolidated Appropriations Act (or any other statute) granted Defendants some power vis-à-vis the Foundation and that such

---

[5] Defendants suggest that Plaintiffs seek to "place the Foundation in judicial receivership" and have this Court "prohibit[] the Foundation from exercising its authority to cancel *any* grants, contracts, and employment arrangements." Defs.' Mot. 25. Just the opposite is true. Plaintiffs have recognized repeatedly that Defendants could cancel these or other grants, so long as they do so in a lawful manner. *E.g.*, Pls.' Mot. 39.

power has been exceeded. Rather, they allege that Defendants' actions violate core facets of our constitutional structure.

As is the case throughout their brief, Defendants mischaracterize Plaintiffs' claims as narrowly limited to whether some statutory provision requires the Foundation "to maintain employment and grants at the current levels"—*i.e.*, whether the President and his subordinates are barred from making *any* changes to Foundation spending and staffing. *See* Defs.' Br. 26. This framing ignores the substance of Plaintiffs' arguments that Defendants' decisions to effectively shutter the Foundation, in abdication of its statutory purpose and mission, and to impound its appropriated funding, arrogate to the Executive Branch powers reserved for Congress. These are properly pleaded constitutional claims.

Defendants' substantive objections to Plaintiffs' separation-of-powers claim is a distraction. Once again, they argue that no source of law "requires that the Foundation continue to fund Plaintiffs through now-terminated grant agreements[6] … because Plaintiffs are not funded through direct congressional appropriations." *Id.* at 27. This is true but irrelevant. Plaintiffs did not argue, and need not establish, that some source of law prevents Defendants from *lawfully* terminating their grants. Plaintiffs have established, however, that Defendants' actions to cancel all but one of the Foundation's grants, fire all but one of its employees, usurp the powers of its Senate-confirmed Board, fire its President, and all but cease its operations violate structural constitutional safeguards by aggrandizing power that does not belong to the President (or his officers). That is a viable constitutional claim that simply does not turn on "the routine execution of [Plaintiffs'] grant agreements." *Id.*[7]

---

[6] Defendants' description of the grants as "now-terminated," Defs.' Br. 27, also refutes their argument that this case is moot. *See* supra § I.A.

[7] Defendants' characterization of the actions challenged here as "the routine execution of … grant agreements," Defs.' Br. 27, does not withstand scrutiny. Prior to this Court's order in *Aviel*, Defendants' actions had left the Foundation in ashes.

Defendants' attempt to place their actions outside the reasoning of then-Judge Kavanaugh's opinion in *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013), is ineffectual. *See* Defs.' Br. 27-28. It is irrelevant that the "case had nothing to do with grant or contractual funding" and instead arose in the procedural posture of a "mandamus action," just as it matters not that Congress did not mandate here that the Foundation "fund any particular grants" or "operate with any specified number of employees," *see id. Aiken County* stands for the proposition that, under "settled, bedrock principles of constitutional law," neither the President nor "subordinate executive agencies" may refuse to spend appropriated funds due to policy disagreements with the purposes set by Congress or refuse "to perform a statutorily mandated activity." 725 F.3d at 257, 260. It is directly on point.

The contention that "[t]he Foundation here determined … that the grants in question were 'inconsistent with the agency's priorities' to 'foster[] security and development in the Western Hemisphere,'" Defs.' Br. 28, is farcical. Defendants do not dispute that they undertook no process to discover what any Foundation grants actually fund, how they were operating, or how successful they have proven, or to consider the consequences on migration pressures of abrupt, across-the-board termination of all but *one* Foundation grant. This is not a foreign-affairs decision—it's simply an arbitrary set of actions taken to effectuate the President's own arbitrary determination that the Foundation itself is "unnecessary." Dismantling EO.

And contrary to Defendants' assertion, *see* Defs.' Br. 28, review of these actions does not intrude on the foreign affairs power. That power is shared between Congress and the President. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015). In any event, the relevant powers here are Congress's powers to fund the Foundation's activities and make law. As another court in this district persuasively explained in rejecting this same argument, "[n]o one does or could doubt that the Executive is afforded significant discretion in administering the funds appropriated" to decide "how to use the[] funds," but the "critical point here, which Defendants do not contest, is that Congress's

17

appropriations laws set the amount that is to be spent" and thus "reflect an exercise of Congress's own, core constitutional power to determine *whether and how much* money is spent." *AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, No. 1:25-400, 2025 WL 752378, at *17 (D.D.C. Mar. 10, 2025). Plaintiffs' claim properly challenges Defendants' decision to shutter the Foundation's operations writ large, and relief on that claim would not intrude upon the Executive's core constitutional power.

Defendants' reliance on an opinion of the Department of Justice's Office of Legal Counsel ("OLC") distinguishing "a congressional directive to spend … in an area confided by the Constitution to [the President's] substantive direction and control, such as his authority … over foreign affairs" from a domestic impoundment, *see* Defs.' Br. 28-29, is misplaced. The President undoubtedly has discretion over what projects the Foundation funds, but he lacks authority to determine that congressionally appropriated funding *will not* be spent—whether that appropriation concerns activities domestic or abroad.[8] *See AIDS Vaccine Advocacy Coal.*, 2025 WL 752378, at * 17 (finding plaintiffs likely to succeed on constitutional claim challenging termination of USAID funding because "Defendants' unbridled understanding of the President's foreign policy power … would put the Executive above Congress in an area where it is 'firmly established' that the two branches share power … where Congress is exercising one of its core powers, and where there is no constitutional objection to the laws it has made").

Contrary to Defendants' depiction, Plaintiffs do not ask this Court to "supervise the Foundation's foreign assistance grants in a receivership arrangement." Defs.' Br. 29. Plaintiffs'

---

[8] Defendants also rely on a purported "unreviewable discretion not to take action," Defs.' Br. 29, citing *Heckler v. Chaney*, 470 U.S. 821 (1985). But *Heckler* did not establish any such unreviewable discretion not to act—it merely stands for the proposition that an agency's decision not to take *an enforcement action* is presumptively unreviewable. *See* 470 U.S. at 831. Besides, 5 U.S.C. § 706(1) instructs courts to "compel agency action unlawfully withheld or unreasonably delayed," and Plaintiffs properly have invoked that provision as grounds for the Court to order Defendants to cease their unlawful impoundment.

requested relief would not preserve their grant awards in perpetuity, or prevent the Foundation from later canceling their or other grants—if undertaken in a lawful manner by an officer lawfully wielding the power of the Foundation. Plaintiffs ask this Court simply to roll back unlawful actions taken in the absence of authority, and that request falls firmly within the equitable power routinely exercised by the judicial branch. Defendants' long string-cite of cases confirming that the conduct of foreign affairs rests with the political branches, *id.*, is beside the point.

Indeed, in a thorough and well-reasoned opinion enjoining the administration's attempt to reduce other federal agencies to their purported statutory minimum functions, the Rhode Island District Court held that an Executive Order closely mirroring the Dismantling EO "disregards the fundamental constitutional role of each of the branches of our federal government" by "ignor[ing] the unshakable principles that Congress makes the law and appropriates funds, and the Executive implements the law Congress enacted and spends the funds Congress appropriated." *Rhode Island,* 2025 WL 1303868, at *1. So, too, here, and this Court should grant summary judgment on Plaintiffs' separation-of-powers claim.

## III.    Defendants' actions to impound funds, terminate grants and contracts, and fire employees are *ultra vires*

### A. Federal statutes prohibit Defendants' impoundment of the Foundation's funding

Defendants' contention that an *ultra vires* claim cannot rest on flagrant violation of the Congressional Budget and Impoundment Control Act of 1974 ("Impoundment Act"), Pub. L. No. 93-344, Title X, 88 Stat. 332, or the Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 877 (1982), is wrong. *See* Defs.' Br. 30-31. It matters not that the Impoundment Control Act does not create a private right of action, or that the Comptroller General typically superintends compliance with its provisions. Nothing in either statute prohibits consideration of their provisions when reviewing whether an agency has acted in a manner not in accordance with law. Indeed, recent cases have rejected this same argument and proceeded to review claims alleging violations of the Impoundment Control Act. *See*

*New York v. Trump*, No. 1:25-cv-39, 2025 WL 715621, at \*9-11 & n.13 (D.R.I. Mar. 6, 2025) (rejecting same argument presented here, explaining that the court "declines to adopt such a narrow view of what it may consider when determining whether an agency has acted 'not in accordance with law,'" which "refers to *any* law") (quoting *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003)); *AIDS Vacc. Advoc. Coal.*, 2025 WL 752378, at \*14 & nn. 17-18.[9] Besides, Defendants' view of unreviewable power to withhold congressionally appropriated funding is inconsistent with *Aiken County*, which granted a petition for mandamus, explaining that "our constitutional system of separation of powers would be significantly altered if we were to allow executive and independent agencies to disregard federal law" by refusing to undertake activities directed by Congress. 725 F. 3d at 394; *see also id.* at 394 n.1 (confirming that, under Impoundment Control Act, "even the President does not have unilateral authority to refuse to spend the funds" appropriated by Congress because of policy disagreements).

Defendants' substantive argument regarding the Impoundment Control Act and the Anti-Deficiency Act, *see* Defs.' Br. 31, is meritless. An "impoundment" includes actions temporarily or permanently withholding or delaying the obligation or expenditure of appropriated funds. *See* 2 U.S.C. §§ 682, 684. Defendants' actions here surely meet that threshold. Defendants once again ignore the thrust of Plaintiffs' argument—and the broader context of their own actions in refusing to spend funds Congress appropriated to the Foundation—by blithely claiming that "Plaintiffs identify no provisions in congressional appropriations that mandate Plaintiffs (or, indeed, any specific Foundation

---

[9] Defendants' contention that "courts have refused to authorize *ultra vires* claims alleging violations of the Anti-Deficiency Act," Defs.' Br. 31, is unsupported. Defendants cite *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Services*, 337 F. Supp. 3d 308, 331 n. 14 (S.D.N.Y. 2018), but that case does not—as Defendants' parenthetical suggests—"collect[] authorities" supportive of Defendants' proposition. Instead, *Planned Parenthood* noted that plaintiff there had *abandoned* an Anti-Deficiency Act claim and cited a single case in passing for the proposition that the Act provides no private right of action. Plaintiffs here have not pleaded any claim requiring a private right of action under the Anti-Deficiency Act.

grantee) continue to receive funding." *Id.* Of course Congress did not appropriate funding *to a grantee*, but that is of no import. Congress appropriated millions of dollars *to the Foundation*; Defendants have canceled all but one of its grants, nearly all of its contracts, fired all but one of its employees, and refused to spend those appropriated dollars. That refusal to allow the Foundation to access and spend its appropriated funds (thereby leaving those funds unallocated, in the custody of the Treasury Department) violates the Impoundment Control Act and creates a reserve in violation of the Anti-Deficiency Act. Those actions are *ultra vires*.

Defendants' artful drafting is noteworthy. Nowhere do Defendants claim that their refusal to spend the Foundation's appropriated funding *writ large* comports with the Impoundment Control Act and the Anti-Deficiency Act. Instead, they contend that "Defendants did not violate any 'clear and mandatory' statutory requirement *by terminating Plaintiffs' grant agreements*." Defs.' Br. 31 (emphasis added). This is nonresponsive to Plaintiffs' claims and ignores the substantive requirements imposed by the relevant statutes. It is irrelevant that Congress did not mandate the funding of Plaintiffs' specific grants. Congress *did* choose to continue *the Foundation's* funding as recently as two months ago. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(11) (2025). Defendants' refusal to spend that money by canceling all but one grant is *ultra vires*.

### B. Marocco was improperly appointed to the Board, and all actions he has purported to take in that role are without effect

Defendants provide a mini-treatise on the scope of presidential power and insist that Article II grants the President implicit authority to appoint acting principal officers, including acting members of the Foundation's Board, unless Congress clearly and explicitly precludes it, *see* Defs.' Br. 32-37. Astoundingly, Defendants' discussion fails even to acknowledge the existence of this Court's ruling in *Aviel*—much less attempt to show any error in its reasoning. *See Aviel* Op. at 11-19 (holding that Marocco's appointment violated both the Appointments Clause and the FVRA). But because "[i]nconsistency is the antithesis of the rule of law," "the law-of-the-case doctrine" requires that "the

*same* issue presented a second time in the *same case* in the *same court* should lead to the *same result.*" *LaShawn A. v. Berry*, 87 F.3d 1389, 1394 (D.C. Cir. 1996).[10] And although rulings on a preliminary injunction are not always subject to the doctrine, particularly where "a determination had been made without discovery or the other full range of exploratory and preparatory pretrial procedures and without a full trial on the merits," the D.C. Circuit has held that the preliminary-injunction exception to the law-of-the-case doctrine need not apply where the prior ruling "was established in a definitive, fully considered legal decision based on a fully developed factual record and a decisionmaking process that included full briefing and argument without unusual time constraints." *Sherley v. Sebelius*, 689 F.3d 776, 782 (D.C. Cir. 2012). Those principles certainly apply here,[11] where the Court issued a thorough and well-reasoned opinion on a question of pure law after receiving full briefing and holding oral argument. The Court should apply law of the case to the issues decided in the *Aviel* ruling in subsequent stages of this litigation, absent any displacement of that ruling by a higher court. Defendants' failure even to address the opinion in their opposition to Plaintiff's summary-judgment motion constitutes waiver.

Even if the law-of-the-case doctrine did not apply, Defendants' invocation of the Appointments Clause to justify Marocco's purported service as an acting member of the Foundation's Board fails for all the reasons explained in Plaintiffs' opening brief. *See* Pls.' Mot. 32-37. Defendants read *Williams v. Phillips*, 482 F.2d 669, 670 (D.C. Cir. 1973), as "suggest[ing] that the President has

---

[10] Although *Aviel* and this case are related cases, not precisely the same case, the identity of the relevant parties—Aviel, the fired Board members, and Marocco—are the same, the issue is the same, and there is no reason the Court's analysis would be divergent on this issue. Accordingly, there is no logical reason law-of-the-case principles should not apply here to the same extent they would on the *Aviel* docket.

[11] The relevant briefing in *Aviel* was on an expedited timeframe, but the Court still received full briefing on the relevant issues and held a lengthy, substantive argument. Moreover, the government has not suggested that it would have argued the relevant legal issues differently, or was otherwise prejudiced by, the briefing schedule in *Aviel*.

inherent authority to designate an acting official to supervise an agency while nominees for permanent officers are pending." Defs.' Br. 34. But *Williams* did no such thing; after pointing out that "Art. II, § 2 of the Constitution unequivocally requires that an officer of the United States be confirmed by the Senate unless different provision is made by congressional statute," the D.C. Circuit simply noted that *even if* "on the merits [it] might disagree with the District Court's approach and might conclude that [the acting officer]'s appointment was not invalid *ab initio*," there was no ground to sustain acting service for four and a half months. *Williams'* equivocal statement on the validity of acting appointments cannot sustain the weight Defendants place upon it. Besides, the principle would have no application here anyway, because the FVRA directly prohibits service on the Board in an acting capacity, so there is no statutory silence. *See* 5 U.S.C. § 3349(c).[12]

## IV.    Plaintiffs are entitled to final judgment on their APA claims

Defendants first recycle their Tucker Act argument, *see supra* Section I.B, to argue that Plaintiffs' APA claims are not cognizable because they belong in the Court of Federal Claims. But as explained above, Plaintiffs' claims do not "at their core allege a breach of contract," *contra* Defs.' Br. 37-38. Nor did the Supreme Court's decision in *California* "acknowledge[]" that the Tucker Act "provides Plaintiffs an adequate alternative," *id.* Defendants' channeling argument under the APA fares no better than its jurisdictional defense rebutted above. Plaintiffs' challenges to agency action are justiciable and properly pleaded under the APA.

Defendants' argument that their mass-cancellation decision was committed to agency discretion by law, *id.* at 38-39, is easily dispatched. It is true that an agency typically has broad, even

---

[12] The Court should give no weight to Defendants' assertion, made without any citation, that "the current vacancies were occasioned by the Board's failure to adequately comply with the President's directives." Defs.' Br. 37. Defendants provide no admissible evidence to support this contention. Plaintiffs, meanwhile, have submitted the declaration of Sara Aviel attesting that the Board members were fired after DOGE insisted that they rubber-stamp a plan to gut the agency unlawfully. *See* ECF No. 24-2.

unreviewable, discretion to determine how to allocate a lump-sum appropriation. *See id.* (relying on *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993)). But Plaintiffs do not here challenge the Foundation's decision to allocate funding to one priority over another—or even the decision to cancel any particular grant based on the need "to allot appropriated funds among competing priorities and recipients." *Id.* at 38. Plaintiffs challenge (1) the decision to impound the Foundation's congressionally appropriated funding and unilaterally cancel almost all of its grants and contracts (Compl. ¶¶ 108–114); (2) the blanket denial of funding to the Foundation itself to pursue its legislatively directed mission (Compl. ¶¶ 115–118); and (3) the Treasury Department's violation of its mandatory duty to disburse funds upon a lawfully presented request from the Foundation (Compl. ¶¶ 119–123). Not only are these actions *not* committed to agency discretion by law, but the latter violates a nondiscretionary duty to act. Plaintiffs' APA claims are reviewable.

Defendants' APA merits responses continue to fundamentally misrepresent the nature of Plaintiffs' claims. The arbitrary-and-capricious claim, for instance, does not simply challenge "the termination of Plaintiffs' grants," nor does it turn on whether there exists any "requirement in the relevant statutes to issue these specific grants." Defs.' Br. 39-40. Plaintiffs' motion plainly challenged "[t]he decision to cancel grants and contracts *en masse*," and demonstrated that Defendants (1) made no attempt to engage in any considered approach to determine whether and, if so, which grants should be canceled (or even to discover what the roughly 400 canceled grants funded); (2) failed to consider the requirements of the Impoundment Control and Anti-Deficiency Acts; (3) gave no reasoned explanation to support their decision; and (4) took no account of reliance interests. Pls.' Mot. 37-39. Defendants ignore these arguments. Instead, Defendants simply assert that "there is no requirement in the relevant statutes to issue these specific grants." Defs.' Br. 40. This is not reasoned decisionmaking. Acceptance of such a threadbare basis for agency action would make a mockery of APA review.

Not only did Defendants fail to provide any substantive response to Plaintiffs' arbitrary-and-capricious claim, they failed even to produce an administrative record to support their decision. In opposing Plaintiffs' requested schedule, Defendants urged this Court to give them additional time to oppose Plaintiffs' forthcoming motion because "cross-motions for summary judgment would require compilation and certification of the administrative record." Joint Status Report, ECF No. 22, at 5. But in their brief, Defendants dropped a footnote claiming that, "[i]n light of the competing claims to the exercise of the Foundation's authority at issue in *Aviel v. Gor* … Defendants cannot obtain a certified administrative record from a current Foundation employee." Defs.' Br. 4 n.1. This assertion is risible; it is Defendant Marocco who made the challenged decision to terminate contracts and grants en masse (potentially in consultation with other Defendants), not "a current Foundation employee," *contra id.* And it is Defendants who should be producing an administrative record to support the challenged decision. In the absence of any such production and certification, Defendants cannot even claim that Marocco or anyone else *considered* the grant agreements before effectuating mass terminations. The failure to produce an administrative record (indeed, after requesting additional time to do so) is part of the larger pattern of highly irregular administrative action at the heart of this case.

Defendants next argue that their across-the-board termination of contracts and grants was lawful because Plaintiffs' specific grant agreements "authorize the Foundation to terminate funding at will." Defs.' Br. 40. This is true but equally nonresponsive. Plaintiffs' claim is that Defendant Treasury has a mandatory, nondiscretionary duty under the relevant appropriations statutes to make available and disburse the Foundation's funds for it to carry out its mission, and that Treasury lacks discretion to impound the Foundation's funds. This claim has nothing to do with the terms of any grant agreement. Defendants' response utterly fails to grapple with Plaintiffs' argument.

Defendants' final response is stunning. They assert that Plaintiffs' claim to compel agency action unlawfully withheld—which challenges Treasury's failure (in the absence of this Court's

injunction in *Aviel*) to comply with its nondiscretionary duty to disburse congressionally appropriated funds to the Foundation—fails because "Plaintiffs do not identify any lawfully presented disbursement requests from a Foundation employee with delegated authority over Foundation funding that have been denied." Defs.' Br. 40 (referencing Pls.' Mot. 40). If no such specific request was made (again, prior to this Court's intervention), it was because Defendants *put almost all of the Foundation's employees on administrative leave and fired its President*, leaving no one in place to continue requesting appropriations and carrying out the Foundation's mission. In the absence of the Court's injunction, it is clear that Defendants would continue to withhold the Foundation's appropriated funding and prevent it from fulfilling its mission. Plaintiffs have established that Treasury has a mandatory duty to make available the Foundation's appropriated funds for obligation and that this Court can compel that delayed or withheld agency action.

## V.     The Court should enjoin Defendants' lawless actions to shutter the Foundation

Upon entry of final judgment in their favor, Plaintiffs are entitled to injunctions ordering Defendants to cease their unlawful attempts to dismantle the Foundation (in addition to declaratory relief, *see* Proposed Order, ECF No. 24-3). The Supreme Court has long recognized "[t]he power of federal courts of equity to enjoin unlawful executive action," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); indeed, "injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally," *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). This "[C]ourt's power to enjoin unconstitutional acts by the government ... is inherent in the Constitution itself." *Trudeau v. FTC*, 456 F.3d 178, 190 n.22 (D.C. Cir. 2006) (internal quotation omitted). This power applies to separation-of-powers claims just as it does to other types of constitutional claims. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

Defendants insist that this Court cannot award permanent injunctive relief unless Plaintiffs satisfy all of the traditional equitable factors. Defs.' Br. 40-45. Defendants rely primarily on cases

reviewing requests for *preliminary*, not *permanent*, injunctive relief, however, and the sparse authority they cite considering final judgment, *e.g.*, *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006), did not consider claims of unconstitutional executive action akin to those presented here, where injunctive relief to forestall further unlawful action is the norm. Defendants' attempt to restrict the scope of relief ignores this Court's "wide discretion to fashion appropriate injunctive relief," *Richardson v. Trump*, 496 F. Supp. 3d 165, 189 (D.D.C. 2020) (citation omitted), and that, where "a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293-94 (1976) (citations and internal quotation marks omitted).

Defendants argue that their flagrantly unlawful efforts to dismantle the Foundation cannot be permanently enjoined because Plaintiffs fail to make a (purportedly) requisite showing of irreparable harm where, in their view, economic injuries are insufficient to warrant injunctive relief. Defs.' Br. 41. Defendants rely *entirely* on cases arising in a preliminary posture and thus provide no authority evidencing that this same showing is required at final judgment. Defendants also ignore the fact that, at final judgment, a plaintiff's injuries "are often considered together" with the question whether remedies available at law, such as monetary damages, are adequate to compensate the injuries. *Wilcox v. Trump*, CV 25-334, 2025 WL 720914, at *15 n.20 (D.D.C. Mar. 6, 2025). Here, Plaintiffs have demonstrated that they are suffering significant, concrete harm (both monetary and nonmonetary) due to Defendants' illegal efforts to shut the Foundation down, *see* Pls.' Mot. 11-14, and those harms are irreparable because, in the absence of injunctive relief, Defendants would continue their *ultra vires* and unconstitutional actions to obliterate the Foundation. Defendants' reasoning, whereby unconstitutional executive action could not be enjoined so long as a plaintiff hypothetically could receive money damages to remedy wrongful governmental action, would effect a sea change in constitutional jurisprudence. That is not the law.

Defendants' argument that the balance of equities and public interest favor denying injunctive relief here are meritless. *See* Defs.' Br. 42-43. Defendants contend that the public interest lies "in ensuring that tax dollars are not spent towards foreign projects that [are] inconsistent with American interests" and that an "injunction would displace and frustrate the President's decision about how to best address these questions in the arena of foreign affairs." *Id.* But as shown above, Defendants acted to cancel *all but one* Foundation grant without bothering to ascertain what any of them even funded, based solely on the President's arbitrary pronouncement that the entire federal agency is "unnecessary," *see* Dismantling EO. The public interest lies strongly "in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted). And the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

Defendants also argue that any relief should be limited to Plaintiffs in this case. Defs.' Br. 43-44. This argument suffers from a fundamental flaw: Any order ameliorating the unlawful dissolution of the agency necessarily must extend beyond the nine Plaintiff grantees in this case. The relief Plaintiffs have requested would extend "no more … than necessary to provide complete relief" to Plaintiffs. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). The proposed relief does not, as Defendants continually portray, require the Foundation to lock staffing and funding levels as they were in late February when DOGE descended on the agency. Nor does it require that Plaintiffs' grants continue in perpetuity. It instead would unwind agency actions taken in the absence of lawful authority and ensure that the Foundation once again remains a functioning agency, as intended by Congress, that is free to adjust its staffing and grant-funding levels as it sees fit through lawful processes.

Finally, Defendants argue that that the Court can issue neither declaratory nor injunctive relief against the President. Defs.' Br. 44-45. But courts have authority to issue declaratory relief against unlawful presidential action. *E.g.*, *Clinton v. City of New York*, 524 U.S. 417, 425 n.9 (1998). And Plaintiffs have requested injunctive relief only against subordinate officials—not against the President. This Court undoubtedly "ha[s] power to compel subordinate executive officials to disobey illegal Presidential commands." *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971).

## CONCLUSION

This Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion to dismiss or for summary judgment.

May 9, 2025                                    Respectfully submitted,

                                              /s/ *Kate Talmor*
                                              Kate Talmor* (Maryland Bar)
                                              Rupa Bhattacharyya (D.C. Bar No. 1631262)
                                              Gregory Briker (D.C. Bar No. 90030391)
                                              Mary B. McCord (D.C. Bar No. 427563)
                                              Samuel P. Siegel* (California Bar No. 294404)
                                              INSTITUTE FOR CONSTITUTIONAL ADVOCACY
                                                  AND PROTECTION
                                              600 New Jersey Avenue, NW
                                              Washington, DC 20001
                                              (202) 661-6806
                                              kt894@georgetown.edu
                                              ss5427@georgetown.edu
                                              gb954@georgetown.edu

                                              *Attorneys for Plaintiffs*


* DC Bar application pending, practice pursuant to Rule 49(c)(8), and supervised by DC Bar member.